IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT KRAKAT and <br> DONALD KRAKAT, <br><br>    Plaintiffs, <br><br> v. <br><br> BROOKS RANGE CONTRACT SERVICES, INC., <br><br>    Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No: 1:07-cv-00693-RCL <br> ) <br> ) <br> ) <br> ) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR COURT-ISSUED THIRD-PARTY SUBPOENA**

COMES NOW Defendant Brooks Range Contract Services, Inc. ("BRCS" or "Defendant"), by counsel, and for its Reply in Support of its Motion for Court-Issued Third-Party Subpoena, states as follows:

Plaintiffs' primary reason for opposing Defendant's Motion seems to be because this Court quashed Plaintiffs' subpoena of Kevin Heffern's former employers. Yet the reason why that subpoena was quashed is the same reason why the current subpoena should be issued: Robert Krakt's employment and performance at the Armed Services Retirement Home (the "Home") is directly at issue in this wrongful termination case.

Plaintiff Robert Krakat worked at the Home for approximately thirty years. During that time, three different entities administered the Home. Defendant has sought information from these three entities. As noted by Plaintiffs in their Opposition, Defendant has already subpoenaed and received certain records regarding Robert Krakat from JHT Contracting, the entity contracted to administer the Home prior to Defendant from 2004-2005. Plaintiffs did not object to the information sought by that subpoena. Prior to JHT Contracting, the Home was

administered by the United States Government. As a result, Defendant also attempted to obtain Robert Krakat's personnel file by issuing a subpoena to the United States Bureau of Public Debt (the "Bureau") which was believed to be in possession of such documents. The subpoena was supported by an affidavit, pursuant to 31 C.F.R. 1.11 in which Defendant declared the requested information to be relevant to its defenses. Again, Plaintiffs did not object to Defendant's request. The Bureau did not have the requested documents in its possession and referred counsel to the United States Office of Personnel Management ("OPM"). Accordingly, Defendant issued a subpoena to OPM requesting Robert Krakat's personnel file. Yet again, Plaintiffs did not object to this request. OPM, however, stated that it also did not have the documents and stated that the United States National Archives and Records Administration ("NARA") is believed to be in possession of the requested documents. Pursuant to 5 U.S.C. 552a(b)(11), a court-signed subpoena is required when issuing a request for personnel files, resulting in Defendant's current motion.

It is merely fortuitous that this situation has arisen, because if either the Bureau or OPM had the requested documents, then they would have been produced because Plaintiffs did not object. After waiving any objections to Defendant's requests for Robert Krakat's personnel file to JHT Contractors and after waiving any objection to Defendant's prior two attempts to obtain Robert Krakat's personnel file from the government, it is puzzling why Plaintiffs now choose to object only when a Court order is required and after this Court quashed Plaintiffs' subpoena to Kevin Heffern's former employers. In light of Plaintiffs' prior waivers, the Court should issue the subpoena to NARA.

Plaintiffs' counsel also mischaracterizes Defendant's subpoena as a "fishing expedition." Defendants know, however, that Robert Krakat had prior disciplinary problems while working

2

for the government at the Home.  Thus, it is believed that the file contains relevant information, such as evaluations, reports, and disciplinary records.  At Robert Krakat's deposition, he testified that he had been disciplined "[a] couple of times" when he was employed by the government from 1974 to 2004.  See pages 86 of deposition transcript, attached as Exhibit A.  Defendant is entitled to further explore these incidents.  It is typical in a wrongful termination case such as this that the party-plaintiff's personnel files be examined and constitute permissible discovery.  Defendant's request satisfies the standard of seeking information that is reasonably calculated to yield information that will support its defenses.

     WHEREFORE, Defendant respectfully requests that the Court issue the subpoena attached as Exhibit A to its Motion, which will then be served upon NARA by Defendant, and for such other relief this Court may deem appropriate.

     Respectfully submitted,

     _____/s/_____
     Karen A. Doner (#458626)
     Thomas J. McKee, Jr. (#492482)
     WILLIAMS MULLEN, P.C.
     8270 Greensboro Drive, Suite 700
     McLean, Virginia   22102
     (703) 760-5238
     (703) 748-0244 (fax)
     Counsel for Defendant

**CERTIFICATE OF SERVICE**

  I hereby certify that on the 30th day of January, 2008, a copy of the foregoing document was served via e-filing, to:

> Timothy P. Leahy, Esq.
> 14300 Gallant Fox Lane, Suite 120
> Bowie, Maryland 20715
> *Counsel for Plaintiffs*

          _____/s/_____
          Thomas J. McKee, Jr.

1561667v1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT KRAKAT and DONALD | ) | |
| KRAKAT, | ) | |
| Plaintiffs, | ) | CASE NO: |
| -vs- | ) | 1:07-CV-00693-RCL |
| BROOKS RANGE CONTRACT SERVICES, | ) | |
| INC., | ) | |
| Defendant. | ) | |

Wednesday, November 28, 2007

McLean, Virginia

Deposition of

ROBERT KRAKAT

called for examination by counsel for the

Defendant, pursuant to notice, held at the offices

of Williams Mullen, 8270 Greensboro Drive, McLean,

Virginia beginning at 10: A.M., before Sandy

Mefford Nelson, a notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

EXHIBIT
A

Page 84

1 turbines, cooling towers, air conditioning,
2 chillers, anything that had to do with steam,
3 heat, air conditioning, lighting, anything. I was
4 to repair it or get somebody in to repair it.
5   Q. Okay. You referred earlier to some RIFs.
6     Are those reductions in force you're
7 referring to?
8   A. No. That was back in '74.
9   Q. Okay. What RIFs were you a part of?
10  A. I didn't get RIFed. I got pulled inside
11 from being outside from building engineers.
12  Q. Okay. They just changed your duties as
13 you just described, correct?
14  A. Right.
15  Q. Okay. Was there only one RIF?
16  A. Yeah.
17  Q. Okay. That affected you in any way?
18  A. Didn't affect me. They pulled me in. I
19 just didn't -- I wasn't a building engineer for 19
20 years.
21  Q. Well, they changed your title and made
22 you --

Page 85

1   A. Right.
2   Q. You weren't let go?
3   A. No.
4   Q. Okay. You were never let go?
5   A. No.
6   Q. And was there another RIF when you then
7 went from being a fireman back to being a night
8 engineer?
9   A. No, ma'am.
10  Q. Okay.
11  A. Night engineer came open and I applied
12 for it.
13  Q. Okay. But you never really stopped being
14 a night engineer the whole time, correct?
15  A. No, ma'am, correct.
16  Q. Okay. It was just your position title,
17 right?
18  A. Yes, ma'am.
19  Q. Did your compensation change throughout
20 your employment?
21  A. Compensation.
22  Q. Your salary?

Page 86

1   A. Yes.
2   Q. Do you remember what your salary was when
3 you started at the home approximately?
4   A. I think it was $17.
5   Q. What you started at?
6   A. I think that's what it was. I'm not
7 positive.
8   Q. Okay. And what did you end at?
9     What was your last salary?
10  A. The hourly?
11  Q. Yes.
12  A. Twenty-two, $23.
13  Q. And I assume you had increases throughout
14 your employment there?
15  A. Yes, ma'am.
16  Q. Were you ever disciplined for anything
17 when you were a government employee?
18  A. A couple of times.
19  Q. Okay. What were those?
20  A. He said I left the job one day, but I
21 didn't really leave. I went out to get something
22 to eat. He said I left, but I didn't really

Page 87

1 leave. And he suspended me for two weeks.
2   Q. Anything else?
3   A. Not that I can remember.
4   Q. When did that happen?
5     Do you recall approximately what year?
6   A. No. I couldn't remember that.
7   Q. Did you have the same supervisor
8 throughout your employment there?
9   A. No, ma'am.
10  Q. Was Al Clark ever your supervisor?
11  A. No, ma'am, no, ma'am.
12  Q. He was not?
13  A. No, ma'am.
14  Q. Was he a coworker?
15    Or what was his position?
16  A. He was carpenter foreman, masonry
17 carpenter.
18  Q. So, he did not become your supervisor
19 until JHT; is that correct?
20  A. Yes.
21  Q. Yes? Did you apply for a supervisor
22 position with JHT?