IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT KRAKAT and | ) | |
| DONALD KRAKAT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No:  1:07-cv-00693-RCL |
| | ) | |
| BROOKS RANGE CONTRACT SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>RENEWED MOTION FOR SANCTIONS</u>

COMES NOW Defendant Brooks Range Contract Services, Inc. ("Defendant" or

"BRCS"), by counsel, and respectfully requests this Court impose sanctions against Plaintiff

Robert Krakat ("Mr. Krakat") for abusive litigation practices undertaken in bad faith.  Defendant

has filed the accompanying Memorandum in Support of this Renewed Motion.

Respectfully submitted,


_____/s/_____
Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia   22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of February 2008, a true copy of the

foregoing document was sent via electronic filing, to:

> Timothy P. Leahy, Esq.
> 14300 Gallant Fox Lane, Suite 120
> Bowie, Maryland 20715
> Counsel for Plaintiffs


_____/s/_____
Karen A. Doner

1542202v3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT KRAKAT and | ) | |
| DONALD KRAKAT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No:  1:07-cv-00693-RCL |
| | ) | |
| BROOKS RANGE CONTRACT SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S RENEWED MOTION FOR SANCTIONS

Defendant Brooks Range Contract Services, Inc. ("Defendant" or "BRCS"), by counsel, hereby submits its Memorandum in Support of Defendant's Renewed Motion for Sanctions, and states as follows:

1.      On December 13, 2007, Defendant filed a Motion for Protective Order and for Sanctions arising out of Plaintiff Robert Krakat's improper conduct in attempting to intimidate a witness.  Specifically, Mr. Krakat contacted a nonparty witness, James Cavanagh, on December 10, 2007 at his place of employment and threatened him if he did not sign something saying that Mr. Krakat did not steal anything.  Mr. Cavanagh told Mr. Krakat that he knew he in fact stole items from the Armed Forces Retirement Home and that he was not going to sign anything that stated Mr. Krakat did not steal.  See Memorandum in Support of Motion for Protective Order and for Sanctions; See Affidavit of James Cavanagh.

2.      On December 14, 2007, Mr. Krakat again contacted Mr. Cavanagh at his place of employment. Mr. Krakat cursed at Mr. Cavanagh, stated that he can't believe Mr. Cavanagh is "siding with them Defendant]", and that he was going to have his lawyer contact Mr. Cavanagh. Mr. Cavanagh told Mr. Krakat to not call him again.  See Supplemental Memorandum in Support of Motion for Protective Order and for Sanctions; See Declaration of James Cavanagh.

3.      Later in the day on December 14, 2007, Mr. Cavanagh received several telephone calls on his cell phone.  When he answered the calls by calling the telephone number, Mrs. Krakat answered and stated that Mr. Krakat wanted to speak to Mr. Cavanagh.  Mr. Cavanagh hung up the telephone.  See Supplemental Memorandum in Support of Motion for Protective Order and for Sanctions; See Declaration of James Cavanagh.

4.      Mr. Krakat's counsel, Mr. Leahy, declined to instruct his client to cease attempting to contact Mr. Cavanagh.

5.      On December 17, 2007, a hearing was held and this Court granted Defendant's Motion, enjoining Plaintiffs from contacting, or soliciting any person other than Plaintiffs' counsel to contact, any potential third-party witness in connection with this case unless such contact is in the presence of their counsel.

6.      The Court further ordered that the Court's decision on sanctions shall be deferred.[1]

7.      Mr. Cavanagh was deposed in Magistrate Judge Facciola's chambers on January 28, 2008.

8.      Mr. Cavanagh's deposition testimony was entirely consistent with the content of his Affidavit and Declaration.  Mr. Cavanagh testified that he informed Kevin Heffern, Defendant's Project Manager, of Mr. Krakat's acts of theft.  See Deposition Transcript of James Cavanagh attached as Exhibit 1, at p. 10-14, 20-24.  Mr. Cavanagh further testified that Mr. Krakat in fact made the threatening calls to him on December 13th and December 14th.  With respect to the December 13th conversation, Mr. Cavanagh testified:

"Well, Mr. Krakat called me, and at first it was kind of, you know, it was cordial…But… the thing is…I'm not going to lie…and I'm not going to be coerced into lying.  And that's basically what it came down to, you know.  He wanted me to lie for him.  I'm not

---

[1]  At the December 17th hearing, Judge Lamberth stated that he would consider the issue of sanctions after Mr. Cavanagh was deposed.

going to do it.  And then he told me that you [Mr. Leahy], in return, that you were going to call me and write up a statement saying that what Brooks Range said was a lie, and that I was going to meet you somewhere and sign it saying that whatever Brooks Ranges said about Krakat, that I said about Krakat was a lie.  And I told him I wouldn't do it.  And he said he was going to have you call me.  And I said, you can have him call me all day long, I'm not going to talk to him…It was pretty, I mean, we almost had a decent conversation and then…he was, well you need to call…you need to just, you need to talk to my lawyer and tell him that I didn't do these things.  And I said, I'm not going to do that.  And first of all I told him, I said, I don't even know what you're talking about…And then he said, he told me that was on his [Mr. Heffern's] deposition and that my name was on there that I had stated these things.  And I told him I did.  And it was…and I said, and it's the truth…You know, in a court of law, you can't lie.  So…it just got a little heavier and heavier, and I said, well, I can't talk to you no more, so I hung up on him.  And then he called me back saying that he could take me to Court if I didn't change my statements."

See Exhibit 1 at p. 27-29.  With respect to Mr. Krakat threatening to take Mr. Cavanagh to Court, Mr. Leahy asked:  "Do you recall specifically what he told you?" and Mr. Cavanagh responded "Specifically?  Whatever is on my [affidavit] is what he said, pretty much."  See Exhibit 1 at p. 29-30.[2]

With respect to the December 14th telephone calls[3], Mr. Cavanagh confirmed on cross-examination[4] that the statements in the Declaration regarding the first telephone call on December 14th was accurate:

Q.    Does paragraph one accurately reflect what Robert Krakat stated to you during the conversation on the morning of December 14th?
A.    Correct.
Q.    Okay.  And just to be clear, and excuse my French, but when you answered the phone, did he say to you, you motherfucker, what the fuck are you doing?
A.    Correct.
Q.    Okay.  And did he say that he could not believe that you were siding with them, referring to Brooks Range?
A.    Correct.
Q.    And did he say that he was going to sue you?

---

[2]  With respect to para. 6 of the Affidavit, Mr. Leahy questioned Mr. Cavanagh as to the truthfulness of the statement:  "I told Mr. Krakat that I knew he had stolen items from the Retirement Home, including televisions, and that I was not going to sign anything saying that he did not steal…"  Despite Mr. Leahy's attempts to discredit Mr. Cavanagh's Affidavit by emphasizing that Mr. Cavanagh did not actually *see* Mr. Krakat steal a television, Mr. Cavanagh confirmed that he did in fact make that statement to Mr. Krakat, which means that the Affidavit is accurate.  See Exhibit 1 at p. 31-33, 50-51.
[3]  Paras. 2 and 3 of the Declaration contain a typographical error as to the date.  It should have stated December 14th instead of December 17th.  See Exhibit 1 at p. 44-45, 56-57/
[4]  Plaintiffs' counsel did not directly question Mr. Cavanagh regarding the first telephone call on December 14th.

A.    Take me to Court and sue me, yeah.
Q.    Okay.  And did he say to you that he was going to have his lawyer call you?
A.    Correct?
Q.    And did you respond that his lawyer could call you all he wants, but you're not going to speak to him?
A.    Correct.
Q.    Okay.  And did you tell him not to call you again?
A.    Correct.

Mr. Cavanagh testified the following regarding Mr. Krakat's attempts to contact Mr.

Cavanagh the afternoon of December 14th:

"…I started getting these 410 phone numbers on my cell phone…So I kind of figured it was him…So I didn't answer it, and there was no messages left.  So I got home that evening, and there was a phone call from his wife to my personal, to my home.  And my wife said the Krakats had called the house looking for me also.[5]  So when I got to work the following day, I got another 410 number, but I didn't return it from my cell phone.  I went to the work phone and called it from there…I said, this is James Cavanagh. Someone's been trying to get in contact with me from this number.  And I said, who is this?  And she said, this is Shirley…And she said, yes, hold on, Bobby [Mr. Krakat] wants to talk to you…So when I heard him get on the phone, I hung up.  See Exhibit 1 at p. 34-36.

9.    Based upon Mr. Cavanagh's deposition testimony, Defendant renews its Motion

for Sanctions and asks that this Court exercises its discretion to assess appropriate sanctions as

this Court deems fit and proper.

                              Respectfully submitted,


                              _____/s/_____
                              Karen A. Doner (#458626)
                              Thomas J. McKee, Jr. (#492482)
                              WILLIAMS MULLEN, P.C.
                              8270 Greensboro Drive, Suite 700
                              McLean, Virginia   22102
                              (703) 760-5238
                              (703) 748-0244 (fax)
                              Counsel for Defendant

---

[5] Mr. Cavanagh testified that his seven year old daughter answered the telephone when Mr. Krakat called the house but he is not sure what Mr. Krakat stated to his daughter.  He confirmed that he in fact was and is concerned for the safety of his family and wants Mr. Krakat to stop contacting him.  See Exhibit 1 at p. 54-55, 57.

4

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 18th day of February 2008, a true copy of the

foregoing document was sent via electronic filing, to:

> Timothy P. Leahy, Esq.
> 14300 Gallant Fox Lane, Suite 120
> Bowie, Maryland 20715
> Counsel for Plaintiffs

> _____/s/_____
> Karen A. Doner

1568550v1

IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

```
------------------------------x
                              :
ROBERT KRAKAT and DONALD KRAKAT:
                              :
          Plaintiff,          :
                              :
     v.                       :   Civil No. 1:07-CV-00693-RCL
                              :
BROOKS RANGE CONTRACT SERVICES:
INC.,                         :
                              :
          Defendant.          :
                              :
------------------------------x
```

Monday, January 28, 2008

Washington, D.C.

Deposition of

JAMES CAVANAGH

witness, called for examination by counsel for plaintiff,

pursuant to notice, at the U.S. District Court for the

District of Columbia, 3rd Street & Constitution Avenue, N.W.,

Room 2321, Washington, D.C., beginning at 11:19 a.m., before

Donna J. Escobar, a notary public for the District of

Columbia, when were present on behalf of the respective

parties:

**Deposition Services, Inc.**
6245 Executive Boulevard
Rockville, MD 20852
Tel: (301) 881-3344 Fax: (301) 881-3338
info@DepositionServices.com   www.DepositionServices.com

COPY

For the Plaintiff:

    TIMOTHY P. LEAHY, ESQ.
    BYRD & BYRD, LLC
    14300 Gallant Fox Lane, Suite 120
    Bowie, Maryland  20715

For the Defendant:

    KAREN DONER, ESQ.
    WILLIAM MULLEN, P.C.
    8270 Greensboro Drive, Suite 700
    McLean, Virginia 22102

Also present:

    KEVIN HEFFERN, Defendant
    ROBERT KRAKAT, Plaintiff

* * * * *

C O N T E N T S

| WITNESS: | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| | PLAINTIFF: | DEFENDANT: |
| James Cavanagh | 3, 56 | 50 |

* * * * *

E X H I B I T S

| EXHIBIT NO. | MARKED FOR IDENTIFICATION |
|---|---|
| Deposition Exhibit No. 1 | 30 |
| Deposition Exhibit No. 2 | 42 |
| Deposition Exhibit No. 3 | 52 |

Tsh                                                                         3

1                          P R O C E E D I N G S

2    WHEREUPON,

3                              JAMES CAVANAGH

4    having been called for examination by counsel for plaintiff,

5    and having been first duly sworn by the notary, was examined

6    and testified as follows:

7                 EXAMINATION BY COUNSEL FOR PLAINTIFF:

8                 BY MR. LEAHY:

9         Q    Good morning, Mr. Cavanagh.  My name is Tim Leahy.

10   I'm an attorney.  I represent Robert and Donald Krakat.

11        A    Okay.

12        Q    Have you ever had your deposition taken before?

13        A    Have I ever had one taken before?

14        Q    Yes.

15        A    I don't think so.  I don't remember.

16        Q    Okay. Just to give you an idea of some of the

17   rules of deposition, everything that we're saying is being

18   recorded.

19        A    Okay.

20        Q    So you have to speak your answers.  You need to

21   say yes rather than nod your head --

22        A    Okay.

Tsh
                                                                        4

1        Q    -- because obviously the audio won't pick up a nod

2    of the head.

3        A    Okay.

4        Q    Similarly, because a transcript is being made of

5    what we say, it is better if you wait until I finish my

6    question, even if you think you know what I'm asking you,

7    before you provide your answer, just to make the record more

8    clear.

9        A    Okay

10       Q    If you do not understand a question, feel free to

11   ask me to clarify so we make sure that we've got a good

12   understanding of what your testimony is.

13       A    Okay.

14       Q    If you need any kind of break at all, just let us

15   know and we'll take a break.  Are you on any medication that

16   would affect your memory or your ability to testify this

17   morning?

18       A    No, sir.

19       Q    Could you identify yourself for the record?

20       A    James Cavanagh.

21       Q    And how do you spell Cavanagh?

22       A    C-A-V-A-N-A-G-H.   No U.

Tsh                                                                    5

1       Q    And what's your address?

2       A    627 Brookfield Drive, Centerville, Maryland 21617.

3       Q    Okay.  And where do you work?

4       A    Soldier's Home.  Armed Forces Retirement.

5       Q    And what do you do there at the Armed Forces

6  Retirement Home?

7       A    Boiler plant operator.

8       Q    And how long have you done that?

9       A    I've been in the plant for approximately 18 years.

10  But I've worked in the plumber's shop prior to that, so I've

11  been at the home for 20.

12       Q    And what did you do before you worked for the

13  Armed Forces Retirement Home?

14       A    I worked for plumbing companies, like John G.

15  Webster, S.R. Bendette, places like that.

16       Q    Okay.  And can you tell me what your education is?

17       A    The highest, graduated from high school, a year in

18  college, a whole boatload of training schools.

19       Q    Do you hold any certifications?

20       A    Yeah, I'm a third-class engineer, CFC, Backflow.

21       Q    Any other certifications?

22       A    I've got my Maryland, I've got my NOB license,

Tsh                                                                    6

1   stuff like that, just basic engineering license.

2        Q    Okay.  And what exactly do you do in the boiler

3   plant now?

4        A    What do I do?

5        Q    Yes.

6        A    I supervise the maintenance crew to keep the

7   boilers in operation year round.

8        Q    Okay.  And is that what you've been doing since

9   2005, or --

10       A    Uh-huh.

11       Q    You've basically held the same position --

12       A    Well, I --

13       Q    -- with the same responsibilities since 2005?

14       A    Yeah, pretty much have.

15       Q    Okay.  Tell me, do you know Robert Krakat?

16       A    Yes.

17       Q    And how long have you known Robert Krakat?

18       A    I've known Mr. Krakat for -- I know him well over

19   15 years.

20       Q    And how do you know him?

21       A    I've worked with him.  He used to be employed at

22   the heating plant.

Tsh

7

1    Q    Okay.

2    A    And then I worked under his supervision when he

3    was, I believe he was a supervisor.  I'm not sure exactly

4    what his title was, for Brooks Range.  But I had worked for

5    them for, I'm not exactly sure, a couple of months, because

6    then it became a conflict of interest, I couldn't work for a

7    contractor.

8    Q    Well, when you were both employed by the

9    government, were you his supervisor, was he your supervisor?

10   A    No, neither one of us were supervisors.

11   Q    Okay.

12   A    We were both firemen.

13   Q    Okay.  And what did Mr. Krakat do as a fireman?

14   A    He just took readings off of boilers, made sure he

15   maintained water level and pressures on the boiler and, you

16   know, if anything was to have been wrong, I guess, you know,

17   he got the report to the engineer, and the engineer would

18   take care of the situation that occurred.

19   Q    And you said that you were no longer able to work

20   with him once he began to work with Brooks Range because of

21   a conflict of interest.  Could you explain what you mean?

22   A    The thing is that the Brooks Range is a

Tsh

8

1    contractor.  I'm federal government.  So Kevin could

2    probably explain it to you a lot better than I can.  Since

3    it's a mechanical contract, since I do mechanical work, I

4    can't work with anybody that has a contract on the Soldier's

5    Home on a mechanical situation or something like that.

6         Q    Okay.  Well, what contract did you have with

7    Robert Krakat after he began to work with Brooks Range?

8         A    Well, you know, he would give me work orders to do

9    in the evening.  I worked in the evening for him, up until,

10   you know, up until, you know, I left.  And then after that,

11   I never really had -- I mean, we'd have contact here and

12   there, but other than that, it wasn't on a -- you know, it

13   wasn't like we went out and did anything other than work on

14   a job site together.

15        I'm stationed, so I don't get out in the

16   buildings.  So in order for us to even run into each other,

17   he'd have to come to the heating plant or I'd have to run

18   into him somewhere, which means the buildings and the heat

19   plant if I had other things to do.

20        Q    Did you ever see each other socially?

21        A    No.

22        Q    What is, how do you interact with Brooks Range at

Tsh                                                                                      9

1    this point?

2         A    Right now I don't really interact with them at

3    all, you know, unless they have, you know, a shutdown in the

4    buildings or something is occurring where, you know, it's

5    affecting the heating plant, you know.  We go through our

6    supervisor and then he goes ahead and contacts Dave Rouse,

7    which is our supervisor, the plant supervisor, and they, and

8    in return they contact Kevin or whoever is supervising that

9    day.

10        Q    Do you have any relationship with anybody at

11   Brooks Range outside of work?

12        A    I know one guy that works down there but, he's

13   from the same area I grew up in, so I see him occasionally,

14   but I don't really associate with him, you know, like going

15   out to dinner or anything like that, you know.  I live, I

16   don't live in the area.  So --

17        Q    Well, are you aware that in November Mr. Heffern

18   had his deposition taken in this case and indicated that you

19   had come to him to indicate that Mr. Krakat, or that there

20   were some allegations of theft with regard to Robert Krakat.

21             MS. DONER:  Objection to form.

22

Tsh                                                                    10

1              BY MR. LEAHY:

2         Q    You're aware of that deposition?

3         A    Yeah.

4         Q    Okay.  Did you, in fact, go to Mr. Heffern to tell

5    him that there were some allegations of theft related to

6    Robert Krakat?

7              MS. DONER:  Same objection.

8              THE WITNESS:  Yeah, I've said, I've told him that,

9    yeah.

10             BY MR. LEAHY:

11        Q    When did you tell him that?

12        A    Oh, prior to when Mr. Krakat called me and told me

13   that I was on the deposition.  Is that what you're asking?

14        Q    I'm just trying to figure out the time line, when

15   things happened.  Do you remember when you went to Mr.

16   Heffern and said, I know about some allegations of theft

17   related to Robert Krakat?

18        A    Do I remember when I said that?

19        Q    Yes.

20        A    I remember talking to him, and I can't give you a

21   specific date.

22        Q    Do you know a month before you heard about the

Tsh                                                                    11

1   deposition or --

2              MS. DONER:  Objection.

3              THE WITNESS:  Like I said, I can't give you a

4   specific date on that, no.

5              BY MR. LEAHY:

6       Q    Was it after Robert and Donald Krakat were fired

7   from Brooks Range?

8       A    Afterwards?

9       Q    Yes.

10      A    I believe it was afterwards, yes.

11      Q    Do you know if it was right after or sometime

12  after?

13      A    It was -- I'd say it was a while after they were

14  let go.

15      Q    Did Mr. Heffern come to you to ask you about the

16  Krakats?

17      A    Did he come to me?  No.  Huh-uh.  I went to him.

18      Q    And why did you go to Mr. Heffern?

19      A    Well, I heard a lot of different things going on.

20  Actually, I didn't go to him personally.  It was almost like

21  a shop talk thing, you know, there was a couple guys there.

22  So then after that was said and done, I brought it to his

Tsh                                                                                          12

1   attention.

2        Q    Okay.  What was the shop talk?

3        A    Just shop talk.  You know, how guys get together

4   and they, you know, water cooler talk, how they talk around

5   the water cooler.

6        Q    All right.  Well --

7        A    But it wasn't basically, it wasn't based on Mr.

8   Krakat.  It was on, you know, a lot of other things, but his

9   name had happened to come up.

10       Q    Okay.

11       A    So them, you know, it was brought to my attention

12  that maybe it was a good thing for Kevin to know.

13       Q    And who brought that to your attention?

14       A    I can't remember who it was.

15       Q    Okay.  But somebody in the shop thought it would

16  be a good idea if Mr. Heffern knew about allegations --

17       A    Right.

18       Q    -- against Robert Krakat?

19       A    Correct.

20       Q    And so you went to Mr. Heffern with the

21  allegations?

22       A    I spoke to him about it.

Tsh                                                                    13

1          Q      Okay.  What did you tell him?

2          A      Well, I told him that Mr. Krakat, you know, he was

3     previously employed at, you know, previous employed at the

4     heating plant for a duration of time.  Then when he left to

5     go into the building, as a building engineer, this is all

6     federal government.  This is before Brooks Range or any

7     contractor even came aboard we still had federal employees,

8     and we had an active laundry above the heating plant.  And

9     you can access it from behind number one boiler steps.  And

10    there's a door there, and you can open it.  You can come and

11    go as you please.

12               Well, you know, when he was working in the

13    buildings, he would come in in the evenings on the 4:00 to

14    12:00 shift, and I've seen it when I've worked 4:00 to

15    12:00, I've seen him do it, and other, you know, other guys

16    witnessed it also, but you know, we banded together, pretty

17    much and told the foreman, look, Mr. Krakat's coming through

18    the heating access in the laundry through the heating plant,

19    and removing linens and, you know, not one or two, but a

20    bundle at a time.

21         Q      So you witnessed Robert Krakat removing linens --

22         A      I seen him.

14

1      Q      -- from behind the boiler room?

2      A      Yes, coming from the laundry.

3      Q      Okay.  And you reported this to your foreman?

4      A      Exactly.

5      Q      And who was the foreman?

6      A      At the time it was Mr. Killington.

7      Q      Does he have a first name?

8      A      Tom.

9      Q      And what happened as a result of that report?

10     A      What happened after that was, he was verbally

11   reprimanded and was told not to access the heating plant for

12   any reason at all.  And in return, they put a lock on the

13   door and put a key in the key box, so if anybody wanted to

14   access the laundry from the heating plant, they had to sign

15   it out.  And that was solely for the sole purpose of keeping

16   Mr. Krakat from entering the heating plant.  And he was

17   unauthorized to come in.  And he didn't come in for a few

18   years, until, I think after Mr. Killington left.

19     Q      Your recollection is there was a verbal reprimand?

20     A      Yeah.

21     Q      Do you know if he was, if there was a written

22   reprimand, or if he was formally written up?

Tsh                                                                15

1        A      It was verbal.  I think, I think when you go

2   through the processes of reprimanding, I think you have to

3   verbally reprimand them at first, but if they continue to do

4   what they're doing, then you give them a written reprimand.

5   Then after that, it's, you know, suspension for a while or

6   whatever.

7        Q      And this was when Mr. Krakat was working for the

8   Armed Forces Retirement Home --

9        A      Correct.

10       Q      -- as a government employee?

11       A      Exactly.

12       Q      Do you know if the government had a policy with

13  regard to the penalties for theft at the time this incident

14  occurred?

15       A      Well, you know, at the time, you know, a lot of

16  stuff was, you know, we kind of kept it in.  You know, a lot

17  of times if something was happening, you know, they tried to

18  keep it in house, tried to figure, tried to get things taken

19  care of without going to that extreme.  But there is a theft

20  policy, yes, on any job site.

21       Q      And what was the theft policy at the time this

22  incident occurred?

Tsh                                                                          16

1       A    Well, you can't take anything off the, on a

2  federal facility that's not yours.

3       Q    And was the penalty for violating this penalty

4  termination?

5            MS. DONER:  Tim, I'm going to object.  My concern

6  is that you're asking him questions about the government

7  policy.  He's not represented by government counsel.

8            MR. LEAHY:  To the extent he understand.  I'm just

9  asking --

10           THE WITNESS:  I mean, I understand what you're

11 trying to say, but I mean I haven't read the handbook in

12 years.  So I know that there's a policy on any job.

13           BY MR. LEAHY:

14      Q    When was this alleged theft of linens?

15      A    You know, it's been so -- years ago.

16      Q    1990's, 1980's, 1970's?

17      A    That I'm not sure I can answer because I can't

18 remember the exact date that Mr. Krakat left the heating

19 plant to go into the building.

20      Q    Do you know if it was 10 years ago or 20 years

21 ago?

22      A    I'd say 10 -- I'd say at least 15, 14-15.

Tsh                                                                          17

1    Somewhere between 12 and 15 years, I'd say.  Whatever,

2    whenever he wasn't employed in the heating plant, but when

3    he was the building engineer working 4:00 to 12:00 in the

4    buildings is when people were concerned about him accessing

5    the heating plant to get into the laundry.

6         Q    And whenever this incident occurred, what was your

7    understanding of the government policy with regard to

8    terminating employment for theft?

9              MS. DONER:  I'm going to, again, restate my

10   objection.  I don't think it's appropriate with government

11   counsel --

12             MR. LEAHY:  Karen, I understand --

13             MS. DONER:  Let me at least state my objection.

14             MR. LEAHY:  No, I will not.

15             MS. DONER:  Let me finish.

16             MR. LEAHY:  Speaking objections are not

17   appropriate.  You are attempting to coach the witness.  You

18   can object for the record.  If he has a problem, he can

19   clarify it.

20             MS. DONER:  I'm going to state my objection.

21             MR. LEAHY:  Speaking objections are inappropriate.

22             MS. DONER:  It's not a speaking objection.

Tsh                                                                                            18

1              MR. LEAHY:  All right.

2              MS. DONER:  And I'm going to state the basis for

3     the objection.

4              MR. LEAHY:  Let the record, let the record note

5     that Mrs. Doner is coaching the witness.

6              MS. DONER:  Let me finish my objection.  My

7     objection is to this line of questioning, I don't think it's

8     appropriate.  He's not a government representative.  He's

9     not being deposed as that.  I understand that you're

10    questioning him regarding his understanding of the policy,

11    but I don't think this line of questioning is appropriate

12    for a government witness.

13            There are mechanisms for how to depose a

14    government witness.  You didn't follow those.

15              MR. LEAHY:  How long are you going to coach the

16    witness for, counsel?

17              MS. DONER:  You did not follow those in this case.

18    So I don't think this line of questioning is appropriate.

19    And I obviously --

20              MR. LEAHY:  Are you saying I can't ask his

21    understanding?

22              MS. DONER:  I don't represent the government.  I

Tsh                                                                    19

1    don't think it's necessary for you to ask him regarding his

2    understanding of the government policy.  And I don't think

3    that's what you're doing.  You're not asking him what his

4    understanding is.  You're asking him what the government

5    policy is.

6              MR. LEAHY:  All right.

7              MS. DONER:  He's a fact witness.  So I don't think

8    it's appropriate.  I'm stating that.  I'm not going to

9    participate in it.  I think you can go on with your

10   questions about his factual knowledge without asking him

11   what the government's policy is.

12             BY MR. LEAHY:

13        Q    Mr. Cavanagh, what was your understanding at the

14   time the linens were allegedly stolen with regard to the

15   government's policy for termination for theft of government

16   property?

17             MS. DONER:  Same objection.  Go ahead.

18             THE WITNESS:  Well, the thing is, once we brought

19   it to the supervisor's attention, he was the one that was

20   supposed to enact whatever policy was at the time.  So you

21   know, once we told him what we seen, it was out of our

22   hands.

Tsh                                                                          20

1              BY MR. LEAHY:

2         Q    The question was, what was your understanding of

3    the policy?

4         A    I guess, I mean, my understanding of the policy of

5    alleged theft?

6         Q    Yes.

7         A    I'm not exactly sure.

8         Q    And you weren't sure then or you're just not sure

9    now?

10        A    Well, I know that, you know, they usually take you

11   aside and they do something, but I'm not, you know, I'm not

12   really exactly sure of the policy itself.

13        Q    Is it fair to say that back when this alleged

14   theft of linens occurred, you weren't aware of what the

15   policy was regarding theft and termination of employment?

16             MS. DONER:  Objection.  Asked and answered.

17             BY MR. LEAHY:

18        Q    Is that fair to say?

19        A    Yes.

20        Q    What else did you tell Mr. Heffern regarding

21   allegations of theft and Robert Krakat?

22        A    Well then there was other incidents where, see

Tsh                                                                      21

1    they would park their work vehicles, the vans, they would

2    park at the heating plant in the evenings, and they would

3    get into their vehicles, personal vehicles, and leave the

4    premises from the heating plant.  But there was times when,

5    you know, they would come down with packaged meat, like

6    steaks, chops, and stuff like that, and he would transport

7    it from his van to his vehicle, and they would, you know, we

8    asked, where do you get that from?  And he said, from the

9    Scott building.  I took it before they threw it in the

10   dumpster.

11        Q    You said they.  Were you referring to more than

12   one individual or just Mr. Krakat?

13        A    Well, there was people, there was other people

14   than myself, you know, that, you know, that knew of him

15   transporting, taking, you know, chops and stuff like that,

16   and putting it into his own personal vehicle, I mean other

17   than myself, you know.  And --

18        Q    What other people knew?

19        A    That are pretty much that are there now.  I can

20   only say, probably two other people.

21        Q    And who are they?

22        A    I'd say it would be Mr. Adams.  I'd say he'd

Tsh

22

1    probably be the only one left.

2        Q    Do you know his first name?

3        A    Melvin.

4        Q    What's he do?

5        A    He's a boiler operator, engineer.

6        Q    What building is he in?

7        A    Heating plant.

8        Q    And did you report this transporting of meat to

9    anyone at the government?

10        A    Well, then again, you know, everything was falling

11    into, you know, to the foreman.  Everything was reported to

12    the foreman.  So whatever, however he took care of the

13    matter, I don't know.  But I know that, you know, after all

14    this was said and done, that Mr. Krakat, or any of the

15    building engineers weren't authorized to come into the

16    heating plant.

17        Q    And when you said, now, did you report to the

18    foreman the transporting of the meat?

19        A    I seen it but I, you know, there was other guys

20    that were concerned more about than, you know, I see it from

21    a distance.  I knew was he was -- I was like, what is he

22    doing, you know.  And they said, he took some chops or

23

1    whatever and put, you know, just you know, I seen him do it

2    from a distance.  I didn't go up there in the, you know, and

3    inspect what he had, what type of meats and stuff.  But I

4    know, because he'd bring them down and try to offer them to

5    other people, you know.

6        Q    So Mr. Krakat wasn't hiding the fact that he was

7    transporting meat?

8        A    No, I mean, he wasn't hiding it.

9        Q    And did you report to a supervisor that Mr. Krakat

10    was transporting meat?

11        A    Yeah, I said it to him.

12        Q    To whom?

13        A    I believe it was Mr. Killington.

14        Q    And what did Mr. Killington say to you?

15        A    He said he would take care of the map.  See, there

16    was a bunch of guys together and told him, you know, of what

17    was going on.  So him being the supervisor, he took it to

18    the next step.  I guess he contacted the logistics engineer,

19    Krakat's supervisor at the time.  So whatever happened after

20    that, I don't know.

21        Q    And do you know when this transporting the meat

22    occurred?

Tsh                                                                                    24

1      A    Years ago.

2      Q    How about in relation to the incident with the

3    linens?

4      A    About, around the same time.

5      Q    What else did you tell Mr. Heffern?

6      A    Other than Mr. Krakat calling me?

7      Q    About allegations of theft.

8      A    I mean, there's other things that were said but I

9    didn't actually witness anything.

10     Q    Okay.  Well what did you tell Mr. Heffern?

11     A    I just heard, you know, certain things that he was

12   taking out of there that, you know, but you know, other than

13   the linens and the meats, I didn't, I didn't actually,

14   physically see him take anything.  But I heard of him

15   taking, you know, a television out the pipes building.  And

16   pretty much that's about it.

17     Q    Who did you hear from that Robert Krakat took a

18   television from the pipes building?

19     A    You know, that'd be hard to pinpoint on one

20   certain person but, you know, it was kind of a, you know,

21   like a shop talk thing.  And I can't really be exactly sure

22   who said that one thing.

Tsh                                                                                     25

1          Q      From whatever source you heard regarding the

2     television, do you know when that incident occurred?

3          A      From my -- I say it happened previous to him being

4     left go.

5          Q      But after he began working for Brooks Range?

6          A      Previous to him leaving Brooks Range.

7          Q      Okay.  Well, my question is, was he a government

8     employee at the time?

9          A      No.

10         Q      Or was he an employee of a contractor at the time?

11         A      Contractor.

12         Q      And do you know whether he was employed by JHT at

13    that point or Brooks Range?

14         A      Brooks Range.

15         Q      So at the time you heard about the alleged

16    incident with the television, Mr. Krakat was employed at

17    Brooks Range?

18         A      Correct.

19         Q      Did you or did anyone you know report the alleged

20    theft of the television?

21         A      Not that I know of.

22         Q      Did you or anyone you know make any investigation

Tsh                                                                                      26

1    to find out if there was a television missing?

2        A    No.  No, sir.

3        Q    Since that time, have you heard that there's a

4    television missing?

5        A    No, sir.

6        Q    What else did you tell Mr. Heffern in that initial

7    conversation?

8        A    Other than Mr. Krakat calling me trying to coerce

9    me into changing my statement.

10       Q    We'll get to the telephone calls, but when I said

11   initial conversation, what I mean is --

12       A    Oh, that's basic.

13       Q    -- is how you went to Mr. Heffern and said --

14       A    That's pretty much, that'd be basically about it.

15       Q    You don't recall any other details about that

16   initial conversation with Mr. Heffern?

17       A    No, sir.

18       Q    After that initial conversation with Mr. Heffern,

19   when is the next time you spoke with him or any other

20   employee from Brooks Range?

21       A    You mean on a personal basis?

22       Q    With regard to the Krakats?

Tsh                                                                    27

1          A      Nothing.  Nobody.

2          Q      So you had a conversation with Mr. Heffern --

3          A      And that was it.

4          Q      The next time you talked to Mr. Heffern was after

5    you and Robert Krakat had a telephone conversation?

6          A      Correct.

7          Q      Okay.  Well, tell me about that telephone

8    conversation?

9          A      Well, Mr. Krakat called me, and at first it was

10   kind of, you know, it was cordial.  You know, we were having

11   a pretty good conversation.  But, you know, the thing is,

12   you know, I'm not going to lie, you know, and I'm not going

13   to be coerced into lying.  And that's basically what it came

14   down to, you know.  He wanted me to lie for him.  I'm not

15   going to do it.

16          And then he told me that you, in return, that you

17   were going to call me and write up a statement saying that

18   what Brooks Range said was a lie, and that I was going to

19   meet you somewhere and sign it saying that whatever Brooks

20   Ranges said about Krakat, that I said about Krakat was a

21   lie.  And I told him I wouldn't do it.

22          And he said he was going to have you call me.  And

Tsh                                                                        28

1    I said, you can have him call me all day long, I'm not going

2    to talk to him.  So that's when, you know, then his wife,

3    his wife has a 410 number, and she started calling me on my

4    -- well, then after, you know, a couple other conversations,

5    I, you know, like pretty much --

6        Q    Well, let's stay with just that first

7    conversation.

8        A    Well, I'm trying to, you know, okay.

9        Q    Because I'm just trying to figure out the whole

10   time line about things.  So stay with that first

11   conversation.  It started off as cordial and then at some

12   point --

13       A    It was pretty, I mean, we almost had a decent

14   conversation and then, you know, he was, well you need to

15   call, you know, you need to just, you need to talk to my

16   lawyer and tell him that I didn't do these things.  And I

17   said, I'm not going to do that.

18           And first of all I told him, I said, I don't even

19   know what you're talking about, you know.  And then he said,

20   he told me that was on his deposition and that my name was

21   on there that I had stated these things.  And I told him I

22   did.

1    And it was, and you know, and I said, and it's the

2    truth.  I'm not going to change my, you know, what's on

3    there to accommodate him, because I'm not going to do that.

4    You know, in a court of law, you can't lie.  So, you know,

5    it just got a little heavier and heavier, and I said, well,

6    I can't talk to you no more, so I hung up on him.  And then

7    he called me back saying that he could take me to Court if I

8    didn't change my statements.

9         Q    Do you remember exactly what Mr. Krakat said to

10    you?

11         A    Pretty much, you know, which phone call, the first

12    or the second one?

13         Q    I think you started to talk about the second

14    telephone call.

15         A    Yeah, the second telephone call --

16         Q    Let me just ask the questions a little bit more

17    specifically.  You said that the second telephone call

18    Mr. Krakat called and said something about taking you to

19    Court.

20         A    Yeah.

21         Q    Do you recall specifically what he told you?

22         A    Specifically?  Whatever is on my deposition is

1  what he said, pretty much.

2      Q    Your affidavit?

3      A    My affidavit.  I'm sorry.

4      Q    Okay.  Mr. Cavanagh, can you identify for us

5  what's been marked as Deposition Exhibit 1?

6                              (Deposition Exhibit No. 1 was

7                              marked for identification.)

8          MS. DONER:  He's asking you what that is.

9          THE WITNESS:  This is my statement.

10         BY MR. LEAHY:

11     Q    And on the second page of it, that's your

12 signature?

13     A    Yes.

14     Q    Now, look at paragraph four of this.  I think it

15 says Mr. Krakat threatened to take me to Court if I didn't

16 sign it.  Were those his exact words or did he explain?

17     A    Pretty -- yeah.

18     Q    Did he explain what he meant by taking you to

19 Court?

20     A    Yeah, he said that if I don't change my statement

21 and sign -- if I don't change my statement, first of all, I

22 needed, you were going to write up something saying that I

Tsh                                                                              31

1    didn't say that, and that I needed to meet with you and sign

2    it, and if I don't change my statement, then I'll take you

3    to Court.

4         Q    Okay.  So that's as close to verbatim as you

5    recall?

6         A    Pretty much.

7         Q    We're looking at paragraph 6 here.  It says, I

8    told Mr. Krakat that I knew he had stolen items from a

9    retirement home including televisions.  Is it fair to say

10   that you don't know if he stole televisions?

11        A    Like I told you, I said, I never visually seen him

12   take it.

13        Q    So then, that portion of paragraph six would be

14   inaccurate.

15        A    I'd say --

16             MS. DONER:  Objection.  Objection.  You're asking

17   him whether the entire sentence as to what he told Mr.

18   Krakat is inaccurate.

19             MR. LEAHY:  Now, you're coaching him again.

20             MS. DONER:  I'm asking you a question. I don't

21   understand your question.

22             MR. LEAHY:  Can you read that back?

Tsh                                                                                    32

1          (Whereupon, the question was replayed.)

2          BY MR. LEAHY:

3      Q    The question had to do with that portion.  My

4  question had to do with that portion of paragraph six.

5      A    Well, that first sentence right there, that he had

6  stole items from the retirement home, I can say that's true,

7  but including the television, like I said, I never really

8  visually seen him take the television.

9      Q    So it's fair to say that you do not know that he

10 actually stole a television?

11     A    Right.  I mean, yeah.

12     Q    Okay.  And that portion of paragraph six which

13 says you know that he stole a television is inaccurate?

14          MS. DONER:  Objection.  That's not what paragraph

15 six says.  But if you understand the question, you can

16 answer it.

17          THE WITNESS:  Do you want to repeat that?

18          BY MR. LEAHY:

19     Q    Sure.  The portion of paragraph six which

20 indicates that I knew he had stolen items from the

21 retirement home including televisions is inaccurate in that

22 you don't know that he stole televisions?

Tsh                                                                    33

1       A     Just that, just that including --

2             MS. DONER:   Same objection.

3             BY MR. LEAHY:

4       Q     I'm sorry, can you repeat your answer?

5       A     Just the television part.  I mean, I've heard that

6    he had taken it, but I visually didn't see him actually take

7    it.

8       Q     Okay.  And you don't know who you heard that from?

9       A     No, sir.

10      Q     Going back to that second telephone conversation,

11   can you tell me what was discussed in that second telephone

12   conversation between you and Robert Krakat?

13      A     Yeah, that's when he initially when he called me

14   the second time is when he kind of, this started becoming a

15   harassment, you know, type of deal, you know.  He was like,

16   you know, kind of a couple words were exchanged, and I told

17   him that I wasn't going to be coerced into changing my

18   statement.  And that's when he told me that you were, you

19   got in contact with me.

20            I spoke to you and told you not to call me no

21   more.  I didn't even want to get, I told him I didn't even

22   want to get involved in this situation but, you know, it

Tsh

1    became a harassing, you know, just continuous phone calls.

2        Q    You say continuous, I just want to focus on that

3    second telephone conversation.  What was discussed during

4    the second telephone conversation?

5        A    Well, whatever's in the affidavit is pretty much

6    what I said.  I'm trying to --

7        Q    And the affidavit doesn't deal with, I think, a

8    second telephone conversation.  It just deals with the

9    December 10th telephone conversation.  Can you tell me,

10   please, you testified that there was a second telephone

11   conversation?

12       A    Yeah.

13       Q    Can you tell me what you recall about that second

14   telephone conversation?

15       A    I'm drawing a blank.

16       Q    Okay.  Was there a third telephone conversation?

17       A    Well, yes, there was a third conversation.

18       Q    Can you tell me about --

19       A    But it wasn't, it actually wasn't an actual

20   conversation.  I hung up on him.  His wife was trying to

21   call me from a 410 number.

22       Q    It's fair to say that what I characterize as a

Tsh

1    third telephone conversation, you received a telephone call

2    from Shirley Krakat.

3        A    What it was --

4        Q    Can you tell me what you and Shirley Krakat

5    discussed?

6        A    What it was is, I started getting these 410 phone

7    numbers on my cell phone.  I didn't answer them because, you

8    know, at the time me and Krakat, you know, we, you know, I

9    was having these phone calls.  So I kind of figured it was

10   him.

11       Q    Okay.

12       A    So I didn't answer it, and there was no messages

13   left.  So I got home that evening, and there was a phone

14   call from his wife to my personal, to my home.  And my wife

15   said the Krakats had called the house looking for me also.

16   So when I got to work the following day, I got another 410

17   number, but I didn't return it from my cell phone.  I went

18   to the work phone and called it from there, because when you

19   do call from the Soldier's Home, just one number comes up.

20   It's like an operating number.

21            So that's when she answered the phone and I

22   introduced myself.  I said, this is James Cavanagh.

Tsh                                                                                                    36

1    Someone's been trying to get in contact with me from this

2    number.  And I said, who is this?  And she said, this is

3    Shirley.  And I don't know no Shirley.  And she said, yes,

4    hold on, Bobby wants to talk to you.

5              So I'm thinking to myself, who's Bobby, for a

6    minute there, you know, it kind of threw me off.  So when I

7    heard him get on the phone, I hung up.

8        Q    Okay.  And did you have any conversations with Mr.

9    Krakat after that?

10       A    No.

11       Q    Did you have any contact with Mr. Krakat after

12   that, I mean, other than --

13       A    No.  Other than you calling me.

14       Q    Okay.  And is that the conversation where you

15   indicated that you didn't want to talk to me?

16       A    Correct.

17       Q    Mr. Cavanagh, do you do any work outside of your

18   employment with the government?

19       A    Do I?  Yeah.

20       Q    What work is that?

21       A    I work for the Homeland Security.

22       Q    And what do you do for Homeland Security?

Tsh

1      A      Building Engineer.  Well, actually, it's Homeland

2   Security.  It's D.C. Government.  It's at the new 911

3   Communications Center on Martin Luther King Avenue.

4      Q      Okay.  And what do you do for them?

5      A      Building engineer.

6      Q      Is that similar duties to what you do with the

7   Armed Forces Retirement Home?

8      A      Yeah.

9      Q      Do you work full-time?

10      A      Part-time.  Saturday.

11      Q      Do you work part-time for both jobs, or do you

12   work full-time for --

13      A      I work full-time for the Armed Forces Retirement

14   Home, 6:30 to 3:00, Monday through Friday.  I work part-time

15   for the U.S. facilities with a contract company that works

16   for the Communications Center.  Continue?

17      Q      Yes, please.

18      A      I work part-time, 3:00 to 11:00 Saturdays and

19   Sundays.  I work seven days a week.

20      Q      Okay.  Do you ever work outside jobs doing

21   contracting or subcontracting?

22      A      Yeah.

Tsh

1    Q    And tell me about that?

2    A    What I do for subcontracting?

3    Q    Sure.

4    A    I flip homes.

5    Q    And do you work for yourself or do you work for

6 another?

7    A    I work for Cavanagh Home Improvement.

8    Q    Who's involved in Cavanagh Home Improvement?

9    A    That would be my brother, Pat, and myself, James.

10    Q    Do you know who Donna Sutherland is?

11    A    Donald Sutherland, the actor?

12    Q    Donna?

13    A    No, huh-uh.

14    Q    What about Virginia Contracting Services?

15    A    Never heard of them.

16    Q    What about William Jenkins?

17    A    Bill Jenkins?

18    Q    Yes.

19    A    I know Bill Jenkins.  Are you talking about Bill

20 Jenkins over at the Soldier's Home?

21    Q    Yes.

22    A    I know Bill.

Tsh                                                                                          39

1       Q    What's your relationship with Bill Jenkins?

2       A    Pretty much my relationship with Krakat and Kevin.

3   I mean, on job, you know, I see him here and there.  Other

4   than that, I don't have any contact with him.

5       Q    When is the last time you talked to Bill Jenkins?

6       A    Probably a week and a half, two weeks.

7       Q    And what did you guys talk about?

8       A    I believe it was on the, we had a lot of steam

9   coming back into the heating plant from one of the buildings

10  there.  They have some kind of mechanical issue up there.  I

11  believe I spoke to him then.

12      Q    Did you ever talk with him about the Krakats?

13      A    Not that I know of.

14      Q    Do you know who Ann Flynn is?

15      A    Ann Flynn.  That sounds familiar.  I think, is

16  that the one -- yeah, I think she was, was she the

17  supervisor, Kevin?

18           MS. DONER:  You can't ask him.

19           BY MR. LEAHY:

20      Q    You can't --

21      A    Yeah, I think she was the supervisor.  Yeah, Ann,

22  I think that's who that was.  Yeah.  Brooks Range.

Tsh                                                                          40

1       Q    Do you know why she left Brooks Range?

2       A    No idea.  I didn't really know the lady at all.  I

3  think that's who you are talking about, though.

4       Q    Do you know who Katie Farber is?

5       A    Yeah, I know Katie.

6       Q    And how do you know Katie?

7       A    She used to be employed by Brooks Range as the

8  administrator, I guess, secretary, whatever you want to call

9  it.

10      Q    And did you have any relationship with her outside

11  of --

12      A    No, sir.

13      Q    -- knowing that she worked for Brooks Range?

14      A    No.

15      Q    Did you bring any documents with you today?

16      A    Such as?

17      Q    Any pieces of paper?  Did you bring any pieces of

18  paper with you today?

19           MS. DONER:  He has --

20           THE WITNESS:  I got a book.

21           MS. DONER:  I gave him a copy of the affidavit and

22  declaration that he brought.

Tsh                                                                      41

1              THE WITNESS:  Well, I requested that a couple

2      weeks ago, about a week ago, anyway.

3              BY MR. LEAHY:

4      Q    So that was provided to you by Ms. Doner. You

5      didn't bring any documents with you today?

6      A    Well, other than what I wrote.

7      Q    Which was a copy of your affidavit?

8      A    No, I mean, I made some notes for myself.

9      Q    Can I see those notes?

10     A    You want to see my notes?

11     Q    Sure.

12     A    Is he allowed to see them?

13     Q    Just this one page, sir?

14     A    That's it.

15     Q    Okay.  Can I ask you when you made these notes?

16     A    I made them yesterday, trying to prepare for

17     today.

18     Q    Sir, I'd like to get a copy of that.  Do you mind

19     if we remove it from this book and mark it as a deposition

20     exhibit?

21     A    Certainly.

22             MS. DONER:  Can I ask you to make a copy for me,

Tsh                                                                    42

1    too?

2              MR. LEAHY:  Sure.

3              MS. DONER:  Take a two minute break?

4              MR. LEAHY:  Yes, let's take a two minute break so

5    we can stretch.

6              (Whereupon, at 12:02 p.m., a brief recess was

7    taken.)

8              BY MR. LEAHY:

9        Q    Mr. Cavanagh, can you identify for us what's been

10   marked as Deposition Exhibit 2?

11                            (Deposition Exhibit No. 2 was

12                            marked for identification.)

13             MS. DONER:  Just what is that.

14             THE WITNESS:  Yes, I'm making sure he didn't

15   change it nowhere.  Yeah.

16             BY MR. LEAHY:

17       Q    And what is that document, sir?

18       A    That's my notes.

19       Q    Which I believe you testified you made yesterday?

20       A    Correct.

21       Q    Do you have notes from I guess 12 to 15 years ago

22   when you indicated these incidents with linens or meats --

Tsh

1    A    No, sir.

2    Q    -- happened?

3    A    No, sir.  This was pretty much written so I could

4    pretty much remember what occurred.

5    Q    Did you do anything else to prepare for today's

6    deposition?

7    A    No.

8    Q    Did you review any other documents?

9    A    Only -- what is this --

10    MS. DONER:  The affidavit and the declaration.

11    THE WITNESS:  The affidavit that I made.  Yeah.

12    BY MR. LEAHY:

13    Q    Is that what we've marked as Deposition Exhibit 1?

14    A    Correct.

15    MS. DONER:  And he's also referring to the

16    declaration.

17    MR. LEAHY:  May I see the declaration?

18    BY MR. LEAHY:

19    Q    Mr. Cavanagh, looking at your declaration there's

20    an indication that Mr. Krakat made statements to you on

21    December 17th.

22    MS. DONER:  Objection.

Tsh

1          BY MR. LEAHY:

2      Q     Did you get a telephone call -- how were those

3   statements made to you?

4          MS. DONER:  It doesn't state that.  Are you

5   referring to the 14th?

6          THE WITNESS:  The 17th?

7          BY MR. LEAHY:

8      Q     Can I see the declaration one more time?

9      A     Which one?  That one?

10      Q     Yes.

11      A     You said the 17th, right?

12      Q     Looking at paragraph three of the declaration, the

13   indication that I am not friends with Mr. Krakat.  Krakat's

14   statements to me on December 17th, 2007, were in a harassing

15   manner.

16          MS. DONER:  That's my typo, for the record.

17          BY MR. LEAHY:

18      Q     Okay.  So I guess Ms. Doner has indicated that the

19   December 17th was a typo made by her firm.  Is it your

20   understanding that any conversations between you and

21   Mr. Krakat happened prior to December 17th?

22      A     I'd say that's correct.

Tsh

1          MS. DONER:  And just so we're clear, I was

2    referring to the typographical error in paragraph three.  It

3    should have been December 14th.

4          BY MR. LEAHY:

5      Q    How did you come to sign an affidavit for Brooks

6    Range?

7          MS. DONER:  Which one are you referring to?

8          THE WITNESS:  The first one?

9          BY MR. LEAHY:

10     Q    Yes, the initial affidavit.

11     A    How did I do it?  What made me do it?

12     Q    Well, did someone ask you to sign an affidavit?

13     A    Well, yeah, I went to Kevin and I told Kevin

14   exactly what occurred that day, and he wanted to know if I

15   would write a statement down and have it certified?  And I

16   told him I would have no problem doing it.

17     Q    Okay.  And tell me about that conversation with

18   Mr. Heffern?

19     A    Well, I've confronted Kevin, I went down there

20   personally because I couldn't get him on the phone.  And I

21   went down there personally and I asked him what was going

22   on, because I had no idea.

Tsh                                                                      46

1              And he stated to me that, how did I, you know,

2    what was going on?  He wanted to know what I was talking

3    about, and I told him, Mr. Krakat was calling me on the

4    phone, pretty much.

5         Q    Okay.

6         A    And, you know, I told him exactly what happened,

7    and he told me he'd get back to me later.

8         Q    And did he get back with you later?

9         A    Yeah.

10        Q    Tell me about that?

11        A    Well, he came back and asked me if I could make a

12   statement on it, and I told him, no problem.

13        Q    Who drafted the statement?

14        A    I believe Kevin did.  I'm not exactly sure.  But I

15   told him exactly what happened.

16        Q    Okay.  And then somebody drafted the statement and

17   handed it to you to review and sign?

18        A    Exactly.

19        Q    And where did you review and sign the document?

20        A    At the Soldier's Home.

21        Q    And that was the affidavit that we've marked as

22   Exhibit 1?

Tsh                                                                          47

1      A    Yeah, I believe that's the one.  Yeah, the one we

2   put the sticker on?  No, that's not it.

3           MS. DONER:  Where is the original?  Do you have

4   it?

5           THE WITNESS:  Oh.  Yes.

6           BY MR. LEAHY:

7      Q    After you signed the affidavit, did you have any

8   other conversations with anyone from Brooks Range with

9   regard to the Krakats?

10     A    No, sir.

11     Q    Did you have any conversations with Brooks Range's

12  attorney?

13     A    Well, I spoke to Karen on a conference call.

14     Q    Okay.  Tell me about the conversation with Karen?

15     A    She pretty much wanted me to tell her exactly what

16  occurred, and I told her.

17     Q    And what did you tell her?

18     A    Basically, what's on here.

19     Q    And when you say what's on here --

20     A    On the affidavit.

21     Q    -- you're indicating on the affidavit?

22     A    Right.

Tsh                                                                                          48

1      Q    Okay.  What else did you talk about?

2      A    That's it.

3      Q    Did you have any conversations with Ms. Doner

4   after that initial conversation?

5      A    I contacted her one time after that, once I was

6   getting all these phone calls, and from you.

7      Q    Okay.  And what did you tell her?

8      A    I told her you guys wouldn't stop calling me,

9   calling me at my house, calling me at work, called me on my

10  cell phone.  I mean, it was ridiculous.

11     Q    And these are the telephone calls that you had

12  testified to earlier?

13     A    Correct.

14     Q    Did you give Mr. Krakat your cell and house

15  number?

16     A    No.  I believe that somebody was calling the

17  heating plant, and I believe it was you, trying to obtain

18  those number.  I think you spoke to Mr. Adams in the heating

19  plant in the evenings.  Because he told me that you called

20  him and were trying to get my phone numbers.  And he

21  wouldn't give out that information, because you're not

22  supposed to call anyone's job site.

Tsh

1     Q    So you don't know how Mr. Krakat got your home

2  phone number --

3     A    I have no idea.

4     Q    -- or your cell phone number?

5     A    I mean, it's pretty much public knowledge, my home

6  phone number. You can pull that up anywhere.  Cell phone, no

7  idea.  He might have had it, he might have had it when he

8  was working for Brooks Range, because I've had the same

9  phone number for years.  So he might have had it before.

10     Q    Okay.  During these telephone conversations, did

11  you  invite Mr. Krakat to come see your new house?

12     A    No way.

13     Q    Do you have a new house?

14     A    Yeah.

15     Q    When did you get a new house?

16     A    Why are you asking these questions?

17     Q    When did you get your new house?

18     A    I thought my house about two, about two and a half

19  years ago.

20     Q    Did you ever tell Mr. Krakat that you purchased a

21  new house?

22     A    Everybody knew I had a house being built.  It

1    wasn't like it was a secret.

2        Q    May I have your indulgence for a moment.  We'll

3    probably be able to finish up.  Mr. Cavanagh, do you have

4    any criminal convictions?

5        A    Other than, other than traffic violations, no.

6            MR. LEAHY:  Okay.  I don't have any other

7    questions for Mr. Cavanagh.

8            MS. DONER:  I just have a couple questions to

9    clarify some of the things that you said.

10           EXAMINATION BY COUNSEL FOR DEFENDANT:

11           BY MS. DONER:

12       Q    Could I get Exhibit 1 back, please?  Mr. Leahy

13   asked you some questions about paragraph six which states

14   that, I told Mr. Krakat that I knew he had stolen items from

15   the retirement home, including televisions, and that I was

16   not going to sign anything saying he did not steal.  I then

17   hung up the phone.  And he was asking you about this portion

18   of that sentence that says, I knew he had stolen items.  Do

19   you recall that testimony?

20       A    Yeah.

21       Q    Notwithstanding the fact, regardless of the fact

22   that you hadn't personally eyewitnessed him stealing the

Tsh

1    television, does this paragraph six accurately reflect, in

2    fact, what you told Mr. Krakat during that conversation?

3         A    Yes.

4         Q    Okay.  And on Exhibit number 2, which are your

5    notes, can I get those?  Do you have the original?

6         A    Yeah, I got it right there.

7              (Discussion off the record.)

8              BY MS. DONER:

9         Q    Exhibit 2, this just looks like a word is cut off

10   here.  A lock was, is that word --

11        A    Installed.

12        Q    -- installed, on the original?

13        A    Installed.

14        Q    Okay.  I don't think anything else was cut off.

15   Right?

16        A    It was, a lock was installed on the door that

17   Mr. -- yeah.

18        Q    Okay.  I just wanted to clarify that.  Those are

19   the only two exhibits you have, correct?  Can I have this

20   marked as Exhibit 3, please.  I do not have, he has my extra

21   copy.  Do you have it with you?

22             (Discussion off the record.)

Tsh

52

                    (Deposition Exhibit No. 3 was

1

                    marked for identification.)

2

       BY MS. DONER:

3

    Q    Can I asked you to look at what's been marked as

4

Exhibit 3, which is entitled your declaration.  Is that your

5

signature?

6

    A    Yes.

7

    Q    Does paragraph one accurately reflect what Robert

8

Krakat stated to you during the conversation on the morning

9

of December 14th?

10

    A    Correct.

11

    Q    Okay.  And just to be clear, and excuse my French,

12

but when you answered the phone, did he say to you, you

13

mother fucker, what the fuck are you doing?

14

    A    Correct.

15

    Q    Okay.  And did he say that he could not believe

16

that you were siding with them, referring to Brooks Range?

17

    A    Correct.

18

    Q    And did he say that he was going to sue you?

19

    A    Take me to Court and sue me, yeah.

20

    Q    Okay.  And did he say to you that he was going to

21

have his lawyer call you?

22

1    A    Correct.

2    Q    And did you respond that his lawyer could call you

3  all he wants, but you're not going to speak to him?

4    A    Correct.

5    Q    Okay. And did you tell him not to call you again?

6    A    Correct.

7    Q    Okay.  And does paragraph two accurately reflect

8  what took place during the afternoon of December 17th?

9    A    Correct.

10    Q    Okay.  And are you aware of the fact that I

11  drafted this affidavit, or this declaration?

12    A    Correct.

13    Q    Okay.  And the words I used in the fourth

14  sentence, I said, I finally, I finally answered one of the

15  calls because I thought it might be someone else trying to

16  reach me, and then the next sentence starts off, when I

17  answered the call.  In fact, you clarified earlier that you

18  had received these calls on your cell phone and actually you

19  went to another phone to return --

20    A    Correct.

21    Q    -- the call, is that correct?

22    A    That's correct.

Tsh

1   Q   Okay.  And so is it still accurate that you

2   answered the call just in that fashion?

3   A   Right.

4   Q   Okay.  And in paragraph three, I had indicated

5   earlier that this was actually a typographical error on my

6   part.  Is it true to state that Mr. Krakat's statements to

7   you on December 17th should have read, on December 14th,

8   2007 --

9   A   Correct.

10   Q   -- were in a harassing manner, is that correct?

11   A   Correct.

12   Q   Okay.  And this declaration then stated, I'm

13   concerned for the safety of my family, and I want him to

14   stop contacting me.

15   A   Correct.

16   Q   Is that true?

17   A   That's true.

18   Q   Okay.  And in fact at some point Mr. Krakat had a

19   conversation with your seven-year-old daughter, is that

20   correct?

21   A   From what I understand when they called the house,

22   and she had answered the phone.  I'm not sure what occurred.

Tsh                                                                                            55

1      Q     Okay.

2      A     So do you make that a yes?

3      Q     Okay.  You weren't happy, though, about the fact

4   that he spoke to your daughter?

5      A     No, I don't want nobody calling my house.

6      Q     Okay.  And you testified earlier that you thought

7   but you weren't sure but maybe Kevin Heffern drafted the

8   affidavit.  Do you recall that testimony?

9      A     Right.

10      Q     Okay.  The first affidavit?

11      A     Right.

12      Q     Okay. And you also described a conversation that

13   you had with me.  That conversation took place prior to you

14   being given the affidavit, is that correct?

15      A     Correct.

16      Q     Okay.  And did this affidavit and the declaration

17   accurately reflect what you had discussed with me?

18      A     Correct.

19            MS. DONER:  Okay.  I have no further questions.

20            MR. LEAHY:  Just a couple.

21

22

Tsh                                                                          56

1            EXAMINATION BY COUNSEL FOR PLAINTIFF:

2            BY MR. LEAHY:

3       Q    On looking again at the declaration, Exhibit

4    number 3, on paragraph two it says, during the early

5    afternoon of December 17.  Is the December 17th date also

6    correct?  Or is that a typographical error?

7       A    That would be correct.

8       Q    Paragraph two should read December 17th, and

9    paragraph three should read December 14th?

10           MS. DONER:  If you don't know, you can state you

11   don't know.  Don't guess or speculate.

12           THE WITNESS:  Pretty accurate, but I'm not -- I

13   mean, I'd have to review my -- I mean, I guess they are

14   pretty accurate, yeah.

15           BY MR. LEAHY:

16      Q    Well, we had noted that in paragraph three of this

17   declaration there was a typographical error that the date

18   should be December 14th, not December 17th.

19      A    Correct.

20      Q    So what I'm asking you is about the same

21   declaration.  But this time in paragraph two, there is a

22   date saying, during the early afternoon of December 17th.

Tsh                                                                    57

1    Is that a typographical error, or should that read, December

2    14th?

3         A     Paragraph two should read December 17th --

4         Q     Okay.

5         A     -- correct, on the top, during the early

6    afternoon.

7         Q     Got you.  I understand.  Tell me about your

8    concern for the safety of your family?

9         A     Well, you know, I don't want anybody harassing my

10   family.  You know, I got small children.  And I work seven

11   days a week.  And, you know, I'm not around to protect them.

12   I don't know who's calling my house or anything like that.

13   I don't want my kids involved in any, you know,

14   conversations with anybody that they don't know, that they

15   consider strangers.

16        Q     Is there any other reason, or was it just the

17   telephone calls to the house?

18        A     Well, I mean, you know, I mean, I don't know if

19   you have kids or not, but you don't want them talking to

20   strangers.

21        Q     I completely understand you.  I'm just asking, is

22   there any other --

Tsh                                                                           58

1        A    I just didn't want any, I didn't want any

2   involvement with the Krakats.

3        Q    And your concern for the safety of your

4   children --

5        A    Of course.

6        Q    -- stemmed from the telephone calls, but not from

7   anything else?

8        A    Well then, I can't say, you know, I can't say yes

9   or no on that.  I can say, I was concerned from when they

10  were calling my house.  I didn't want nobody to come over to

11  my house when I'm not home.

12       Q    Okay.

13       A    All right.

14       Q    Fair enough.

15       A    All right.

16       Q    Is there anything that you wanted to add to that?

17       A    I'm just sorry this whole thing is occurring.  I

18  pretty much didn't want to get involved in this.  And I've

19  regretted even having to come down here and talk to you.

20  But, you know, things happen.

21       Q    If you didn't want to be involved, tell me the

22  reason that you initially when to Mr. Heffern regarding the

1  allegations of theft?

2        A    It was just something I had to do.

3        Q    Can you tell me why you had to do it?

4        A    It was my, you know, just my responsibility to let

5  them know.

6             MR. LEAHY:  Okay.  I don't have any other

7  questions.

8             MS. DONER:  I don't have any questions, either.

9             (Whereupon, at 12:24 p.m., the deposition was

10  concluded.)

11                          *  *  *  *  *

12             I have read the foregoing pages 3 through 59 which

13  contain a correct transcription of my answers to the

14  questions recorded therein, except as noted on the errata

15  sheet, if any.

16

17

18             _____

19                            JAMES CAVANAGH

20

21

22

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Donna J, Escobar, the officer before whom the

foregoing deposition was taken, do hereby certify that the

witness whose testimony appears in the foregoing deposition

was duly sworn by me, that the testimony of said witness was

taken by me electronically and thereafter reduced to

typewriting by me or under my supervision; that said

deposition is a true record of the testimony given by said

witness, that I am neither counsel for, related to, nor

employed by any of the parties to the action in which this

deposition was taken; and, further, that I am not a relative

or employee of any attorney or counsel employed by the

parties hereto, nor financially or otherwise interested in

the outcome of the action.


*Donna J. Escobar*
_____
NOTARY PUBLIC OF THE
STATE OF MARYLAND


My Commission Expires:
January 1, 2009