IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT and )
DONALD KRAKAT, )
  )
    Plaintiffs )
  )
v. ) Case No: 1:07-cv-00693-RCL
  )
BROOKS RANGE CONTRACT SERVICES, INC., )
  )
    Defendant )
  )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### REPLY IN OPPOSITION TO RENEWED MOTION FOR SANCTIONS

### AND

### MOTION TO RECONSIDER ORDER OF DECEMBER 17, 2007

**NOW COME** the Plaintiffs Robert Krakat and Donald Krakat, by and through their undersigned counsel, and pursuant to the Federal Rules of Civil Procedure hereby file this Reply in Opposition to the Renewed Motion for Sanctions and Motion to Reconsider Order of December 17, 2007:

Defendant filed a libelous and materially false affidavit of James Cavanagh in its original request to claim witness intimidation and obtain sanctions. In what can only be viewed as an act of hubris to distract from the libel, Defendant has filed a renewed motion for sanctions. The affidavit of James Cavanagh was false as follows: "I told Mr. Krakat that I knew he had stolen items from the Retirement Home, including televisions, . ." Affidavit of James Cavanagh, at ¶ 6.

At his deposition, Cavanagh acknowledged that he did not know if a television had been stolen, had merely heard a rumor that a television had been stolen, had not investigated whether a television had been stolen, and could not recall the name of the individual who had told him

1

the rumor that a television had been stolen or who might have stolen that rumored television. The Defendant, and Cavanagh in his Affidavit, asserted a criminal rumor from an undisclosed source as fact. It is facially evident that Defendant and Cavanagh libeled Robert Krakat in any telephone conversation or Affidavit filed in this matter.

"Q   Who did you hear from that Robert Krakat took a television from the pipes building?

A    You know, that'd be hard to pinpoint on one certain person but, you know, it was kind of a, you know, like a shop talk thing. And I can't really be exactly sure who said that one thing." Cavanagh deposition excerpt as **Exhibit 1** hereto, p. 24, l. 17-22.

\*\*\*

"Q   Did you or did anyone you know report the alleged theft of the television?

A    Not that I know of.

Q    Did you or anyone you know make any investigation to find out if there was a television missing?

A    No. No, sir.

Q    Since that time, have you heard that there's a television missing?

A    No, sir." Cavanagh deposition excerpt as **Exhibit 1** hereto, p. 25-6, l. 19-5.

\*\*\*

"Q   So it's fair to say that you do not know that he actually stole a television?

A    Right. I mean, yeah." Cavanagh deposition excerpt as **Exhibit 1** hereto, p. 32, l. 9-11.

2

Cavanagh further indicates in his Affidavit that the call from Robert Krakat was "in a harassing manner." Affidavit of James Cavanagh, at ¶ 5. Defendant followed up the libelous affidavit with the December 17, 2007 "Declaration of James Cavanagh" which related how Robert Krakat's telephone calls were ". . . in a harassing manner. I am concerned for the safety of my family . . ." Declaration of James Cavanagh, at p. 2, ¶ 3. At his deposition, Mr. Cavanagh acknowledged that his concern for the safety of his family was limited to the fact that his daughter once answered the telephone, when Robert Krakat attempted to reach him, and he didn't want anyone calling his house or speaking to anyone in his family. There was no allegation that anything inappropriate was ever said to Cavanagh's daughter or anyone else in his family.

"Q     Okay. And in fact at some point Mr. Krakat had a conversation with your seven-year-old daughter, is that correct?

A     From what I understand when they called the house, and she had answered the phone. I'm not sure what occurred.

Q     Okay.

A     So do you make that a yes?

Q     Okay. You weren't happy, though, about the fact that he spoke to your daughter?

A     No, I don't want nobody calling my house." Cavanagh Deposition as **Exhibit 1** hereto, p. 54 – 55, l. 18 – 5.

\*\*\*

"Q     Got you. I understand. Tell me about your concern for the safety of your family?

3

A    Well, you know, I don't want anybody harassing my family. You know, I got small children. And I work seven days a week. And, you know, I'm not around to protect them. I don't know who's calling my house or anything like that. I don't want my kids involved in any, you know, conversations with anybody that they don't know, that they consider strangers.

Q    Is there any other reason, or was it just the telephone calls to the house?

A    Well, I mean, you know, I mean, I don't know if you have kids or not, but you don't want them talking to strangers.

Q    I completely understand you. I'm just asking, is there any other –

A    I just didn't want any, I didn't want any involvement with the Krakats.

Q    And your concern for the safety of your children --

A    Of course.

Q    -- stemmed from the telephone calls, but not from anything else?

A    Well then, I can't say, you know, I can't say yes or no on that. I can say, I was concerned from when they were calling my house. I didn't want nobody to come over to my house when I'm not home.

Q    Okay.

A    All right.

Q    Fair enough.

A    All right.

Q    Is there anything that you wanted to add to that?

A    I'm just sorry this whole thing is occurring. I pretty much didn't want to get involved in this. And I've regretted even having to come down here and talk to you. But, you know, things happen." Cavanagh Deposition as **Exhibit 1** hereto, p. 57 – 58, l. 7 – 20.

4

Defendant's motion for sanctions further rests on allegations that Robert Krakat used foul language in his telephone conversation with Cavanagh. Robert Krakat has denied this in open court and further affirms it below. Aside from Cavanagh's credibility, this court can take judicial notice that if an individual falsely accuses another of stealing, the falsely accused individual is likely to be upset by the false accusation. Becoming upset at a false accusation is not harassment, and does not warrant the imposition of sanctions. It is understandable how Cavanagh would be uncomfortable in being called to account for his willingness to report rumor and willingness to sign affidavits that criminal rumor was fact. However, Cavanagh's discomfort stems from his own libelous acts and not sanctionable actions by Robert Krakat.

The imposition of sanctions on both Robert and Donald Krakat should be lifted. First, there were no allegations regarding Donald Krakat. The only allegations raised were related to Robert Krakat's alleged actions.

Second, the imposition of sanctions was imposed based on an affidavit, over Plaintiff's objection and without Cavanagh being present and subject to cross examination. Such evidence is generally not admissible absent special circumstances. Now that Cavanagh's deposition has been taken it is clear that there was no legitimate fear for his family, no harassment occurred, and Cavanagh was simply uncomfortable about being asked why he would falsely report, and sign an Affidavit, that Robert Krakat had stolen a television. This matter was brought to the Court's attention by the Defendant and not by Cavanagh who could have sought a Peace Order if he truly felt harassed. It is a fair inference that the sanctions request is merely a tactical maneuver of the Defendant.

Third, finally, and aside from the stigma that the imposition of sanctions carries, the Krakats are prejudiced in pursuing their legal case by being enjoined from talking with *any* potential witnesses. First, this is overbroad and involves individuals the Plaintiffs consider friends and have known for up to 30 years while working at the Armed Forces Retirement Home. Second, the court can take judicial notice that witnesses may prefer not to be involved in a legal case or would prefer not to talk to an attorney but to talk rather with the client with whom they may have a relationship. There is simply no good reason to prejudice the Plaintiffs in this matter over Defendant's libel of Robert Krakat and subsequent tactical motions.

**WHEREFORE**, Plaintiffs Robert Krakat and Donald Krakat, by and through their undersigned counsel, request that this Honorable Court deny the Renewed Motion for Sanctions and vacate the sanctions imposed on Plaintiffs by this Court's Order of December 17, 2007.

### AFFIRMATION

**I CERTIFY**, under penalties of perjury that the foregoing facts asserted herein are true and accurate to the best of my knowledge, information, and belief.

*[signature]*
Robert Krakat


Respectfully Submitted:

BYRD & BYRD, LLC


/s/

_____
Timothy P. Leahy, D.C. Bar No. 472964
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
(301) 464-7448
(301) 805-5178 – Fax
Tleahy@byrdandbyrd.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 29th day of February, 2007, a copy of the foregoing was mailed first class, postage pre-paid to:

Karen A. Doner (Bar No. 458626)
Thomas J. McKee, Jr. (Bar No. 492482)
Williams Mullen, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia 22102
703-760-5200 (phone)
703-748-0244 (fax)

/s/
_____
Timothy P. Leahy, Bar No. 15084

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT KRAKAT, ET. AL. | ) |
| | ) |
|     Plaintiffs | ) |
| | ) |
| v. | ) Case No: 1:07-cv-00693-RCL |
| | ) |
| BROOKS RANGE CONTRACT SERVICES, INC., | ) |
| | ) |
|     Defendant | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORDER

Having considered the Defendant's Renewed Motion for Sanctions and the Plaintiff's Reply in Opposition thereto including Motion to Reconsider Order of December 17, 2007, the Defendant's Renewed Motion for Sanctions is **DENIED** and Plaintiff's Motion to Reconsider Order of December 17, 2007 is **GRANTED** and the Order of December 17, 2007 imposing sanctions on the Plaintiffs is **VACATED**.

    cc:    Timothy P. Leahy, Bar No. 15084
              Byrd & Byrd, LLC
              14300 Gallant Fox Lane, Suite 120
              Bowie, Maryland 20715

              Karen A. Doner
              Thomas J. McKee, Jr.
              Williams Mullen, P.C.
              8270 Greensboro Drive, Suite 700
              McLean, Virginia 22102

                                      END OF ORDER

```
 1      IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

 2

 3  -------------------------------x
                                    :
 4  ROBERT KRAKAT and DONALD KRAKAT :
                                    :
 5           Plaintiff,             :
                                    :
 6      v.                          :  Civil No. 1:07-CV-00693-RCL
                                    :
 7  BROOKS RANGE CONTRACT SERVICES  :
    INC.,                           :
 8                                  :
             Defendant.             :
 9                                  :
    -------------------------------x
10

11                                          Monday, January 28, 2008

12
                                            Washington, D.C.
13

14  Deposition of

15                          JAMES CAVANAGH

16

17  witness, called for examination by counsel for plaintiff,

18  pursuant to notice, at the U.S. District Court for the

19
    District of Columbia, 3rd Street & Constitution Avenue, N.W.,
20

21  Room 2321, Washington, D.C., beginning at 11:19 a.m., before

22
    Donna J. Escobar, a notary public for the District of Columbia,
23

24  when were present on behalf of the respective parties:

25
```

*Deposition Services, Inc.*
6245 Executive Boulevard
Rockville, MD  20852
Tel: (301) 881-3344  Fax: (301) 881-3338
info@DepositionServices.com   www.DepositionServices.com

```
1    A    Years ago.
2    Q    How about in relation to the incident with the
3  linens?
4    A    About, around the same time.
5    Q    What else did you tell Mr. Heffern?
6    A    Other than Mr. Krakat calling me?
7    Q    About allegations of theft.
8    A    I mean, there's other things that were said but I
9  didn't actually witness anything.
10   Q    Okay.  Well what did you tell Mr. Heffern?
11   A    I just heard, you know, certain things that he was
12 taking out of there that, you know, but you know, other than
13 the linens and the meats, I didn't, I didn't actually,
14 physically see him take anything.  But I heard of him
15 taking, you know, a television out the pipes building.  And
16 pretty much that's about it.
17   Q    Who did you hear from that Robert Krakat took a
18 television from the pipes building?
19   A    You know, that'd be hard to pinpoint on one
20 certain person but, you know, it was kind of a, you know,
21 like a shop talk thing.  And I can't really be exactly sure
22 who said that one thing.
```

1    Q    From whatever source you heard regarding the
2    television, do you know when that incident occurred?
3    A    From my -- I say it happened previous to him being
4    left go.
5    Q    But after he began working for Brooks Range?
6    A    Previous to him leaving Brooks Range.
7    Q    Okay. Well, my question is, was he a government
8    employee at the time?
9    A    No.
10   Q    Or was he an employee of a contractor at the time?
11   A    Contractor.
12   Q    And do you know whether he was employed by JHT at
13   that point or Brooks Range?
14   A    Brooks Range.
15   Q    So at the time you heard about the alleged
16   incident with the television, Mr. Krakat was employed at
17   Brooks Range?
18   A    Correct.
19   Q    Did you or did anyone you know report the alleged
20   theft of the television?
21   A    Not that I know of.
22   Q    Did you or anyone you know make any investigation

1   to find out if there was a television missing?

2       A    No.  No, sir.

3       Q    Since that time, have you heard that there's a
4   television missing?

5       A    No, sir.

6       Q    What else did you tell Mr. Heffern in that initial
7   conversation?

8       A    Other than Mr. Krakat calling me trying to coerce
9   me into changing my statement.

10      Q    We'll get to the telephone calls, but when I said
11  initial conversation, what I mean is --

12      A    Oh, that's basic.

13      Q    -- is how you went to Mr. Heffern and said --

14      A    That's pretty much, that'd be basically about it.

15      Q    You don't recall any other details about that
16  initial conversation with Mr. Heffern?

17      A    No, sir.

18      Q    After that initial conversation with Mr. Heffern,
19  when is the next time you spoke with him or any other
20  employee from Brooks Range?

21      A    You mean on a personal basis?

22      Q    With regard to the Krakats?

1          (Whereupon, the question was replayed.)

2          BY MR. LEAHY:

3     Q    The question had to do with that portion.  My
4 question had to do with that portion of paragraph six.

5     A    Well, that first sentence right there, that he had
6 stole items from the retirement home, I can say that's true,
7 but including the television, like I said, I never really
8 visually seen him take the television.

9     Q    So it's fair to say that you do not know that he
10 actually stole a television?

11    A    Right.  I mean, yeah.

12    Q    Okay.  And that portion of paragraph six which
13 says you know that he stole a television is inaccurate?

14         MS. DONER:  Objection.  That's not what paragraph
15 six says.  But if you understand the question, you can
16 answer it.

17         THE WITNESS:  Do you want to repeat that?

18         BY MR. LEAHY:

19    Q    Sure.  The portion of paragraph six which
20 indicates that I knew he had stolen items from the
21 retirement home including televisions is inaccurate in that
22 you don't know that he stole televisions?

Tsh                                                                54

1     Q    Okay. And so is it still accurate that you
2  answered the call just in that fashion?
3     A    Right.
4     Q    Okay. And in paragraph three, I had indicated
5  earlier that this was actually a typographical error on my
6  part. Is it true to state that Mr. Krakat's statements to
7  you on December 17th should have read, on December 14th,
8  2007 --
9     A    Correct.
10    Q    -- were in a harassing manner, is that correct?
11    A    Correct.
12    Q    Okay. And this declaration then stated, I'm
13 concerned for the safety of my family, and I want him to
14 stop contacting me.
15    A    Correct.
16    Q    Is that true?
17    A    That's true.
18    Q    Okay. And in fact at some point Mr. Krakat had a
19 conversation with your seven-year-old daughter, is that
20 correct?
21    A    From what I understand when they called the house,
22 and she had answered the phone. I'm not sure what occurred.

Tsh                                                                                55

1   Q   Okay.

2   A   So do you make that a yes?

3   Q   Okay. You weren't happy, though, about the fact
4   that he spoke to your daughter?

5   A   No, I don't want nobody calling my house.

6   Q   Okay. And you testified earlier that you thought
7   but you weren't sure but maybe Kevin Heffern drafted the
8   affidavit. Do you recall that testimony?

9   A   Right.

10  Q   Okay. The first affidavit?

11  A   Right.

12  Q   Okay. And you also described a conversation that
13  you had with me. That conversation took place prior to you
14  being given the affidavit, is that correct?

15  A   Correct.

16  Q   Okay. And did this affidavit and the declaration
17  accurately reflect what you had discussed with me?

18  A   Correct.

19      MS. DONER: Okay. I have no further questions.

20      MR. LEAHY: Just a couple.

21

22

1   Is that a typographical error, or should that read, December
2   14th?
3       A    Paragraph two should read December 17th --
4       Q    Okay.
5       A    -- correct, on the top, during the early
6   afternoon.
7       Q    Got you. I understand. Tell me about your
8   concern for the safety of your family?
9       A    Well, you know, I don't want anybody harassing my
10  family. You know, I got small children. And I work seven
11  days a week. And, you know, I'm not around to protect them.
12  I don't know who's calling my house or anything like that.
13  I don't want my kids involved in any, you know,
14  conversations with anybody that they don't know, that they
15  consider strangers.
16      Q    Is there any other reason, or was it just the
17  telephone calls to the house?
18      A    Well, I mean, you know, I mean, I don't know if
19  you have kids or not, but you don't want them talking to
20  strangers.
21      Q    I completely understand you. I'm just asking, is
22  there any other --

1    A    I just didn't want any, I didn't want any
2    involvement with the Krakats.
3    Q    And your concern for the safety of your
4    children --
5    A    Of course.
6    Q    -- stemmed from the telephone calls, but not from
7    anything else?
8    A    Well then, I can't say, you know, I can't say yes
9    or no on that. I can say, I was concerned from when they
10   were calling my house. I didn't want nobody to come over to
11   my house when I'm not home.
12   Q    Okay.
13   A    All right.
14   Q    Fair enough.
15   A    All right.
16   Q    Is there anything that you wanted to add to that?
17   A    I'm just sorry this whole thing is occurring. I
18   pretty much didn't want to get involved in this. And I've
19   regretted even having to come down here and talk to you.
20   But, you know, things happen.
21   Q    If you didn't want to be involved, tell me the
22   reason that you initially when to Mr. Heffern regarding the