IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT KRAKAT and <br> DONALD KRAKAT, <br><br>     Plaintiffs <br><br> v. <br><br> BROOKS RANGE CONTRACT SERVICES, INC., <br><br>     Defendant | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No: 1:07-cv-00693-RCL <br> ) <br> ) <br> ) <br> ) <br> ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION
TO MOTION TO VACATE ORDER OF DECEMBER 17, 2007**

**NOW COME** the Plaintiffs Robert Krakat and Donald Krakat, by and through their undersigned counsel, and pursuant to the Federal Rules of Civil Procedure hereby file this Reply to Defendant's Opposition to Plaintiff's Motion to Vacate Order of December 17, 2007:

In that the Defendant's Motion for Sanctions and Plaintiff's Motion to Vacate those sanctions are interrelated, Plaintiff incorporates herein by reference its Sur-Reply in Opposition to the Renewed Motion for Sanctions.

Defendant ends its reply to Plaintiff's opposition to the Renewed Motion for Sanctions by asserting, without any personal knowledge, that James Cavanagh "simply has no reason to lie." Reply, at p. 3. This despite the fact that it is clear that Cavanagh's affidavit and statements to Robert Krakat were libelous and materially false. Defendant's tortured defense of the affidavit aside, at p. 1, ¶ 1 of their reply, it is clear that Cavanagh's affidavit was at minimum, misleading and inflammatory.

And despite Defendant's assertion that Cavanagh "simply has no reason to lie," there is additional evidence that he did in fact lie. Cavanaugh asserted in his deposition that he reported

1

what he believed to be Robert Krakat's alleged theft, of meat and linens, to their mutual supervisor, Thomas Kellington. See Cavanagh deposition excerpts at p. 13-14, 22-23, as **Exhibit 2** hereto. Mr. Kellington denies that any allegation of theft was ever reported to him. See Affidavit of Thomas Kellington, as **Exhibit 1** hereto.

"2.    I was employed by the Federal Government at the Armed Forces Retirement Home and at one time supervised both Robert Krakat and James Cavanagh.

3.    If there were reports that an individual whom I supervised, including Robert Krakat, had committed theft, my understanding is that those reports would have been made known to me so that I could participate in any investigation of the alleged theft.

4.    I have no recollection of James Cavanagh, or anyone else, making a report or allegation that Robert Krakat had committed any theft." See Affidavit of Thomas Kellington, as **Exhibit 1** hereto.

Cavanaugh appears to have lied yet again. It is undisputed that James Cavanagh, as an employee at the Armed Forces retirement Home, maintains a working relationship with the Defendant. See Cavanagh deposition excerpts at p. 5, 7-8 as **Exhibit 2** hereto. Whatever James Cavanaghs reasons are for lying about Robert Krakat, or providing deliberately misleading affidavits to the Court are his and neither counsel has personal knowledge of his motivations. If he is willing to lie or deliberately mislead the Court on other matters, there is a reasonable inference that he is willing to mislead the Court on other matters. Despite Defendant's renewed attempt to claim that Cavanagh has a concern for the safety of his family the only allegation is that Cavaugh's daughter once answered the telephone. There was no allegation that anything inappropriate was ever said to Cavanagh's daughter or anyone else in his family. Plaintiffs submit that any allegation of harassment or concern by Cavanagh is not credible.

Other than the disproved allegations of Cavanagh, Defendant argues that its arguments at the December 17th hearing that Kevin Heffern alleged he received a telephone call from Donald Krakat threatening to kill his dogs provides a basis for entering the protective order. First, there has been no evidence that supports that allegation submitted to the Court. Second, Defendant has indicated it cannot produce telephone records to corroborate its claim. Third, the Court may also recall that Robert Krakat attended the hearing (Defendant didn't bring any witnesses) to defend himself and deny Cavanagh's claim. If Defendant intends to submit evidence to the Court, the Krakats will submit counter evidence, including Defendant's inability to corroborate its claim. Given Defendant's willingness to submit false or deliberately misleading affidavits, the Plaintiff submits that there is no basis for sanctions, unless it is sanctions against the Plaintiffs for that willingness to submit false or deliberately misleading affidavits.

Respectfully Submitted:

BYRD & BYRD, LLC

/s/

_____
Timothy P. Leahy, D.C. Bar No. 472964
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
(301) 464-7448
(301) 805-5178 – Fax
Tleahy@byrdandbyrd.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that on this 6th day of March, 2008, a copy of the foregoing was mailed first class, postage pre-paid to:

Karen A. Doner (Bar No. 458626)
Thomas J. McKee, Jr. (Bar No. 492482)
Williams Mullen, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia 22102
703-760-5200 (phone)
703-748-0244 (fax)

                                                                  /s/
                                          _____
                                          Timothy P. Leahy, Bar No. 15084

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT, ET. AL. )
)
    Plaintiffs )
)
v. ) Case No: 1:07-cv-00693-RCL
)
BROOKS RANGE CONTRACT SERVICES, INC., )
)
    Defendant )
)

*************************************************************

## AFFIDAVIT OF THOMAS KELLINGTON

1. I am over the age of 18, and am competent to testify.

2. I was employed by the Federal Government at the Armed Forces Retirement Home and at one time supervised both Robert Krakat and James Cavanagh.

3. If there were reports that an individual whom I supervised, including Robert Krakat, had committed theft, my understanding is that those reports would have been made known to me so that I could participate in any investigation of the alleged theft.

4. I have no recollection of James Cavanagh, or anyone else, making a report or allegation that Robert Krakat had committed any theft.

**I CERTIFY**, under penalties of perjury that the foregoing facts asserted herein this Affidavit are true and accurate to the best of my knowledge, information, and belief.

_/s/ Thomas Kellington_
Thomas Kellington

# NOTARY

STATE OF MARYLAND

COUNTY OF _Prince George's_

On this _2nd_ day of _March_, 2008, before me, a Notary Public in and for the jurisdiction aforesaid, personally appeared ___Thomas Kellington___, known to me or satisfactorily proven as the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes contained therein.

IN WITNESS THEREOF, I hereunto set my hand and Notarial Seal.

_Patricia A. Hughes_
Notary Public

My Commission Expires: _06-01-09_




# University of Maryland
## Department of Intercollegiate Athletics
## Operations & Facilities

# Fax

| To: | From: Kellington |
|---|---|
| Fax: | Pages: |
| Phone: | Date: |
| Re: | cc: |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

• Comments




University of Maryland, Department of Intercollegiate Athletics
0738 Comcast Center
College Park, MD 20742
301.314.7126 Office – 301.314.7907 Fax

```
 1      IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

 2

 3   ------------------------------x
                                    :
 4   ROBERT KRAKAT and DONALD KRAKAT:
                                    :
 5          Plaintiff,               :
                                    :
 6      v.                           :  Civil No. 1:07-CV-00693-RCL
                                    :
 7   BROOKS RANGE CONTRACT SERVICES :
     INC.,                          :
 8                                   :
            Defendant.               :
 9                                   :
     ------------------------------x
10

11                                       Monday, January 28, 2008

12
                                         Washington, D.C.
13

14   Deposition of

15                        JAMES CAVANAGH

16

17   witness, called for examination by counsel for plaintiff,

18   pursuant to notice, at the U.S. District Court for the

19
     District of Columbia, 3rd Street & Constitution Avenue, N.W.,
20

21   Room 2321, Washington, D.C., beginning at 11:19 a.m., before

22
     Donna J. Escobar, a notary public for the District of Columbia,
23

24   when were present on behalf of the respective parties:

25
```

                    **Deposition Services, Inc.**
                       6245 Executive Boulevard
                        Rockville, MD  20852
                Tel: (301) 881-3344  Fax: (301) 881-3338
         info@DepositionServices.com    www.DepositionServices.com

1   Q   And what's your address?

2   A   627 Brookfield Drive, Centerville, Maryland 21617.

3   Q   Okay.  And where do you work?

4   A   Soldier's Home.  Armed Forces Retirement.

5   Q   And what do you do there at the Armed Forces
6   Retirement Home?

7   A   Boiler plant operator.

8   Q   And how long have you done that?

9   A   I've been in the plant for approximately 18 years.
10  But I've worked in the plumber's shop prior to that, so
11  I've been at the home for 20.

12  Q   And what did you do before you worked for the
13  Armed Forces Retirement Home?

14  A   I worked for plumbing companies, like John G.
15  Webster, S.R. Bendette, places like that.

16  Q   Okay.  And can you tell me what your education is?

17  A   The highest, graduated from high school, a year in
18  college, a whole boatload of training schools.

19  Q   Do you hold any certifications?

20  A   Yeah, I'm a third-class engineer, CFC, Backflow.

21  Q   Any other certifications?

22  A   I've got my Maryland, I've got my NOB license,

1   Q   Okay.

2   A   And then I worked under his supervision when he
3 was, I believe he was a supervisor. I'm not sure exactly
4 what his title was, for Brooks Range. But I had worked for
5 them for, I'm not exactly sure, a couple of months, because
6 then it became a conflict of interest, I couldn't work for a
7 contractor.

8   Q   Well, when you were both employed by the
9 government, were you his supervisor, was he your supervisor?

10  A   No, neither one of us were supervisors.

11  Q   Okay.

12  A   We were both firemen.

13  Q   Okay. And what did Mr. Krakat do as a fireman?

14  A   He just took readings off of boilers, made sure he
15 maintained water level and pressures on the boiler and, you
16 know, if anything was to have been wrong, I guess, you know,
17 he got the report to the engineer, and the engineer would
18 take care of the situation that occurred.

19  Q   And you said that you were no longer able to work
20 with him once he began to work with Brooks Range because of
21 a conflict of interest. Could you explain what you mean?

22  A   The thing is that the Brooks Range is a

Tsh                                                                        8

1    contractor.  I'm federal government.  So Kevin could

2    probably explain it to you a lot better than I can.  Since

3    it's a mechanical contract, since I do mechanical work, I

4    can't work with anybody that has a contract on the Soldier's

5    Home on a mechanical situation or something like that.

6        Q    Okay.  Well, what contract did you have with

7    Robert Krakat after he began to work with Brooks Range?

8        A    Well, you know, he would give me work orders to do

9    in the evening.  I worked in the evening for him, up until,

10   you know, up until, you know, I left.  And then after that,

11   I never really had -- I mean, we'd have contact here and

12   there, but other than that, it wasn't on a -- you know, it

13   wasn't like we went out and did anything other than work on

14   a job site together.

15            I'm stationed, so I don't get out in the

16   buildings.  So in order for us to even run into each other,

17   he'd have to come to the heating plant or I'd have to run

18   into him somewhere, which means the buildings and the heat

19   plant if I had other things to do.

20       Q    Did you ever see each other socially?

21       A    No.

22       Q    What is, how do you interact with Brooks Range at

1  Q    Okay. What did you tell him?

2  A    Well, I told him that Mr. Krakat, you know, he was
3  previously employed at, you know, previous employed at the
4  heating plant for a duration of time. Then when he left to
5  go into the building, as a building engineer, this is all
6  federal government. This is before Brooks Range or any
7  contractor even came aboard we still had federal employees,
8  and we had an active laundry above the heating plant. And
9  you can access it from behind number one boiler steps. And
10 there's a door there, and you can open it. You can come and
11 go as you please.

12      Well, you know, when he was working in the
13 buildings, he would come in in the evenings on the 4:00 to
14 12:00 shift, and I've seen it when I've worked 4:00 to
15 12:00, I've seen him do it, and other, you know, other guys
16 witnessed it also, but you know, we banded together, pretty
17 much and told the foreman, look, Mr. Krakat's coming through
18 the heating access in the laundry through the heating plant,
19 and removing linens and, you know, not one or two, but a
20 bundle at a time.

21 Q    So you witnessed Robert Krakat removing linens --
22 A    I seen him.

Tsh                                                                                14

1   Q   -- from behind the boiler room?

2   A   Yes, coming from the laundry.

3   Q   Okay. And you reported this to your foreman?

4   A   Exactly.

5   Q   And who was the foreman?

6   A   At the time it was Mr. Killington.

7   Q   Does he have a first name?

8   A   Tom.

9   Q   And what happened as a result of that report?

10  A   What happened after that was, he was verbally
11  reprimanded and was told not to access the heating plant for
12  any reason at all. And in return, they put a lock on the
13  door and put a key in the key box, so if anybody wanted to
14  access the laundry from the heating plant, they had to sign
15  it out. And that was solely for the sole purpose of keeping
16  Mr. Krakat from entering the heating plant. And he was
17  unauthorized to come in. And he didn't come in for a few
18  years, until, I think after Mr. Killington left.

19  Q   Your recollection is there was a verbal reprimand?

20  A   Yeah.

21  Q   Do you know if he was, if there was a written
22  reprimand, or if he was formally written up?

1   probably be the only one left.

2        Q    Do you know his first name?

3        A    Melvin.

4        Q    What's he do?

5        A    He's a boiler operator, engineer.

6        Q    What building is he in?

7        A    Heating plant.

8        Q    And did you report this transporting of meat to
9   anyone at the government?

10       A    Well, then again, you know, everything was falling
11  into, you know, to the foreman.  Everything was reported to
12  the foreman.  So whatever, however he took care of the
13  matter, I don't know.  But I know that, you know, after all
14  this was said and done, that Mr. Krakat, or any of the
15  building engineers weren't authorized to come into the
16  heating plant.

17       Q    And when you said, now, did you report to the
18  foreman the transporting of the meat?

19       A    I seen it but I, you know, there was other guys
20  that were concerned more about than, you know, I see it from
21  a distance.  I knew was he was -- I was like, what is he
22  doing, you know.  And they said, he took some chops or

1   whatever and put, you know, just you know, I seen him do it
2   from a distance. I didn't go up there in the, you know, and
3   inspect what he had, what type of meats and stuff. But I
4   know, because he'd bring them down and try to offer them to
5   other people, you know.
6       Q    So Mr. Krakat wasn't hiding the fact that he was
7   transporting meat?
8       A    No, I mean, he wasn't hiding it.
9       Q    And did you report to a supervisor that Mr. Krakat
10  was transporting meat?
11      A    Yeah, I said it to him.
12      Q    To whom?
13      A    I believe it was Mr. Killington.
14      Q    And what did Mr. Killington say to you?
15      A    He said he would take care of the map. See, there
16  was a bunch of guys together and told him, you know, of what
17  was going on. So him being the supervisor, he took it to
18  the next step. I guess he contacted the logistics engineer,
19  Krakat's supervisor at the time. So whatever happened after
20  that, I don't know.
21      Q    And do you know when this transporting the meat
22  occurred?