IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT and )
DONALD KRAKAT, )
)
Plaintiffs, )
)
v. ) Case No: 1:07-cv-00693-RCL
)
BROOKS RANGE CONTRACT SERVICES, INC., )
)
Defendant. )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7 and 56 for

the United States District Court for the District of Columbia, Defendant Brooks Range Contract

Services, Inc. ("BRCS"), by counsel, hereby moves this Court to enter summary judgment in its

favor in this action and to dismiss Plaintiff's Complaint in its entirety. The entry of summary

judgment is appropriate because the undisputed material facts establish that Plaintiffs' claims are

insufficient as a matter of law. The reasons and legal authority in support of this motion are set

forth in the accompanying Memorandum of Law.

### Defendant respectfully requests a hearing on this motion.

Respectfully submitted,

_____/s/_____

Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia 22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June 2008, a true copy of the foregoing

document was sent via e-filing, to:

> Timothy P. Leahy, Esq.
> 14300 Gallant Fox Lane, Suite 120
> Bowie, Maryland 20715
> Counsel for Plaintiffs


_____/s/_____
Karen A. Doner

1620631v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT KRAKAT and<br>DONALD KRAKAT,<br><br>                 Plaintiffs,<br><br>v.<br><br>BROOKS RANGE CONTRACT SERVICES, INC.,<br><br>                 Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No: 1:07-cv-00693-RCL<br>)<br>)<br>)<br>) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant Brooks Range Contract Services, Inc. ("Defendant" or "BRCS"), by counsel,

pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submits its Memorandum in

Support of its Motion for Summary Judgment, and states as follows:

**I.      INTRODUCTION**

This case is much ado about nothing.  It is based solely upon Plaintiffs' inaccurate

speculation of wrongdoing and lacks credible evidentiary support.  Plaintiffs' conclusory

allegations, which are unsupported by the evidence adduced in discovery, are insufficient for

survival of Plaintiffs' claims beyond the summary judgment stage.

The Complaint filed by Plaintiffs, Robert Krakat ("Robert") and Donald ("Donald")

Krakat (father and son, respectively) (collectively "Plaintiffs"), against BRCS alleges that they

were wrongfully terminated, in violation of public policy, from their employment at BRCS

(Counts I and III), and that BRCS defamed Plaintiffs by making allegations of theft, poor

performance, and excessive absenteeism (Counts II and IV).

In 2005, BRCS contracted with the Federal Government to provide maintenance services

at the Armed Forces' Retirement Home (the "Home") located in the District of Columbia.

Complaint ¶ 2.  Shortly thereafter, BRCS hired Robert Krakat and Donald Krakat.  Prior to

BRCS maintaining the Home, a third party, JHT, Inc., maintained the Home, and prior to that,

the Home was maintained by the Federal Government.  Complaint ¶¶ 3-4.  Robert was

employed at the Home since 1973 until his termination from BRCS.  Complaint ¶ 3.  Donald was

employed at the Home since sometime in 2005. Complaint ¶ 5.  During their employment with

BRCS, Plaintiffs were supervised by Kevin Heffern ("Heffern"), the BRCS Project Manager for

the Home.  Complaint ¶ 6.

Under Count I of the Complaint, Plaintiffs allege that sometime in 2005, they became

aware of "alleged problems with the work and invoicing of Heffern" based upon their own

personal knowledge and when Heffern's administrative assistant, Katie Farver, with whom

Donald was romantically involved, informed Plaintiffs of her concern that "she could be fired or

criminally charged for processing fraudulent invoices prepared by Heffern".  Complaint ¶ 7.

Specifically, Plaintiffs allege in the Complaint that Heffern:  (1) overcharged the Federal

Government by charging $500 for each air conditioning unit that cost BRCS $200 when BRCS

was only entitled to a 12% mark-up (Complaint ¶ 8); (2) overcharged the Federal Government

for work not performed relating to a 2005 Christmas Party (Complaint ¶ 9); (3) overcharged the

Federal Government for cement cleanup (Complaint ¶ 10); (4) allowed Virginia Contracting

Services ("VCS"), a company owned by Heffern[1], to charge BRCS for work that Donald Krakat

and other BRCS employees performed during normal business hours (Complaint ¶ 11); and (5)

disregarding lower bids for tree services in order to hire a company owned by a friend of Heffern

(Complaint ¶ 12).

---

[1] There is no evidence to support the contention that Heffern has any ownership interest in VCS.  Rather, VCS is owned by his girlfriend, Donna Sutherland.  Ms. Sutherland is not a BRCS employee.  See relevant portions of Kevin Heffern's Deposition Transcript attached as **Exhibit A** hereto at p. 64-66.

Under Count II of the Complaint, Plaintiffs allege that BRCS made defamatory statements about Plaintiffs' theft, poor performance, and absenteeism to "employees of BRCS and the Home". Complaint ¶¶ 36, 47. Plaintiffs further allege that BRCS "reduced its false accusations to writing and published those accusations to individuals who worked for both the Home and for BRCS." Complaint ¶¶ 39, 50.

The Complaint seeks $200,000 per count ($800,000 total) in compensatory damages, plus punitive damages.

BRCS is entitled to summary judgment as a matter of law because there are no material facts in dispute. Plaintiffs have failed to prove a prima facie case of wrongful discharge in violation of public policy. The mere closeness in proximity of time between the alleged complaint(s) and Plaintiffs' termination are insufficient to survive summary judgment. The person who made the decision to terminate Plaintiffs' employment had no knowledge of Plaintiffs' complaint(s) at the time of the termination and there is no evidence whatsoever to suggest otherwise. And Plaintiffs did not have a good faith belief that BRCS, through Heffern, had engaged in criminal theft, fraud, or conspiracy. Plaintiffs' defamation claims likewise cannot survive summary judgment. Plaintiffs have no evidence of any publication by BRCS to a third party. Plaintiffs themselves published the alleged defamatory statements to the only person alleged to have heard them. Accordingly, summary judgment should be granted in BRCS' favor as to all counts in the Complaint.

## II.     STATEMENT OF UNDISPUTED FACTS

1.      In 2005, BRCS contracted with the Federal Government to provide maintenance services at the Armed Forces' Retirement Home ("Home") located in the District of Columbia. Complaint ¶ 2. Shortly thereafter, BRCS hired Robert Krakat and Donald Krakat. Prior to

BRCS maintaining the Home, a third party, JHT, Inc., maintained the Home, and prior to that, the Home was maintained by the Federal Government. Complaint ¶¶ 3-4. Robert was employed at the Home since 1973 until his termination from BRCS. Complaint ¶ 3. Donald was employed at Home since sometime in 2005. Complaint ¶ 5. During their employment with BRCS, Plaintiffs were supervised by Kevin Heffern ("Heffern"), the BRCS Project Manager for the Home. Complaint ¶ 6.

2.     Howard Anastasi made the decision to terminate Plaintiffs' employment. Exh. H.

3.     Neither Plaintiff complained to Mr. Anastasi.

4.     Ms. Farver complained to BRCS, through her uncle, who was also an employee of BRCS, sometime in the Fall of 2005 regarding the invoicing by Heffern. Exh. D hereto at Interrogatory No. 4.

5.     BRCS self-reported the complaint to the Federal Government and conducted its own investigation and concluded that there was no fraudulent invoicing. Exh. D at Interrogatory No. 2.

6.     The Federal Government approved the mark-up of the air conditioning units to $500 each. Exh. E at p. 58-59.

7.     Heffern did not charge for work not performed in connection with the 2005 Christmas party. Exh. B at p. 206.

8.     Robert saw Heffern and Sutherland doing work on the canopy between the Pipes Building and LaGarde Building. Exh. B at p. 147. Robert was not there the entire time and therefore does not know if they did any cleaning on the roof. Exh. B. at p. 147-148. The Federal Government approved the work performed by VCS. Exh. J.

9.      Robert does not know if VCS performed any work in connection with cleaning up the ground floor area in the Pipes Building. Exh. B at p. 148-150. The Federal Government approved the work performed by VCS. Exh. J.

10.     Robert does not know if VCS performed any work in connection with cleaning up water in the kitchen of the LaGuard Building. Exh. B at p. 155-158. The Federal Government approved the work performed by VCS. Exh. J.

11.     The Federal Government approved the painting of rooms by VCS. Exh. A at p. 92-93.

12.     As a result of a Summer storm in 2005, the Federal Government requested that BRCS arrange for the removal of trees and other debris from the Home's property. Due to the urgency of the matter, BRCS solicited bids from third party vendors. They received three bids from companies in response to BRCS' solicitation. In conformance with BRCS' internal procedure, the lowest and highest bids were discarded. Exh. D at Interrogatory No. 13. The remaining bid, submitted by A.R. Bryant, was accepted. Complaint ¶ 12. Robert had no involvement in the bid process and has no knowledge of BRCS' process for considering bids that are submitted for work. Exh. B at p. 201-203. The Federal Government approved of the use of the bid submitted by A.R. Bryant. Exh. E at p. 59-61.

13.     Ms. Farver was *not* present for the termination meetings contrary to this allegation in the Complaint. Exh. B at p. 223; Exh.C at p. 101-103. Nor did Ms. Farver overhear the alleged defamatory statements. Exh. K at p. 48-60. Plaintiffs, not BRCS employees, are the ones who informed Ms. Farver that they were terminated because of theft. Exh. K at p. 48-60.

14.     Plaintiffs are unable to identify a single person to whom BRCS allegedly showed the disciplinary logs. See Exh.B at 241-242; Exh. I at Interrogatory Answer No. 15.

## III.  ARGUMENT

### A.    APPLICABLE LEGAL STANDARD

A moving party is entitled to summary judgment when it demonstrates the absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. <u>Dunaway v. International Brotherhood of Teamsters</u>, 310 F.3d 758 (D.C. Cir. 2002).  When the non-moving party bears the ultimate burden of proof at trial "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  To defeat summary judgment, the non-moving party must produce evidence on which a jury might rely, and the admission of "factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  Indeed, a plaintiff who has not made a sufficient showing should not be allowed to require a defendant to "undergo the considerable expense of preparing for and participating in a trial." <u>See</u> <u>Catrett</u>, 477 U.S. at 323-24. A non-moving party's conclusory allegations are not sufficient to defeat the entry of summary judgment. <u>Beard v. Goodyear Tire and Rubber Co.</u>, 587 A.2d 195, 198 (D.C. 1991).

### B.    **PLAINTIFFS HAVE NO EVIDENCE THAT THEIR TERMINATIONS WERE IN RETALIATION FOR ANY WHISTLEBLOWER COMPLAINT MADE BY PLAINTIFFS**

#### 1.    WRONGFUL DISCHARGE LEGAL STANDARD

The District of Columbia recognizes the general rule that "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." <u>Owens v. National Medical Care, Inc.</u>, 337 F.Supp.2d 131, 137 (D.D.C. 2004).  In <u>Adams v. George W. Cochran & Co., Inc.</u>, 597 A.2d 28 (D.C. 1991), the District of Columbia Court of Appeals recognized a very

narrow exception that "a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law." Owens, 337 F.Supp.2d at 137. The burden is on the employee, to prove by a preponderance of the evidence, that the refusal to violate the law was the sole reason for the termination. See Adams, 597 A.2d at 34. To state a prima facie case under the public policy exception, a plaintiff must prove that he "(1) engaged in a protected activity, i.e., refused to violate the law; (2) the employer took an adverse personnel action against him; and (3) there was a causal connection between the two." Id. While the proof necessary for the first two elements is relatively clear, the evidence of a causal connection can vary. See Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985) (stating that the causal connection element may be established by "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.") (emphasis added).

Mere proximity in time to the protected activity and the discharge alone is not sufficient to satisfy the element of causal connection. See Owens, 337 F.Supp.2d at 138; see also Children's Defense Fund v. District of Columbia Department of Employment Services, 726 A.2d 1242, 1248 (D.C. 1999) (rejecting the notion that proximity in time is sufficient to establish a prima facie case in a retaliatory discharge workers' compensation case); see Hazward v. Runyon, 14 F.Supp.2d 120, 122 (D.D.C. 1998) (expressly rejecting the theory that mere proximity in time to the protected activity and the adverse employment action is sufficient to satisfy the causation element).

Beyond timing, a plaintiff must also demonstrate that the decision makers who terminated the plaintiff had knowledge of the alleged protected activity. It is not sufficient for mere Company employees to know. See Buggs v. Powell, 293 F.Supp.2d 135, 150-51 (D.D.C.

2003); see Owens, 337 F.Supp.2d at 138 ("[A]s a matter of law, a causal connection cannot exist solely based on the temporal proximity of [employee's] protected activity to his termination and general 'company' knowledge of [the employee's] protected activity."); see also Laboy v. O'Neil, 180 F.Supp.2d 18, 26 (D.D.C. 2001) (holding that summary judgment not appropriate when plaintiff failed to demonstrate that the decision maker had knowledge of the protected activity).

A plaintiff making a claim of wrongful discharge in violation of public policy must have a good faith belief that the defendant's actions constituted a violation of public policy. In Goos v. National Association of Realtors, 715 F.Supp.2d (D.D.C. 1989), a Title VII retaliation case, the Court said that "the plaintiff does not have to prove the conduct opposed was in fact a violation of Title VII. Instead, the rule is that opposition activity is protected if it is based on a *'good faith, reasonable belief* that the challenged practice violates Title VII.'" Id. at 3.[2] See also Knox v. United States Department of Labor, 232 Fed.Appx. 255 (D. Md. 2007) (holding that in order for a plaintiff to be entitled to whistleblower protection under Clean Air Act, the plaintiff is required to prove that he had a good-faith, reasonable belief that the employer was violating EPA regulations).[3]

## 2.    PLAINTIFFS HAVE NOT PROVED A PRIMA FACIE CASE

According to Plaintiffs, they were told they were being suspended and ultimately terminated due to allegations of theft made against them. Complaint ¶¶ 17, 18. Plaintiffs allege that the real reason they were terminated was because of their "refusal to knowingly participate

---

[2] The elements of retaliatory discharge based on a Title VII violation and wrongful discharge in violation of public policy are nearly identical. Compare, Shore v. Groom Law Group, 877 A.2d 86 (D.C. 2005) and Adams v. George W. Cochran & Co., Inc., 597 A.2d 28 (D.C. 1991).
[3] District of Columbia courts look to Maryland law for guidance when their own precedent is not dispositive. See Newby v. U.S., 797 A.2d 1233, 1243 (D.C. 2002); see also Brandon v. Molesworth, 655 A.2d 1292 (1995), rev'd on other grounds, 672 A.2d 608 (1996) (holding that the models of proof used in employment discrimination cases were instructive in wrongful discharge cases).

in the alleged fraudulent activity undertaken by the Defendant." Complaint ¶¶ 31, 42. Plaintiffs further allege that "[p]articipation in the alleged fraudulent activity would have caused [Plaintiffs] to transgress statutes in violation of public policy." Complaint ¶¶ 32, 43. Plaintiffs also allege that they were terminated "in retaliation for [plaintiffs'] reporting the alleged fraudulent activity to the Home which is a violation of public policy as well as Federal and District statutes protecting whistleblowers." Complaint ¶¶ 33, 44.

BRCS denies that Plaintiffs were disciplined because of any allegation of theft. Rather, Plaintiffs were disciplined as a result of their ongoing poor performance issues and Plaintiffs are unable to prove that the articulated reasons for Plaintiffs' terminations are pretext for retaliatory discharge. However, the factual dispute regarding whether Plaintiffs were terminated for performance issues need not be decided by this Court at this juncture because Plaintiffs are unable to prove a prima facie case against BRCS.

### a.    Proximity of discharge alone is not sufficient.

The only evidence Plaintiffs could possibly rely upon in claiming wrongful discharge is the timing of the disciplinary action following the alleged complaint on February 17th. Such evidence, however, is insufficient to state a prima facie case, let alone meet Plaintiffs' burden of proving wrongful discharge in violation of public policy. See Owens v. National Medical Care, Inc., 337 F.Supp.2d 131, 138 (D.D.C. 2004).

### b.    There is no evidence that the decision-maker knew of Plaintiffs' complaint at the time of termination.

Plaintiffs have adduced no evidence whatsoever that they were terminated in retaliation for submitting any complaint about Heffern and/or BRCS. Plaintiffs allege in the Complaint that Robert complained to Thomas Starr, Asst. Facilities Director for BRCS, sometime during the end

of November or beginning of December 2005 regarding "alleged problems with the work and invoicing of Heffern." Complaint ¶ 14. They further allege in the Complaint that Robert complained to certain employees of the Home (not BRCS) regarding improper invoicing on February 17, 2006 and that Plaintiffs were consequently suspended on February 21, 2006 and terminated on February 23, 2006.[4]  Complaint ¶¶ 16-18. Donald contends that he complained on various occasions to his father, Robert, and to Ms. Farver but admits that he did not complain to anyone else at BRCS. See copies of relevant portions of Donald Krakat's Deposition Transcript attached as **Exhibit C** at p. 104.

It is undisputed that Ms. Farver complained to BRCS, through her uncle, who was also an employee of BRCS, sometime in the Fall of 2005 regarding the invoicing by Heffern. See copies of relevant portions of BRCS' Answers to Interrogatories attached as **Exhibit D** hereto at Interrogatory No. 4. As a result, BRCS self-reported the complaint to the Federal Government and conducted its own investigation and concluded that there was no fraudulent invoicing.[5] Exh. D at Interrogatory No. 2.

None of the foregoing persons, however, were involved in the decision to terminate Plaintiffs' employment. And Plaintiffs have no evidence to support the contention that the only person who decided to terminate Plaintiffs' employment, Howard Anastasi, BRCS' Director of Human Resources, had any knowledge of Robert's alleged complaints at the time of the

---

[4] Robert testified in his deposition that he spoke to Jerry Wessell and Donna Smith (both Federal Government employees) in late December or after December. See copies of relevant portions of Robert Krakat's Deposition Transcript attached as **Exhibit B** at p. 179. On February 17, 2006, Robert allegedly spoke to Donna Smith, Jerry Wessell, and David Rouse (also a Federal Government employee). Complaint ¶ 16. Robert allegedly gave documentation of the alleged problems to Mr. Rouse. Complaint ¶ 16. Messrs. Starr, Wessell and Rouse deny that Robert spoke to them about any wrongdoing by Heffern. However, this is a factual dispute that is not material to BRCS' Motion as set forth below.
[5] Although BRCS found no wrongdoing by Heffern, he was counseled by Howard Anastasi and others with respect to his poor judgment in using VCS as a vendor due to his personal relationship with the owner. Exh. D at Interrogatory No. 11. He was also temporarily demoted to the position of Asst. Project Manager. Id.; Complaint ¶ 24.

termination.[6]  Indeed, Mr. Anastasi had no such knowledge.  See Affidavit of Howard Anastasi

attached as **Exhibit H** hereto.

> **c.**    **Plaintiff's lacked a good faith basis for their underlying complaints against Heffern and/or BRCS.**

Plaintiffs lack evidence to meet their burden that they had a good faith basis on which to

complaint that Heffern and/or BRCS violated public policy.  In Plaintiffs' Answer to

Interrogatory No. 3, Plaintiffs identify two D.C. statutes as forming the underlying basis for their

claim:  D.C. ST. §§ 22-3201 et seq.  and 22-1805a.  See copies of relevant portions of Plaintiff's

Answers to Interrogatories attached as **Exhibit I** hereto at Interrogatory No. 3.  The first statute,

§ 22-3201 et seq., makes it unlawful, among other things, to "wrongfully obtain or use the

property of another with intent to deprive the other of a right to the property or a benefit of the

property or to appropriate the property to his or her own use or to the use of a third person" (i.e.,

theft) and to "engage in a scheme or systematic course of conduct with intent to defraud or to

obtain property of another by means of a false or fraudulent pretense, representation, or promise"

(i.e., fraud).  The second statute, § 22-1805a, makes it unlawful for  "two or more persons to

commit a criminal offense or to defraud the District of Columbia or any court or agency thereof

in any manner or for any purpose…"

The allegations of wrongdoing by Heffern do not amount to violations of either criminal

theft, fraud, or criminal conspiracy under the plain language of the D.C. statutes.  As set forth

below, Jerry Wessell, the Home's Contract Surveillance Specialist Supervisor, and David Rouse,

---

[6] BRCS denies having any knowledge of Plaintiffs' complaint to the Home officials and Messrs. Wessell and Rouse both deny that Robert ever complained to them on February 17th or at any other time. Exh. G; See copies of relevant portions of Gerald ("Jerry") Wessell's Deposition Transcript attached as **Exhibit E**  at p. 50 and David Rouse's Deposition Transcript attached as **Exhibit F** at p.4-5.  In fact, the first time that BRCS learned of Robert's allegations against Heffern was after Robert was terminated when Robert threw a packet of papers, including VCS invoices, across the table at Mr. Anastasi after he was terminated.  See copies of relevant portions of Howard Anastasi's Deposition Transcript attached as **Exhibit G** hereto at p. 126-129.  It is undisputed that Donald never

the Chief of Campus Operations at the Home (a.k.a. Contracting Officer), both testified that there was no improper invoicing or any other wrongdoing by Heffern and BRCS from the Federal Government's perspective. The allegations were made based upon mere supposition, not any credible facts. Having no understanding of the manner in which BRCS invoices the government, Plaintiffs make conclusory allegations of wrongdoing, which should be disregarded and do not form a basis for Plaintiffs' wrongful discharge claims. Regardless of whether there was an actual violation of D.C. law by Heffern and/or BRCS, Plaintiffs do not appear to have had a good faith belief that there was a violation based upon the undisputed facts set forth below.

### (i)    Mark-Up of Air Conditioning Units.

Plaintiffs contend that BRCS, through Heffern, improperly over-charged the Federal Government $500 per air conditioning unit for the Home. Robert testified at his deposition that he became suspicious that Heffern had acted improperly when he overheard a conversation between Mr. Wessell and Heffern in or around December 2005 regarding $500 for air conditioning units. Exh. B at p. 126-136. Robert testified as follows:

Q.    ...what about the statement by Mr. Wessel was suspicious to you of some kind of wrong-doing?

A.    Because the air conditioners they ordered, you could buy them all day long for $100. And, when he mentioned $500 for those air conditioners, I knew something was going on.

Q.    And what is it that you think was going on?

A.    I was thinking [Heffern] was doing, you know, something underhanded or something or overcharging the government. I just didn't mention it to nobody. This was just my opinion, what I thought.

Q.    And you said that you can buy air conditioners for $100 per unit?

A.    Sure.

---

complained to BRCS or the Home regarding Heffern. However, whether Plaintiffs in fact complained is immaterial because the timing alone is insufficient to prove retaliation as cited above.

12

\*        \*        \*

Q.     Those particular air conditioners?

A.     Yes, ma'am.

Q.     What kind were they?

A.     I couldn't remember what the name of them were right now.

Q.     What do you remember about them?

A.     That they were cheap-looking.

Q.     And is it based upon the fact that they were cheap-looking that you contend that they could be bought [for] $100?

A.     Yes, ma'am.

\*        \*        \*

Q.     Did you, yourself, see the invoices for the air conditioners?

A.     No, ma'am.

\*        \*        \*

Q.     …And you don't know if there were any labor or material costs included in the price charged to the government, do you?

A.     No.

\*        \*        \*

Q.     …So, you don't have an understanding, do you, of the deal that has been struck between the government and Brooks Range regarding how much can be charged for various work done, do you?

A.     Yes.

\*        \*        \*

Q.     …What is your knowledge about that?

13

A.     It's 12 percent above cost.  They're only allowed to charge the [H]ome 12 percent.

Q.     How do you know that?

A.     Well, I had papers and all that where it states where they're only allowed to charge 12 percent above the cost.

*          *          *

Q.     ...What document were you looking at?

A.     Basically, I was looking at the contract [between BRCS and the Federal Government].

Id.

Donald Krakat admitted that he has no knowledge regarding the allegation that Heffern overcharged the government for air conditioner units.  Exh. C at p. 107-108.

Heffern explained in his deposition that the air conditioning units were purchased because of the relocation of approximately 500 residents to the Home as a result of Hurricane Katrina.  Exh. A at p. 78-79.  The Federal Government had requested that BRCS purchase and install 50 window air-conditioning units for the Pipes Building at the Home.  Id. at 79.  The actual cost of each unit was $345 and they were each marked-up to $500 to include the labor costs of accepting delivery of the units, delivery of the units, and installation.  Id. at 79-82.  This mark-up was proper because this was a performance-based contract and not part of BRCS' original base contract with the Federal Government.  Id. at 80.

Mr. Wessell testified that there was nothing improper about the invoicing of the air condition units.  Exh. E at p. 58-59.  Specifically, Mr. Wessell confirmed that the 12 percent mark-up does not apply to the air conditioning units, and notwithstanding, there was no issue with the BRCS' mark-up to the air conditioning units from the Government's perspective.  Id.

Plaintiffs' suspicion that the air conditioning units had been marked-up based upon the fact that

the units "looked cheap" does not constitute good faith to support a wrongful discharge claim.

> **(ii)     Overcharged for Work Not Performed in Connection with 2005 Christmas Party.**

Despite this allegation in the Complaint, neither Plaintiff has any knowledge of it.[7]

Robert testified:

> Q.     ...You allege in paragraph nine of the complaint that Mr. Heffern allegedly charged the government for work that [VCS] was not doing in connection with the 2005 Christmas party. What was that referring to?
>
> \*        \*        \*
>
> A.     I have no idea.

Exh. B at p. 206.

Similarly, Donald has no knowledge of this allegation either. Exh. C at p.108-109.

Although Plaintiffs' counsel previously indicated he may remove this allegation from the

Complaint, he never did so. Exh. B at p. 209.

> **(iii)     Overcharged the Federal Government for Cement Clean-Up.**

This allegation in the Complaint appears to be the same as allegation that Virginia

Contracting Services charged BRCS for this work performed by BRCS employees.[8] See below

discussion.

> **(iv)     Invoicing by Virginia Contracting Services for Work Performed by BRCS Employees.**

---

[7] Robert did testify that Heffern stated that he had "ways" to pay for the Christmas party even though, according to Robert, petty cash was depleted at that time. But Robert admitted that he did not know how Heffern paid for the party. Exh. B at p. 206-209. This does not appear to be a basis for Plaintiffs' Complaint and it is undisputed, based upon the documents produced by Defendant in discovery that the party was properly paid for using petty cash.
[8] Robert testified in his deposition that it was the same allegation. Exh. B at p. 211.

Plaintiffs complain that Heffern's girlfriend's company, VCS, performed work as a third party vendor for BRCS and that VCS charged BRCS for work performed by BRCS employees, including Donald, during regular BRCS work hours. This contention is based upon the following alleged incidents:

First, Robert testified that he saw a BRCS employee, Steve Spensler, cleaning the roof of the canopy between the Pipes Building and LaGarde Building at the Home and that VCS invoiced BRCS for the same work. Exh. B at p. 142-147. However, Robert admitted that he saw Heffern and his girlfriend, Donna Sutherland ("Sutherland"), on the roof on a Saturday putting tar down and that he was not there for the entire time they were up there. Id. at 147. When asked if he was 100% sure that Heffern and Sutherland did not do any cleaning on the roof, Robert testified: "Well, if they did, it wasn't a whole lot because [Heffern] had my man – one of my men up there doing it on the weekday." Id. at 147-148.

In fact, Heffern explained during his deposition that work on the roof of the canopy was performed by both BRCS employees and VCS, which was approved by the Federal Government. Exh. A at p. 94-97. A copy of the proposal to the Federal Government shows that BRCS employees were to be billed separately from the work to be performed by VCS, along with other third party vendors. See copy of relevant proposals approved by Mr. Wessell attached as **Exhibit J** hereto at document bates-numbered BRCS-0054. Robert's speculation that VCS invoiced the Federal Government for work actually performed by Mr. Spensler was baseless.

Second, Robert testified that he had told two or three plumbers to clean up the ground floor area in the Pipes Building and that VCS had invoiced BRCS for the same work. Id. at 148-150. Robert testified as follows:

> Q.    ...Tell me what knowledge or information you had about the cleanup of the Pipes Building.

A.     I don't have any knowledge of [Heffern] cleaning it up because I really didn't pay no attention until I seen this because I told the guys to go up there and clean it up because you can't leave that stuff laying around the hospital. It had to be cleaned up directly.

Q.     ...So, your knowledge about this incident is that you had told Brooks Range employees to clean this up?

A.     Right.

Q.     ...And you have no knowledge of any work that Virginia Contracting Services did, correct?

A.     Nope, none.

Id. at p. 149-150.

By Robert's own admission, he has no knowledge of the work performed by VCS and it

is purely speculation that VCS invoiced BRCS for work performed by BRCS employees. A

copy of the estimate to the Federal Government shows that BRCS employees were to be billed

separately from the work to be performed by VCS for the clean-up in the Pipes Building. Exh. J

at document bates-numbered BRCS-00573. Here too, Robert's speculation was groundless.

Third, Robert testified that Donald and housekeeping staff had cleaned up water in the

kitchen of the LaGuard Building and that VCS invoiced BRCS for the same work. Id. at 155-

158. Robert testified that he himself had asked housekeeping to do the clean up:

Q.     How is it then that you were so sure that [the VCS invoice] was reflecting work that you had assigned to housekeeping and not some separate clean up job that was done?

A.     Anything that gets done in the LaGuard, the Pipes Building – and note that's a hospital – housekeeping takes care of all the cleaning. It's been that way for years. Anything goes on, housekeeping comes in right afterwards and cleans it up. They did it when we were with the government and they continue to do it after the government because it's a hospital.

Q.     You weren't there that day, though, for the work reflected in the invoice, were you?

A.     For this work?

Q.    Yes.

A.    No.  I wasn't here for this.

Id. at p. 157-158.

Heffern described the LaGuard clean up work performed by VCS during his deposition:

Q.    ...Did Virginia Contracting Services, in fact, provide cleanup of the LaGarde kitchen area?

A.    Yes.

Q.    Did employees of Brooks Range also provide cleanup of the LaGarde kitchen area?

A.    Yes.

Q.    So both Brooks Range and Virginia Contracting Services were both involved in the cleanup of the LaGarde kitchen area?

A.    Yes.

Q.    Did Virginia Contracting Services employ any individuals who were also employed by Brooks Range to do this work?

A.    No.

Q.    Can you tell me why both Brooks Range and Virginia Contracting Services were involved in the cleanup of the LaGarde kitchen area?

A.    Yes...this was an estimate that was generated.  At the time, I believe there's probably two to three weeks of ongoing issues in the LaGarde kitchen area.  The Brooks Range estimate included this amount...for this work.  It included labor hours for Brooks Range employees that were doing work.  It included hours for Magnolia Plumbing to come in and snake and jet lines both during what I'll call standard hours and at night, non-standard hours.  I want to say over this period of time, Magnolia came in on three different occasions.  So it was a culmination of outside vendors, Brooks Range employees getting this work completed; again, approved by the government.

Exh. A at p. 94-96.

Robert was not even present on the date the work was performed by VCS, and thus, has

no knowledge of the work performed other than his supposition that all work was performed by

18

Housekeeping staff and not by any third party vendors. A copy of the estimate to the Federal Government shows that BRCS employees were to be billed separately from the work to be performed by VCS for the LaGarde kitchen clean-up. Exh. J at document bates-numbered BRCS-00572. Again, Robert's supposition of wrongdoing does not constitute good faith that D.C. law was violated.

Finally, Robert made some vague allegation during his deposition that he had heard from Ms. Farver that Heffern charged the Federal Government for painting of approximately 10 rooms that were never painted but Robert did not even know if it was VCS or another vendor who invoiced for the alleged painting that was not done. Exh. B at p. 170-174. Heffern testified during his deposition that VCS painted rooms in the Pipes Building and such work was approved by the Federal Government. Exh. A at p. 92-93.

Robert's complaints were based solely on his belief that because BRCS employees performed some of the work, VCS must have been billing for BRCS employees' work rather than work actually performed by VCS. Robert admits that he was not there at all times, and thus, does not have any first-hand knowledge of the work performed by VCS. This type of baseless speculation does not rise to the level of good faith.[9]

    (v)    **Disregarding Lower Bids for Tree Removal Service.**

As a result of a summer storm in 2005, the Federal Government requested that BRCS arrange for the removal of trees and other debris from the Home's property. Due to the urgency of the matter, BRCS solicited bids from third party vendors. They received three bids from

---

[9] With respect to the contention that Donald performed some of the work during regular BRCS work hours that was subsequently invoiced by VCS, Complaint ¶ 11, he testified that he did some of the LaGarde kitchen clean-up, and the clean-up of the floor in the Pipes Building. Exh. C at p. 117-119. But neither Donald nor Robert contend that they were asked to participate in the alleged fraudulent invoicing to the Federal Government. The only alleged "participation" is that Donald performed some of the work as a BRCS employee, which is irrelevant to Plaintiffs' claims of wrongful discharge.

companies in response to BRCS' solicitation.  In conformance with BRCS' internal procedure,

the lowest and highest bids were discarded.  Exh. D at Interrogatory No. 13. The remaining bid,

submitted by A.R. Bryant, was accepted.  Plaintiffs contend that A.R. Bryant is owned by a

friend of Heffern.  Complaint ¶ 12.

Mr. Wessell testified as follows with respect to the tree removal bid:

> Q.    ...With respect to the tree removal bids, are you aware of any Brooks Range
> internal policy that they throw out the highest bid, throw out the lowest bid and then take the
> mean bid?
> A.    No, I'm not familiar with that.
>
> Q.    If they had that policy where they automatically removed the lowest bid, would
> that be [any] kind of issue or problem for the government?
>
> A.    No, it's not a problem with the government because first of all, we are going to do
> our own government estimate.  If the bids they give to us are within the range of the government
> estimate, then we feel it's fair priced, the government.
>
> *       *       *
>
> Q.    The A.R. Bryant Construction bid, do you recall that being within the approved
> government estimate for that project?
>
> A.    Almost every one of them prices on there were within the bid of the government
> estimate.
>
> Q.    It was considered reasonable, correct?
>
> A.    Right.

Exh. E at p. 59-61.

Plaintiffs complain that Heffern disregarded a bid for tree removal that was solicited by

Robert (not Heffern or any one else at BRCS) and was submitted by a friend of Robert's son,

Tim Kaufman, owner of Kaufman Construction.  Exh. B at p. 197-204.  Robert admitted that he

had no involvement in the bid process and has no knowledge of BRCS' process for considering

bids that are submitted for work.  Id. at p. 201-203.  Robert further admitted that he has no

understanding of whether or not BRCS routinely discards the highest and lowest bids when awarding a contract to a third party vendor. Id. at 203.

Therefore, it is undisputed that Heffern and BRCS did not act improperly in awarding the bid to A.R. Bryant Construction and this allegation in the Complaint cannot serve as a basis for a wrongful discharge claim. Again, Robert's lack of knowledge and mere speculation do not support a finding of good faith.

Because Plaintiffs have failed to prove a prima facie case of wrongful discharge, BRCS is entitled to summary judgment as a matter of law.

C.      THERE IS NO EVIDENCE OF PUBLICATION BY DEFENDANT OF THE ALLEGED DEFAMATORY STATEMENTS

A statement is considered defamatory if it tends to "injure [the] plaintiff in his trade, profession, or community standing or lower him in the estimation of the community. Guilford Transp. Indus., Inc. v. Wilner, 760 A.2d 580, 594 (D.C.2000). A claim of defamation requires a showing that "(1) the defendant made a false and defamatory statement concerning the plaintiff; (2) that the *defendant* published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." Beeton v. District of Columbia, 779 A.2d 918, 923 (D.C. 2001) (emphasis added).

Publication by the defendant is a vital element of defamation, because without publication, there can be no showing of injury to standing in the community. See Carter v. Hahn, 821 A.2d 890, 893 (D.C. 2003) (stating that it is necessary to prove publication without privilege to a third party). In Tobin v. John Grotta Co., 886 A.2d 87 (D.C. 2005), the District of Columbia Court of Appeals affirmed a granting of summary judgment to a defendant because the

plaintiff failed to show a factual dispute regarding publication. The court explained that the plaintiff failed to proffer any facts showing defendant published statements to third parties. The four individuals whom the plaintiff alleged to have overheard the statements all denied overhearing them.

Plaintiffs allege that BRCS made defamatory statements about Plaintiffs' theft, poor performance, and absenteeism to "employees of BRCS and the Home". Complaint ¶¶ 36, 47. In Plaintiffs' Answer to Interrogatory No. 7, the only "employee" identified by Plaintiffs to whom defamatory statements were made is Katie Farver. Exh. I at Interrogatory No. 7. Specifically, Plaintiffs allege that Ms. Farver attended the meeting(s) at which Plaintiffs were fired, and thus, "witnessed" the allegations of theft. Id.; Complaint ¶ 19.

Plaintiffs further allege that BRCS "reduced its false accusations to writing and published those accusations to individuals who worked for both the Home and for BRCS." Complaint ¶¶ 39, 50. In Plaintiffs' Interrogatory Answer No. 15, the only writing identified by Plaintiffs is a "fake disciplinary log containing false and defamatory statements" allegedly prepared by Mr. Anastasi, who allegedly "passed it on to other employees of BRCS."[10] Exh. I at Interrogatory No. 15.

The allegation that Ms. Farver witnessed the allegations of theft because she allegedly attended the meetings at which Plaintiffs were terminated is indisputably false. Plaintiffs admit that Ms. Farver was *not* present for the termination meetings contrary to this allegation in the Complaint. See Exh. B at p. 223; Exh.C at p. 101-103. Therefore, this allegation should be entirely disregarded. In fact, Plaintiffs, not BRCS employees, are the ones who informed Ms. Farver that they were terminated because of theft. See copies of relevant portions of Katie

---

[10] Plaintiffs also stated that they reserved the right to supplement this Interrogatory Answer "as discovery progresses" but they did not.

Farver's Deposition Transcript attached as **Exhibit K** hereto at p. 48-60[11]. To the extent Plaintiffs claim that Ms. Farver "overheard" the alleged defamatory statements, this too is denied by Ms. Farver. Id. Accordingly, there was no publication to a third party; Plaintiffs published the alleged derogatory statement themselves. Interestingly, at their depositions, Robert and Donald both testified that they are not aware of anyone to whom such statements were made and believe the allegation in the Complaint merely refers to the statements made by Mr. Anastasi to the Plaintiffs during the termination meetings. See Exh. B at 233-234; Exh. C at p. 154-156.

Nor are Plaintiffs able to identify a single person to whom BRCS allegedly showed the disciplinary logs. See Exh.B at 241-242; Exh. I at Interrogatory Answer No. 15. Thus, Plaintiffs cannot prove publication with respect to this allegation either. As such, Defendant is entitled to summary judgment on Plaintiffs' defamation claims in their entirety.

## IV.   CONCLUSION

As set forth above, Plaintiffs have not made the requisite showings to justify a trial on the merits of Plaintiffs' claims. BRCS should not be required to undergo the expenses associated with trial where Plaintiffs' claims are unsupported by any credible evidence and are based merely on Plaintiffs' speculation of wrongdoing. Therefore, Defendant respectfully requests that summary judgment be entered in its favor, and for such other and further relief that this Court deems proper.

---

[11] Note that there is a typo on p. 60 of the transcript – "either" should read "neither".

Respectfully submitted,


_____/s/_____

Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia   22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June 2008, a true copy of the foregoing

document was sent via e-filing, to:

>Timothy P. Leahy, Esq.
>14300 Gallant Fox Lane, Suite 120
>Bowie, Maryland 20715
>Counsel for Plaintiffs

_____/s/_____
Karen A. Doner

1594316v1

1            IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF COLUMBIA

2

3 ROBERT KRAKAT, et al.,     )

                           )

4         Plaintiffs,     )

                           )

5         -vs-          )  CASE NO. 1:07-cv-00693-

6 BROOKS RANGE CONTRACT    )

 RCL SERVICES, INC.,      )

7                            )

8        Defendant.      )

9

10                  Thursday, November 29, 2007

                 Bowie, Maryland

11

12 Deposition of

13         KEVIN MARK HEFFERN, SR.

14 called for examination by counsel for the

15 Plaintiff, pursuant to notice, held at the

16 offices of Byrd & Byrd, LLC, 14300 Gallant Fox

17 Lane, Suite 120, Bowie, Maryland 20715,

18

19 beginning at 10:08 a.m., before Bonnie Marcus

20 Olachea, a notary public in and for the District

21 of Columbia, when were present on behalf of the

22

23 respective parties:

24

25

EXHIBIT

A

COPY

1       Donny would call Katie.  Katie would call Donny.

2  It just got out of hand at times. Not all the time, but there

3  was definitely specific instances where it was.

4       Q.   Well, did you counsel either Donny or Katie with

5  regard to their relationship?

6       A.   I spoke to Katie probably on two or three

7  occasions.

8       Q.   And how about Donald, did you speak to him?

9       A.   Probably on two or three occasions.

10      Q.   And did you document this as a counseling session?

11      A.   No, I did not.

12      Q.   Did you document these conversations in any way?

13      A.   No, I did not.

14      Q.   Is it fair to say that during this time period your

15 relationship with Donna Sutherland was also a distraction at

16 Brooks Range?

17           MS. DONER:  Objection to form.

18           THE WITNESS:  I would not say it was a distraction

19 to working at Brooks Range.

20      Q.   How did your relationship with Donna Sutherland

21 affect your work at Brooks Range?

22           MS. DONER:  Objection to form.

23           THE WITNESS:  I don't think it was affected.

24           BY MR. LEAHY:

25      Q.   What is your interest in Virginia Contracting

1  Services?

2      A.   Zero.

3      Q.   You're not a director?

4      A.   No.

5      Q.   You're not an agent?

6      A.   No.

7      Q.   You don't own any percentage of it?

8      A.   I own no percentage of it.

9      Q.   Was that true at -- at any point in time did you

10 ever have any interest in Virginia Contracting Service or any

11 official position with Virginia Contracting Service?

12     A.   I've never had an interest and I don't recall any

13 official position ever.

14     Q.   You don't recall an official position there.  What

15 did you do for Virginia Contracting Services?

16     A.   Nothing that I can recall.

17     Q.   You heard Robert Krakat's testimony this week about

18 observing you and Mrs. -- Sutherland?

19     A.   Sutherland, yes.

20     Q.   -- working on a roof.  Does that refresh your

21 recollection as to whether you've done any work for Virginia

22 Contracting Services?

23     A.   I did help Donna do the roof.

24     Q.   Did you ever help Virginia Contracting Services do

25 any other work?

1    A.    I helped her with the Leguard (phonetic) kitchen.

2    Q.    What was done at the Leguard kitchen?

3    A.    Shop VAC, power wash.  That's about it.

4    Q.    Other than those two instances did you ever do

5    anything for Virginia Contracting Services?

6         MS. DONER:  When you say do anything do you mean

7    perform work?

8         MR. LEAHY:  No, do anything.

9         MS. DONER:  I'm not sure I understand the question

10   then.

11        BY MR. LEAHY:

12   Q.    Did you ever do anything else that was to the

13   benefit of Virginia Contracting Services?

14        MS. DONER:  Objection to form.

15        THE WITNESS:  Those were the two times I recall

16   physically performing work for Virginia Contracting Services.

17        BY MR. LEAHY:

18   Q.    How did Virginia Contracting Services come to

19   perform work at the Armed Forces Retirement Home?

20   A.    I called Donna.

21   Q.    When did you first call Donna with regard to

22   Virginia Contracting Services doing work at the home?

23   A.    Probably around September of '05.

24   Q.    And why is that?

25   A.    Because I knew that she had her own company or

1          CERTIFICATE OF NOTARY PUBLIC

2    I, BONNIE MARCUS OLACHEA, the officer before whom the

3    foregoing deposition was taken, do hereby testify that the

4    witness whose testimony appears in the foregoing deposition

5    was duly sworn by me; that the testimony of said witness

6    taken by me stenographically and thereafter reduced to

7    typewriting under my direction; that said deposition is a

8    true record of the testimony given by said witness; that I

9    am neither counsel for, related to, nor employed by any of

10    the parties to the action in which this deposition was

11    taken; and further, that I am not a relative or employee of

12    any attorney or counsel employed by the parties hereto nor

13    financially or otherwise interested in the outcome of the

14    action.

15

16    *Bonnie Marcus Olachea*
           BONNIE MARCUS OLACHEA

17

18    Notary Public in and for

19    the State of Maryland

20

21    My Commission expires: June 14, 2006

22

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
---------------------------------x
ROBERT KRAKAT, et al.,            :
        Plaintiffs,               :
    v.                            :  CASE NO.: 1:07-cv-00693
BROOKS RANGE CONTRACT RCL         :  Vol. II
SERVICES, INC.,                   :
        Defendant.                :
---------------------------------x
```

January 22, 2008

Bowie, Maryland

CONTINUED DEPOSITION OF:

KEVIN MARK HEFFERN, SR.,

called for oral examination by counsel for the Plaintiffs,

at 14300 Gallant Fox Lane, Suite 120, Bowie, Maryland,

beginning at 10:00 a.m., Tuesday, January 22, 2008, before

Lohna Esteb, Reporter and Notary Public, when were

present:

*Deposition Services, Inc.*

6245 Executive Boulevard

Rockville, MD 20852

Tel: (301) 881-3344 Fax: (301) 881-3338

info@DepositionServices.com  www.DepositionServices.com

COPY



1    Q.    Let me ask you about some of the allegations made

2    in the complaint.

3        Did you have any discussions with Katie Farver

4    regarding what she believed to be wrongdoing on your part?

5    A.    No.

6    Q.    Did she ever have any discussions with you

7    regarding Virginia Contracting Services?

8    A.    No.

9    Q.    Paragraph 8 of the complaint talks about the

10    government being charged $500 each for air-conditioning

11    units which cost Brooks Range $200.

12        Do you know anything about that  allegation?

13        MS. DONER:  Objection to form.  Do you want to

14    show him?

15        MR. LEAHY:  Oh, sure.  I didn't make a copy.  I

16    can certainly show you.

17        BY MR. LEAHY:

18    Q.    It's Paragraph 8 of the complaint.

19    A.    Yeah, I know about that situation.

20    Q.    What can you tell me about that situation?

21    A.    Hurricane Katrina devastated Gulf Port,

22    Mississippi.  Armed Forces Retirement Home has a home in

1    Washington D.C. and had a home, still owns a property in

2    Gulf Port, Mississippi.

3            Because of the storm, the hurricane, they had to

4    relocate 4 or 500 residents out of Gulf Port to Washington

5    D.C.

6            The government approached Brooks Range initially

7    by way of conference call to myself and Chuck Quinlan of

8    the urgent requirement to get accommodations made for these

9    incoming residents.

10           With regards to the air-conditioning units, I

11   believe the government asked for us to  purchase 50 window

12   air-conditioning units, 9000 BTUs, and install them in

13   various locations in the Pipes Building.

14       Q.   And did Brooks Range purchase those 50 air-

15   conditioning units?

16       A.   Yes.

17       Q.   Do you know how much Brooks Range purchased those

18   units for?

19       A.   The actual cost was $345 a unit from Granger.

20       Q.   And do you how much the government was charged

21   for those units?

22       A.   I want to say it was $500 per unit.  No, I think

1    it was $465 per unit.

2        Q.    What do you know about Brooks Range being allowed

3    a 12 percent markup to the government?

4        A.    With regards -- I would like to clarify that the

5    facilities maintenance contract that Brooks Range has and

6    had at the time is a performance-based contract.  It's not

7    a repair contract.  It's not a construction contract.  It's

8    a performance-based maintenance contract.

9            So the reference to the 12 percent allowable

10   markup is in reference to, for example, a pump that breaks

11   relating to a preventative maintenance work order.

12           We have a broken pump.  Brooks Range will propose

13   to the government to replace that pump and the markup that

14   we are allowed on our contract for the facilities

15   maintenance contract is 12 percent on that item.

16           What I think needs to be understood here is the

17   Hurricane Katrina urgent relief, I'll call it, was not part

18   of any original contract where Brooks Range was forced or

19   agreed to charge a fixed rate of 12 percent.

20           From what I understand, the allowable markup --

21   the GSA markup that Brooks Range has posted on the GSA

22   website is anywhere from 17 to 19 percent.  And that markup

81

1   does not include direct cost of labor, direct cost of

2   material.  That's Brooks Range's markup on what I

3   understand to be the corporate overhead, the corporate

4   technical support.

5           That does not encompass the, what I'll call,

6   direct cost associated with any specific contract over and

7   above the base contract.

8           For all intents and purposes, anything relating

9   to the Pipes Building, we call it over and above, it's

10  outside of our base contract.  It is a negotiated

11  procurement in some cases.  We are not bound to the terms

12  and conditions of our facilities maintenance contract when

13  it comes to changes in the -- changes, period.

14      Q.   So your understanding with respect to the air-

15  conditioners was that Brooks Range was not limited to a 12

16  percent markup on the air-conditioners?

17      A.   They were not limited in any shape, way or form

18  to 12 percent markup on those air-conditioners.

19      Q.   Do you know what the markup was on those air-

20  conditioners?

21      A.   I'm not sure what the markup was, but I want to

22  say that I recall the overall cost per unit included

1    uncrating -- first of all, it included receipt of the

2    delivery from Granger, taking them off the truck, 50 units.

3    It included taking the  unit to whatever room they wanted

4    the unit installed in.

5         And I think it even included putting the air-

6    conditioner in the window and plugging it in. So I think

7    that overall 465, $500 per unit also included a couple

8    other things besides just the unit itself.

9         Q.   Do you know if Brooks Range charged a markup on

10   the cost of the unit and then added a labor expense?

11        A.   There may have been an added labor expense; but,

12   the way Brooks Range does business, did business then, does

13   business now, is Brooks Range will not charge overhead and

14   profit on a unit labor rate.

15        So if there's labor on an estimate for the air-

16   conditioners, there won't be any overhead and profit

17   associated with the labor because our labor -- our hourly

18   rate includes the overhead and markup.

19        Q.   Do you know if there was a markup charged

20   specific just to the cost of the units?

21        A.   The markup could have been 12 percent.  It could

22   have been 15 percent.  If -- if Brooks Range proposed $460

92

1    him about his knowledge; but, if you're not going to show

2    him the documents to refer to, then that's, I guess, your

3    prerogative but you should have them.

4             THE WITNESS:  I cannot recall a specific document

5    from the government other than acknowledgment of the

6    various estimates and proposals that granted approval.

7             BY MR. LEAHY:

8        Q.   My confusion is you say the government is

9    acknowledging receipt of the proposal.

10       A.   And approved the proposal.

11       Q.   Okay.

12       A.   But there's no other notice to proceed or

13   separate contract modification -- actually, I take that

14   back.  The answer is yes.

15            Brooks Range would get contract modifications

16   that went directly to either Ed Nalin (phonetically) or

17   Chuck Quinlan, maybe even Pete Peterson at the corporate

18   level.

19            So, yes, when these estimates were  approved, the

20   government would issue a contract modification.  And that

21   was the -- that was the notice to proceed, if you will.

22       Q.   So your understanding is the government approved

1    work related to Hurricane Katrina by sending to Brooks

2    Range a contract modification?

3        A.    Yes.

4        Q.    And your understanding is the work for the paint

5    rooms in Pipe Building was approved by the government --

6        A.    Absolutely.

7        Q.    -- in a contract modification sent to Brooks

8    Range?

9        A.    Yes.

10       Q.    Do you know if any Brooks Range employees were

11   involved in painting the rooms in the Pipes Building?

12       A.    Brooks Range employees were not painting any

13   rooms in the Pipes Building.  Brooks Range employees were

14   painting rooms in the Scott Building and Sheridan Building.

15       Q.    Virginia Contracting Services painted  rooms in

16   the Pipes Building?

17       A.    Yes.

18       Q.    Did they employ any individuals who also worked

19   for Brooks Range?

20       A.    No.

21       Q.    You heard the deposition testimony of Katie

22   Farver yesterday with regard to cleaning up the LaGarde

94

1    kitchen area?

2        A.    Yes.

3        Q.    She testified that Brooks Range employees did the

4    cleanup of the LaGarde kitchen.   Do you recall that

5    testimony?

6        A.    Yes, I do.

7        Q.    On Page 559 of this exhibit, there's an invoice

8    from Virginia Contracting Services indicating that it would

9    provide cleanup of the LaGarde kitchen area.

10             Did Virginia Contracting Services, in fact,

11   provide cleanup of the LaGarde kitchen area?

12       A.    Yes.

13       Q.    Did employees of Brooks Range also provide

14   cleanup of the LaGarde kitchen area?

15       A.    Yes.

16       Q.    So both Brooks Range and Virginia Contracting

17   Services were both involved in the cleanup of the LaGarde

18   kitchen area?

19       A.    Yes.

20       Q.    Did Virginia Contracting Services employ any

21   individuals who were also employed by Brooks Range to do

22   this work?

1    A.   No.

2    Q.   Can you tell me why both Brooks Range and

3   Virginia Contracting Services were involved in the cleanup

4   of the LaGarde kitchen area?

5    A.   Yes.  Again, similar to the painting, this was an

6   estimate that was generated.  At the time, I believe

7   there's probably two to three weeks of ongoing issues in

8   the LaGarde kitchen area.

9         The Brooks Range estimate included this amount,

10  1750, for this work.  It included labor hours for Brooks

11  Range employees that were doing work.  It included hours

12  for Magnolia Plumbing to come in and snake and jet lines

13  both during what I'll call standard hours and at night,

14  non-standard  hours.  I want to say over this period of

15  time, Magnolia came in on three different occasions.

16        So it was a culmination of outside vendors,

17  Brooks Range employees getting this work completed; again,

18  approved by the government.

19    Q.   It's your testimony that the government approved

20  Virginia Contracting Services to provide additional help

21  for cleaning up the LaGarde kitchen area?

22    A.   Yes.

96

1      Q.    Was there competitive bids to clean up the

2  LaGarde kitchen area?

3      A.    No.

4      Q.    Were there competitive bids for the painting in

5  the pipes room?

6      A.    Yes.

7      Q.    What competitive bids were for the painting?

8      A.    There were three bidders for the painting. I want

9  to say the range of price was anywhere from $850 per room

10 to $1,300 per room.

11     Q.    Do you know who those other companies that  bid

12 on the painting were?

13     A.    One was Mullally Construction.   The other was A.

14 R. Bryant.

15     Q.    Your testimony is Mullally Construction, A. R.

16 Bryant and Virginia Contracting Services bid on the

17 painting in the pipes room?

18     A.    Yes.

19     Q.    Looking at Page 561 of this document, "Pipes

20 Building Canopy Repair," you recall Katie Farver's

21 deposition testimony that this work was performed by Brooks

22 Range employees?

1      A.    Yes.

2      Q.    Were Brooks Range employees involved in this

3  work?

4      A.    Similarly to the last one, yes, there was an

5  estimate given by Brooks Range to the government. I want to

6  say there were 12 manhours for a general maintenance worker

7  to mop the floor underneath and to get all the leaves off

8  the roof.

9            And then there was another line item for Virginia

10 Contracting Services.  So there was, again, a combination

11 of Brooks Range employee and a vendor  service to

12 accomplish this task.

13     Q.    Did Virginia Contracting Services employ any

14 individuals employed by Brooks Range to perform this work?

15     A.    No.

16     Q.    Is it your understanding the government approved

17 this and sent a contract modification to Brooks Range?

18     A.    Yes.

19     Q.    Was there competitive bidding for this work?

20     A.    No, there was not.

21     Q.    What can you tell me about Document 563, an

22 October 24th invoice for cleaning up the ground floor areas

1          **CERTIFICATE OF NOTARY PUBLIC**

2          I, LOHNA ESTEB, the officer before whom the foregoing

3     deposition was taken, do hereby certify that the witness

4     whose testimony appears in the foregoing deposition was duly

5     sworn by me; that the testimony of said witness was taken by

6     me in stenotypy and thereafter reduced to typewriting under

7     my direction; that said deposition is a true record of the

8     testimony given by said witness; that I am neither counsel

9     for, related to, nor employed by and of the parties to the

10    action in which this deposition was taken; and, further,

11    that I am not a relative or employee of any counsel or

12    attorney employed by the parties hereto, nor financially or

13    otherwise interested in the outcome of this action.

14

15

16

17          LOHNA ESTEB
            Notary Public in and for the
18          State of Maryland

19
      My commission expires: 3/1/08
20

21

22

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT and DONALD          )

KRAKAT,                           )

                Plaintiffs,    )    CASE NO:

        -vs-                    )    1:07-CV-00693-RCL

BROOKS RANGE CONTRACT SERVICES,   )

INC.,                             )

              Defendant.     )

Wednesday, November 28, 2007

McLean, Virginia

Deposition of

      ROBERT   KRAKAT

called for examination by counsel for the

Defendant, pursuant to notice, held at the offices

of Williams Mullen, 8270 Greensboro Drive, McLean,

Virginia beginning at 10: A.M., before Sandy

Mefford Nelson, a notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

EXHIBIT

b

1 him because the home paid for the other air

2 conditioners.  They ordered the ones with the heat

3 pump, but the home refused to have them ordered.

4 They paid for it.

5    Q.   Did you say that you had asked them not

6 to buy those air conditioners?

7    A.   I suggested them to buy air conditioners

8 with heat pumps in it because it was coming on

9 winter.

10    Q.   And so, it's your understanding that the

11 air conditioners that Mr. Heffern had ordered were

12 not with heat pumps?

13    A.   Yes, ma'am.

14    Q.   Okay.  And so, other than being contrary

15 to what you had suggested, what about the

16 statement by Mr. Wessel was suspicious to you of

17 some kind of wrong-doing?

18    A.   Because the air conditioners they

19 ordered, you could buy them all day long for $100.

20 And, when he mentioned $500 for those air

21 conditioners, I knew something was going on.

22    Q.   And what is it that you think was going

1 on?

2    A.    I was thinking he was doing, you know,

3 something underhanded or something or overcharging

4 the government.  I just didn't mention to it to

5 nobody.  This was just my opinion, what I thought.

6    Q.    And you said that you can buy air

7 conditioners for $100 per unit?

8    A.    Sure.

9    Q.    Do you know if the air conditioners that

10 were ordered by Mr. Heffern could be bought for

11 $100 a unit?

12    A.    Yes, ma'am.

13    Q.    Those particular air conditioners?

14    A.    Yes, ma'am.

15    Q.    What kind were they?

16    A.    I couldn't remember what the name of them

17 were right now.

18    Q.    What do you remember about them?

19    A.    That they were cheap-looking.

20    Q.    And is it based upon the fact that they

21 were cheap-looking that you contend that they

22 could be bought by $100?

1    A.   Yes, ma'am.

2    Q.   Or for $100, rather?

3    A.   Yes, ma'am.

4    Q.   Did you, yourself, see the invoices for

5 the air conditioners?

6    A.   No, ma'am.

7    Q.   Okay.  Do you know if anyone else saw

8 them?

9    A.   Not to my knowledge.  I don't know.

10    Q.   So, other than Jerry Wessel's statement

11 $500 for these air conditioners question mark, you

12 have no knowledge or understanding personally or

13 through other people as to what specifically the

14 government was charged --

15    A.   No.

16    Q.   -- and -- what the unit price was?

17    A.   No.

18    Q.   All right.  And you don't know if there

19 were any labor or material costs included in the

20 price charged to the government, do you?

21    A.   No.

22    Q.   Okay.  Was there any other basis for your

Page 129

1 call to Mr. Starr regarding Mr. Heffern?

2        Or was it just about the air conditioning

3 units?

4    A.   Well, basically on that and there was one

5 other time that I called that Kevin refused to

6 have me write up, was Bill Jenkins and his son for

7 leaving the job with flooded -- with the building

8 flooded.  And it was dead winter.

9    Q.   And you talked to Mr. Starr about that?

10    A.   Yes, because I told him -- I said, Kevin

11 told me not to write him up.  And he said, well,

12 you should have.

13    Q.   Was that the same conversation you had

14 with Mr. Starr in or around 2005 about the air

15 conditioning units?

16    A.   It was about the same day, yeah.  Around

17 the same time.

18    Q.   Were they two different conversations?

19    A.   Yeah.  I talked to Tom Starr three or

20 four times about it.

21    Q.   About Mr. Heffern?

22    A.   Yes, ma'am.

Page 130

1    Q.    Okay.  Do you think that the conversation

2 about not writing Mr. Jenkins and his son up for

3 leaving the building when the building was

4 flooded -- was that conversation before or after

5 your conversation with Mr. Starr?

6    A.    Before.

7    Q.    Okay.  Let me just finish the question

8 and make sure you understand.

9          Before or after your conversation with

10 Mr. Starr regarding the air conditioning units?

11    A.    It was before.

12    Q.    It was before, okay.

13          But you think it was also in December

14 2005?

15    A.    I think it was.

16    Q.    And you think it was probably the same

17 day?

18    A.    Yes.

19    Q.    And so, you called him back later that

20 day to talk about the air conditioning units; is

21 that correct?

22    A.    I talked to him the same day, the same

1  time when I had him on the phone.

2    Q.    It was the same conversation?

3    A.    I said something about Mr. Jenkins and

4  his son, and then we went from that.  And I told

5  him about the air conditioning and some of the

6  stuff that Kevin was doing around there, and they

7  said they already knew about it.

8    Q.    Okay.  So, it was the same telephone

9  conversation --

10   A.    Same, same.

11   Q.    -- right?

12   A.    Yeah.

13   Q.    Okay.  And, when you spoke to him about

14 -- you used the word shady or underhanded deals

15 referring to Mr. Heffern.

16         Did you specifically tell him about the

17 air conditioning units?

18   A.    Yeah.  I said something to him about it.

19   Q.    Do you recall what you said to him?

20   A.    That I think Kevin's overcharged the home

21 for them air conditioners.

22   Q.    Did you discuss with him what you thought

1 they cost?

2    A.   No.

3    Q.   And what Kevin was charging?

4    A.   No.

5    Q.   Okay.  And do you have any involvement at

6 all in the financial arrangements or agreements

7 between the government and Brooks Range?

8    A.   No.

9    Q.   So, you don't have an understanding, do

10 you, of the deal that has been struck between the

11 government and Brooks Range regarding how much can

12 be charged for various work done, do you?

13    A.   Yes.

14    Q.   You do have knowledge?

15    A.   Yes.

16    Q.   What is your knowledge about that?

17    A.   It's 12 percent above cost.  They're only

18 allowed to charge the home 12 percent.

19    Q.   How do you know that?

20    A.   Well, I had papers on all that where it

21 states where they're only allowed to charge 12

22 percent above the cost.

1    Q.    You have papers?

2    A.    I've seen the papers on it from up on the

3 Hill.

4    Q.    Okay.

5    A.    See, the other thing, too -- they always

6 believed in what I had to say, and they believed

7 me about it because I've been there for 30 years.

8 So, they wanted me to be there to work there

9 because I knew the place inside and out.

10         And I knew what was going wrong with that

11 place, and I knew what was wrong and I knew what

12 needed to be fixed.  And I knew certain prices on

13 different things and some of the people up there

14 showed me the prices on some of that stuff on

15 there.  They're only allowed to charge 12 percent

16 on anything that Brooks Range was supposed to

17 charge.

18    Q.    Okay.  When did you see the paper or when

19 did you learn that there was only supposed to be a

20 12 percent markup?

21    A.    It was before even the air conditioners

22 were ordered.  I seen all that.  They showed it to

Page 134

1  me.

2     Q.    Okay.  You'd seen that before you heard

3  about this from Jerry Wessel regarding the air

4  conditioners, right?

5     A.    Right.

6     Q.    Okay.  And what exactly did you see?

7     A.    Just where it says that they are allowed

8  to charge 12 percent markup for anything that is

9  bought through Brooks Range.

10    Q.    Okay.

11    A.    They was allowed to charge 12 percent for

12 the home for markup, or however they want to put

13 that.

14    Q.    Okay.  What document were you looking at?

15    A.    Basically, I was looking at the contract.

16    Q.    Okay.  How thick was the contract?

17    A.    Like that.

18    Q.    About a foot?

19    A.    I don't know.  It was thick.

20    Q.    Okay.  Did you read through the entire

21 contract?

22    A.    No, no, I didn't.

1    Q.    Okay.  Who showed you the provision that

2 said the 12 percent markup?

3    A.    It was Jerry.

4    Q.    Jerry showed that to you?

5    A.    Yes.

6    Q.    And why was he showing that to you?

7    A.    Because he was showing me the prices on

8 some of the things that they can only allow 12

9 percent.

10    Q.    And this was prior to you learning about

11 the air conditioning units?

12    A.    Right.  And they've already stated --

13 even Mr. Baker said we're only allowed to charge

14 12 percent -- or Mr. Baxter or Mr. Baker or

15 whatever.

16    Q.    But you don't know whether that's in

17 addition to labor and additional materials that

18 might need to be supplied, do you?

19    A.    No.

20    Q.    You don't know.

21         All you know is the 12 percent markup

22 limitation, right?

Page 136

1    A.    Right.

2    Q.    Okay.  It's just your suspicion that

3 there's something wrong with charging $500 for an

4 air conditioning unit that looked cheap-looking,

5 correct?

6    A.    Not only looked cheap, but, like I said,

7 I can go out and buy them same kind for $100, or a

8 little more than $100.

9    Q.    But, sitting here today, you can't tell

10 me which air conditioners they were?

11    A.    Not the name of them, no.  I think they

12 were GEs.  I'm not positive.

13    Q.    Okay.  But how are you, then, so positive

14 that you can go out and buy the same units for

15 $100 apiece?

16    A.    Because I've been dealing with this my

17 whole life, and I know people that's in the

18 business that sells them.  I've changed many an

19 air conditioner in my life.

20    Q.    Did you discuss the issue of the air

21 conditioning units with anyone else other than Tom

22 Starr?

1 Starr?

2    A.    Well, I didn't mention anything that was

3 going on, but I just mentioned there was some

4 stuff going on with Kevin that he shouldn't be

5 doing.  That's all I said to him.  And he said

6 that he was -- that Brooks Range already knew

7 about it and they were checking in on it.

8    Q.    Did you -- I'm sorry.  Go ahead.

9    A.    And that's all that was said.

10    Q.    Did you specifically mention Virginia

11 Contracting Services?

12    A.    Yes.  I told them -- I said something

13 about Virginia Contracting Services.  He says he

14 already knows about it.  They already know about

15 it.

16    Q.    And he told you they were looking into

17 it?

18    A.    Yes.

19    Q.    Did you tell him anything about it?

20    A.    No.

21    Q.    How did you come to learn about the work

22 that Virginia Contracting Services was doing?

1    A.   Well, for one thing, I came in on a

2 Saturday.  I was called in, which I was called in

3 constantly because the guys that worked there

4 didn't want to come in, didn't want to work.  So,

5 to make the company look good, I'd come in myself

6 and took care of a lot of the stuff.

7          And, when I came in, I seen him and his

8 girlfriend up on the roof of the canopy between

9 the Pipes and the Barnes Building repairing the

10 roof.  And I looked and I said, something's going

11 on here.  I says, why is he -- him and her up on

12 that roof.

13          And then I knew right then and there that

14 there was other stuff going on, too.  He charged

15 -- the Virginia Contracting Services charged

16 Brooks Range for stuff that Brooks Range did

17 themselves.  He had a man go up there and clean

18 that roof, and he charged them for cleaning and

19 sealing the roof.

20    Q.   Who did he have clean?

21    A.   Steve Spensler went up there and swept

22 and scraped and cleaned it on Brooks and Range's

1 time.  And I asked Steve, who told you to do that.

2 And he said Kevin.  I said okay.  That's all I

3 said to him.

4    Q.    And is it your contention that Virginia

5 Contracting Services then billed Brooks Range for

6 Mr. Spensler's work?

7    A.    Yes, yes, ma'am.

8    Q.    How do you know that?

9    A.    Because I've got papers on it.

10    Q.    Do you have them with you?

11    A.    No, I don't.

12    Q.    If you'll look at Exhibit 5 from Donald

13 Krakat's deposition please.

14         (Witness examined document.)

15 BY MS. DONER:

16    Q.    Tell me if the invoice you're referring

17 to is in Exhibit 5.

18    A.    This ain't it -- or is it?  This is it

19 right here.

20    Q.    Just keep that together for me.

21    A.    Okay.

22    Q.    Just tell me, is it the last page?

Page 145

1    A.    Yes, ma'am, the last page.

2    Q.    Okay.  So, it's the invoice dated

3 December 10th, 2005 on Virginia Contracting

4 Services' letterhead; is that right?

5    A.    Yes, ma'am.

6    Q.    Okay.  And the description -- well, let

7 me ask you, what about that description suggests

8 to you that Virginia Contracting Services was

9 charging Brooks Range for Mr. Spensler's work?

10    A.    What was that again?

11    Q.    What about the description on this

12 November 10th invoice suggests to you that

13 Virginia Contracting Services was charging Brooks

14 Range for Mr. Spensler's work on the roof?

15    A.    Yeah.  He charged them for the work that

16 Brooks Range -- Steve Spensler did, but Brooks

17 Range still paid Steve Spensler for the day's

18 work.

19    Q.    Okay.

20    A.    And now he probably added that into it.

21    Q.    Okay.

22    A.    He probably stated that he cleaned it up,

1 Kevin himself cleaned it.  But it was Steve

2 Spensler because, when I came in, I seen Steve up

3 there cleaning it myself.  And I asked him what he

4 was doing.  He said, Kevin told me to come up here

5 and clean it.

6     Q.   Okay.  Were you there the entire time?

7     A.   For what?

8     Q.   Were you there the entire day, that day

9 you're referring to?

10    A.   No.  I came in -- when I had to come in,

11 I seen Kevin and his girlfriend up there on the

12 roof putting tar down.  Now, I was in, and then.

13 I had to leave.  I left.

14    Q.   Okay.  How long were you there?

15    A.   I was there about two or three hours.

16    Q.   Did you ask Mr. Spensler whether Kevin or

17 Donna Sutherland were cleaning?

18    A.   Did I ask Steve?

19    Q.   Yes.

20    A.   No, because I didn't have to because

21 Steve did it on the weekday.

22    Q.   I thought you said -- did you see Mr.

1 Spensler cleaning the roof when you were there on

2 the weekend?

3    A.    No.  It was during the week.

4    Q.    Okay.

5    A.    And I asked him why come.

6    Q.    Okay.  So, you saw him during the week,

7 but then on the weekend -- was this a Saturday?

8    A.    This was a Saturday.

9    Q.    Okay.  You saw Donna and Kevin up there

10 putting tar down, right?

11    A.    Right.

12    Q.    Okay.  You were only there for two or

13 three hours, right?

14    A.    Right.

15    Q.    Okay.  So, you don't know what else they

16 did other than put tar down, do you?

17    A.    No.

18    Q.    Okay.  Are you a hundred percent sure

19 that they did not do any cleaning on the roof?

20    A.    Well, if they did, it wasn't a whole lot

21 because he had my man -- one of my men up there

22 doing it on the weekday.

Page 148

1    Q.    Okay.  You're referring to Mr. Spensler?

2    A.    Mr. Spensler.

3    Q.    Okay.  And, other than this incident on

4  that Saturday with the roof, was there -- did you

5  have knowledge or information about any other

6  alleged misconduct or wrong-doing by Mr. Heffern

7  which was the cause of you calling Mr. Starr --

8    A.    There was a lot of them.  There was one

9  or two more of them I've seen.  For instance, next

10 to the last page, provide cleanup of ground floor

11 area that was affected by sewage link in Pipes

12 Building.  Remove waste water and floor.

13         Now, the plumbers -- and refers to Brian

14 and John and I guess Chris Jenkins should have

15 been in there.  They cleaned all that up because,

16 once they fixed that line, they couldn't leave it.

17 They had to clean it.  Excuse me.  They had to

18 clean it up.  I told them they had to clean it up.

19 They cleaned it up afterwards, and they got -- he

20 charged them $1,000 for going in there and

21 cleaning it, which he never did.

22    Q.    Okay.  Is that something -- and put the

1 exhibit down for the second.

2          Is that something you were aware of when

3 you called Mr. Starr to complain about Virginia

4 Contracting Services?

5     A.    I was aware of this, yes.

6     Q.    You were aware of it?

7     A.    Yes.

8     Q.    Okay.  So, in addition to the invoice

9 regarding the roof repair, you were aware of this

10 October 24th, 2005 invoice regarding the cleanup

11 of the Pipes; is that correct?

12    A.    Yes, ma'am.

13    Q.    Okay.  And I'm sorry.  I may have

14 interrupted you before.

15          Tell me what knowledge or information you

16 had about the cleanup of the Pipes Building.

17    A.    I don't have any knowledge of him

18 cleaning it up because I really didn't pay no

19 attention until I seen this because I told the

20 guys to go up there and clean it up because you

21 can't leave that stuff laying around the hospital.

22 It had to be cleaned up directly.

Page 150

1    Q.    Okay.  So, your knowledge about this

2 incident is that you had told Brooks Range

3 employees to clean this up?

4    A.    Right.

5    Q.    Right.  And you have no knowledge of any

6 work that Virginia Contracting Services did,

7 correct?

8    A.    Nope, none.

9    Q.    And when did you first see this invoice?

10    A.    Oh, I had to go in on a weekend.  I had a

11 sewer problem.  I needed a plumbing company.  We

12 were using Magnolia Plumbing, and I didn't have

13 the phone number because we just started over

14 there.  We just started with Magnolia Plumbing.  I

15 went through -- in the files to get the numbers.

16        And I seen this and I seen -- what really

17 brought my attention to Donna Sutherland, his

18 girlfriend -- and I said, what is this.  And I

19 looked at it and I feared that I was going to get

20 in trouble.  I made copies of these to keep me

21 from getting in trouble, so I wouldn't get in

22 trouble.

1 question.

2          Were you aware of all three invoices when

3 you called Mr. Starr?

4     A.    Yes.

5     Q.    Okay.  And you have no idea when it was

6 that you discovered these?

7     A.    No.  I couldn't remember the date, but I

8 know it was a Saturday or Sunday afternoon.

9     Q.    And what were you trying to find Magnolia

10 Plumbing's number for?

11    A.    Because I had a sewage problem over

12 there, mainline backup, and I had to call them in.

13    Q.    And where was the problem?

14    A.    It was in the -- I believe it was in the

15 Scott Building.  I can't be positive on that.

16    Q.    Okay.  Was there anything else that you

17 were aware of or reported to Mr. Starr during that

18 conversation regarding Virginia Contracting

19 Services?

20    A.    Just these three things here.  Told him

21 about the cleanup for the Pipes -- the LaGuard

22 building.

1    Q.    Okay, yeah.  Let me ask you about that.

2          What was your knowledge or information

3 about that work?

4    A.    The work was performed was done by Brooks

5 and Range.  Like Donny stated yesterday, he

6 vacuumed the water all up and everything.  And I

7 had turned around and went and asked housekeeping

8 to clean it up.  And there's a bill here for

9 cleanup for 1750, which I know he didn't clean up

10 because it was already cleaned up by the

11 housekeeping because in a hospital you can't leave

12 that stuff laying around.  It has to be cleaned up

13 immediately.

14   Q.    And who did you ask in housekeeping?

15   A.    The foreman of housekeeping.

16   Q.    Who is that?

17   A.    I don't know her name.  There was new

18 people over there all day every day, but I went to

19 head housekeeping and asked if they could clean

20 that up and they said they'd get right on it, and

21 they took care of it right away.

22   Q.    Did Magnolia Plumbing do any cleanup --

Page 157

1    A.    They came in and pumped out the grease

2 pits.

3    Q.    Is that all they did, to your knowledge?

4    A.    Grease pits and the injector pit.

5    Q.    Could there have been -- strike that.

6         Is it possible that there was more than

7 one occasion when the LaGuard kitchen floor drains

8 backed up?

9         MR. LEAHY:  Objection.

10        THE WITNESS:  Them floor drains back up

11 all the time, maybe two or three times a day.

12 BY MS. DONER:

13   Q.   How is it then that you were so sure that

14 this October 5th, 2005 Virginia Contracting

15 Services invoice was reflecting work that you had

16 assigned to housekeeping and not some separate

17 clean up job that was done?

18   A.   Anything that gets done in the LaGuard,

19 the Pipes Building -- and note that's a hospital

20 -- housekeeping takes care of all the cleaning.

21 It's been that way for years.  Anything goes on,

22 housekeeping comes in right afterwards and cleans

Page 158

1 it up.  They did it when we were with the

2 government and they continue to do it after the

3 government because it's a hospital.

4     Q.    You weren't there that day, though, for

5 the work reflected in the invoice, were you?

6     A.    For this work?

7     Q.    Yes.

8     A.    No.  I wasn't here for this.

9     Q.    Okay.

10    A.    Wasn't no need for me to be there because

11 I'd already had them clean it up.

12    Q.    Because they always cleaned it up, right?

13    A.    And, on that, I'd have to go up and get

14 them especially on that because of the sewage.

15    Q.    Okay.  Other than the three Virginia

16 Contracting Service invoices, was there anything

17 else that you had knowledge of or reported to Mr.

18 Starr --

19    A.    No.

20    Q.    -- when you called him about Virginia

21 Contracting Services?

22    A.    No.

1 of you, other than what you just described?

2    A.    No.  It was just that he didn't say a

3 whole lot, and then he just heehawed around every

4 time he came around he me.  And I just said, I

5 know something's going on.  He wants to get rid of

6 me.

7    Q.    What do you mean he heehawed around you?

8    A.    I could tell the way he talked and the

9 way he acted sometimes.  Because when we first

10 came there, they were all right, you know.  And

11 then all of a sudden kind of...

12    Q.    Did he say anything in particular that

13 gave you that impression?

14    A.    No.  I could just get the feeling from

15 him.  When all this stuff started going down, I

16 just backed away from him because I'm not that

17 kind of person.

18    Q.    You had said that you had the feeling he

19 was trying to get rid of you because you knew too

20 much?

21    A.    That, too.

22    Q.    What did you know?

Page 171

1    A.    I knew all about this stuff here.  Air

2 conditioning and some other, like, rooms being

3 painted that wasn't being painted.  There was

4 charge for it.  It was brought to my attention by

5 Katie, brought to my attention that there's

6 supposed to be rooms being painted, but they're

7 not being painted.

8              I went and checked them.  There was no

9 rooms.  There was no paint in no rooms.  I checked

10 with the painters over there one day when I went

11 in there.  I said, well, where's the contractors

12 at, they're supposed to be painting these rooms.

13 He said, they're not here.  I said, what do you

14 mean they're not here, they're supposed to be here

15 painting.  He said, they're not.

16    Q.    Are you referring to another painting --

17    A.    The people that work for Brooks Range.

18 We have a painter -- Brooks and Range had a

19 painter.  They hired a painter to paint the rooms,

20 but there was some other rooms that were supposed

21 to have been painted.  I think it was ten rooms or

22 something that was supposed to have been painted

Page 172

1 by another contractor because we needed to get

2 them rooms ready for -- and the rooms were never

3 painted.  But from what I understand -- Katie told

4 me that it was billed, but the rooms were never

5 pained.

6       Q.    Who billed it?

7       A.    Kevin.

8       Q.    Virginia Contracting Services?

9       A.    I don't know whether it was Virginia

10 Contracting.  These are the only ones I've got on

11 Virginia Contracting.  I don't know who he went

12 through to bill it, but he billed them.

13      Q.    And you're referring to painting that was

14 done -- not the 22 rooms that you were talking

15 about a few minutes ago.  You're talking about --

16      A.    All the rooms in the Sheridan and the

17 Scott --

18      Q.    The other rooms --

19      A.    -- Sheridan and --

20      Q.    -- that should have been painted by

21 Brooks Range employees; is that correct?

22      A.    Well, they -- well, they couldn't paint

Page 173

1 them because there was only one or two painters,

2 and they couldn't stay with it.  So, he was --

3 supposedly hired somebody to come up there and

4 paint them.  And my understanding was the

5 contractors were supposed to be on the weekend to

6 paint.

7            And, when I showed up one day to get the

8 air conditioners running, I went upstairs to the

9 painters to see how they were doing -- our

10 painters were doing.  And I asked him where the

11 contractors were, and he said, they're not here,

12 they never came.

13    Q.    And what is wrong about that?

14    A.    Charging for rooms that didn't get

15 painted, is what's wrong.

16    Q.    Oh, you're saying that Katie brought to

17 your attention that they had actually charged for

18 the work, even though they hadn't done it?

19    A.    Right.

20    Q.    Do you know which contractor?

21    A.    No, I don't.

22    Q.    But it wasn't Virginia Contracting

Page 174

1 Services, was it?

2          MR. LEAHY:  Objection.

3          THE WITNESS:  I don't know.

4 BY MS. DONER:

5      Q.    And Katie brought that to your attention?

6      A.    Yes, ma'am.

7      Q.    And did she show you any invoices?

8      A.    No, ma'am.

9      Q.    And when did that happen?

10     A.    Towards -- about in the fall of the year

11 of 2000 -- I think maybe five, yeah.  In the fall.

12     Q.    So, that incident with the contractors,

13 charging for painting that had never been done --

14 that happened even prior to the air conditioning

15 units incident?

16     A.    Yeah.  That was all in there at once.

17 It's all this rotates in --

18     Q.    I'm trying to understand the chronology.

19 You said that your first knowledge or complaint of

20 any wrong-doing by Mr. Heffern was with respect to

21 the air conditioning units?

22     A.    Right.

Page 179

1 complained to anyone, then how is it --

2     A.    I can't -- go ahead.

3     Q.    Who did you speak to first:  Mr. Starr

4 regarding the air conditioning units or Ms. Smith

5 and Mr. Wessel?

6     A.    I talked to Tom Starr about all this

7 first before I took it to -- I took it to the

8 government officials.

9     Q.    Okay.  And, according to your

10 interrogatories answers and your testimony today,

11 that conversation took place in December; is that

12 correct?

13     A.    Yes.  I would think so.

14     Q.    So, your conversation with Donna Smith

15 and Mr. Wessel was sometime after either later in

16 December or after December?

17     A.    Yeah.

18     Q.    Is that correct?

19     A.    Yes.

20     Q.    Okay.  But you're not sure exactly when?

21     A.    Not the date, no.

22     Q.    Okay.  And you gave -- during that

Page 223

1    --

2    A.    Yes, I did.

3    Q.    -- the government who said that?

4    A.    Yes, I did.

5    Q.    Okay.  And who did you speak to?

6    A.    I spoke to Mr. Rouse.  Talked to Jerry.

7 And they all said that they never said no such

8 thing.  They never said anything about that.

9    Q.    Was that immediately after you were

10 terminated?

11    A.    Yes, ma'am.  Mr. Rouse said he knew

12 nothing about it.

13    Q.    Was Katie Farver present when she was

14 terminated?

15    A.    Not in the room.  She was outside in the

16 other room.

17    Q.    Was she present when you were suspended?

18    A.    Not in the room.  She was outside the

19 room.

20    Q.    After you were suspended, did you have

21 any conversation with Katie Farver about the fact

22 that you'd been suspended?

Page 233

1  reduced its false allegation to writing and

2  published those allegations for individuals who

3  worked for both the home and for BRCS.

4         Do you know what that's referring to?

5     A.   (Nodding.)

6     Q.   No?

7     A.   Writing?  You just said reduced to

8  writing.  I don't know what you're saying.

9     Q.   Well, do you know whether -- strike that.

10        Do you have any information or knowledge

11  that anyone at Brooks Range told anyone else at

12  Brooks Range or anyone in the government or anyone

13  else that you or Donald had committed theft of

14  some sort?

15    A.   Not to my recollection, no.

16    Q.   Okay.  So, the only statement regarding

17  theft that you're aware of are the statements that

18  were made to you and Donald when you were

19  suspended and when you were terminated; is that

20  correct?

21    A.   Yes.

22    Q.   Okay.  You're not aware of Mr. Anastasi

Page 234

1 saying anything to anyone else that you had stolen

2 anything, are you?

3    A.    No.

4    Q.    Okay.  In fact, Mr. Rouse told you and

5 Mr. Wessel told you that they had heard nothing

6 about it, correct?

7    A.    Correct.

8    Q.    And are you aware of Mr. Anastasi or

9 anyone else at Brooks Range making any statements

10 to anyone that Donald had an excess of absenteeism

11 record or problem?

12    A.    No, ma'am.

13    Q.    Okay.  Are you aware of Mr. Anastasi or

14 anyone else at Brooks Range making any statements

15 to anyone that you had performance problems,

16 including insubordination?

17    A.    No, ma'am.

18       MS. DONER:  Mark that.

19       (Deposition Exhibit No. 5 was marked for

20       identification.)

21       (Witness examined document.)

22 BY MS. DONER:

Page 241

1          (Recess.)

2          MS. DONER:  Let's go back on the record.

3 BY MS. DONER:

4     Q.    Are you aware of anyone at Brooks Range

5 providing or sharing a copy of either your

6 disciplinary log or Donald Krakat's disciplinary

7 log to anyone?

8     A.    There was never no disciplinary logs.

9          MS. DONER:  Well, the -- I understand

10 that you take the position that it did not exist

11 or was fabricated.  Hold on for me.  These are --

12 do you have the exhibits from today?

13          (Discussion off the record.)

14 BY MS. DONER:

15    Q.    Let me show you Donald Krakat Exhibit 10

16 and Robert Krakat Exhibit 5.  These documents are

17 entitled Employee Disciplinary Logs.

18          And you testified earlier you have not

19 seen these documents prior to today.

20    A.    No, ma'am.

21    Q.    Okay.  And you're not aware of anyone at

22 Brooks Range sharing these documents or showing

1 these documents to anyone else, are you?

2    A.    No, ma'am.

3    Q.    Okay.  Are you sure that you did not have

4 any sleep or hypertension problems prior to your

5 termination?

6          MR. LEAHY:  Objection.

7          THE WITNESS:  I'm sure.  No.

8 BY MS. DONER:

9    Q.    Okay.  Not that you recall, right?

10    A.    No.  I haven't had any.

11    Q.    Not until your termination?

12    A.    Right.

13    Q.    And is there any other cause, in your

14 opinion, for these problems you've had other than

15 your termination from Brooks Range?

16    A.    No, ma'am.

17    Q.    I asked you earlier whether your job

18 responsibilities at Brooks Range involved Building

19 77, and you weren't sure which building I was

20 referring to.  It's my understanding that that

21 building was the grounds' maintenance garage.

22          Do you know what that is?

Page 197

1    Q.    This memo refers to the tree cleanup and

2 the Kaufman Construction bid; is that correct?

3            In the third paragraph, do you see that?

4            (Witness examined document.)

5 BY MS. DONER:

6    Q.    It starts on the bottom.  You're looking

7 at Donald Krakat Exhibit 4.

8    A.    Here it is right here.  I've got it.

9    Q.    Okay.  I'm actually not asking you to

10 look at the Kaufman proposal.  I'm asking you to

11 look at the memo that's Exhibit 4.

12    A.    Which one is this one?

13    Q.    You were just looking at it.

14    A.    This one?

15    Q.    Yes.  The third paragraph at the bottom

16 refers to the Kaufman bid.

17            Do you see that?

18    A.    Yes, ma'am.

19    Q.    Okay.  And you testified earlier that you

20 learned from -- I think it was Jerry Wessel that

21 the government never saw Kaufman bid; is that

22 correct?

Page 198

1    A.    Yes, ma'am.

2    Q.    And you also testified that you spoke to

3 Mr. Kaufman, who told you words to the effect of,

4 you know, usually they would get some kind of

5 correspondence back telling them that their bid

6 was not being accepted, or words to that effect.

7         Right?

8    A.    Right.

9    Q.    Did your conversation with Mr. Kaufman

10 take place before or after your conversation with

11 Mr. Wessel when you learned that they had not seen

12 -- the government had not seen the Kaufman bid?

13    A.    This -- it was after.

14    Q.    During your employment at Brooks Range,

15 have you personally had any involvement in the

16 solicitation or consideration of any bids for

17 work?

18    A.    No, ma'am.

19    Q.    Okay.  And you have no responsibility

20 with respect to soliciting bids for the tree

21 removal; is that correct?

22    A.    Right.

Page 199

1    Q.    Okay.  And the tree removal, that was

2 after there was some kind of windstorm and damage

3 as a result of a local storm in D.C.; is that

4 correct?

5    A.    Yes, ma'am.

6    Q.    Okay.  And do you recall there being any

7 urgency about getting the trees removed and the

8 work being done?

9    A.    No, no urgency.

10    Q.    All right.  Not that you were aware of,

11 correct?

12    A.    No, right.

13    Q.    Okay.  What is your relationship with

14 Kaufman Construction?

15    A.    I don't have any relationship with them.

16    Q.    Have you worked with them prior to Brooks

17 Range?

18    A.    No, ma'am.

19    Q.    How do you know Tim Kaufman?

20    A.    Tim Kaufman is a friend of my son, my

21 oldest son.

22    Q.    How long have you known him?

Page 200

1    A.    Mr. Kaufman?  I've only known him maybe a

2 year.

3    Q.    Did you know him as of the time that you

4 spoke to him?

5          Or was that the first time you ever spoke

6 to him?

7    A.    No.  I've spoken to Mr. Kaufman at the

8 racetrack.

9    Q.    How long has your son been friends with

10 him?

11    A.    I don't know.  I have no idea.

12    Q.    Do you know how they know each other?

13    A.    Not really.

14    Q.    Okay.

15    A.    Through maybe -- thru D.C.  My oldest son

16 is a D.C. inspector.

17    Q.    Okay.  Did you ask Kaufman to submit the

18 proposal?

19    A.    Yes, ma'am.

20    Q.    Okay.  Who did you ask at Kaufman to

21 submit it?

22    A.    I asked Mr. Kaufman himself if he was

Page 201

1 interested to propose it, make a proposal for it.

2    Q.    Did anyone at Brooks Range authorize or

3 ask you to solicit any bids?

4    A.    No.

5    Q.    Okay.  Did you speak to anyone at Brooks

6 Range about the fact that you were going to ask or

7 had asked Kaufman to submit a bid?

8    A.    I told Mr. Heffern there I had -- that he

9 was going to submit a bid, and he said fine.

10    Q.    When did you tell him that?

11    A.    When the proposals were coming in for the

12 tree, for the other proposals were coming in for

13 the trees.  He asked me if I knew anybody.  I

14 said, sure, I can find somebody.

15    Q.    Well, were you aware that the bids that

16 were submitted other than Kaufman's had been

17 specifically invited and solicited?

18    A.    No.  They were just called and people

19 sent in -- from what I understand, Jerry said they

20 called people and they sent in bids.

21    Q.    You weren't personally involved in that

22 process of soliciting bids, were you?

1          MR. LEAHY:  Objection.

2          THE WITNESS:  No, ma'am.

3          BY MS. DONOR:

4     Q.   Okay.  And you weren't present for any

5 conversations with anyone inviting any of the

6 other companies to submit bids, correct?

7     A.   Correct.

8     Q.   Okay.  And were you present when the

9 other companies were given a tour of the damaged

10 area and were made aware of the scope of the work?

11          Were you present for that?

12    A.   I wasn't present, but I was aware of it.

13    Q.   How were you aware of it?

14    A.   I knew they were here to get a price on

15 it.

16    Q.   And representatives from those four other

17 companies were all there at the same time; is that

18 correct?

19    A.   Right, as far as I know they are.

20    Q.   Right.  But Kaufman wasn't there for

21 that, correct?

22    A.   Correct.

Page 203

1    Q.    And they weren't asked to be there for

2 that, correct?

3    A.    No.

4    Q.    And do you know whether Kaufman's

5 proposal was submitted after that meeting took

6 place?

7    A.    I believe it was submitted at the same

8 time.

9    Q.    Okay.  Do you have any knowledge about

10 Brooks Range's process for considering bids that

11 are submitted for work?

12    A.    No, I don't.

13    Q.    Okay.  You have no understanding of

14 whether or not they routinely discard the highest

15 bid and the lowest bid?

16    A.    No, I don't.

17    Q.    You don't have any reason to believe that

18 that doesn't happen, do you?

19    A.    No.

20    Q.    Did you -- strike that.

21         At the time that Kaufman submitted its

22 bid, did you have knowledge of what the other bids

Page 204

1 were that had been submitted?

2    A.    Yes, a couple of them.

3    Q.    Okay.  How did you know that?

4    A.    Through Jerry Wessel.

5    Q.    Was it through Katie?

6         MR. LEAHY:  Objection.

7 BY MS. DONER:

8    Q.    Did you ask Jerry what the bids were?

9    A.    He told me what the bids were because the

10 bids went through the government first.

11   Q.    Did you discuss with Mr. Kaufman what the

12 bids were?

13   A.    No.

14   Q.    You didn't tell him what the other bids

15 were?

16   A.    No.

17   Q.    Did Kaufman Construction do any other

18 work at the home?

19   A.    He just brought a dumpster in.

20   Q.    Where was that at?

21   A.    Behind the Pipes Building.

22   Q.    Did you review your interrogatory answers

Page 206

1    Q.    Yes.

2    A.    Yes.

3    Q.    Okay.   You allege in paragraph nine of

4 the complaint that Mr. Heffern allegedly charged

5 the government for work that VRCS was not doing in

6 connection with the 2005 Christmas party.

7          What was that referring to?

8    A.    Christmas party?

9    Q.    Yes.   What is that allegation referring

10 to?

11   A.    I have no idea.

12   Q.    In your answer to interrogatory number

13 nine, you said that Kevin Heffern made statements

14 to Plaintiff Robert Krakat that he had quote/

15 unquote ways to pay for the Christmas party, even

16 though all petty cash was depleted at that time or

17 at the time.   Katie Farver may have more

18 information on this matter, and this answer will

19 be supplemented.

20         Did Mr. Heffern make statement to you

21 that he has ways to pay for the Christmas party?

22   A.    Actually, he made statements to everybody

1 that was there.  He said he'd find ways to pay for

2 it.

3    Q.    Okay.  And do you know how it was paid

4 for?

5    A.    No, I do not.

6    Q.    Okay.  And did you have knowledge that

7 the petty cash was depleted at the time?

8    A.    Only by what Kevin said.

9    Q.    What did he say?

10    A.    Just that it was depleted.

11    Q.    Tell me everything he said during this

12 conversation.

13    A.    Well, just said that we had no money in

14 petty cash and I'll find ways to get it.

15    Q.    And what about that statement do you

16 think is improper?

17    A.    Improper?

18    Q.    Right.  What is wrong about him saying

19 that he'll find ways to pay for the Christmas

20 party?

21    A.    Nothing's wrong with it, unless he plans

22 on doing it some other way, about getting it

Page 208

1 through some other way other than him paying for

2 it.

3    Q.    But you have no knowledge of any improper

4 way that he paid for the Christmas party, do you?

5    A.    I didn't even go to the Christmas party.

6    Q.    Okay.

7    A.    I didn't care about it.

8    Q.    But please answer the question.

9          The question is, you had no knowledge of

10 any improper way that he paid for it, correct?

11    A.    No.

12    Q.    Okay.  And you don't know what this

13 allegation in paragraph nine means when it says,

14 on information, belief Mr. Heffern alleged charged

15 the government for work that VRCS was not doing in

16 connection with the 2005 Christmas party, do you?

17    A.    No.

18    Q.    You've no idea what that refers to?

19    A.    Other than just what it says right there.

20 Actually, I might not have even really paid a

21 whole lot attention on there because it never even

22 bothered me.

Page 209

1          MS. DONER:  Okay.  Is that something

2 you're planning on removing from the complaint?

3 Because neither plaintiff seems to have any idea

4 what it refers to.  It appears to be a mistake, I

5 assume, if no one knows what it's referring to --

6 I mean if it's a claim that you plan on keeping, I

7 need to know what it is so I can defend it.

8          MR. LEAHY:  The interrogatory response

9 indicates that Katie Farver may have some

10 additional information.  So, I think we probably

11 have to get through her deposition before I

12 consider removing that particular allegation.

13          MS. DONER:  Okay.  That's fair.

14 BY MS. DONER:

15    Q.   Paragraph ten of the complaint states

16 that, on information and belief, Heffern allegedly

17 overcharged the government for cleaning up cement.

18          Do you have any knowledge or cement about

19 that allegation?

20    A.   That's the Pipes Building.  That's when

21 they had that sewer line back there when they had

22 to bust the concrete all out and everything.

Page 211

1 the Virginia Contracting Services's invoices, were

2 you?

3    A.   No, ma'am.

4    Q.   All right.  Okay.  Your interrogatory

5 answer to number ten says, the plaintiffs were

6 informed of overcharging for the cement cleanup by

7 Katie Farver, who is believed to have personal

8 knowledge.  Plaintiffs cannot recall of a specific

9 date that they learned of the overcharging.

10         Are you referring to -- do you know what

11 that -- let me just ask you this.

12         Do you know what that's referring to?

13    A.   The only thing I can think of it's

14 referring to is this Pipes Building when they had

15 to clean all that up.

16    Q.   Okay.  Are you aware -- strike that.

17         Other than your complaints to the various

18 individuals you testified before regarding Mr.

19 Heffern, are you aware of any other complaints

20 made by anyone else regarding Mr. Heffern?

21    A.   None, other than Katie.

22    Q.   Okay.  What complaints did Katie make to

Page 246

1              CERTIFICATE OF NOTARY PUBLIC

2

3        I, SANDY MEDFORD NELSON, the officer before

4   whom the foregoing deposition was taken, do hereby

5   certify that the witness whose testimony appears in

6   the foregoing deposition was duly sworn by me in

7   stenotype and thereafter reduced to typewriting

8   under my direction; that said deposition is a true

9   record of the testimony given by said witness; that

10  I am neither counsel for, related to, nor employed

11  by and the parties to the action in which this

12  deposition was taken; and, further, that I am not a

13  relative or employee of any counsel or attorney

14  employed by the parties hereto, nor financially or

15  otherwise interested in the outcome of this action.

16

17

18

19              SANDY MEDFORD NELSON
                Notary Public in and for the
20              State of Virginia

21

22  My commission expires:
    September 30, 2010

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLUMBIA

3    ROBERT KRAKAT and DONALD        )

4    KRAKAT,                         )

5              Plaintiffs,           )   CASE NO:

6              -vs-                  )   1:07-CV-00693-RCL

7    BROOKS RANGE CONTRACT           )

8    SERVICES, INC.,                 )

9              Defendant.            )

10   *ORIGINAL*            Tuesday, November 27, 2007

11                        McLean, Virginia

12   Deposition of

13        **DONALD ALLEN KRAKAT**

14   called for examination by counsel for the

15   Defendant, pursuant to notice, held at the

16   offices of Williams Mullen, 8270 Greensboro

17   Drive, McLean, Virginia beginning at 10:08 A.M.,

18   before Karen N. McConnell, CSR-RMR-CRR, a notary

19   public in and for the Commonwealth of Virginia,

20   when were present on behalf of the respective

21   parties:

22

EXHIBIT
C

1       Q.    You don't know of any conversations

2   your father has ever had with Mr. Starr?

3       A.    No.

4       Q.    Do you have any knowledge of any

5   complaints made by Mr. Starr regarding

6   Mr. Heffern?

7       A.    No.

8       Q.    Do you know whether Mr. Starr was

9   terminated or voluntarily resigned?

10      A.    I don't know.

11      Q.    You have no knowledge one way or the

12  other?

13      A.    No.

14      Q.    Is it your understanding that Katie

15  Farver resigned from Brooks Range, or was she

16  terminated by Brooks Range?

17      A.    I don't know.

18      Q.    Has she told you whether she resigned

19  or whether she was terminated?

20      A.    No.

21      Q.    You never discussed that with her?

22      A.    No.

1    Q.    Was she present when you were

2    suspended by Brooks Range?  Was she present

3    during that meeting?

4    A.    You mean was she inside the room?

5    Q.    Correct.

6    A.    No.

7    Q.    Was the door closed?

8    A.    Yes.

9    Q.    Was she present when you were

10   terminated?

11   A.    You mean -- she was at work.

12   Q.    Was she in the room?

13   A.    No.

14   Q.    Where was she located when you were

15   terminated, if you know?

16   A.    I guess in the next room in the

17   office.

18   Q.    Your interrogatory answer to number 5

19   states, "Plaintiffs were informed that the

20   reason for their termination was that the AFRH

21   had alleged that plaintiffs were stealing.

22   Plaintiffs responded that the allegations of

1    theft were not true.  Katie Farver was present

2    at the meeting, and she also stated the

3    allegations made against plaintiffs were not

4    true."

5              Is that not accurate?

6        A.    I don't recall.  She wasn't in the

7    room.

8        Q.    Okay.

9        MS. DONER:  Okay.  Why don't we go

10   ahead and take a break.

11       MR. LEAHY:  Okay.

12              (A lunch recess was taken from 12:19

13   until 12:50.)

14

15

16

17

18

19

20

21

22

AFTERNOON SESSION

1

2    Thereupon,                                    12:57 p.m.

3                    **DONALD ALLEN KRAKAT**

4    a witness, called for examination by counsel for

5    the Defendant, having been previously sworn by

6    the notary, was further examined and testified

7    as follows:

8    FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT

9    BY MS. DONER:

10        Q.    Other than your discussions with Miss

11   Farver and your discussions with your father --

12   I just want to be clear -- you didn't have any

13   discussions with anyone else at Brooks Range or

14   the government regarding the allegations against

15   Mr. Heffern?

16        A.    No.

17              MR. LEAHY:   Objection.

18   BY MS. DONER:

19        Q.    Okay.   That's correct, right?

20        A.    (Witness nodding head.)

21        Q.    Yes?

22        A.    Yes.

1    Q.    When you say Kevin's work, are you

2    referring to Virginia Contracting Services?

3    A.    Virginia Contracting Services.

4    Q.    And when you say you were doing work

5    that you were not supposed to be doing, do you

6    mean that you weren't supposed to be doing it

7    because you were a Brooks Range employee, or

8    what do you mean?

9    A.    Right, yes.

10    Q.    Okay.  Now, isn't that, though,

11    related to the Virginia Contracting invoices?

12    MR. LEAHY:  Objection.

13    BY MS. DONER:

14    Q.    Is it your understanding that that was

15    the alleged part of the problem, at least with

16    the Virginia Contracting Services invoices?

17    A.    Right.

18    Q.    Okay.  Other than the Virginia

19    Contracting Services, are you aware of any other

20    alleged wrongdoing or misconduct by Mr. Heffern?

21    A.    No.

22    Q.    Okay.  Do you have any knowledge or

1    information regarding the allegation that

2    Mr. Heffern charged the government over $500 for

3    air-conditioning units each when it only cost

4    Brooks Range $200, and Brooks Range was only

5    allowed a 12 percent markup?  Do you have any

6    knowledge or information about that allegation?

7         A.    No.

8         Q.    Are you aware that that allegation was

9    being made in this lawsuit?

10        A.    Yeah, I was aware, but I don't --

11        Q.    You personally have no knowledge about

12   it?

13        A.    Right.

14        Q.    Okay.  Do you know who does have

15   knowledge about it?

16        A.    No.

17        Q.    Okay.  Do you have any information or

18   knowledge about the allegation in the Complaint

19   that Mr. Heffern charged the government for work

20   that Brooks Range it says was not doing in

21   connection with the 2005 Christmas party?

22        A.    I don't recall.

1      Q.    Go ahead.

2      A.    I don't know what you are saying.

3      Q.    Well, it says, paragraph 9 of the

4    Complaint says, on information and belief,

5    Heffern allegedly charged the government for

6    work that BRCS was not doing in connection with

7    the 2005 Christmas party.

8            Do you have any idea what that is

9    about?

10     A.    No.

11     Q.    You have no knowledge or information

12   about that allegation?

13     A.    No.

14     Q.    Do you know who does have information

15   or knowledge about it?

16     A.    No.

17     Q.    Do you have any knowledge that the

18   government was being charged $500 each for

19   air-conditioning units?

20     A.    Did I know they were being charged?

21     Q.    Yes.

22     A.    Yes.  I --

1    cleanup?

2        A.    No.

3        Q.    Do you have any knowledge or

4    information about the allegation that the

5    government was overcharged for that cleanup?

6        A.    No.

7        Q.    Have you ever heard before that they

8    were overcharged the cleanup?

9        A.    No.

10        Q.    So your only knowledge is the fact

11    that you participated in the cleanup, correct?

12        A.    Yes.

13        Q.    With respect to Virginia Contracting

14    Services, were you involved in any of the work

15    that was done that was allegedly then invoiced

16    to Brooks Range by Virginia Contracting

17    Services?

18        A.    No.

19            MR. LEAHY:   Objection.

20    BY MS. DONER:

21        Q.    You weren't involved in the cleanup of

22    the LaGarde kitchen?

1          MR. LEAHY:  Karen, I normally don't do

2    speaking objections, but I guess my objection

3    really goes to, you know, whether or not he may

4    or may not know what Virginia Contracting was

5    involved with.  So I guess it is a foundational

6    objection.  I'm not going to stop him from

7    answering the question, but I wanted you to know

8    why.

9    BY MS. DONER:

10         Q.    My current question is were you

11   involved in the cleanup of the LaGarde kitchen.

12         A.    Was I there?  Yes.

13         Q.    Did you do the work?

14         A.    Yeah.

15         Q.    Did you do work on the Pipes building,

16   roofing and canopy repair?

17         A.    No.  Canopy repair?

18         Q.    Did you do work on the sewage cleanup

19   in the Pipes building?

20         A.    Yes.

21         Q.    Were you involved in the painting of

22   the home?

1   A. No.

2   Q. No painting?

3   A. No.

4   (Krakat Deposition Exhibit Number 5 was

5   marked for identification and retained by

6   counsel.)

7 BY MS. DONER:

8   Q. If you could look through what has

9 been marked and handed to you as Exhibit 5, and

10 let me know if any of these documents look

11 familiar to you.  Have you ever seen these

12 before?

13   A. Yeah, when Katie showed me some of

14 them.  I can't remember if it is all of them.

15 She showed me some of them.  But I know on the

16 grease traps and stuff like that, I did that.

17   Q. Well, I'm going to ask you about that.

18 The last three pages of the exhibit are the

19 Virginia Contracting offices, dated October 5th,

20 October 24, 2005; and November 10, 2005.

21   Did Katie show you any of these

22 invoices?

1    psychiatrist or any mental health counselor, or

2    anything like that?

3         A.    No.

4         Q.    And have you had any physical symptoms

5    related to stress, such as lost appetite or

6    difficulty sleeping, anything like that?

7         A.    No.

8         Q.    So your claim for emotional distress,

9    is that primarily just that you were out of work

10   and stress relating to whether to put Brooks

11   Range down as an employer on job applications,

12   is that it?

13        A.    Yes.

14        Q.    Okay.  I want to ask you about your

15   claim for defamation.  Where it is alleged in

16   the Complaint that, in paragraph 47, in accusing

17   Donald Krakat of theft, poor performance, and

18   excessive absenteeism, and in publishing those

19   accusations, Defendant published false and

20   misleading statements tending to expose, it says

21   the Donald Krakat, to public scorn, hatred

22   contempt and/or ridicule.

1          Tell me what statements you are

2    referring to in the Complaint regarding

3    statements made by Brooks Range about accusing

4    you of poor performance, theft, excessive

5    absenteeism.  What statements are you referring

6    to?

7          A.    The poor performance and the stealing,

8    because I have never stolen anything.

9          Q.    Who at Brooks Range has made those

10   statements?  Or are you just referring to the

11   statements about theft made to you during the

12   termination meeting?

13         A.    Right.

14         Q.    Okay.  To your knowledge, did anyone

15   at Brooks Range make statements about the theft

16   to anyone else other than to you?

17         A.    I don't know.

18         Q.    Okay.  To your knowledge, did anyone

19   at Brooks Range make statements regarding your

20   poor work performance to anyone that you know

21   of?

22         A.    I don't -- not that I know of.

1      Q.    And to your knowledge, did anyone at

2   Brooks Range make any statements regarding

3   excessive absenteeism about you to anyone else?

4      A.    I don't know.

5      Q.    You don't know of any statements made

6   by Mr. Anastasi or Mr. Heffern to any Brooks

7   Range employees regarding allegations of theft,

8   poor performance and/or excessive absenteeism?

9      A.    I don't know.

10      Q.    And you don't know of any statements

11   by Mr. Anastasi or Mr. Heffern to any employee

12   of the home, including government employees,

13   regarding your theft, poor performance and/or

14   excessive absenteeism?

15              MR. LEAHY:  Objection.

16              THE WITNESS:  I don't know.

17              MS. DONER:  Okay.  I have no further

18   questions.

19              MR. LEAHY:  Okay.  Great.

20              MS. DONER:  Do you want to advise him

21   about his right to read?

22              MR. LEAHY:  I think we'd like to read.

CERTIFICATE OF NOTARY PUBLIC

1

2        I, Karen N. McConnell, the officer before

3   whom the foregoing deposition was taken, do

4   hereby certify that the witness whose testimony

5   appears in the foregoing deposition was duly

6   sworn by me; that the testimony of said witness

7   was taken by me in stenotypy and thereafter

8   reduced to typewriting under my direction; that

9   said deposition is a true record of the

10  testimony given by said witness; that I am

11  neither counsel for, related to, nor employed by

12  any of the parties to the action in which this

13  deposition was taken; and, further, that I am

14  not a relative or employee of any attorney or

15  counsel employed by the parties hereto, nor

16  financially or otherwise interested in the

17  outcome of the action.

18      _____

19      Notary Public in and for
        The Commonwealth of Virginia

20      Registration Number: 132230

21  My Commission Expires:
    January 31, 2010

22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT and ) 
DONALD KRAKAT, ) 
 ) 
          Plaintiffs, ) 
 ) 
v. ) Case No: 1:07-cv-00693-RCL
 ) 
BROOKS RANGE CONTRACT SERVICES, INC., ) 
 ) 
          Defendant. ) 

## DEFENDANT'S ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

      Defendant Brooks Range Contract Services, Inc. ("BRCS" or "Defendant"), by counsel, hereby responds to Plaintiffs' Robert Krakat and Donald Krakat (collectively "Plaintiffs") Interrogatories, and states as follows:

## GENERAL OBJECTIONS

      1.    Defendant objects generally to Plaintiffs' Definitions and Instructions to the extent that they are contrary to or exceed the requirements of the Federal Rules of Civil Procedure and the Local Rules.

      2.    Defendant objects generally to all discovery requests to the extent that they seek confidential information or trade secrets, privileged attorney-client communications, or attorney work-product material.

      3.    Defendant objects generally (i) to the release of any information provided by Defendant in response to Plaintiffs' discovery requests to any persons other than Plaintiffs, their attorneys, or their expert witnesses; and (ii) to the use of any information provided by Defendant


**EXHIBIT**
D

in response to Plaintiffs' discovery requests for any purpose other than the litigation of this lawsuit.

4. Defendant objects generally to any of Plaintiffs' discovery requests that are (a) irrelevant to the subject matter involved in this lawsuit or otherwise not reasonably calculated to lead to the discovery of admissible evidence; (b) unreasonably cumulative or duplicative; (c) unduly burdensome or expensive, or otherwise obtainable from some other source that is more convenient, less burdensome, or less expensive; (d) overly broad, unduly vague, or otherwise ambiguous; or (e) oppressive, vexatious, or otherwise designed to harass.

5. All Answers and Responses are made expressly subject to the foregoing general objections, regardless of any lack of specific reference. Where such objections are particularly pertinent, they have been specifically noted. Failure to specifically note such objections, however, should not be regarded as, and do not constitute, a waiver.

## **INTERROGATORIES**

**INTERROGATORY NO. 1**: Identify the party answering these interrogatories including the legal name of the Defendant, representative answering on behalf of corporate defendant, present residence or business address, date of incorporation, employment identification number, and the dates of any lapses in corporate status.

**ANSWER**: Howard Anastasi.

**INTERROGATORY NO. 2**: Identify all persons who have knowledge of any of the facts and/or allegations set forth in the Complaint or subsequent pleadings, and for each such person, describe in detail the facts and/or allegations of which they have knowledge.

ANSWER:

    1.    Howard Anastasi

Mr. Anastasi has knowledge regarding all aspects of the Complaint, as well as the reasons for Plaintiffs' terminations, including Plaintiffs' performance issues. Mr. Anastasi also has knowledge regarding statements made by third parties after Plaintiffs' terminations regarding alleged theft by Plaintiffs throughout their employment. He also has knowledge regarding threats made by Donald Krakat after Plaintiffs' terminations.

    2.    Chuck Quinlan

Mr. Quinlan has knowledge regarding Defendant's investigation of certain allegations against Mr. Heffern and self-report of such allegations to the Bureau of Public Debt., Division of Procurement, and the conclusion by the Bureau of no wrongdoing by Defendant. Mr. Quinlan also has general knowledge regarding all aspects of the Complaint.

    3.    Kevin Heffern

Mr. Heffern has knowledge of the allegations made by Plaintiffs against him. Mr. Heffern also has knowledge regarding Plaintiffs' performance issues. He also has knowledge regarding Donald Krakat's statements to him regarding Robert Krakat's attempted theft of certain property at the work-site. He also has knowledge regarding threats made by Donald Krakat after Plaintiffs' terminations. Mr. Heffern also has general knowledge regarding all aspects of the Complaint.

    4.    Katie Farver

Ms. Farver has knowledge regarding her relationship with Donald Krakat and her apparent falsification of company documents at the request of Donald Krakat. Ms. Farver has knowledge regarding her discussions with Defendant's management regarding certain allegations

against Mr. Heffern. Ms. Farver also has knowledge regarding the circumstances surrounding her cessation of employment with Defendant.

    5.    Bryon A. Clare

Mr. Clare has knowledge regarding the circumstances surrounding his cessation of employment with Defendant.

    6.    Thomas Starr

Mr. Thomas has knowledge regarding the circumstances surrounding his cessation of employment with Defendant.

    7.    Ed Neilan

Mr. Neilan has knowledge regarding Defendant's investigation of certain allegations against Mr. Heffern and self-report of such allegations to the Bureau of Public Debt., Division of Procurement, and the conclusion by the Bureau of no wrongdoing by Defendant.

INTERROGATORY NO. 3: Identify each expert witness you anticipate calling at the trial of this matter, specifying (a) the name, address, occupation and the area of expertise of such expert, (b) the subject matter to which the expert will testify, (c) the substance of the facts and opinions to which he is expected to testify, and (d) the grounds for each opinion and his/her qualifications.

OBJECTION: Defendant objects to Interrogatory No. 3 to the extent it is inconsistent with the deadlines in the Court's Scheduling Order.

RESPONSE: Subject to and without waiving its Objection, Defendant has not yet retained any expert.

<u>INTERROGATORY NO. 4</u>: Identify all individuals who approached or reported to you any allegedly incorrect, unlawful, or fraudulent billing or conduct by any individual associated with BRCS in connection with the contract between BRCS and the Home.

<u>ANSWER</u>:    In or around the Fall 2005, Howard Anastasi was contacted by Katie Farver's uncle, an employee of BRCS, regarding some concerns that Ms. Farver had. Mr. Anastasi subsequently spoke to Ms. Farver. Ms. Farver told Mr. Anastasi that there may be inconsistencies regarding billing practices and that she was very happy that Mr. Anastasi called her. Mr. Anastasi asked her to send him any relevant documentation she had. Unbeknownst to BRCS at that time, Ms. Farver was romantically involved with Donald Krakat. Donald Krakat never complained to BRCS regarding the above subject matter. Robert Krakat only complained once to BRCS, after he was told that his employment was terminated, when he pulled a package of papers out of the front of his pants and handed them to Mr. Anastasi. There have been no other complaints.

<u>INTERROGATORY NO. 5</u>: Describe in detail all facts and circumstances surrounding your suspension of the employment of the Plaintiffs from BRCS on or about February 21, 2006. Include in your answer the following: (a) the identity of the person(s) who communicated to the Plaintiffs that they were being suspended; (b) the date, time, and location thereof; (c) the substance of what was communicated to Plaintiffs and the substance of their response thereto; (d) the identity of persons who were present or who otherwise may have heard the discussion; and (e) the identity of all documents relating to the suspension.

<u>ANSWER</u>:    Plaintiffs had performance problems throughout their employment with BRCS. Shortly prior to Plaintiffs' suspensions, Donald Krakat approached Kevin Heffern and asked to speak with him privately. During the discussion, Donald Krakat told Mr. Heffern that

INTERROGATORY NO. 10:  Detail the reasons for the termination of employment of the Thomas Starr, Bryon Clare, and Katie Farver.

ANSWER:    Mr. Starr voluntarily resigned from employment.  Mr. Clare was laid off with intent to rehire if he obtained more experience in the private sector.  Katie Farver voluntarily resigned from employment immediately after Plaintiffs were terminated.

INTERROGATORY NO. 11:  Detail your employment history of Kevin Heffern including date of hire, all positions held, reasons for any promotions or demotions, compensation & compensation basis, and any counseling or disciplinary actions taken against him and why.

ANSWER:

INTERROGATORY NO. 12:  Detail any procedures that you have for verifying, auditing, or accounting for the appropriateness of any billings sent to the Home for work performed by you, your agents, or contractors.

ANSWER:    During the relevant time period, all invoices submitted to the Home are reviewed by Contract Administrator and Project Manager at the site.  At corporate headquarters, all invoices are reviewed, sometimes multiple times, by an accounts payable clerk, an accounting manager, and the COO or CEO.

INTERROGATORY NO. 13:  Detail any allegedly incorrect, unlawful, or fraudulent billing or conduct by Kevin Heffern, or other agent or employee, brought to your attention by the Plaintiffs, Thomas Starr, Bryon Clare, Katie Farver, or other individual.  Include in your answer any steps you took to investigate those allegations, who undertook that investigation, the results of that investigation, and any actions taken by you as a result of that investigation.

ANSWER:    See Answer to Interrogatory No. 4 and see attached documents.

9

11-20-07;12:49  ;brooks  ange contrac                    ;9074528148          #  2/  2

## VERIFICATION

I represent that I am authorized to sign these Interrogatory Answers on behalf of
Defendant and that the information contained herein is true and correct to the best of my
information, belief and knowledge.

_____
Howard Anastasi

STATE OF ALASKA                )
                               ) ss:
CITY/COUNTY OF Fairbanks       )


Subscribed and sworn to before me this 20th day of November, 2007.

_____
Notary Public

My Commission Expires: 4/21/09  _____



12

RESPONSE:  Subject to and without waiving its Objection, Defendant states that it has not been party to any litigation or administrative action in which there has been a claim of wrongful discharge in violation of public policy.

INTERROGATORY NO. 18:  State whether you intend to rely on any alleged admission made by any Plaintiff in this action; and if so, identify the person making the admission, the person(s) to whom the admission was made, any document relating to such admission, and the substance of each such admission.

ANSWER:    Defendant is not aware of any such statements at this time.

INTERROGATORY NO. 19:  Detail the factual basis for any affirmative defense raised, or will be raised, in your Answer to the Complaint and/or any amendment to your Answer, and identify the individuals with personal knowledge of material facts regarding those affirmative defenses.

ANSWER:    See attached documents.


Respectfully submitted,


Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia  22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT KRAKAT and<br>DONALD KRAKAT,<br><br>              Plaintiffs,<br><br>v.<br><br>BROOKS RANGE CONTRACT SERVICES, INC.,<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No: 1:07-cv-00693-RCL<br>)<br>)<br>)<br>) |

## DEFENDANT'S AMENDED ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Brooks Range Contract Services, Inc. ("BRCS" or "Defendant"), by counsel, hereby amends its answers to Plaintiffs' Robert Krakat and Donald Krakat (collectively "Plaintiffs") Interrogatories, as follows:

## INTERROGATORIES

INTERROGATORY NO. 2:  Identify all persons who have knowledge of any of the facts and/or allegations set forth in the Complaint or subsequent pleadings, and for each such person, describe in detail the facts and/or allegations of which they have knowledge.

ANSWER:

     1.     Howard Anastasi

Mr. Anastasi has knowledge regarding all aspects of the Complaint, as well as the reasons for Plaintiffs' terminations, including Plaintiffs' performance issues.  Mr. Anastasi also has knowledge regarding statements made by third parties after Plaintiffs' terminations regarding alleged theft by Plaintiffs throughout their employment. He also has knowledge regarding threats made by Donald Krakat after Plaintiffs' terminations.

2.    Chuck Quinlan

Mr. Quinlan has knowledge regarding Defendant's investigation of certain allegations against Mr. Heffern and self-report of such allegations to the Bureau of Public Debt., Division of Procurement, and the conclusion by the Bureau of no wrongdoing by Defendant. Mr. Quinlan also has general knowledge regarding all aspects of the Complaint.

3.    Kevin Heffern

Mr. Heffern has knowledge of the allegations made by Plaintiffs against him. Mr. Heffern also has knowledge regarding Plaintiffs' performance issues. He also has knowledge regarding Donald Krakat's statements to him regarding Robert Krakat's attempted theft of certain property at the work-site. He also has knowledge regarding threats made by Donald Krakat after Plaintiffs' terminations. Mr. Heffern also has general knowledge regarding all aspects of the Complaint.

4.    Katie Farver

Ms. Farver has knowledge regarding her relationship with Donald Krakat and her apparent falsification of company documents at the request of Donald Krakat. Ms. Farver has knowledge regarding her discussions with Defendant's management regarding certain allegations against Mr. Heffern. Ms. Farver also has knowledge regarding the circumstances surrounding her cessation of employment with Defendant.

5.    Bryon A. Clare

Mr. Clare has knowledge regarding the circumstances surrounding his cessation of employment with Defendant.

6.    Thomas Starr

Mr. Thomas has knowledge regarding the circumstances surrounding his cessation of employment with Defendant.

7.      Ed Neilan

Mr. Neilan has knowledge regarding Defendant's investigation of certain allegations against Mr. Heffern and communications with the Bureau of Public Debt., Division of Procurement regarding same.

INTERROGATORY NO. 7:  Identify any and all communications that you had with any employee or agent of the Home regarding any allegedly incorrect, unlawful, or fraudulent billing or conduct by any individual associated with BRCS in connection with the contract between BRCS and the Armed Forces' Retirement Home.  Include in your answer the following for each such communication: (a) the date, time and location thereof; (b) the identity of the person and the name of their employer with whom you had the communication; (c) the identity of persons who were present or who otherwise may have heard the communication; (d) the substance and form (e.g., in person, email, telephone conversation, etc.) of the communication; and (e) the identity of all documents relating to such communication.

ANSWER:    See  previously-produced  documents  bates-numbered  BRCS-00232  – BRCS-00250.  Defendant has been unable to locate any other responsive documents.  Defendant expressly reserves the right to supplement this Answer upon further discovery.

INTERROGATORY NO. 8:  If you, or any agent or employee of yours ever reported or made,  to  anyone,  "accusations  of  theft,  poor  performance,  and/or  excessive  absenteeism", regarding either or both Plaintiffs detail such reports or accusations.  Include in your answer the following for each such alleged report or accusation: (a) the date, time, and location thereof (b) the identity of the person who made the alleged report or accusation; (c) the identity of persons

who were present or who otherwise may have heard the report or accusation; (d) the specific

substance and form (e.g., in person, email, telephone conversation, etc.) of the alleged report or

accusation; and (e) the identity of all documents relating to such alleged report or accusation.

ANSWER:    Defendant is not aware of any statements regarding the above subject

matter made to anyone other than Plaintiffs during counseling sessions, the suspension meetings,

and the termination meetings.  See Answers to Interrogatory Nos. 5 and 6.   Plaintiffs, however,

were never accused of theft.  They were merely asked about it by Mr. Anastasi.

INTERROGATORY NO. 9:  If you, or any agent or employee of yours ever determined

that either or both of the Plaintiffs were guilty of theft, poor performance, and/or excessive

absenteeism, detail such determinations.  Include in your answer the following for each such

determinations: (a) the identity of the person(s) who made the determinations; (b) the

information on which such determinations were based; (c) the identity of persons who gave

information on which such determinations were based; (d) the specific substance of the

determination; and (e) the identity of all documents on which the determination was based or

relate in any way to such determination.

ANSWER:    Defendant did not determine that Plaintiffs were "guilty" of theft.

Defendant's "determinations" regarding Plaintiffs' performance issues were made by Mr.

Anastasi and are documented in previously-produced documents bates-numbered BRCS-00231,

BRCS-00345 – BRCS-00346.

INTERROGATORY NO. 11:  Detail your employment history of Kevin Heffern

including date of hire, all positions held, reasons for any promotions or demotions, compensation

& compensation basis, and any counseling or disciplinary actions taken against him and why.

ANSWER:    See previously-produced documents bates-numbered BRCS-00374 –
BRCS-00411.  Mr. Heffern was demoted to the position of Assistant Project Manager as a result
of his conduct with respect to using Virginia Contracting Services as a BRCS vendor.  Although
there was nothing unlawful about such conduct, BRCS determined that it had the appearance of a
conflict of interest and was poor judgment on the part of Mr. Heffern.  Mr. Heffern was
counseled regarding his conduct and was subsequently demoted on February 26, 2006, although
the decision to demote Mr. Heffern was made earlier.  Mr. Heffern was officially demoted after
BRCS found a replacement for Mr. Heffern, Anne Flynn.  Although Mr. Heffern's base salary
stayed the same, as Assistant Project Manager, he was not entitled to any bonus as he would
have been had he remained in the Project Manager position.  This resulted in financial loss to
Mr. Heffern of approximately $25,000.  Mr. Heffern returned to the Project Manager position
after the end of Ms. Flynn's employment with BRCS.

INTERROGATORY NO. 13:  Detail any allegedly incorrect, unlawful, or fraudulent
billing or conduct by Kevin Heffern, or other agent or employee, brought to your attention by the
Plaintiffs, Thomas Starr, Bryon Clare, Katie Farver, or other individual.  Include in your answer
any steps you took to investigate those allegations, who undertook that investigation, the results
of that investigation, and any actions taken by you as a result of that investigation.

ANSWER:    See Answers to Interrogatory Nos. 4, 7 and 11.  Upon learning of Mr.
Heffern's conduct with respect to Virginia Contracting Services from Ms. Farver, Mr. Anastasi
reviewed the documents submitted to him by Ms. Farver and he spoke to Mr. Heffern.  Mr.
Anastasi counseled Mr. Heffern and instructed him to cease using VCS as a BRCS vendor, to
which Mr. Heffern agreed.  Mr. Heffern may have been counseled by others.  Mr. Anastasi made
the decision to recruit for a new Project Manager and to demote Mr. Heffern to the position of

Assistant Project Manager.   It appears that BRCS began advertising for Mr. Heffern's replacement on or around January 23, 2006.  Ms. Flynn was hired on February 2, 2006 and her employment and Mr. Heffern's demotion was effective February 26, 2006.   Upon receipt of Robert Krakat's Memorandum regarding Mr. Heffern dated February 26, 2006, Chuck Quinlan instructed Ed Neilan to conduct a further investigation into the matters raised in Mr. Krakat's Memorandum and to prepare a response to the email request dated February 27, 2006 from Jeffrey Shaffer.

Mr. Neilan reviewed the VCS invoices and spot checked the work performed by VCS to confirm that it had in fact been performed.  His ability to check all of the work was limited by the presence of residents living in the spaces at issue.  Mr. Neilan also reviewed invoices by other subcontractors (see documents attached as BRCS-00575 - BRCS-00620) and confirmed that VCS was one of the least expensive vendors, if not the least expensive vendor.  With respect to the tree removal issue, he was already familiar with the bids submitted because he had personally been involved in the prior bid selection process but he nevertheless reviewed the bids again to confirm that the lowest and highest bid had been discarded, which it had.  Mr. Neilan had various discussions with Mr. Heffern and Mr. Anastasi as part of his investigation but he does not recall the specifics of those discussions.

On March 1, 2006, Mr. Neilan faxed a response to Mr. Shaffer (see previously-produced documents bates-numbered BRCS-00236 – BRCS-00250).  Mr. Neilan may have had subsequent discussions with David Rouse and/or Mr. Shaffer in follow-up to the Memorandum but Mr. Neilan does not recall the details of any such discussions other than he believes that the Bureau of Public Debt was satisfied with BRCS' response and did not find any wrongdoing on the part of Mr. Heffern and/or BRCS.

## VERIFICATION

I represent that I am authorized to sign these Amended Interrogatory Answers on behalf of Defendant and that the information contained herein is true and correct to the best of my information, belief and knowledge.

_____
Howard Anastasi

STATE OF O H I O )
                  ) ss:
CITY/COUNTY OF Jofferson )

Subscribed and sworn to before me this 6 day of January, 2008.

_____
Notary Public

My Commission Expires: January 8, 2012

9

<u>ANSWER</u>:    Plaintiffs both testified at their depositions that they are wholly unaware of any defamatory remarks made to third parties.  Thus, Defendant is unaware of the factual basis for Plaintiffs' defamation claim.    Plaintiffs' status as at-will employees is evidenced by previously-produced documents bates-numbered BRCS-00169 – BRCS-00181, BRCS-00204, and BRCS-00302.

Respectfully submitted,

Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia   22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT KRAKAT and<br>DONALD KRAKAT,<br><br>Plaintiffs,<br><br>v.<br><br>BROOKS RANGE CONTRACT SERVICES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No: 1:07-cv-00693-RCL<br>)<br>)<br>)<br>) |

## DEFENDANT'S SUPPLEMENTAL ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Brooks Range Contract Services, Inc. ("BRCS" or "Defendant"), by counsel, hereby supplements its answers to Plaintiffs' Robert Krakat and Donald Krakat (collectively "Plaintiffs") Interrogatories, as follows:

## INTERROGATORIES

INTERROGATORY NO. 2:  Identify all persons who have knowledge of any of the facts and/or allegations set forth in the Complaint or subsequent pleadings, and for each such person, describe in detail the facts and/or allegations of which they have knowledge.

ANSWER:

1.    Howard Anastasi

Mr. Anastasi has knowledge regarding all aspects of the Complaint, as well as the reasons for Plaintiffs' terminations, including Plaintiffs' performance issues.  Mr. Anastasi also has knowledge regarding statements made by third parties after Plaintiffs' terminations regarding alleged theft by Plaintiffs throughout their employment. He also has knowledge regarding threats made by Donald Krakat after Plaintiffs' terminations.

2.    Chuck Quinlan

Mr. Quinlan has knowledge regarding Defendant's investigation of certain allegations against Mr. Heffern and self-report of such allegations to the Bureau of Public Debt., Division of Procurement, and the conclusion by the Bureau of no wrongdoing by Defendant.   Mr. Quinlan also has general knowledge regarding all aspects of the Complaint.

3.    Kevin Heffern

Mr. Heffern has knowledge of the allegations made by Plaintiffs against him.  Mr. Heffern also has knowledge regarding Plaintiffs' performance issues.  He also has knowledge regarding Donald Krakat's statements to him regarding Robert Krakat's attempted theft of certain property at the work-site.  He also has knowledge regarding threats made by Donald Krakat after Plaintiffs' terminations.  Mr. Heffern also has general knowledge regarding all aspects of the Complaint.

4.    Katie Farver

Ms. Farver has knowledge regarding her relationship with Donald Krakat and her apparent falsification of company documents at the request of Donald Krakat.  Ms. Farver has knowledge regarding her discussions with Defendant's management regarding certain allegations against Mr. Heffern.  Ms. Farver also has knowledge regarding the circumstances surrounding her cessation of employment with Defendant.

5.    Bryon A. Clare

Mr. Clare has knowledge regarding the circumstances surrounding his cessation of employment with Defendant.

6.    Thomas Starr

Mr. Thomas has knowledge regarding the circumstances surrounding his cessation of employment with Defendant.

      7.      Ed Neilan

Mr. Neilan has knowledge regarding Defendant's investigation of certain allegations against Mr. Heffern and communications with the Bureau of Public Debt., Division of Procurement regarding same.

<u>SUPPLEMENTAL ANSWER</u>:

      6.      Thomas Starr

Mr. Starr has knowledge regarding the circumstances surrounding his cessation of employment with Defendant.  Mr. Starr also has knowledge that Robert Krakat never complained to him regarding Mr. Heffern and/or BRCS.

      7.      Jerry Wessell

Mr. Wessell has knowledge regarding all matters testified to during his deposition.

      8.      David Rouse

Mr. Rouse has knowledge regarding all matters testified to during his deposition.

      9.      Donna Smith

Ms. Smith may have knowledge that Robert Krakat never complained to her regarding Mr. Heffern and/or BRCS.

      10.      Jeff Schaeffer

Mr. Schaeffer may have knowledge regarding the Bureau of Public Debt's investigation, if any, regarding the allegations by Robert Krakat of wrongdoing by Mr. Heffern and BRCS. Mr. Schaeffer also may have knowledge regarding his communications with BRCS regarding BRCS's investigation regarding allegations made by Katie Farver and/or Robert Krakat.  Mr.

Respectfully submitted,

_____

Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia  22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

## **VERIFICATION**

I represent that I am authorized to sign these Supplemental Interrogatory Answers on behalf of Defendant and that the information contained herein is true and correct to the best of my information, belief and knowledge.

_____
Howard Anastasi

STATE OF _Alaska_         )
                          ) ss:
CITY/COUNTY OF _Fairbanks_ )

Subscribed and sworn to before me this _10_ day of April, 2008.

_____
Notary Public

My Commission Expires: _3/1/2012_

6

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   ------------------------------x
     ROBERT KRAKAT, et al.,          :
 4           Plaintiffs,             :
         v.                          :  CASE NO.: 1:07-cv-00693
 5   BROOKS RANGE CONTRACT RCL       :
 6   SERVICES, INC.,                 :
             Defendant.              :
 7   ------------------------------x

 8
                              Tuesday March 25, 2008
 9                            Bowie, Maryland

10

11   DEPOSITION OF:

12              GERALD LEROY WESSEL,

13   called for oral examination by counsel for the

14
15   Plaintiffs, at 14300 Gallant Fox Lane, Suite 120,

16   Bowie, Maryland, beginning at 9:56 a.m.,

17   Tuesday, March 25, 2008, before Lohna Esteb,

18   Court Reporter and Notary Public, when were present:
19

20

21

22

23

24

25
```

*Deposition Services, Inc.*
*6245 Executive Boulevard*
*Rockville, MD 20852*
*Tel: (301) 881-3344 Fax: (301) 881-3338*
*info@DepositionServices.com  www.DepositionServices.com*



EXHIBIT

C

50

1     Q.   I want to clarify your testimony on a couple of

2  points.  You testified earlier that Mr. Krakat, Robert

3  Krakat, never complained to you regarding Kevin Heffern

4  or Brooks Range Contract Services with respect to any

5  alleged wrongdoing --

6     A.   Right.

7     Q.   -- is that correct?

8     A.   Yes, ma'am.

9     Q.   And that is so during the course of his

10  employment, correct?

11     A.   Yes.

12     Q.   And after Mr. Krakat was terminated, did you

13  have an opportunity to speak to him?

14     A.   He called me a couple times.

15     Q.   Did you see him in person or just telephone

16  calls?

17     A.   Just telephone calls.  The last time I saw him

18  I think he was coming up the back steps the day -- it was

19  -- fired.

20     Q.   When you say he was coming up the back steps --

21     A.   That's where I go out to our office.  He went

22  up to see Mr. Rouse.

1    contract.  That's where your 12 percent would pop into

2    the play.

3         Q.   I had written down that you said 2500.  Was it

4    25,000?

5         A.   No, 2500, we require bids but not under our

6    IDIQ.  See, in other words, IDIQ has so much money put on

7    it for the year.  That's how much money we are spending

8    per year on this.

9              Now, we can add to it if we have to, but that's

10   -- it's a limited amount.

11        Q.   The air-conditioning units that were purchased,

12   you said that you were familiar with those?

13        A.   Right.

14        Q.   Does the 12 percent mark-up apply to the air-

15   conditioning units or is that a separate contract?

16        A.   That's a separate, individual contract.  In

17   other words, it doesn't apply to this.

18        Q.   Okay.

19        A.   Actually, I would probably apply it under the

20   Roger Bacon -- Davis-Bacon, I mean, as far as payout and

21   everything else goes.

22        Q.   Okay.  And would it have been you or the

1  contracting officer who would have approved the price

2  charged by Brooks Range for the --

3       A.    Contracting officer.   In fact, I'm pretty sure

4  he did the whole thing on that one.

5       Q.    To your knowledge, was there any issue with

6  Brooks Range's markup on the air-conditioning units?

7       A.    No.

8       Q.    You never showed this contractural provision or

9  any other provision referring to 12 percent markup to

10  Robert Krakat in connection with any discussion about the

11  air-conditioning units, correct?

12       A.    No.

13       Q.    Okay.   With respect to the tree removal bids,

14  are you aware of any Brooks Range internal policy that

15  they throw out the highest bid, throw out the lowest bid

16  and then take the mean bid?

17       A.    No, I'm not familiar with that.

18       Q.    If they had that policy where they

19  automatically removed the lowest bid, would that be kind

20  of issue or problem for the government?

21       A.    No, it's not a problem with the government

22  because first of all, we are going to do our own

60

1  government estimate.  If the bids they give to us are

2  within the range of the government estimate, then we feel

3  it's fair priced, the government.

4      Q.   Okay.  And would you normally see a bid that

5  was unsolicited?

6      A.   No, normally, you don't see that.

7      Q.   Because that's not something you want to see

8  because it wasn't solicited?

9      A.   Well, no, because of the fact -- unless we sent

10  out a request for a quote or proposal, we can't do that.

11  That goes through the contracting officer. He has to send

12  that out to get that quote.

13          Unless we awarded on, you know, on a sole

14  source, do a justification for sole source, then we would

15  ask for the three bids; otherwise, we don't ask for bids

16  because the bids are coming from different contractors.

17      Q.   The A. R. Bryant Construction bid, do you

18  recall that being within the approved government estimate

19  for that project?

20      A.   Almost every one of them prices on there were

21  within the bid of the government estimate.

22      Q.   It was considered reasonable, correct?

61

1      A.    Right.

2      Q.    Did you ever have any discussion with Robert

3   Krakat regarding the fact that you had not seen the

4   Kauffman proposal for the tree bid?

5      A.    No.

6      Q.    You never told him you never received it?

7      A.    I don't -- you know, I don't remember seeing

8   it, no.

9      Q.    Who is Donna Smith?

10     A.    Right now she's the CFO, chief financial

11  officer.  She's acting right now.

12     Q.    What was her position in February of '06?

13     A.    What I'm doing right now.  More or less.

14     Q.    Okay.  You were never present during any

15  discussion between Mr. Krakat, yourself and Ms. Smith

16  regarding Kevin Heffern in which you told Mr. Krakat that

17  you would keep an eye on Kevin and see what happens?

18     A.    No.

19     Q.    Okay.  You said earlier you were not aware of

20  any performance problems with either Robert Krakat or

21  Donald Krakat, correct?

22     A.    Right.

1          **CERTIFICATE OF NOTARY PUBLIC**

2          I, LOHNA ESTEB, the officer before whom the foregoing

3    deposition was taken, do hereby certify that the witness

4    whose testimony appears in the foregoing deposition was duly

5    sworn by me; that the testimony of said witness was taken by

6    me in stenotypy and thereafter reduced to typewriting under

7    my direction; that said deposition is a true record of the

8    testimony given by said witness; that I am neither counsel

9    for, related to, nor employed by and of the parties to the

10   action in which this deposition was taken; and, further,

11   that I am not a relative or employee of any counsel or

12   attorney employed by the parties hereto, nor financially or

13   otherwise interested in the outcome of this action.

14

15

16

17          LOHNA ESTEB
            Notary Public in and for the
18          State of Maryland

19
     My commission expires: 3/23/12
20

21

22

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
------------------------------x
ROBERT KRAKAT, et al.,           :
          Plaintiffs,            :
     v.                          : CASE NO.: 1:07-cv-00693
BROOKS RANGE CONTRACT RCL        :
SERVICES, INC.,                  :
          Defendant.             :
------------------------------x
```

Tuesday, March 25, 2008

Bowie, Maryland

DEPOSITION OF:

DAVID ROUSE,

called for oral examination by counsel for the

Plaintiffs, at 14300 Gallant Fox Lane, Suite 120,

Bowie, Maryland, beginning at 11:23 a.m.,

Tuesday, March 25, 2008, before Lohna Esteb,

Court Reporter and Notary Public, when were present:



EXHIBIT

F

4

1          A.    I'm not direct supervisor for that contract,

2    the COTR or core contracting officer's technical

3    representative or --

4               (Whereupon, a brief recess was taken.)

5               THE WITNESS:   I'm not the direct contracting

6    officer's technical representative or contracting

7    officer's representative.   It's called the COTR or core

8    who oversees the day-to-day operations of the contract

9    for the government.

10               BY MR. LEAHY:

11          Q.    And I think you have something which is labeled

12    Deposition Exhibit No. 1, which is a letter from Robert

13    Krakat to Steven McMannis (phonetically).

14               And can you tell me when you first saw this

15    letter?

16          A.    I would say probably February 27, 2006 when I

17    received this e-mail.

18          Q.    And when is the first time you had heard Robert

19    or Donald Krakat make allegations that Brooks Range was

20    billing in any kind of improper manner?

21          A.    I would say about this time when I received

22    this letter.

5

1       Q.    Had either Robert other Donald Krakat come to

2   you prior to receipt of this letter to tell you they'd

3   been suspended or terminated?

4       A.    Mr. Krakat, Bob Krakat, the older, had come to

5   me and told me that.

6       Q.    Prior to coming to you and telling you that

7   they'd been suspended or terminated, had he come to you

8   to discuss what he thought were allegations of wrongdoing

9   by Brooks Range?

10      A.    Not prior to that.

11      Q.    Are you aware whether or not Robert Krakat or

12  Donald Krakat made the allegation of any wrongdoing to

13  anybody in the government prior to coming to you to let

14  you know he had been suspended or terminated?

15      A.    Not that I know of.

16      Q.    What did you do when you got this letter we

17  marked as Exhibit 1?

18      A.    We contacted the contracting officer at the

19  Bureau of Public Debt, and forward it on to them for

20  action.

21      Q.    Would that be Jeff Schaffer?

22      A.    Either going to be Jeff Schaffer or it may have

1                    CERTIFICATE OF NOTARY PUBLIC

2           I, LOHNA ESTEB, the officer before whom the foregoing

3    deposition was taken, do hereby certify that the witness

4    whose testimony appears in the foregoing deposition was duly

5    sworn by me; that the testimony of said witness was taken by

6    me in stenotypy and thereafter reduced to typewriting under

7    my direction; that said deposition is a true record of the

8    testimony given by said witness; that I am neither counsel

9    for, related to, nor employed by and of the parties to the

10   action in which this deposition was taken; and, further,

11   that I am not a relative or employee of any counsel or

12   attorney employed by the parties hereto, nor financially or

13   otherwise interested in the outcome of this action.

14

15

16

17                    LOHNA ESTEB
                      Notary Public in and for the
18                    State of Maryland

19
     My commission expires:  3/23/12
20

21

22

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, MARYLAND

-------------------------------x

ROBERT KRAKAT and DONALD :
KRAKAT,  :
  :
  Plaintiffs, :
  :
  v. :Case No. 1:07-CV-00693-RCL
  :
BROOKS RANGE CONTRACT SERVICES,:
INC., :
  :
  Defendant. :
  :

-------------------------------x

     Friday, February 29, 2008

     Rockville, Maryland


Deposition of

   HOWARD ANASTASI

witness, called for examination by counsel for

plaintiff, pursuant to notice, at the office of Byrd and

Byrd, LLC,

14300 Gallant Fox Lane, Suite 120, Bowie, Maryland

20715, beginning at 3:17 p.m., before Donna Escobar, a

notary public of the State of Maryland, when were

present on behalf of the respective parties:


**EXHIBIT**

G

Page 126

1 every other time I talked to him to the point of being

2 quite upset that this was allegedly too place.

3    Q    Did you ever contact Byron Claire to talk with

4 him about whether the problems with Kevin Heffren and

5 Virginia Contracting Services had been reported to him?

6    A    I did not talk to Byron.  The last time I

7 talked to Brian, he called me.  He had a good job

8 opportunity.  I gave him a stellar reference.  We had

9 kind of a 15, 20 minute chat.  I was asking him about his

10 experience.  He had gone to another company after leaving

11 us.  Thanked me for the opportunity because it looked

12 good on his resume coming out of the Navy.  He called me

13 back a couple days later to thank me for the reference,

14 he got the job.  I have not talked to Brian, quite

15 frankly okay, since then.  So I didn't call Brian

16 regarding this.

17    Q    Now you had your hearings with the Krakats at

18 the Armed Forces Retirement Home, I think two hearings,

19 one on February 21st, one on February 23rd.

20    A    I had four all together.  Two with each

21 gentleman.

22    Q    Who was present for those meetings?

Page 127

1   A   Myself, Kevin Heffren and obviously in Donald's

2 meeting, Donald.  In Robert's meeting, Robert.

3   Q   And where were all four of those meetings held?

4   A   They were in a conference room which was, just

5 by happenstance, I was curious the other day, we had a

6 measuring wheel, 23 feet away from the closest point that

7 Katie Farver could have been to the conversation behind

8 file cabinets which are two feet deep.  A reinforced

9 block wall which is one foot thick.  Behind that wall in

10 a conference room with an outer door closed and a

11 conference room door closed.  So that's where the

12 meetings were held.  And I sat like this with my back to

13 where the outer office is and talked that way, and the

14 Krakats spoke this way.

15   Q   And were all four meetings held the same way?

16   A   Same place.  Same way.  Same MO.

17   Q   Each time all doors closed?

18   A   Absolutely.  Kevin actually stood, Kevin never

19 sat through any of the meetings.  Kevin actually stood up

20 against the door with the door closed.  And it wasn't by

21 design.  It's just where he happened to be.  I never

22 conduct meetings in the general public.  Not like this.

Page 128

1 It's not anybody else's business.

2    Q    I noticed in your hearing notes from Robert

3 Krakat on the 23rd that you indicated that he had given

4 you an envelope with papers apparently about Kevin

5 Heffren and that you had indicated that you would review

6 the papers that he gave you.  What were those papers?

7    A    They were just the allegation of Virginia

8 Contracting was in there, and there was some stuff he

9 said that he had hired a private investigator and that

10 Kevin had been sued by other people, and that, let's see,

11 Kevin had been sued.  Kevin had been fired.  Kevin had

12 this company, Virginia Contracting.  There was no

13 allegation of anything regarding inappropriate dealings

14 with the government, just internal.  That this was, oh,

15 Kevin wanted to get him fired because Kevin knew he knew

16 this and that, you know, I tried to explain it to him

17 that Kevin had nothing to do with him being terminated,

18 because he didn't.  I'm the one that did it.  I made the

19 decision.  It was fait accompli the date I hired him.

20 Just a matter of time.

21          And I forget what.  It seemed to me there was

22 some court documents that he had said that a private

1 investigator had retrieved out of some court, and Robert

2 was upset.  I was shocked because he picked up his shirt

3 and pulled out an envelope and flung it across the table.

4 And whatever we got, you should have a copy of.  So, I

5 mean, I don't recall every document.  It wasn't like a

6 thing like that, you know.  It wasn't two inches thick.

7 It was relatively thin.  There was a few documents in

8 there.

9      Q    But your understanding is that the documents

10 that Robert Krakat gave you that day have been produced

11 to us in discovery?

12      A    Yes.

13           MR. LEAHY:  If we could take a five minute

14 break, I think we could wrap up.

15           (Whereupon, a brief recess was taken.)

16           MR. LEAHY:  Back on the record.

17           BY MR. LEAHY:

18      Q    Mr. Anastasi, for the record could you identify

19 what's been marked as Deposition Exhibit 15?

20      A    Fifteen is the weekly reports.

21      Q    All right, well, I don't have any further

22 questions for him.  So thank you very much for your time.

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Donna Escobar, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me electronically and thereafter reduced to typewriting by me or under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

_____

NOTARY PUBLIC OF THE
STATE OF MARYLAND

My Commission Expires:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT KRAKAT and<br>DONALD KRAKAT, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No:  1:07-cv-00693-RCL |
| | ) | |
| BROOKS RANGE CONTRACT SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF HOWARD ANASTASI

I, Howard Anastasi, being duly sworn under oath do hereby state as follows:

1.    I am over the age of 18 and have personal knowledge regarding the facts contained in this Affidavit.  I am making this Affidavit freely and voluntarily.

2.    I am the Human Resources Director for Brooks Range Contract Services, Inc. ("BRCS").

3.    I made the decision to suspend and terminate Robert Krakat and Donald Krakat from employment at BRCS.  I was the only decision-maker.  There were no other decision-makers with respect to Plaintiffs' suspensions and terminations.  Neither Thomas Starr, Jerry Wessell, David Rouse, nor Donna Smith made the decision to suspend and/or terminate Plaintiffs' employment.

4.    At the time that I made the decision to suspend and terminate Plaintiffs' employment, I had no knowledge of any complaint made by either Plaintiff regarding Kevin Heffern, fraudulent invoicing, or any other wrongdoing by Mr. Heffern or BRCS.

EXHIBIT

H

I affirm that the foregoing is true to the best of my knowledge.

Howard Anastasi

STATE OF ALASKA                                          )
CITY/COUNTY OF Fairbanks North Star )  ss:

Subscribed and sworn to before me this 17th day of June 2008.

Notary Public

My Commission Expires: 03/01/2012

1620198v1

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT and )
DONALD KRAKAT, )
 )
Plaintiffs, )
 )
 ) Case No: 1:07-cv-00693-RCL
v. )
 )
BROOKS RANGE CONTRACT SERVICES, INC., )
 )
Defendant. )

### PLAINTIFF'S ANSWERS TO DEFENDANT BROOKS RANGE CONTRACT SERVICES, INC.'SFIRST SET OF INTERROGATORIES

NOW COME Plaintiffs Robert Krakat and Donald Krakat. (collectively "Plaintiffs"), by and through their undersigned counsel, and pursuant to Rule 33(b) of the Federal Rules of Civil Procedure hereby answers the following Interrogatories propounded by Defendant Brooks Range Contract Services, Inc. ("Defendant") as follows:

### Objections

1.    Plaintiffs object to the interrogatories to the extent they call for disclosure of confidential information or documents protected by the attorney-client, work product or other privilege or protection.

2.    Plaintiffs object to the interrogatories to the extent they call for disclosure of information obtained or prepared in anticipation of litigation and/or trial preparation material without the showing required under the Rules of this Court.

3.    Plaintiffs object to the interrogatories to the extent they seek disclosure of information not relevant to the issues raised in this lawsuit, and not reasonably calculated to lead to the discovery of admissible evidence.



EXHIBIT
I

provided other than the allegations made by Kevin Heffern and Howard Anastasi. Shortly after the Plaintiffs were fired, one of Plaintiffs' work colleagues, Katie Farver, addressed Kevin Heffern's fraudulent billing with Howard Anastasi and Ms. Farver was also fired the morning of February 23, 2007.

**INTERROGATORY NO. 3:**     Identify all Federal and District of Columbia statutes you alleged BRCS violated, including without limitation, those relating to BRCS's invoicing and its termination of your employment.

**Answer:** Plaintiffs object to this interrogatory as it calls for a legal conclusion. Without waiving the objection, see D.C. Code §§ 22-3201 et. seq. for both fraud and theft. D.C. Code § 22-1805a.

**INTERROGATORY NO. 4:**     Identify all persons to whom you complained of, and/or reported, the allegedly unlawful conduct of Heffern during your employment with BRCS, and which you reference in your Complaint.

**Answer:**     See Complaint, also Robert Krakat complained of and/or reported Heffern to Tom Starr, Donna Smith, Jerry Wessell, and David Rouse. On information and belief, Byron Claire also discussed the matter with BRCS

Donald Krakat complained of and/or reported Heffern to Robert Krakat and to Katie Farver.

**INTERROGATORY NO. 5:**     Describe in detail all facts and circumstances surrounding your termination of employment from BRCS. Include in your answer the following: (a) the identity of the person(s) who told you that you were being terminated; (b) the date, time, and location thereof; (c) the substance of what was told to you and the substance of your

4

**INTERROGATORY NO. 7:**       Describe in detail all "accusations of theft, poor performance, and excessive absenteeism," or any other statements alleged by you to be defamatory, regarding Plaintiffs, and allegedly made by BRCS. Include in your answer the following for each such alleged statement: (a) the date, time, and location thereof; (b) the identity of the person who made the alleged statement; (c) the identity of persons who were present or who otherwise may have heard the statement; (d) the specific substance and form (e.g., in person, email, telephone conversation, etc.) of the alleged statement; and (e) the identity of all documents relating to such alleged statement.

**Answer:** On February 23, 2006 at approximately 10:00 a.m., Howard Anastasi and Kevin Heffern informed Plaintiffs that they were being terminated as the AFRH had alleged that Plaintiffs were stealing. Katie Farver was present at this meeting. Robert Krakat subsequently asked Mr. Rouse, the chief operating engineer of AFRH, if he or anyone at the home had made allegations that the Plaintiff's had stolen from the AFRH, and Mr. Rouse stated that no one at AFRH made statements alleging that Plaintiff's stole.

**INTERROGATORY NO. 8:**       Describe in detail all facts which support your contention that "Heffern allegedly charged the government over $500 ea. for air conditioning units which cost BRCS $200.00 when BRCS was allowed a 12% markup – to $224.00," as alleged in paragraph 8 of the Complaint. Include in your answer the following: (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; and (d) the identity of all other persons with knowledge of it.

**Answer:**       During the summer of 2005, Plaintiff Robert Krakat was informed by Jerry Wessell, a Contracting Officer for AFRH, Katie Farver, and Donald Krakat that AFRH

Rouse that he was under the impression that Mr. Heffern was trying to get rid of him.  Mr. Rouse informed Plaintiff Robert Krakat that he was going straight to Mr. Quinlan, CEO of BRCS to discuss the situation, and stated that he would get back to Plaintiff Robert Krakat.

**INTERROGATORY NO.14:**     Describe in detail all facts and circumstances which support your contention that Defendant "acted tortiously and with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the Plaintiff's rights, and under circumstances that aggravated Plaintiff's injuries," as alleged in paragraphs 34, 40, 45, and 51 of the Complaint.

**Answer:**  Plaintiffs object to this interrogatory as it calls for a legal conclusion.  Without waiving that objection, Defendants terminated Plaintiffs' employment with BRCS for allegedly stealing from AFRH, an allegation that was made up by Defendants in an effort to keep Plaintiffs from exposing the fraudulent billing of Defendants to AFRH. After the termination of Plaintiffs, Defendants relayed the false statements, that Plaintiffs stole from AFRH, to other individuals, including Katie Farver, other BRCS employees and government agents, painting Plaintiff's in a bad light.  See also factual allegations included in the Complaint.

**INTERROGATORY NO. 15:**     Describe in detail all facts and circumstances which support your contention that "Defendant reduced its false accusations to writing and published those accusations to individuals who worked for both the Home and for BRCS," as alleged in paragraphs 39 and 50 of the Complaint.  Include in your answer the following:  (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; (d) the identity of all other persons with knowledge of it; and (e) the identity of all such writings or documents referred to in the allegation.

**Answer:** Plaintiffs object to this interrogatory as it calls for a legal conclusion. Without waiving that objection, on information and belief Howard Anastasi prepared the fake disciplinary log, attached to Plaintiff's document production, containing false and defamatory statements, and passed it on to other employees of BRCS. Plaintiffs reserve the right to supplement this answer as discovery progresses.

**INTERROGATORY NO. 16:**    Describe in detail all disciplinary actions taken against you by BRCS, including without limitation, all formal and informal counseling sessions, reprimands, and warnings. Your answer should include, without limitation, the date of each such action, the subject of such action, from whom the action was received, and the steps you took to correct your conduct and/or misconduct.

**Answer:** No disciplinary action was ever taken against Plaintiffs by BRCS, prior to Plaintiffs' termination.

**INTERROGATORY NO. 17:**    If you have ever been arrested and/or convicted of a crime, state the date of every arrest/conviction and the court, identify each crime for which you were arrested and/or convicted, and the city and state of each such arrest/conviction.

**Answer:** Plaintiff Robert Krakat has never been arrested and/or convicted of a crime. Plaintiff Donald Krakat was convicted of DUI in May 2004 in Carroll County, Maryland.

**INTERROGATORY NO. 18:**    Describe in detail your claim for monetary damages, including: (a) each element of monetary damages claimed, (b) the amount of each element of monetary damages claimed, and (c) a complete explanation of the calculation method, amount or value of each element of money damages claimed.

**Answer:** Objection to the extent the interrogatory seeks a legal conclusion. Without waiving the objection, Plaintiffs have each lost income, continue to lose income, have suffered

**INTERROGATORY NO. 24:**    State whether you have been involved as a party in any litigation or administrative action other than the instant case.  For each such action, state (1) the court or agency in which such litigation or action was brought, (2) the parties to the litigation or administrative action, and (3) the outcome of such litigation or administrative action.

**Answer**:  Neither plaintiff has been involved as a party in any litigation or administrative action other than the instant case.

**INTERROGATORY NO. 25:**    State whether you intend to rely on any alleged admission made by any Defendant and/or Defendant's agents, in this action; and if so, identify the person making the admission, the person(s) to whom the admission was made, any document relating to such admission, and the substance of each such admission.

**Answer:**  Objection to the extent the request seeks a legal conclusion. Without waiving the objection, see Heffern, Rouse, Starr, and Farver statements disclosed herein. Plaintiffs reserve the right to supplement this answer as discovery continues.

**WE SOLEMNLY DECLARE AND AFFIRM** under the penalties of perjury that we are over eighteen (18) years of age, competent to make this declaration, and that the contents of the foregoing Answers to Interrogatories are true to the best of our knowledge, information and belief.

Robert Krakat

Donald Krakat

Respectfully Submitted:

Byrd & Byrd, LLC

Timothy P. Leahy
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
(301) 464-7448
(301) 8-5-5178 – Fax
Tleahy@byrdandbyrd.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 2\_ day of September, 2007, a copy of the foregoing Answers to Interrogatories was mailed first class, postage pre-paid to:

Karen A. Doner (Bar No. 458626)
Thomas J. McKee, Jr. (Bar No. 492482)
Williams Mullen, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia 22102
703-760-5200 (phone)
703-748-0244 (fax)

Timothy P. Leahy



## Proposal

**Armed Forces Retirement Home**

| Requested by |
|---|
| Jerry Wessel |

| Description of Work |
|---|
| Snake drain lines LaGarde kitchen grease pit. WO#05-010616 |

| Quantity | Unit | Description | Labor | | Material | |
|---|---|---|---|---|---|---|
| | | | Cost | Total | Cost | Total |
| 26 | hrs | 9/30 maintenance mechanic | $61.55 | $1,600.30 | | |
| 20 | hrs | 10/01 maintenance mechanic | $61.55 | $1,231.00 | | |
| 8 | hrs | 10/02 maintenance mechanic | $61.55 | $492.40 | | |
| 1 | ea | fuel | | | $161.48 | $161.48 |
| 1 | ea | subcontractor clean-up grease spills 9/30 & 10/01 | | | $1,750.00 | $1,750.00 |
| 1 | ea | subcontractor snake and jet lines 9/30 | | | $1,200.00 | $1,200.00 |
| 1 | ea | subcontractor snake lines 10/01 | | | $900.00 | $900.00 |
| 1 | ea | subcontractor snake lines 10/04 | | | $1,200.00 | $1,200.00 |
| 6 | hrs | 10/3 maintenance mechanic | $61.55 | $369.30 | | |
| 8 | hrs | 10/4 maintenance mechanic | $61.55 | $492.40 | | |
| 4 | hrs | 10/5 maintenance mechanic | $61.55 | $246.20 | | |
| 10 | hrs | 10/6 maintenance mechanic | $61.55 | $615.50 | | |
| 1 | ea | subcontractor to snake lines 10/6 | | | $1,200.00 | $1,200.00 |
| 1 | ea | Service Call | $20.70 | $20.70 | | |

Estimate#    10250013

Date:    9/30/05   RWA or PO Number   _____

Approved By:   _____ Jerry Wessel    Date:    9/30/05

Completion Date__10/7/05__  Approved for billing by   _____ Jerry Wessel

VISA #   _____ Exp. Date   _____

| | |
|---|---|
| Labor Total | $5,067.80 |
| Parts Total | $6,411.48 |
| Handling 12% | $769.38 |
| Labor | $5,067.80 |
| Subtotal | $12,248.66 |
| Less $1000 | -$1,000.00 |
| **Total** | **$11,248.66** |

**EXHIBIT**

tabbies

✓

BRCS-00572
CONFIDENTIAL



## Proposal

**Armed Forces Retirement Home**

| Requested by |
| --- |
| Jerry Wessel |

| Description of Work |
| --- |
| Replace 10' of Pipe in Pipes<br>WO#05-010863 |

| Quantity | Unit | Description | Labor | | Material | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Cost | Total | Cost | Total |
| 32 | hrs | maintenance mechanic | $61.55 | $1,969.60 | | |
| 1 | ea | 4" SCH 40 PVC - 10' stick | | | $8.79 | $8.79 |
| 2 | ea | SCH 40 to 4" cast no-hub adaptor | | | $18.50 | $37.00 |
| 1 | ea | chain snap-cutters 4' | | | $499.99 | $499.99 |
| 1 | ea | subcontractor clean-up waste water | | | $1,000.00 | $1,000.00 |
| 2 | ea | package sawzall blades | | | $22.50 | $45.00 |
| 8 | hrs | GMW notify residents of bathroom closures | $43.20 | $345.60 | | |
| 8 | hrs | electrician relamp / repair water damaged fixtures | $61.00 | $488.00 | | |
| 1 | ea | Service Call | $20.70 | $20.70 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Estimate#    10250020

Date:    10/7/05  RWA or PO Number _____

Approved By: _____  Jerry Wessel  Date: ___ 10/12/05

Completion Date_10/20/05_  Approved for billing by _____  Jerry Wessel

VISA # _____  Exp. Date _____

| | |
| --- | --- |
| Labor Total | $2,823.90 |
| Parts Total | $1,590.78 |
| Handling 12% | $190.89 |
| Labor | $2,823.90 |
| **Total** | **$4,605.57** |

**BRCS-00573**
**CONFIDENTIAL**



## Proposal

**Armed Forces Retirement Home**

| Requested by |
| --- |
| Jerry Wessel |

| Description of Work |
| --- |
| PIPES - KATRINA<br>Repair Roof Leak at Pipes/LaGarde Connector<br>WO#05- |

| Quantity | Unit | Description | Labor | | Material | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Cost | Total | Cost | Total |
| 8 | hrs | maintenance mechanic | $61.55 | $492.40 | | |
| 1 | ea | subcontractor labor/material to repair roof leaks | | | $3,855.00 | $3,855.00 |
| 4 | hrs | GMW mop & clean-up water | $43.20 | $172.80 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Estimate#    10250026

Date:    10/28/05  RWA or PO Number    _____

Approved By:    _____ Jerry Wessel    Date:    11/3/05

Completion Date_11/3/05_  Approved for billing by  _____ Jerry Wessel _____

VISA # _____  Exp. Date  _____

| | |
| --- | --- |
| Labor Total | $665.20 |
| Parts Total | $3,855.00 |
| Handling 12% | $462.60 |
| Labor | $665.20 |
| **Total** | **$4,982.80** |

BRCS-00574
CONFIDENTIAL

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3    ROBERT KRAKAT and DONALD        )

4    KRAKAT,                         )

5              Plaintiffs,           )  Case No.

6              -vs-                  )  1:07cv00693-RCL

7    BROOKS RANGE CONTRACT           )

8    SERVICES, INC.,                 )

9              Defendant.            )

10

11                                   Monday, January 21, 2008

12                                   McLean, Virginia

13   Deposition of

14                      KATIE FARVER

15   called for examination by counsel for the

16   Defendant, pursuant to notice, held at the

17   offices of, Williams Mullen, PC, 8270 Greensboro

18   Drive, Suite 700, McLean, Virginia 22102,

19   beginning at 10:01 a.m., before Bonnie Marcus

20   Olachea, a notary public in and for the

21   Commonwealth of Virginia, when were present on

22   behalf of the respective parties:
```

ORIGINAL

EXHIBIT

K

METRO REPORTERS, INC.

(703) 968-9796        FAX (703) 643-3039

1    A.    I don't think so.

2    Q.    Were you present when Donny was

3    terminated?

4    A.    No.

10:49:07AM  5    Q.    Where were you at that time?

6    A.    At my desk.

7    Q.    And you said they were in a backroom,

8    so they were not in Kevin's office; is that

9    correct?

10:49:20AM 10    A.    That's correct.

11    Q.    Can you hear -- sitting at your desk

12    can you hear what's being discussed during -- at

13    that backroom?

14    A.    No.

10:49:27AM 15    Q.    Okay.  So you couldn't hear anything

16    that was said during the time that Donny was

17    terminated; is that correct?

18    A.    Correct.

19    Q.    Did you talk to Donny before he went

10:49:49AM 20    into that meeting?

21    A.    About what?

22    Q.    About anything.

1    A.    Yes.

2    Q.    Okay.  Did he know that he was or did

3    he tell you that he felt he was going to be

4    terminated?

10:50:04AM  5    A.    No.

6    Q.    Okay.  Did he tell you that he didn't

7    think he would be terminated?

8    A.    At that time?  No.

9    Q.    At that time.  Did he discuss anything

10:50:17AM  10    about what he thought the meeting would be

11    about?

12    A.    No.

13    Q.    Do you recall what you did discuss

14    with him?

10:50:24AM  15    A.    Good morning, you know, stuff like

16    that.

17    Q.    Okay.  When he came out of the room

18    what happened?

19    A.    He came out.  Kevin was following

10:50:48AM  20    behind him, took him to go get his tools from

21    his locker.  Compartment area, I don't know what

22    you would call it, and kept saying, man, I

1    didn't do this, Donny.  I didn't do this.

2         Q.    You heard him say that?

3         A.    Yes.

4         Q.    Were you following them, too?

10:51:11AM  5    A.    Yes.

6         Q.    Was anyone else there?

7         A.    Robert had not gone in yet.  I think

8    Howard -- Howard might have been out there as

9    well.  I think he went out and smoked, but I

10:51:32AM 10    don't know.  This was in the shop area.

11               They walked through the door that

12    connects the office to the shop and over to get

13    Donny's stuff, and then out into the parking

14    lot.

10:51:44AM 15    Q.    So Robert -- was Robert walking with

16    you all?

17         A.    No.

18         Q.    So it was Donny, Kevin, and you

19    walking from the office to the locker.  And then

10:52:01AM 20    did Kevin come out to the parking lot as well?

21         A.    Yes.  He stood there and watched me.

22    They had taken separate cars that day.  We were

1    at Donny's car.

2             And Kevin kept going, Katie, get back

3    in here.   Katie --

4             So, yeah, he was standing by the

10:52:17AM  5    doorway.

6        Q.   Did Kevin go back inside and you

7    stayed outside to talk to Donny?

8        A.   I stayed outside to talk to Donny but

9    Kevin stood there and watched me.

10:52:28AM  10       Q.   Okay.   Could he hear what was being

11   discussed do you know?

12       A.   I don't know.   You would have to ask

13   him.

14       Q.   How far away was he from you and Donny

15   at the time?

16       A.   We were in the parking lot by the car

17   and he was by the wall.   I don't know how far it

18   is.

19       Q.   More than 10 feet would you say?

10:52:41AM  20       A.   No.

21       Q.   Okay.   What did Donny say to you at

22   that time regarding his termination?

1    A.   He told me that Kevin, you know, kept

2  saying that it wasn't his fault.

3         And I told him, yeah, I already heard

4  him say that.

10:53:09AM  5         And Donny was mad.  He didn't really

6  say much.  He was just mad.  He told me it would

7  be okay, It would be okay.

8         Cause I told him that I wouldn't let

9  them do this, and that I would quit too if they

10:53:26AM 10  were going to wrongfully terminate them.

11         And he left.

12    Q.   You told Donny that you would quit?

13    A.   Yes.

14    Q.   Okay.  So since Donny had been

10:53:38AM 15  terminated at that point, did you tell Donny

16  that you were going to quit?

17    A.   If the government -- what my words

18  were, If the government really let this happen

19  that I would quit too, because I don't want to

10:53:56AM 20  work for a bunch of crooks.

21    Q.   Okay.  And then you went inside?

22    A.   I went inside when Donny left, yes.

1          Q.    Okay.  You said Donny was mad.  What

2     was he doing that indicated to you he was mad?

3          A.    His face was red and he was walking

4     real fast, and Kevin kept following him.  He

10:54:17AM  5     told Kevin, go away.

6          Q.    Anything else?

7          A.    No.  Who wouldn't be mad?

8          Q.    I'm just asking how you knew he was

9     mad.  Did -- was he cursing?

10:54:32AM 10          A.    At me?

11          Q.    No, about the situation.

12          A.    I don't remember.

13          Q.    Okay.  Did you see -- strike that.

14              When Donny came out of the room did he

10:54:51AM 15     say anything to you regarding the fact that he

16     had just been terminated when you started

17     following him and Kevin?

18          A.    No.

19          Q.    Okay.  How did you know he had been

10:55:01AM 20     terminated, or when did you first learn he had

21     been terminated?

22          A.    When he told me.

1    Q.    Okay.  Was it before you got to the

2    parking lot or at the parking lot?

3    A.    He didn't tell me what happened until

4    we got into the parking lot by his car.  But

10:55:17AM  5    when he was packing his tools and being escorted

6    out by Kevin, I kind of assumed that they had

7    terminated his employment.

8    Q.    Okay.  And then you went back inside

9    after you spoke to him and he left; is that

10:55:30AM  10    right?

11    A.    Yes.

12    Q.    Okay.  And then did you -- where was

13    Robert when you came back into the building?

14    A.    In the little hallway between the

10:55:42AM  15    office and the shop.

16    Q.    Okay.  And had he already been

17    terminated at that time?

18    A.    No.  Kevin was still outside watching

19    me.  Kevin hadn't gone back inside yet.

10:55:53AM  20    Q.    Okay.  What happened next?

21    A.    Bob went back into the room with Kevin

22    and Howard.

1  Q. Did anyone tell Bob or did he know

2 that Donny had just been terminated?

3  A. I don't know.  I assume he knew, but

4 you'd have to ask him.

10:56:23AM 5  Q. You didn't tell him?

6  A. No.  I didn't talk to Bob.

7  Q. Okay.  So he went into the meeting.

8 Was that meeting also in the back room, the same

9 one where they had met with Donny?

10:56:37AM 10  A. Yes.

11  Q. And where were you while Bob was back

12 in the room?

13  A. At my desk.

14  Q. Okay.  You couldn't hear anything that

10:56:41AM 15 was going on in the room?

16  A. I heard Howard get loud a few times,

17 but, no.

18  Q. You couldn't hear specifically what he

19 said?

10:56:49AM 20  A. No.

21  Q. Could you hear what anyone else said

22 during the meeting?

1         A.    No.

2         Q.    Okay.  What happened next?  Did Robert

3    come out of the room?

4         A.    Yes.

10:57:14AM  5    Q.    Okay.  And did you speak to him?

6         A.    Yes.

7         Q.    What did he say to you?  What did you

8    say to him?

9         A.    I just kept saying what they were

10:57:31AM 10   doing was not right, and he said he knows.

11        Q.    Anything else discussed?

12        A.    He told me that he was also

13   terminated.

14        Q.    Did he say why?

10:57:57AM 15   A.    I don't remember at that point he told

16   me why, because then it was my turn to talk to

17   Howard, so I don't know.

18              When we talked on the phone after that

19   we definitely discussed that he was fired for

10:58:24AM 20   theft, but at that point I'm not sure.

21        Q.    Did you walk with Robert outside?

22        A.    He didn't go outside.

METRO REPORTERS, INC.

(703) 968-9796          FAX (703) 643-3039

1      Q.    Where did he go when he came out of

2   the meeting and after he was done talking to

3   you?

4      A.    I'm not sure but when I came out --

10:58:40AM  5   when I was in the office with Howard and Kevin,

6   he was still out in the office area so I'm not

7   sure where -- if he went into the shop and then

8   came back in.

9           I don't know.

10:58:53AM  10      Q.    Okay.  Did Howard or Kevin ask to

11   speak to you or did you ask to speak to them?

12      A.    I asked to speak to them.

13      Q.    Okay.  Tell me what happened.

14      A.    Didn't we discuss this?  I can tell

10:59:07AM  15   you again.

16      Q.    Well, again, yes.  I want to make sure

17   I'm not missing anything.  You asked to speak to

18   them and --

19      A.    I asked to speak to Howard.  I told

10:59:14AM  20   Howard he knew this wasn't right.  He had

21   already had knowledge of the company Kevin made.

22   I was completely confused because we thought

1    that he was coming to fire Kevin.  I kept asking

2    what happened.

3              He told me I didn't know what I was

4    talking about.  I needed to mind my own

10:59:36AM  5    business.

6              Then Kevin came back in.  I think

7    Kevin was smoking or something but Kevin came

8    back in the office.  Howard told me to sit down.

9    I was sitting at the head of the table.  Howard

10:59:44AM  10   was on my left, and Kevin was on my right.

11             And Howard asked why I was crying and

12   making a big deal about everything.  And that's

13   when I went into what he was doing was not

14   right.  I didn't want to work for a company like

11:00:00AM  15   that, and that I would go and write him a

16   resignation letter and give him my two-week's

17   notice.

18        Q.   Did he tell you that he was

19   terminating you prior to you saying that you'd

11:00:17AM  20   give him two-week's notice?

21        A.   No.

22        Q.   Did he ever say, you're being

1    terminated or you're fired?  Or did he just tell

2    you if you didn't sit down and shut up, then you

3    could leave?

4        A.    Yes.

11:00:37AM  5        Q.    That's all he said, right?  Okay, he

6    never said to you that you're being terminated

7    or you're fired, correct?

8        A.    Correct.

9        Q.    Okay.  And you were crying; is that

10   correct?

11       A.    Yes.

12       Q.    Okay.  And then was that it?  Was

13   there anything else discussed?  Is that

14   everything you can think of?

11:00:58AM 15       A.    No.  I said -- I also asked Howard

16   before the two-week's notice thing I asked him,

17   what did they steal?  What did they steal?

18            And he -- his response to pretty much

19   everything was that I didn't know what I was

20   talking about, that I was naive, or to shut up

21   and sit down.

22       Q.    Do you recall specifically what he

1    said to you when you asked what they stole?

2        A.    It was one of the three.  Either shut

3    up and sit down, I was naive, or I didn't know

4    what I was talking about.

11:01:31AM  5        Q.    So Howard, nor Kevin, told you during

6    that conversation that either of the Krakats had

7    been terminated because of theft; is that

8    correct?

9        A.    Correct.

11:01:52AM  10        Q.    In fact they didn't discuss the reason

11    for the termination with you, correct?

12            MR. LEAHY:  Objection; asked and

13    answered.

14            THE WITNESS:  What?

11:01:59AM  15    BY MS. DONER:

16        Q.    You can answer.

17        A.    At that meeting?

18        Q.    Correct.

19        A.    No.  At my termination whatever

11:02:08AM  20    meeting, no.

21        Q.    Okay.  And you left the room.  And

22    what happened?

CERTIFICATE OF NOTARY PUBLIC

1

2          I, Bonnie Marcus Olachea, the officer

3    before whom the foregoing deposition was taken,

4    do hereby certify that the witness whose

5    testimony appears in the foregoing deposition

6    was duly sworn by me; that the testimony of said

7    witness was taken by me in stenotype and

8    thereafter reduced to typewriting under my

9    direction; that said deposition is a true record

10   of the testimony given by said witness; that I

11   am neither counsel for, related to, nor employed

12   by any of the parties to the action in which

13   this deposition was taken; and, further, that I

14   am not a relative or employee of any attorney or

15   counsel employed by the parties hereto, nor

16   financially or otherwise interested in the

17   outcome of the action.

18          *Bonnie M. Olachea*

19   Notary Public in and for
     The Commonwealth of Virginia

20   *Registration No. 345468*

21   *My Commission Expires:*
     *May 31, 2008*

22

METRO REPORTERS, INC.

(703) 968-9796          FAX (703) 643-3039

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT KRAKAT and | ) | |
| DONALD KRAKAT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No: 1:07-cv-00693-RCL |
| | ) | |
| BROOKS RANGE CONTRACT SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### **<u>ORDER</u>**

UPON CONSIDERATION of Defendant Brooks Range Contract Services, Inc.'s

("Defendant" or "BRCS") Motion for Summary Judgment, and any opposition thereto, it is

hereby

ORDERED that Defendant's Motion is hereby GRANTED and SUMMARY

JUDGMENT is hereby ENTERED in favor of Defendant Brooks Range Contract Services, Inc.;

and it is further

ORDERED that Defendant's Complaint is dismissed with prejudice.

IT IS SO ORDERED.

Entered this ___ day of _____, 2008.

_____
U.S. District Court Judge

WE ASK FOR THIS:


_____/s/_____
Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia   22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant


SEEN AND _____:


_____
Timothy P. Leahy, Esq.
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
Counsel for Plaintiffs