**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT KRAKAT and** | ) |
| **DONALD KRAKAT,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) **Case No: 1:07-cv-00693-** |
| **RCL** | |
| | ) |
| **BROOKS RANGE CONTRACT SERVICES, INC.,** | ) |
| | ) |
| **Defendant** | ) |
| | ) |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

      **NOW COME** the Plaintiffs Robert Krakat and Donald Krakat. (collectively "Plaintiffs"), by and through their undersigned counsel, and hereby files this Reply in Opposition to Motion for Summary Judgment filed by the Defendant Brooks Range Contract Services, Inc. ("Defendant") as follows:

## I.    <u>Introduction</u>

      Robert Krakat worked for the Federal Government at the Armed Forces Retirement Home ("AFRH") for over 30 years in essentially the same position although over the last few years he worked for contractors rather than as a federal employee. During 2005 and in part during the aftermath of Hurricane Katrina, when the Federal Government was getting work completed without competitive bids, the Krakats and Katie Brinn nee Farver ("Katie Brinn") came to understand that Kevin Heffern ("Heffern"), their superior and Project Manager at the Defendant's AFRH jobsite, was directing subcontract work to Heffern's fiancée, friends, and using Defendant's employees to do the work that those subcontractors were being paid to perform.

The Krakats and Katie Brinn also came to realize that the Defendant, through Heffern, was overcharging for subcontract work by marking up subcontract work by a percentage greater than allowed by contract. Defendant was also overcharged, in one known instance, by throwing out a low bid which resulted in Defendant receiving a mark up on a higher subcontract amount while the awarded work was directed to Heffern's friend.

The Krakats and Katie Brinn reported this fraudulent activity to their superiors at the Defendant for nearly a half year period before reporting the problems to officials at the AFRH. Four (4) days later the Krakats reported the fraudulent activity to the AFRH, they were suspended and then two (2) days later they were fired.

Defendant quotes William Shakespeare in claiming that the allegations of the Krakats were "much ado about nothing" because the AFRH approved the subcontract work and billings. A more appropriate reference would have been to the Bard's "Hamlet" as "Something is rotten in the state of Denmark" as relates to the Defendant at the AFRH. The AFRH did approve the billings but didn't know that the subcontractors were Heffern's fiancée or friends.  The AFRH did not know that Defendant's employees were performing the subcontractor's work during the time when Defendant's employees should have been working for the AFRH at no additional charge under the contract between the AFRH and the Defendant. The AFRH did not know that a low bid, of which the AFRH would have liked to have been aware, had been thrown out. The AFRH did not know that they were being charged more of a mark up on subcontract work than their contract allowed.

Contrary to Defendant's claim that the government investigated all of the above allegations, there is no documentation that the government did anything other than rely on Defendant's investigation of itself which resulted, unsurprisingly, in Defendant exonerating itself. Heffern was demoted for what Defendant had to acknowledge was at least "unethical behavior" and Heffern's fiancées' company was prohibited from working for the AFRH in the future. Despite assertions to the AFRH that the Krakat's allegations had been investigated, the Defendant failed to investigate Heffern's use of Defendant's employees to do subcontract work for himself and his fiancée for which the AFRH was being additionally billed.

As Defendant received increased income from allowing the above referenced mark-ups and fraudulent activity, Defendant had a pecuniary interest in maintaining the status quo, terminating the Krakats, and slandering their name. The Krakats have more than made a prima facie case. Defendant's motion should be denied and the matter set for trial.

II.     **Material Facts to which there is a Genuine Dispute**

Contrary to the assertions made by Defendant in their Statement of Undisputed Facts, many of the facts asserted therein are disputed:

1.      At paragraph 2 of Defendant's Statement of Undisputed Facts, the Defendant indicates that "Howard Anastasi made the decision to terminate the Plaintiffs." However many more individuals were involved in the discussions related to the Krakats and the reporting of Heffern's fraudulent billings including Kevin Heffern, Ed Nealon, Chuck Quinlan, Byron Claire, Thomas Starr, Rick Phillips, and Katie Brinn nee Farver. Heffern himself was in the February 21, 2006 meeting at which Anastasia informed the Krakats

that they were being suspended pending an investigation and acknowledged that he had

over 12 hours of discussions with Chuck Quinlan and Ed Nealon about the allegations

brought forward by the Krakats and Katie Brinn. See Heffern deposition, at

pp. 91-93, as **Exhibit 1** hereto. Prior to being fired, Plaintiffs discussed the fraudulent

billings directly with Heffern and complained to other superiors, including Byron Claire,

Defendant's Assistant Project Manager who was fired shortly after reporting the

fraudulent activities, and to Thomas Starr, Defendant's Facilities Manager who quit

shortly after the Plaintiffs were fired. See Plaintiff's Answers to Interrogatories, Answer

No. 2 and 4, as **Exhibit 2** hereto. The Defendant acknowledges Katie Brinn's

reporting of Heffern's fraudulent billings to her uncle, Rick Phillips, another Project

Manager for the Defendant. See Defendant's Statement of Undisputed Facts at ¶ 4.

According to Katie Brinn when told that the Krakats had been fired, not Heffern, Rick

Phillips indicated that wasn't what he understood was to have occurred. See Brinn

deposition, at p. 41, as **Exhibit 3** hereto.

2.      Also at paragraph 2 of Defendant's Statement of Undisputed Facts, the Defendant

indicates that "Howard Anastasi made the decision to terminate the Plaintiffs and at

paragraph 3 that "Neither Plaintiff complained to Mr. Anastasi." However as noted

above, the Krakats complained to their superiors including Heffern, Claire, Starr, and

through Katie Brinn, Rick Phillips and Anastasi. There is also evidence that other

corporate officers including Keith Barker, Gina Duhamel, Director of Operations, and

individuals involved in a "corporate review," were involved as Heffern said he discussed

the Krakats performance with Anastasi, those heretofore identified individuals, and others

directly and in emails and progress reports. See Heffern deposition, at pp. 100-102, as

**Exhibit 1** hereto. Defendant appears to be implying that as Anastasi never heard complaints directly from the Krakats his decision to terminate them could not be related to the complaints that they had been making to other superiors for months prior to their termination. That implication is not logically sustainable and a jury should be allowed to resolve how many superior officers, either notified by the Krakats of the fraud, or simply as corporate officers, were involved in firing the Krakats.

3.      Also at paragraph 2 of Defendant's Statement of Undisputed Facts, the Defendant indicates that "Howard Anastasi made the decision to terminate the Plaintiffs." Anastasi's veracity is impeachable. Anastasi claimed that he did not fire the Krakats for retaliatory purposes, but that he had planned to fire the Plaintiffs *even before they were hired* and only fired them when he did because he had hired enough manpower to replace them. See Anastasi deposition, at pp. 87-9, as **Exhibit 4** hereto. This is demonstrably false as Defendant had less manpower at the time the Krakats were fired then when they were hired. See manpower assessment, BRCS No. 1104, as **Exhibit 5** hereto. Further, Defendant through Anastasi created a handwritten disciplinary log for the Krakats, claiming no standard form was in use, when all the employees at the AFRH where Plaintiffs worked, including Heffern, Brinn, and Robert Krakat were using the standard disciplinary forms. See Brinn deposition, at p. 239, as **Exhibit 3** hereto. See Heffern deposition, at pp. 37-8 and 42-43, as **Exhibit 1** hereto. Although Anastasi claimed Defendant's use of the standard forms stopped in 2004, Defendant could not produce any documentation that use of the discipline forms had been discontinued. See Anastasi deposition, at pp. 14-5, as **Exhibit 4** hereto. See also Defendant's Response to Fourth Request for Production of Documents, Request No. 37, as **Exhibit 6** hereto.

Further, Defendant had not advertised to replace the Plaintiffs. See advertisements, BRCS No. 1099 - 1103, as **Exhibit 7** hereto. It is not relevant whether Anastasi or another individual made the final determination to fire the Plaintiffs. What is relevant is that BRCS has given reasons for the termination that are not supported by the evidence and directly contradicted by documents produced by BRCS.

4.      Also concerning paragraph 3 of Defendant's Statement of Undisputed Facts, the Defendant indicates that "Neither Plaintiff complained to Mr. Anastasi." However Plaintiffs did complain to other superiors, including Byron Claire, Defendant's Assistant Project Manager and to Thomas Starr, Defendant's facilities manager. See Plaintiff's Answers to Interrogatories, Answer No. 2, as **Exhibit 2** hereto. Plaintiffs were also aware, as indicated by Defendant at paragraph 5 of Defendant's Statement of Undisputed Facts, that Katie Brinn, Defendant's Contract Administrator, had raised the issue directly with her Uncle, a Project Manager for the Defendant, who had raised the issue directly with Mr. Anastasi. See Plaintiff's Answers to Interrogatories, Answer No. 4, as **Exhibit 2** hereto.

5.      At paragraph 5 of Defendant's Statement of Undisputed Facts, the Defendant indicates that it "self-reported the complaint to the Federal Government and conducted its own investigation and concluded that there was no fraudulent invoicing." However, BRCS did not "self-report." Robert Krakat reported the over-billing on February 17, 2006. See Answer to Interrogatory No. 2 as **Exhibit 2** hereto.  BRCS did not report the problem until after the Federal Government emailed a letter from Robert Krakat to the Defendant. See Email with attachments, BRCS 232 – 239, as **Exhibit 8** hereto.

6.      Also with regard to paragraph 5 of Defendant's Statement of Undisputed Facts,

the Defendant indicates it, implying the Federal Government, "conducted its own investigation and concluded that there was no fraudulent invoicing." To the contrary, David Rouse acknowledged that no one at the AFRH was involved in any investigation regarding the Krakat's report. See Rouse deposition at pp. 6-7 as **Exhibit 9** hereto. Rouse indicated he believed the Bureau of Public debt may have investigated but in response to a FOIA request, the government indicated it did not have any documents related to any investigation other than documents it had received from the Defendant. See ARFH FOIA letter as **Exhibit 10** hereto. Further, Jerry Wessell, the government employee who oversaw the Defendant's work indicated he did not investigate whether any of BRCS employees were also employed by a subcontractor charging the Federal Government for work performed outside of Defendant's base contract. See Wessell Deposition at pp. 45-6 as **Exhibit 11** hereto. Howard Anastasi also acknowledged that no investigation was performed regarding whether Kevin Heffern and VCS used Defendant's employees to do subcontract work when those employees were supposed to be performing work for the Federal Government under Defendant's base contract. Anastasi claimed that no investigation was done because no such allegations were made. See Anastasi deposition, at pp. 75-6, as **Exhibit 4** hereto. This is flatly false as those allegations were made by Robert Krakat and memorialized in his letter to the Government contained in **Exhibit 8** hereto. Grounds for impeachment is the fact that Anastasi is contradicted by Defendant's own report that indicated the question was investigated by the Defendant, although Defendant never produced any documents related to this investigation. See **Exhibit 8** hereto.

7.      Also regarding paragraph 5 of Defendant's Statement of Undisputed Facts, Jerry

Wessell the government employee who oversaw the Defendant's work and should have but failed to investigate the Krakat's claims is subject to impeachment based on his relationship with Heffern and Wessell's own motivations for failing to investigate. According to Wessell, anyone who took government property off of the AFRH grounds should not be allowed back to the AFRH. See Wessell Deposition at pp. 25-6 as **Exhibit 11** hereto.

Heffern took scaffolding off of the AFRH grounds for his own personal use and returned it only after the Krakats allegations were reported to the AFRH and after Heffern was demoted. Heffern claims that he didn't steal the scaffolding, he had permission to take the scaffolding from Wessell. See Heffern deposition, at p. 75, as **Exhibit 1** hereto. Wessell denies that he authorized any such removal and that he would ask that anyone who removed government property not be allowed back to the AFRH. See Wessell Deposition at pp. 25-6 as **Exhibit 11** hereto.

Either Heffern or Wessell has a bad memory or is lying. In either case, the relationship between the two is grounds for impeachment inquiry and gives rise to a permissible inference that Wessell may have lied about other things, including his reason for not investigating the Krakat's claims that Heffern and Defendant had fraudulently billed the AFRH. .

8.    In paragraphs 8, 9, 10, and 11 of the Defendant's Statement of Undisputed Facts, the Defendant indicates that Robert Krakat doesn't know if work allegedly performed by VCS was done using Defendant's employees and that the Federal Government approved the work. The fact that the Federal Government approved the work is not relevant as it does not logically require a finding that the work should have been approved or that there

was no fraud by Heffern or the Defendant. The AFRH did not know that the

sub contractors were Heffern's fiancée or friends.  The AFRH did not know that

Defendant's employees were performing the subcontractor's work during the time when

Defendant's employees should have been working for the AFRH at no additional charge

under the contract between the AFRH and the Defendant. The AFRH did not know that a

low bid, of which the AFRH would have liked to have been aware, had been thrown out.

The AFRH did not know that they were being charged more of a mark up on subcontract

work than their contract allowed.

What is relevant to a motion for summary judgment is that those allegations were

made by the Plaintiffs and by Katie Farver, they were fired, and they have personal

knowledge that Heffern and Defendant were fraudulently billing the AFRH. See Brinn

deposition, at p. 210 -212, as **Exhibit 3** hereto. Neither the Federal Government nor the

Defendant has produced any documents to show any investigation as to the truth of the

Krakat's allegations. See ARFH FOIA letter as **Exhibit 10** hereto.

9.      In paragraph 12 of the Defendant's Statement of Undisputed Facts Defendant

indicates that it threw out the lowest tree bid in conformance with Defendant's internal

procedures. Despite request, Defendant has produced no documentation of the alleged

policy. Further, Jerry Wessell, an employee of the AFRH testified that the Federal

Government would have wanted to know what the low bid was for any subcontract work

so that the government could save money that would otherwise be additionally paid to the

Defendant and its subcontractors. See Wessell Deposition at pp. 22 as **Exhibit 11** hereto.

It is not relevant whether Robert Krakat had involvement in the process or whether his

knowledge came from outside sources like the tree contractor or Katie Farver. What is

relevant is that the allegation was made that Heffern and Defendant were overcharging the Federal Government for work in order to fraudulently increase their profits and direct money to subcontractors in which they had an interest.

10.     Despite Defendant's assertion that the Krakat's allegations were "much ado about nothing" Heffern was demoted as a result of the Krakat's allegations. See Heffern Deposition, at p. 87 as **Exhibit 1** hereto.

11.     After VCS was removed as an approved contractor for Defendant at the AFRH, Heffern entered into a business partnership with Bryon Claire's replacement as Assistant Project Manager, William Jenkins. Heffern denied a relationship with Jenkins until confronted with corporate documents at his deposition. See Heffern Deposition, at p. 27 - 30 as **Exhibit 1** hereto. The Assistant Project Manager, who should be a check on any wrong doing by the Project manager (Heffern) are business partners in a business which could conceivably perform subcontract work for Defendant in a pattern similar to the pattern of work performed by Heffern's fiancée.

12.     Donna Sutherland was Heffern's fiancée which Heffern did not disclose until February 2006 and then VCS was not allowed to do work for Defendant as Defendant acknowledged it was a conflict of interest. See Heffern Deposition, at p. 70-3 as **Exhibit 1** hereto.

13.     Bryon Claire complained about Heffern's wrongdoing to Katie Brinn and possibly others and was subsequently terminated for reasons which Katie Brinn thought wrongful. See Brinn Deposition, at p. 226 as **Exhibit 3** hereto.

### III.    **Legal Reasoning**

**1.**    The Defendant moves for judgment on counts I and III of the Complaint on the theory that Plaintiffs have no evidence that their terminations were in retaliation for any whistleblower complaint; Defendant's decision makers had no knowledge of the whistle blowing activity; Plaintiff's lacked a good faith basis for their whistle blowing allegations. For the reasons discussed below, Defendant is incorrect and its motion should be denied.

**a.**    For its proposition that Plaintiffs have no evidence that their terminations were in retaliation for any whistleblower complaint Defendant primarily argues that Plaintiff relies solely on the proximity in time of their whistle blowing to their termination. Defendant argues that proximity in time is not sufficient to satisfy the element of causal connection and relies on *Owens v. National Medical Care, Inc.*, 337 F.Supp.2d 131, 137 (D.D.C. 2004) and *Hazward v. Runyon*, 14 F.Supp.2d 120, 122 (D.D.C. 1998). Ironically, the *Owens* case is one where the Court denied Defendant's motion for summary judgment and its analysis suggests that this Court should also deny this Defendant's motion for judgment. *Hazward* discusses the necessity of plaintiff being able to articulate facts from which a reasonable jury could infer that a termination was pretextual and for retaliatory reasons. As reasoned herein, in this matter Plaintiffs have met their burden to present evidence from which a pretext could be reasonably inferred.

Defendant's argument is essentially that if Plaintiff cannot find a smoking gun document or get an employee of the Defendant to admit that Defendant fired the Krakats because they informed the government about the fraudulent billing that the Krakats cannot make a prima facie case. That argument is not sustainable. Plaintiffs need only

11

present evidence from which a reasonable jury could infer that they were fired based on their reporting of Heffern's fraudulent activities and that any reason for the termination asserted by the Defendant was a pretext. See for instance, *McDonnell Douglass Corp. v. Green*, 411 U.S.792, 802 (1973). "As with the prima facie claim for discrimination, the initial burden on the plaintiff is not great. See id. [Reference omitted] the function of the prima facie case is to ensure that the plaintiff "establishes facts adequate to permit an inference of retaliatory motive." *Mitchell v. Baldridge*, 245 U.S. App. D.C. 60, 759, F.2d 80, 87 (D.C. Cir. 1985).

In this case the Plaintiffs have presented evidence that from the Fall of 2005 and over a period of nearly half a year, that they and Katie Brinn reported Heffern's fraudulent activity to their superior officers before finally going to the AFRH on February 17, 2006. The Krakats were under the impression that Byron Claire was fired for following up on the reporting of the fraud as was Thomas Starr, who allegedly resigned shortly after the Krakats were fired. See Complaint ¶ 26.

Defendants have presented evidence that, in Robert Krakat's case, they worked in essentially the same position at the AFRH, albeit for different employers, before being fired on pretexts, such as Anastasi allegedly planning to fire them from the moment of hire and that they were fired because sufficient manpower had been hired, that Defendant's own documentation (manpower report, employment advertisement) refute. See manpower assessment, BRCS No. 1104, as **Exhibit 5** hereto. See advertisements, BRCS No. 1099 - 1103, as **Exhibit 7** hereto. The nakedness of Defendant's pretext is further illustrated in that any discipline, as documented above, of the Krakats was recorded only by Anastasi on a tablet he kept, rather than on standard counseling

disciplinary forms that everyone at the AFRH was using including Robert Krakat, Kevin Heffern, and Katie Brinn. Given that Defendant's pretexts are demonstrably false, there is sufficient evidence, in addition to the mere four (4) day gap between the reporting to the AFRH and the termination for a reasonable jury to conclude that the termination was in retaliation for reporting Heffern's fraudulent activity.

**b.**     Defendant further argues that there is no evidence that the decision maker knew of Plaintiffs complaint at the time of termination and relies on *Laboy v. O'Neil*, 180 F. Supp.2d 18, 26 (D.D.C. 1989). In making this argument, Defendant attempts to define the decision maker solely as Anastasi. Defendant further attempts to limit the evidence to events that occurred between February 17, 2006 when the Krakats finally went to the AFRH, and the Krakat's February 23, 2006 termination.

Regarding the decision maker, it is not relevant that Anastasi is the individual who executed the Krakat's termination. As in the *Owens* case, many individuals were aware of the protected activity for which the Plaintiffs alleged they were fired. As noted above, the individuals who were aware, over a half year period, of the Krakats and their allegations with regard to Heffern or who had discussed termination of the Krakats include Heffern, Anastasia, Claire, Starr, Brinn, Barker, Quinlan, Nealon, Phillips, Duhamel, an unnamed Director of Operations, and any individuals involved in the "corporate review" referenced by Heffern. As noted above, see **Exhibits 1, 2, and 3** hereto. Further, Katie Brinn testified that Rick Phillips was under the impression that Anastasi was coming to the AFRH to fire Heffern, not he Krakats, indicating other officer's knowledge of the Krakats and their allegations. See Brinn Deposition, at p. 41 as **Exhibit 3** hereto.

Anastasi may claim that he had no knowledge of the Krakat's claim but a reasonable jury, given the demonstrable falsehood of his pretexts for the firing, and that other officers knew that he was coming to AFRH because of the allegations against Heffern, could still conclude (and probably would) that he did have knowledge of the reporting. This is especially true as Defendant's employee who was initially contacted by the AFRH, Ed Neilan, and had a "slew of conversations," failed to document when the initial conversations with the AFRH occurred regarding the Complaint. Further, Anastasi had failed to investigate whether Neilan had documented those conversations although Defendant's counsel indicated that the documentation had been requested. See Anastasi deposition, at pp. 114, as **Exhibit 4** hereto. Spoliation of evidence by the Defendant results in a presumption that the evidence would have been detrimental to the Defendant. *Hartford Ins. Co. v. American Automatic Sprinkler Sys.*, 23 F. Supp. 2d 623 (D. Md. 1998).

**c.**    Defendants also argue that the Krakats lacked a good faith basis for underlying allegations against Heffern and the Defendant for fraudulent billing. The good faith basis was manifest, as documented above, in that Heffern was directing non-competitive subcontract work to his fiancée and that Defendant eventually demoted Heffern and decided that VCS could no longer perform work for the Defendant. The Krakats were told by Katie Brinn, Defendant's own Contract Administrator, of the fraudulent activity and had observed Defendant's employees doing subcontract work for VCS while those employees were supposed to be working for the Defendant.

The Krakats knew that Heffern had thrown out a low bid on a tree removal subcontract. Defendant argues that it threw out the lowest bid in conformance with

internal procedures. However Defendant was not able to produce any documentation of

this internal procedure and finally admitted that there was no such written policy. See

Defendants Second Response To Document Requests, at No. 25, as **Exhibit 12** hereto.

Both Robert Krakat and Katie Brinn were aware that there was no such policy and

understood that Heffern's failure to submit the low bid was wrong. See Brinn deposition,

at p. 217, as **Exhibit 3** hereto. Jerry Wessel, the AFRH's Contract Surveillance Specialist

Supervisor testified that he was not aware of a lower bid but if there was a low bid,

AFRH would have wanted to know about it. See Wessell Deposition at p. 22 as **Exhibit**

**11** hereto. As Wessell testified, Defendant was entitled to 12% of the subcontract price. If

a tree contract was for $189,000.00, Defendant could charge an additional 12% or

$22,680.00. If a tree contract was for $245,000.00, Defendant could charge an additional

12% or $29,400.00. See Wessell Deposition at p. 19 as **Exhibit 11** hereto. In this case,

the benefit to Defendant in throwing out the low bid and not showing it to the AFRH was

$6,720.00. In the case of contracts given to VCS, owned by Heffern's fiancée, or to A.R.

Bryant, a friend of Heffern's, the benefit flowing to those awarding the contracts was

even greater. See Plaintiff's Answers to Interrogatories, Answer Nos. 1 and 12, as

**Exhibit 2** hereto. Outside of the tree contract awarded to Heffern's friend, we also know

that 7 – 10 contracts were awarded to VCS. See Heffern Deposition at p. 70 as **Exhibit 1**

hereto. The Krakats had a good faith basis to understand that the AFRH was being

fraudulently charged for a significant amount of money.

There is certainly a permissible inference that Defendant's assertion that there

was an internal policy regarding low bids was a post hoc fabrication formulated to defend

the decision not to accept a low bid. A decision which benefited Defendant financially

and directed work to Heffern's friend. For purposes of deciding defendant's motion, the facts allow a permissible inference of a good faith basis for understanding that there was fraudulent activity going on.

Defendant's memorandum indicates that the air conditioning units which the Krakats alleged were marked up more than the Defendants contract allowed cost $345.00 but were marked up to $500.00 to include other costs including labor, delivery, and installation. Defendant's claim is not supported by the documentation. Documents produced by the Defendant indicate that the units were marked up from $346.50 to $460.00 and then an additional $4,813.20 added for the units transport, installation, carpentry, and clean-up. See Grainger invoice and proposal as BRCS documents Nos. 747 and 951 as **Exhibit 13** hereto. The mark-up from $346.50 to $460.00 is a 33% mark-up. The contract between the parties only allows a 12 % markup which includes labor overhead and profit. See Wessell Deposition at p. 13-15 as **Exhibit 11** hereto. Admittedly Wessell testified at his deposition that he did not now have a problem with the price charged for the air conditioners but Robert Krakat's testimony is that Wessell told him that the AFRH was being overcharged for the air conditioners. See Plaintiff's Answers to Interrogatories, Answer No. 8, as **Exhibit 2** hereto. That ambiguity, especially in light of the questionable relationship between Wessell and Heffern noted above, should be resolved by a jury.

Regarding the work not performed in connection with the Christmas Party, Heffern told Katie Brinn that he would pay for the party by submitting another invoice from VCS. See Brinn deposition, at p. 202, as **Exhibit 3** hereto.

Regarding overcharging for cement clean-up and for work performed by Defendant's employees for VCS, Katie Brinn observed or was told about much of that activity which was relayed to the Krakats. See Plaintiff's Answers to Interrogatories, Answer No. 10, as **Exhibit 2** hereto. Defendant's employees told her that they performed the LaGarde kitchen work for which VCS billed and she personally observed Defendant's employees painting in the Pipes Building for which VCS billed. See Brinn deposition, at p. 211, as **Exhibit 3** hereto. She learned that Defendant's employees were doing the canopy Repair for which VCS billed when Jerry Wessell told her that all of Defendant's guys were out there working on the canopy repair. See Brinn deposition, at p. 213, as **Exhibit 3** hereto. She knows that Donald Krakat did roofing work for which VCS billed and understands Donald Krakat didn't take any money for that work. See Brinn deposition, at p. 222, as **Exhibit 3** hereto.

Katie Brinn testified that she and Donald Krakat were offered $400.00 by Heffern to clean the Pipes Building and that they did the work but didn't take the money. See Brinn deposition, at p. 218, as **Exhibit 3** hereto.

Given the Krakats personal knowledge and the information they received from others including Katie Brinn, Defendant's Contract Administrator, there was abundant good-faith basis for the claims reported by the Krakats to the government.

**2.**    The Defendant moves for judgment on counts II and IV of the Complaint on the assertion that Defendant never published their alleged statements that the Krakats were being investigated for allegations of theft. In addition to Sandy Leubkert, who contacted Katie Brinn regarding the allegations of theft, Katie Brinn overhead the suspension

meeting and that the Krakats were being suspended pending an "investigation." See Brinn deposition, at p. 25 and 31, as **Exhibit 3** hereto.

.       Further, Brinn was told by Heffern, in response to her question regarding what was going on, that Heffern said "I don't know what's going on. I didn't do this.  This isn't me.  People on the Hill said they stole something. We have to investigate." Brinn further testified that "they" referred to both Robert and Donald Krakat. See Brinn deposition, at p. 24 - 25, as **Exhibit 3** hereto.

It is undisputed that Robert and Donald Krakat were suspended on February 21, 2006 and terminated on February 23, 2006. Defendant now denies that it ever insinuated any allegations of theft. See Anastasi deposition, at pp. 117, as **Exhibit 4** hereto. In discovery, Defendant failed to produce any documents related to the alleged "investigation" that occurred between the suspension and the termination. Rhetorically speaking, if Defendant had truly intended to fire the Krakats from the moment Defendant hired them, as testified to by Anastasi at pp. 87-9 of his deposition as **Exhibit 4** hereto, then why the two (2) day delay between the suspension and the termination if not for an investigation? Defendant should not benefit from its failure to document the investigation or corporate review. As reasoned above with respect to Defendant's failure to documents its initial conversations with the AFRH regarding the Krakat's allegations, failure to produce documents related to the "corporate review" and "investigation" which led to the Krakats' termination is spoliation and results in a presumption that the evidence would have been detrimental to the Defendant. *Hartford Ins. Co. v. American Automatic Sprinkler Sys.*, 23 F. Supp. 2d 623  (D. Md. 1998). In resolving Defendant's motion, the ambiguity between the overheard statements, Heffern's statements to Brinn, Leubkert's

knowledge, and Defendant's true motivation for firing the Plaintiffs should be resolved

by a jury.

       **WHEREFORE** all of the reasons indicated above and as supported by Plaintiff Robert Krakat's Affidavit attached **hereto as Exhibit 14**, Plaintiffs request that Defendant's Motion for Summary Judgment be denied.

                      Respectfully Submitted,

                      BYRD & BYRD, LLC

                      /s/
                      _____
                      Timothy P. Leahy, Bar No. 472964
                      14300 Gallant Fox Lane, Suite 120
                      Bowie, Maryland 20715
                      (301) 464-7448
                      (301) 805-5178 Fax
                      tleahy@byrdandbyrd.com

## STATEMENT OF POINTS AND AUTHORITIES

1.    *Owens v. National Medical Care, Inc.*, 337 F.Supp.2d 131, 137 (D.D.C. 2004).

2.    *Hazward v. Runyon*, 14 F.Supp.2d 120, 122 (D.D.C. 1998).

3.    *Laboy v. O'Neil*, 180 F. Supp.2d 18, 26 (D.D.C. 1989).

4.    *Hartford Ins. Co. v. American Automatic Sprinkler Sys.*, 23 F. Supp. 2d 623  (D. Md. 1998).

5.    *Mitchell v. Baldridge*, 245 U.S. App. D.C. 60, 759, F.2d 80, 87 (D.C. Cir. 1985).

6.    *McDonnell Douglass Corp. v. Green*, 411 U.S.792, 802 (1973).

                      /s/
                      _____
                      Timothy P. Leahy, Bar No. 472964

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June _____, 2007, a copy of the foregoing Reply in Opposition to the Defendant's Motion for Summary Judgment was mailed first class, postage pre-paid to:

Karen A. Doner, Esq.
Williams Mullen, P.C.
8720 Greensboro Drive, Suite 700
McLean, Virginia 22102
(703) 760-5200
(703) 748-0244
Attorneys for Defendant Brooks Range Contract Services, Inc.

/s/
_____
Timothy P. Leahy, Bar No. 472964

**IN THE UNITED STATES**
**DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ROBERT KRAKAT, ET. AL.** | * | |
| | * | **CASE NO:    1:07-cv-00693-RCL** |
| **Plaintiffs** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **BROOKS RANGE CONTRACT** | * | |
| **SERVICES, INC.** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**ORDER**

In consideration of the Plaintiff's Reply in Opposition to the Defendant's Motion for Summary Judgment, Defendant's Motion for Summary Judgment is **DENIED.**

_____        _____
Date            Honorable Judge of the U.S. District Court for the District of Maryland

21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT, et al.,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　-vs-　　　　　　　　　　　)　CASE NO. 1:07-cv-00693-
　　　　　　　　　　　　　　　　　　)
BROOKS RANGE CONTRACT　　　　　　　)
RCL SERVICES, INC.,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)

　　　　　　　　　　　　　　　　Thursday, November 29, 2007
　　　　　　　　　　　　　　　　Bowie, Maryland

Deposition of

　　　　　　　　KEVIN MARK HEFFERN, SR.

called for examination by counsel for the

Plaintiff, pursuant to notice, held at the

offices of Byrd & Byrd, LLC, 14300 Gallant Fox

Lane, Suite 120, Bowie, Maryland 20715,

beginning at 10:08 a.m., before Bonnie Marcus

Olachea, a notary public in and for the District

of Columbia, when were present on behalf of the

respective parties:

1    A.    Bill Jenkins.

2    Q.    And who is Bill Jenkins?

3    A.    Who is he?  He's the assistant project manager.

4    Q.    Did you have a prior relationship with him?

5    A.    None other than at work.

6    Q.    How did you meet Bill Jenkins?

7    A.    He was already employed by Brooks Range when I was

8  hired.

9    Q.    And do you have any relationship with him outside

10  of Brooks Range?

11    A.    No.

12    Q.    And during the time when you were assistant project

13  manager was there a project manager?

14    A.    Yes.

15    Q.    And who was that?

16    A.    Excuse me, Ann Flynn.

17    Q.    And what happened to her?

18    A.    To my knowledge I believe she was released.

19    Q.    Do you know why?

20    A.    I do not know why.

21    Q.    But you worked with her at the time as her

22  assistant?

23    A.    Yes.

24    Q.    Were you aware of any reasons why she should be

25  released?

1          MS. DONER:  Objection to form.

2          THE WITNESS:  I -- the only reason I can think of

3     was that she just wasn't cut out for the project manager

4     position with regards to knowledge in engineering, and

5     estimating, and the whole job duties.

6          BY MR. LEAHY:

7     Q.   So she was released by Brooks Range?

8     A.   Yes.

9     Q.   Do you know if she brought a civil suit against

10    Brooks Range?

11    A.   I don't recall.

12    Q.   But she may have?

13    A.   She may have.

14         MS. DONER:  Objection to form.

15         BY MR. LEAHY:

16    Q.   Did anyone from Brooks Range ever come and talk

17    with you after Ann Flynn was released about her having been

18    released?

19    A.   No.

20    Q.   Did anyone from Brooks Range ever talk to you about

21    her potentially suing Brooks Range after she was released?

22         MS. DONER:  Before you answer, I'll object to the

23    extent that that question calls for potentially

24    attorney/client privilege communication.  I don't know what

25    discussions even took place.  And, you know, if I have an

1    opportunity to talk to him I may be able to discern whether

2    there were any non-privileged communications or even

3    privileged communications.  I just don't know.

4         But I am concerned that the question may call for

5    it.  Before you ask anything further about it and he

6    responds, I want the opportunity to talk to him.

7         MR. LEAHY:  Well, I generally object to that kind

8    of thing.  I could ask the question.

9         BY MR. LEAHY:

10   Q.   Other than an attorney for Brooks Range, did anyone

11   ever talk to you with regard to Ann Flynn's termination after

12   she was released?

13   A.   No.

14        MS. DONER:  You can answer whether someone spoke to

15   you, but he should not -- even if it wasn't an attorney who

16   spoke to him, if there was in fact any communication and it

17   was based on communication with an attorney that would still

18   be covered by the privilege.

19        I think he's already testified no, so it resolves

20   it then.

21        BY MR. LEAHY:

22   Q.   What is Imperial Enterprises?

23   A.   Imperial Enterprises is a service disabled veteran-

24   owned company.

25   Q.   And what is your relation to Imperial Enterprises?

1    A.   I am the -- I don't know what I am. I'm a manager I

2  guess.

3    Q.   Is that currently?

4    A.   Yeah.

5    Q.   What work do you do for Imperial Enterprises?

6    A.   I don't do anything.

7    Q.   In your role as manager what do you do for Imperial

8  Enterprises?

9    A.   Look for jobs to bid on.

10   Q.   How much time a week do you spend working for

11  Imperial Enterprises?

12   A.   An hour.

13   Q.   Were you one of the incorporators of Imperial

14  Enterprises?

15   A.   Yes.

16   Q.   And isn't Bill Jenkins associated with Imperial

17  Enterprises?

18   A.   Yes.

19   Q.   Is there a reason you didn't disclose that when I

20  asked you about any other relationship you had with Bill

21  Jenkins?

22        MS. DONER:  Objection.  I don't think you asked

23  that question.

24        MR. LEAHY:  Sure did.  Do you mind going back and

25  reading the question?

1    the work?

2        A.    I asked him why he didn't do the work, and he said

3    he didn't feel like it.  He would do it tomorrow and that he

4    was going to hang out in the office for -- hang out in the

5    shop for the rest of the day.

6        Q.    All right.  Then what did you say?

7        A.    I asked him if he was going to hang around the shop

8    that he might as well punch out and be off the clock.  He

9    could hang around the shop all day long if he wasn't going to

10   do anything.

11       Q.    And do you know if he went back the next day to

12   finish the work?

13       A.    No, he did not.

14       Q.    And how do you know that?

15       A.    Because I sent somebody else to go do the work.

16       Q.    Did you ever counsel Donny Krakat for any other

17   reason?

18       A.    Those are the only times I can specifically recall.

19       Q.    Did you ever document your counseling of Donald

20   Krakat?

21       A.    At one point there were two -- what do you call

22   them -- oral record of reprimand forms. One of them was for

23   absenteeism.  I don't remember what -- what the second one

24   was titled but it was tied to the boisterous comments in the

25   staff meetings, constant disruption.

1    Q.    In his oral record of reprimand, that was a written

2    form that you filled out to document that you had had this

3    conversation or this counseling conversation?

4    A.    Right.  One sheet, I signed it, he signed it, and

5    it went into his file onsite.

6    Q.    And the sheet -- and just to get you to explain

7    your answer a little bit more, when you say that the signed

8    oral records of reprimand forms went into his file, what file

9    are you talking about?

10    A.    In the file cabinet behind the contract

11    administrator's desk there is a 4- or 5-drawer file cabinet.

12    At one end of the third drawer there's personnel files for

13    everybody there, like their W-4 form, their employment

14    application, their resume if they have one, any

15    certifications they may have with relationship to electrical

16    or mechanical, any vacation request forms, stuff like that.

17    Q.    Fair to say that their personnel file was kept

18    onsite?

19    A.    Yes.

20    Q.    And in terms of records for discipline or

21    counseling, are you also aware that Brooks Range used a form

22    called Record of Written Discipline?

23    A.    Yes.

24    Q.    And are you also aware that Brooks Range used a

25    form entitled Record of Suspension?

1       A.    Yes.

2       Q.    I think you had indicated that you had filled out

3    two forms with regard to Donald Krakat?

4       A.    Yes.

5       Q.    Do you recall ever counseling Donald Krakat any

6    other time and filling out a form, or just those two?

7       A.    The two times I filled out the form are the only

8    times I filled out the form.

9       Q.    Do you know at what period in time or when you

10   counseled Donald Krakat these two times?

11      A.    Yeah.   The first time was in his first week there.

12      Q.    Right.   And the second time for being boisterous at

13   a meeting?

14      A.    Yeah.   It was probably the end of September,

15   beginning of October '05.

16      Q.    Do you know if you filled out one of these forms

17   between October 2005 and February 23, 2006 when Donald Krakat

18   was terminated?

19           MS. DONER:   I'm sorry, can you repeat that

20   question?   I didn't hear.

21           MR. LEAHY:   Sure.

22           BY MR. LEAHY:

23      Q.    Do you know if you filled out any counseling or

24   discipline forms in regard to Donald Krakat from October 2005

25   to February 23, 2006?

1     A.    I probably did.

2     Q.    But you only recall doing the two?

3     A.    I recall the two specifically.

4     Q.    An if you did fill out any of these forms it's your

5  understanding it would have gone into his personnel file kept

6  onsite at the home?

7     A.    Yes.

8     Q.    Would they also be transmitted to another office?

9  I mean if you did a counseling form would you immediately

10  send a copy of it to Human Resources?

11     A.    I would not immediately send a copy of it to

12  corporate.

13     Q.    You said immediately.  Would you eventually send

14  these written records of discipline to corporate?

15     A.    I've done that in the past, yeah. They eventually

16  get sent.

17     Q.    All of them eventually get sent?

18     A.    I would say yes.

19     Q.    Do you know within what period of time you would

20  send these forms to corporate?

21     A.    There is -- there is no set frequency.

22     Q.    So you would do it when you got around to it kind

23  of thing?

24     A.    Yeah.

25     Q.    Did Donald Krakat ever come to you and discuss

1    A.    There should be vendor proposals, yes.

2    Q.    And would you have access to those vendor

3    proposals?

4    A.    Yes.

5         MR. LEAHY:  If you could get copies of any vendor

6    proposals related to any work that Virginia Contracting

7    Services bid or performed and give those to your attorney I'd

8    appreciate it.

9         THE WITNESS:  Okay.

10        MS. DONER:  I'm sorry, I just want to make sure I

11   got this.  Could you read back?

12        (Whereby the court reporter read the previous

13   question.)

14        BY MR. LEAHY:

15   Q.    Do you know how many jobs Virginia Contracting

16   Services performed for or at the home?

17   A.    Between 7 and 10, somewhere in there. I'm not

18   exactly sure right offhand.

19   Q.    Do you know how many they bid?

20   A.    Three or four.

21   Q.    And you think you'd have copies of that paperwork

22   back at the office?

23   A.    Yes.

24   Q.    Was anyone at Brooks Range aware -- well, I

25   understand at some point Brooks Range became aware that

```
 1  Virginia Contracting Services was owned by Donna Sutherland

 2  and that you had a relationship with her.

 3       A.   Yes.

 4       Q.   To your knowledge when did Brooks Range become

 5  aware of that relationship?

 6       A.   I honestly don't know.

 7       Q.   Did you go to anyone at Brooks Range to disclose

 8  the relationship?

 9       A.   At any point in time?

10       Q.   Sure.

11       A.   Yes.

12       Q.   When did you disclose the relationship to Brooks

13  Range?

14       A.   February.

15       Q.   Of what year?

16       A.   '06.

17       Q.   When you disclosed that relationship to Brooks

18  Range, who did you disclose it to?

19       A.   Howard.

20       Q.   And what did Howard say?

21       A.   That he already knew about it.

22       Q.   Do you know how he already knew?

23       A.   I don't recall him saying how he knew.

24       Q.   Why did you disclose the information in February of

25  2006?
```

1    A.    Because he asked me about it.

2    Q.    Did he tell you why he was asking you about it?

3    A.    No.

4    Q.    Were you guys talking about anything else during

5    this conversation when he asked you about the relationship

6    with Virginia Contracting Services?

7    A.    No.

8    Q.    Had anybody from Brooks Range ever asked you about

9    your relationship with Virginia Contracting Services prior to

10    February 2006?

11    A.    Not to my knowledge, no.

12    Q.    When is the last time Virginia Contracting Services

13    did any work for Brooks Range?

14    A.    January of '06 or maybe even the end of '05.    I'm

15    not really sure.

16    Q.    And do you know whether Virginia Contracting

17    Services is allowed to do work for Brooks Range at this

18    point?

19    A.    They are not.

20    Q.    Why are they not?

21    A.    Virginia Contracting Services is no longer in

22    business.    There would be no point for them to -- they're not

23    in business anymore.

24    Q.    Did Brooks Range ever tell you that they didn't

25    want Virginia Contracting Services to do any work for Brooks

1    Range?

2        A.    I don't recall that ever being said to me.

3        Q.    Did anybody ever -- from Brooks Range ever indicate

4    to you that they thought it might be a conflict of interest

5    for Virginia Contracting Services to do work for Brooks

6    Range?

7        A.    Yes.

8        Q.    Who made that indication?

9        A.    Ed Nealon.

10       Q.    And when did Ed Nealon indicate to you that he

11    thought it would be a conflict of interest?

12       A.    The latter part of February '06.

13       Q.    Was this after you had disclosed to Howard Anastasi

14    that there was a relationship between you and Virginia

15    Contracting Services?

16       A.    Yes.

17       Q.    And why did Virginia Contracting Services go out of

18    business?

19       A.    It was too much for Donna to do with her other

20    full-time job.

21       Q.    And do you have an interest in any other company?

22    I know we talked about Virginia Contracting Services.  I know

23    we talked about Imperial Enterprises.  Other than those two,

24    do you have an ownership interest in any other company?

25       A.    There may be on file an ownership interest in ADC

1      Q.   So you didn't seek compensation for a lost

2  ownership interest in Regal?

3      A.   No.

4      Q.   Have you ever been accused of taking government

5  property from the grounds of the home?

6      A.   No.

7      Q.   How about scaffolding?

8      A.   No.

9      Q.   Did you ever take scaffolding off the grounds of

10  the home?

11      A.   I took scaffolding and returned it.

12      Q.   When did you take the scaffolding?

13      A.   I think it was around Christmas of 2005 because I

14  replaced a chandelier in my living room.

15      Q.   When did you return the scaffolding?

16      A.   April of '06.

17      Q.   And that was scaffolding belonging to the

18  government?

19      A.   Yes.

20      Q.   And did you get authorization from someone in the

21  government to take the scaffolding?

22      A.   Yes.

23      Q.   Who did you get the authorization from?

24      A.   Jerry Wessel, W-E-S-S-E-L.

25      Q.   Was that authorization in writing?

1       A.   He said that they had this other project manager

2    with a lot of experience and they were going to put her in

3    here to manage the project and I was to work with her

4    accordingly.

5       Q.   Did he say anything else?

6       A.   It was a very short conversation. That was about

7    all I can remember.

8       Q.   Did he talk to you at all about the allegations

9    Katie Farver and the Krakats had made to the home regarding

10   your billing practices?

11      A.   Not at that time, no.

12      Q.   At what time did he talk to you about those

13   accusations?

14      A.   A little bit after that.

15      Q.   So he demoted you, and then he talked to you about

16   the accusations by Katie Farver and the Krakats?

17      A.   That's what I recall.

18      Q.   Did anybody from Brooks Range talk to you about any

19   accusations made by Katie Farver or by the Krakats against

20   you prior to you being demoted?

21      A.   Ed Nealon.

22      Q.   When did Ed Nealon talk to you about the

23   accusations?

24      A.   The end of February '06.

25      Q.   Was that before or after the Krakats were

1    Q.    What differences would you say there were?

2    A.    I can't recall any specific differences.

3    Q.    All right.  And it's I think hard to ignore that

4    these conversations occurred right before you were demoted.

5    Are you aware of any connection between having had these six

6    conversations lasting approximately 12 hours and your

7    demotion?

8    A.    Of a connection between them?

9    Q.    (Nodding.)

10   A.    Sure there was a connection between them.

11   Q.    And what was that connection?

12   A.    That that isn't the way Brooks Range does business

13   and we're demoting you.

14   Q.    What exactly about the way you had done things did

15   they tell you was not the way Brooks Range does business?

16   A.    Just that you know it could give the appearance

17   that it wasn't -- it was inappropriate.

18   Q.    Anything else?

19   A.    That was basically all I remember.

20   Q.    And we had been talking specifically with regard to

21   your conversation with Ed Nealon. With regard to your

22   conversations with Howard or Chuck, was there anything

23   different that was discussed?

24   A.    No.  It was basically the same, the same type of

25   discussion.

1      Q.   Did both Howard and Chuck indicate to you that they

2   thought that from an ethical point of view it was not a good

3   idea for Virginia Contracting Services to do work for Brooks

4   Range?

5           MS. DONER:   You said did they indicate from an

6   ethical view?

7           MR. LEAHY:   Sure.

8           BY MR. LEAHY:

9      Q.   My understanding is that Ed Nealon had indicated

10   that -- and I'm not saying this is definitely verbatim -- but

11   my understanding is Ed Nealon had indicated to you that from

12   an ethical point of view it was not a good idea for Virginia

13   Contracting Services to do work for Brooks Range; is that --

14           MS. DONER:   I object to the form.   I don't recall

15   those specific words.

16           MR. LEAHY:   Sure.

17           MS. DONER:   You can answer the question.

18           THE WITNESS:   I don't think -- I can't testify that

19   Ed Nealon used the specific word unethical.   That was the

20   word that I used to describe the general conversation.

21           BY MR. LEAHY:

22      Q.   Okay.   And you think you had that same conversation

23   with Howard and with Chuck Quinlan?

24      A.   Yes.

25      Q.   You were in the room when Robert and Donald Krakat

1    were suspended in February of 2006?

2        A.    Yes.

3        Q.    Who else was in the room?

4        A.    Howard, myself, and Donny I believe went first.

5        Q.    Was anybody else in the room?

6        A.    No.

7        Q.    What about Katie Farver, do you know where she was?

8        A.    Katie Farver and Bob were in the adjoining office

9    space.

10       Q.    Was the door open?

11       A.    The door was not open.

12       Q.    Do you know if even with the door closed that

13   someone in the adjoining room could hear the conversation

14   going on?

15       A.    I would think that at a normal tone of voice you

16   could not hear through the wall so to speak.

17       Q.    Did Katie Farver ever give you any indication that

18   she had heard an allegation that the Krakats were alleged to

19   have committed theft?

20       A.    Could you repeat the question please?

21       Q.    Sure, it was a very bad question.

22             Did you ever talk with Katie Farver about

23   allegations that either of the Krakats had been alleged to

24   have committed theft?

25       A.    No.  I don't recall talking to Katie Farver about

1  anyone at Brooks Range?

2      A.   I don't recall him saying anything.

3      Q.   Do you recall anything, what Robert Krakat said at

4  that suspension meeting?

5      A.   I don't recall what anybody said.

6      Q.   All right.  Well, what happened after Robert Krakat

7  said whatever he said in response to Mr. Anastasi's

8  questions?

9      A.   He got up from the table and walked out the door,

10 and I don't recall -- and he left. I don't know where they

11 went but they left the site.

12     Q.   Well, what did Mr. Anastasi say to Robert Krakat

13 about suspending him?

14     A.   The same thing he said to Donny.

15     Q.   Did Mr. Anastasi give any reason why he was

16 suspending Robert Krakat?

17     A.   I don't recall Howard's exact words but again it

18 was something along the line of pending corporate review.

19     Q.   Did you take any notes during this meeting?

20     A.   No.

21     Q.   Did Mr. Anastasi take any notes during this

22 meeting?

23     A.   Yes.

24          (Discussion off the record.)

25          BY MR. LEAHY:

1    Q.   Did Mr. Anastasi take notes during both the meeting

2    with Donald Krakat and with Robert Krakat?

3    A.   Yes.

4    Q.   Did he take notes during any meeting he may have

5    had with you discussing your performance issues?

6    A.   I'm sure of it.  He always has a legal pad taking

7    notes.

8    Q.   Had you recommended to anyone at Brooks Range that

9    the Krakats be suspended or fired?

10   A.   As I stated earlier several hours ago, there may be

11   some emails whereby I indicated performance of every employee

12   on the crew.  I'm fairly certain that both Donny and Bob

13   appear in either an email or in a weekly progress report

14   relating to performance issues.

15        But I don't specifically recall saying --

16   recommending the fate of those two guys at that point.

17   Q.   At any point did you ever recommend Donald Krakat

18   or Robert Krakat be suspended or fired?

19   A.   My recollection right now tells me that at some

20   point between the time they were hired and December that

21   there may be again a recommendation from me to the director

22   of operations that at some point we're going to need to

23   replace these guys.

24   Q.   And that would have been done either in an email or

25   weekly progress report?

1    A.    Yes.

2    Q.    And by these guys you mean Donald Krakat and Robert

3   Krakat?

4    A.    Yes.

5    Q.    Do you recall anyone from Brooks Range ever

6   discussing with you your recommendation that Donald Krakat or

7   Robert Krakat be replaced?

8    A.    I don't recall the word replace being used in

9   conversations, but what I can tell you is several corporate

10  officers from time to time would call me and ask me

11  specifically about performance-based questions, particularly

12  about Robert Krakat, and would ask me how I thought he was

13  doing.

14   Q.    What corporate officers called you to ask about

15  Robert Krakat's performance?

16   A.    Keith Barker, Tom Star, Chuck Quinlan, Ed Nealon,

17  Gina Duhamel, Howard.  Those are all I can recall.

18   Q.    Going back to the meeting where Robert Krakat was

19  suspended, what happened after Howard told Robert that he was

20  suspended?

21   A.    I think I answered this question already, but I

22  mean it was Bob stood up asked him why he was being

23  suspended.  And Howard said something along the line of

24  pending corporate review.

25   Q.    Did Robert Krakat make any other comment or use

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT and )
DONALD KRAKAT, )
)
Plaintiffs, )
)
) Case No: 1:07-cv-00693-RCL
v. )
)
BROOKS RANGE CONTRACT SERVICES, INC., )
)
Defendant. )

## PLAINTIFF'S ANSWERS TO DEFENDANT BROOKS RANGE CONTRACT SERVICES, INC.'SFIRST SET OF INTERROGATORIES

NOW COME Plaintiffs Robert Krakat and Donald Krakat. (collectively "Plaintiffs"), by and through their undersigned counsel, and pursuant to Rule 33(b) of the Federal Rules of Civil Procedure hereby answers the following Interrogatories propounded by Defendant Brooks Range Contract Services, Inc. ("Defendant") as follows:

### Objections

1. Plaintiffs object to the interrogatories to the extent they call for disclosure of confidential information or documents protected by the attorney-client, work product or other privilege or protection.

2. Plaintiffs object to the interrogatories to the extent they call for disclosure of information obtained or prepared in anticipation of litigation and/or trial preparation material without the showing required under the Rules of this Court.

3. Plaintiffs object to the interrogatories to the extent they seek disclosure of information not relevant to the issues raised in this lawsuit, and not reasonably calculated to lead to the discovery of admissible evidence.

4.    Plaintiffs object to the interrogatories to the extent they are so vague, overly broad and

unduly burdensome and oppressive as to render it impossible to respond in any reasonable

manner or amount of time.

5.    Plaintiffs object to the interrogatories to the extent they seek information or documents

originating from entities other than Plaintiffs, or generally available and in the public

domain and information or documents that are not in the custody, possession or control of

Plaintiffs.

6.    Plaintiffs object to the interrogatories to the extent they seek to extend the obligations of

Plaintiffs beyond those set forth in the Rules of Civil Procedure governing this action.


## INTERROGATORIES


**INTERROGATORY NO. 1:**        Identify all persons who have knowledge of any of

the facts and/or allegations set forth in the Complaint, and for each such person, describe in

detail the facts and/or allegations of which they have knowledge.

**Answer:**

a) Kevin Heffern, a project manager, has knowledge of allegations that Plaintiffs were

stealing, and of Plaintiffs' discharge from employment.

b) Howard Anastasi has knowledge of allegations that Plaintiffs were stealing, and of

Plaintiffs' termination from employment.

c) Tom Starr, an assistant facility director, Donna Smith of AFRH, Jerry Wessell, a

contracting officer and Technical Representative, and David Rouse, a contracting officer

2

representative, all have knowledge of complaints of Kevin Heffern's fraudulent billing made by Robert Krakat.

d) Katie Farver, an employee of Brooks Range Contracting Service, Inc., has knowledge of Kevin Heffern's fraudulent billing, of complaints of Kevin Heffern's fraudulent billing made by Donald Krakat, and of the Plaintiffs' termination from employment.

e) Chuck Quinlan, CEO of Brooks Range Contracting Services, Inc., has knowledge of Plaintiffs' employment and termination, and of allegations of theft.

f) A.R. Bryant Co., run by a friend of Heffern who has knowledge of low tree bids having been thrown out by Heffern.

g) Byron Claire who has knowledge of Heffern's actions, reported same to BRCS, and was fired.

**INTERROGATORY NO. 2**:    Describe in detail all facts upon which you base your allegations that each Defendant retaliated against you. Include in your answer the nature and date of such conduct and the identity of all individuals with knowledge of such conduct.

**Answer:**    See Complaint, Also, after Byron Claire had reported Heffner's actions to BRCS and been fired, and after Plaintiffs had raised the issue directly with Heffern and Thomas Starr, both Byron Claire and Thomas Starr were fired. On February 17, 2006, Plaintiff Robert Krakat informed David Rouse, a contracting officer representative for the Armed Forces Retirement Home (AFRH), of what appeared to be fraudulent billing by Kevin Heffner. Mr. Rouse assured Plaintiff Robert Krakat that he would check into the matter. On February 21, 2006, both Plaintiffs were suspended as Kevin Heffern and Howard Anastasi alleged that the AFRH said that Plaintiffs were stealing. On February 23, 2006, Plaintiffs were fired from their positions at Brooks Range Contracting Services, Inc. and no proof of the alleged theft was

3

provided other than the allegations made by Kevin Heffern and Howard Anastasi. Shortly after the Plaintiffs were fired, one of Plaintiffs' work colleagues, Katie Farver, addressed Kevin Heffern's fraudulent billing with Howard Anastasi and Ms. Farver was also fired the morning of February 23, 2007.

**INTERROGATORY NO. 3:**    Identify all Federal and District of Columbia statutes you alleged BRCS violated, including without limitation, those relating to BRCS's invoicing and its termination of your employment.

**Answer:** Plaintiffs object to this interrogatory as it calls for a legal conclusion. Without waiving the objection, see D.C. Code §§ 22-3201 et. seq. for both fraud and theft. D.C. Code § 22-1805a.

**INTERROGATORY NO. 4:**    Identify all persons to whom you complained of, and/or reported, the allegedly unlawful conduct of Heffern during your employment with BRCS, and which you reference in your Complaint.

**Answer:**    See Complaint, also Robert Krakat complained of and/or reported Heffern to Tom Starr, Donna Smith, Jerry Wessell, and David Rouse. On information and belief, Byron Claire also discussed the matter with BRCS

Donald Krakat complained of and/or reported Heffern to Robert Krakat and to Katie Farver.

**INTERROGATORY NO. 5:**    Describe in detail all facts and circumstances surrounding your termination of employment from BRCS. Include in your answer the following: (a) the identity of the person(s) who told you that you were being terminated; (b) the date, time, and location thereof; (c) the substance of what was told to you and the substance of your

4

response thereto; (d) the identity of persons who were present or who otherwise may have heard the discussion; and (e) the identity of all documents relating to your termination.

**Answer:** See Complaint, also on February 23, 2006 at approximately 10:00 a.m., Howard Anastasi and Kevin Heffern fired both Robert and Donald Krakat from Brooks Range Contracting Services, Inc. Plaintiffs were informed that the reason for their termination was that the AFRH had alleged that Plaintiffs were stealing. Plaintiffs responded that the allegations of theft were not true. Katie Farver was present at the meeting and she also stated the allegations made against Plaintiffs were not true. No documents were presented to Plaintiffs relating to their termination.

**INTERROGATORY NO. 6:**    Identify any and all communications that you had with any employee of BRCS regarding the subject matter of the Complaint. Include in your answer the following for each such communication: (a) the date, time and location thereof; (b) the identity of the person and the name of their employer with whom you had the communication; (c) the identity of persons who were present or who otherwise may have heard the communication; (d) the substance and form (e.g., in person, email, telephone conversation, etc.) of the communication; and (e) the identity of all documents relating to such communication.

**Answer:** See Complaint and in response to Interrogatory No. 2 and 4. Also during December 2005, Plaintiff Robert Krakat had a telephone conversation with Tom Starr of Brooks Range Contracting Services, Inc. Robert Krakat's wife, Shirley Krakat, and Donald Krakat were both present in the room where Robert Krakat spoke on the telephone. The discussion concerned roofing work that Donald Krakat had completed at AFRH, which work had been approved by Kevin Heffern.

**INTERROGATORY NO. 7:**    Describe in detail all "accusations of theft, poor performance, and excessive absenteeism," or any other statements alleged by you to be defamatory, regarding Plaintiffs, and allegedly made by BRCS. Include in your answer the following for each such alleged statement:  (a) the date, time, and location thereof; (b) the identity of the person who made the alleged statement; (c) the identity of persons who were present or who otherwise may have heard the statement; (d) the specific substance and form (e.g., in person, email, telephone conversation, etc.) of the alleged statement; and (e) the identity of all documents relating to such alleged statement.

**Answer:**    On February 23, 2006 at approximately 10:00 a.m., Howard Anastasi and Kevin Heffern informed Plaintiffs that they were being terminated as the AFRH had alleged that Plaintiffs were stealing. Katie Farver was present at this meeting. Robert Krakat subsequently asked Mr. Rouse, the chief operating engineer of AFRH, if he or anyone at the home had made allegations that the Plaintiff's had stolen from the AFRH, and Mr. Rouse stated that no one at AFRH made statements alleging that Plaintiff's stole.

**INTERROGATORY NO. 8:**    Describe in detail all facts which support your contention that "Heffern allegedly charged the government over $500 ea. for air conditioning units which cost BRCS $200.00 when BRCS was allowed a 12% markup – to $224.00," as alleged in paragraph 8 of the Complaint. Include in your answer the following:  (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; and (d) the identity of all other persons with knowledge of it.

**Answer:**    During the summer of 2005, Plaintiff Robert Krakat was informed by Jerry Wessell, a Contracting Officer for AFRH, Katie Farver, and Donald Krakat that AFRH

6

paid $500.00 each for air conditioning units that Kevin Heffern ordered. Jerry Wessell made comments as to the overcharging for the air conditioning in the presence of Kevin Heffern and Plaintiffs and Kevin Heffern laughed at the comments but did not deny overcharging.

**INTERROGATORY NO. 9:**    Describe in detail all facts which support your contention that "Heffern allegedly charged the government for work that BRCS was not doing in connection with the 2005 Christmas Party" as alleged in paragraph 9 of the Complaint. Include in your answer the following: (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; and (d) the identity of all other persons with knowledge of it.

**Answer:** Kevin Heffern made statements to Plaintiff Robert Krakat that he had "ways" to pay for the Christmas party, even though all petty cash was depleted at the time. Katie Farver may have more information on this matter and this answer will be supplemented.

**INTERROGATORY NO. 10:**    Describe in detail all facts which support your contention that "Heffern allegedly overcharged the government for cleaning up cement," as alleged in paragraph 10 of the Complaint. Include in your answer the following: (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; and (d) the identity of all other persons with knowledge of it.

**Answer:** Plaintiffs were informed of overcharging for the cement cleanup by Katie Farver, who is believed to have personal knowledge. Plaintiffs cannot recall a specific date that they learned of the overcharging.

**INTERROGATORY NO. 11:**    Describe in detail all facts which support your contention that "Heffern allegedly allowed Virginia Contracting Services, which he owns, to

7

charge Defendant BRCS for work that Donald Krakat and other BRCS employees performed during normal business hours, for which the Home was not to be charged, including clean-up of the LaGarde Kitchen, Pipes building roofing and canopy repair, sewage clean up in the Pipes Building, other plumbing work, and painting approximately 10 rooms at the Home which VCS did not paint," as alleged in paragraph 11 of the Complaint. Include in your answer the following:  (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; and (d) the identity of all other persons with knowledge of it.

**Answer:**  Plaintiff Robert Krakat requested AFRH Housekeeping staff to clean up the LaGarde Kitchen.  The AFRH housekeeping staff completed all cleanup of the LaGarde Kitchen mess.  On or about October 6, 2005, Kevin Heffern submitted an invoice for cleanup of the LaGarde Kitchen by Virginia Contracting Services.

Plaintiff Robert Krakat personally witnessed Brooks Range Contracting Services employees perform sewage cleanup and repair the canopy of the Pipes building during normal business hours.  On Saturday, November 11, 2005, Plaintiff Robert Krakat also witnessed Donna Sutherland and Kevin Heffern working on the roof of the Pipes Building.  Donna Sutherland and Kevin Heffern were spreading roof coating on the canopy.  Kevin Heffern subsequently submitted an invoice of $3,855.00 for payment to Virginia Contracting Services for work not performed by Virginia Contracting Services.

Brooks Range Contracting Services, Inc. employees painted the rooms in the Sheridan and Scott buildings and Kevin Heffern submitted an invoice for payment to Virginia Contracting Services for work not performed by Virginia Contracting Services.

**INTERROGATORY NO. 12:**    Describe in detail all facts which support your contention that "Heffern allegedly threw out low bids for tree service, related to a 2005 summer storm, in order to hire A.R. Bryant, a company owned by a friend of Heffern," as alleged in paragraph 12 of the Complaint. Include in your answer the following: (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; and (d) the identity of all other persons with knowledge of it.

**Answer:** Plaintiffs are in possession of a Proposal by Coffman Construction Company in the amount of $189,000.00. The contract was not awarded to Coffman Construction Company, but to A.R. Bryant, who was a friend of Kevin Heffern. Brooks Range Contract Services, Inc. employees, and Katie Farver all had personal knowledge that A.R. Bryant was a friend of Kevin Heffern. A copy of the Coffman proposal is included with Plaintiff's document production.

**INTERROGATORY NO. 13:**    Describe in complete factual detail the February 17, 2006 communications between Robert Krakat, Donna Smith, Jerry Wessell, and David Rouse, during which Robert Krakat allegedly gave Rouse documentation on the alleged problems with the work and invoicing of Heffern, as alleged in paragraph 16 of the Complaint. Include in your answer the following: (a) the date, time, and location of such communications; (b) the specific substance and form of the communications; (c) the identity of the person who made any such statements; (d) the identity of persons who were present or who otherwise may have heard the communications; and (e) identify all documents you allege in paragraph 16 of the Complaint to have given David Rouse.

**Answer:** On February 16, 2006, Plaintiff Robert Krakat went to Mr. Rouse about Kevin Heffern overcharging BRCS for contracting services. Plaintiff Robert Krakat informed Mr.

Rouse that he was under the impression that Mr. Heffern was trying to get rid of him. Mr. Rouse informed Plaintiff Robert Krakat that he was going straight to Mr. Quinlan, CEO of BRCS to discuss the situation, and stated that he would get back to Plaintiff Robert Krakat.

**INTERROGATORY NO.14:**    Describe in detail all facts and circumstances which support your contention that Defendant "acted tortiously and with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the Plaintiff's rights, and under circumstances that aggravated Plaintiff's injuries," as alleged in paragraphs 34, 40, 45, and 51 of the Complaint.

**Answer:** Plaintiffs object to this interrogatory as it calls for a legal conclusion. Without waiving that objection, Defendants terminated Plaintiffs' employment with BRCS for allegedly stealing from AFRH, an allegation that was made up by Defendants in an effort to keep Plaintiffs from exposing the fraudulent billing of Defendants to AFRH. After the termination of Plaintiffs, Defendants relayed the false statements, that Plaintiffs stole from AFRH, to other individuals, including Katie Farver, other BRCS employees and government agents, painting Plaintiff's in a bad light. See also factual allegations included in the Complaint.

**INTERROGATORY NO. 15:**    Describe in detail all facts and circumstances which support your contention that "Defendant reduced its false accusations to writing and published those accusations to individuals who worked for both the Home and for BRCS," as alleged in paragraphs 39 and 50 of the Complaint. Include in your answer the following: (a) how and from whom you learned of the allegation; (b) the date you learned of it; (c) the identity of persons who were present or who otherwise may have heard the communication; (d) the identity of all other persons with knowledge of it; and (e) the identity of all such writings or documents referred to in the allegation.

**Answer:** Plaintiffs object to this interrogatory as it calls for a legal conclusion. Without waiving that objection, on information and belief Howard Anastasi prepared the fake disciplinary log, attached to Plaintiff's document production, containing false and defamatory statements, and passed it on to other employees of BRCS. Plaintiffs reserve the right to supplement this answer as discovery progresses.

**INTERROGATORY NO. 16:**    Describe in detail all disciplinary actions taken against you by BRCS, including without limitation, all formal and informal counseling sessions, reprimands, and warnings. Your answer should include, without limitation, the date of each such action, the subject of such action, from whom the action was received, and the steps you took to correct your conduct and/or misconduct.

**Answer:** No disciplinary action was ever taken against Plaintiffs by BRCS, prior to Plaintiffs' termination.

**INTERROGATORY NO. 17:**    If you have ever been arrested and/or convicted of a crime, state the date of every arrest/conviction and the court, identify each crime for which you were arrested and/or convicted, and the city and state of each such arrest/conviction.

**Answer:** Plaintiff Robert Krakat has never been arrested and/or convicted of a crime. Plaintiff Donald Krakat was convicted of DUI in May 2004 in Carroll County, Maryland.

**INTERROGATORY NO. 18:**    Describe in detail your claim for monetary damages, including: (a) each element of monetary damages claimed, (b) the amount of each element of monetary damages claimed, and (c) a complete explanation of the calculation method, amount or value of each element of money damages claimed.

**Answer:** Objection to the extent the interrogatory seeks a legal conclusion. Without waiving the objection, Plaintiffs have each lost income, continue to lose income, have suffered

emotional damages, and assert that punitive damages are appropriate given Defendant's malice. See Answer nos. 19 and 20 for income information. Plaintiffs calculate their damages based on their income with BRCS less income received from subsequent employment and an exact number will be supplemented and may require expert testimony based on lost future income.

**INTERROGATORY NO. 19:**    Describe in detail all income that you have received since your termination from BRCS, including the source of that income, any employer from whom the income was received, the tasks/job performed to earn the income, and the date the income was received.

**Answer:**

**Plaintiff Robert Krakat:**

a.    From March, 2006 through September 2006, Robert Krakat received unemployment income, from Jorden Howard Tech., in the amount of $648.00, bi-weekly.

b.    From January 29, 2007 through May 7, 2007, Robert Krakat worked for Rill's Bus as a school bus driver.  He was paid $13.00 per hour and worked 20 hours per week.

c.    From May 21, 2007 through June 14, 2007, Robert Krakat was employed by Wide Win Bus Service as a bus driver.  He was paid $14.00 per hour and worked 25 hours per week.

**Plaintiff Donald Krakat:**

a.    From March, 2006 through July 2006, Donald Krakat received unemployment income in the amount of $648.00, bi-weekly.

b.    From August 2006 to November 2006 Donald Krakat was employed by Mainlining Service, Inc. He was paid a total of $5,835.00 during his employment with Mainlining Services, Inc.

c.    From March 2007 through present Donald has been employed by PNM and earns $13.00 per hour, His work weeks vary from 35 to 20 hours per week.

**INTERROGATORY NO. 20:**    Provide a complete history of your past employment, including for each place of employment, the name of employer, address, period of employment, your salary or hourly wage at the beginning and end of employment, the name of your supervisor, your job title, a description of your work, and your reason for leaving each place of employment.

**Answer:**

**Plaintiff Robert Krakat:**

a.    From 1974 through 2004, Robert Krakat worked for Armed Forces Retirement Home as the Night Building Engineer at the AFRH at 3700 N. Capitol Street, NW, Washington, DC 20317. Mr. Krakat was in charge of the building maintenance. In 2004, Robert Krakat made $59,000.00.

b.    From 2004 through 2005, Robert Krakat worked for Jorden Howard Tech., contractors hired by AFRH, as an assistant supervisor at the AFRH. Although his job title changed, his duties did not. He earned $24.00 per hour and worked 40 hours per week.

c.    From 2005 through 2006, Robert Krakat worked for BRCS as a crew chief at AFRH. Again, although his job title changed, his duties did not. Mr. Krakat earned a total of $12,837.50 in 2006.

**Plaintiff Donald Krakat:**

    a.    From 1992 to 2002, Donald Krakat was employed by C&B Electric in Clarksville, Maryland as an electrician. His duties consisted of wiring sulfites. He earned $18.00 per hour.

    b.    From 2002 through 2003, Donald Krakat was employed by Royal Electric in Sykesville, Maryland as an electrician. His duties consisted of wiring houses. He earned $16.00 per hour.

    c.    From 2003 through 2005, Donald Krakat was employed by JHT Armed Forces Retirement Home in Washington, D.C. as an HVAC Technician. His duties consisted of ac unit maintenance. He earned approximately $18.00 per hour.

    d.    From 2005 through 2006, Donald Krakat worked for BRCS as a building mechanic. His duties consisted of maintaining the plumbing and ac units. He earned $20.99 per hour.

**INTERROGATORY NO. 21:**    Describe in detail each attempt you have made to find employment from your date of termination from BRCS to the present, including the company and/or individual contacted; the dates of contact; the method(s) of contact (i.e., telephone, letter, personal interview); the result of such contact, including whether a job was offered; whether a written job application was completed; if you were employed, the date of such employment; and the wages you have received as a result of such employment.

    **Answer:** Plaintiffs object to this interrogatory as it is unduly burdensome. Without waiving that objection, Plaintiffs have both sent out resumes to numerous prospective employers. Plaintiffs have actively engaged in job hunting since their termination. Currently, Plaintiff Robert Krakat is taking training courses offered by Eyre Bus Services. Once he completes the

training courses, he will have the opportunity to work for Eyre Bus Services as a bus driver. Plaintiff Donald Krakat is currently working for P.M. Installation for 25 to 30 hours per week at $13.00 per hour. Please see Answer Nos. 19 and 20 for a complete job history for each Plaintiff.

**INTERROGATORY NO. 22:**    Identify each health care provider, including psychologists, psychiatrists, physicians, social workers, therapists, counselors, family counselors, mental health care nurses, or crisis clinics you have consulted with or been treated or examined within the last 10 years, and specify whether the treatment was related to any psychological, psychiatric or emotional damages that you contend were a result of Defendant's acts or omissions.

**Answer:** Objection as to relevance to the extent that the interrogatory requests information which predates Plaintiffs' termination. Without waiving the objection, Plaintiff Robert Krakat has been seen by Dr. Baig, M.D., his primary care physician. He was treated for high blood pressure as a result of stress from his termination from BRCS. Plaintiff Donald Krakat has not seen any health care provider for any treatment of any illnesses or injuries related to Defendant's acts or omissions.

**INTERROGATORY NO. 23:**    Identify each expert witness you anticipate calling at the trial of this matter, specifying (a) the name, address, occupation and the area of expertise of such expert, (b) the subject matter to which the expert will testify, (c) the substance of the facts and opinions to which he is expected to testify, and (d) the grounds for each opinion and his/her qualifications.

**Answer:** Plaintiffs have not yet identified any experts, but will supplement this response once experts have been retained and/or identified. Plaintiffs anticipate that it may be necessary to designate an expert on the valuation of lost future income.

**INTERROGATORY NO. 24:**    State whether you have been involved as a party in any litigation or administrative action other than the instant case. For each such action, state (1) the court or agency in which such litigation or action was brought, (2) the parties to the litigation or administrative action, and (3) the outcome of such litigation or administrative action.

**Answer:** Neither plaintiff has been involved as a party in any litigation or administrative action other than the instant case.

**INTERROGATORY NO. 25:**    State whether you intend to rely on any alleged admission made by any Defendant and/or Defendant's agents, in this action; and if so, identify the person making the admission, the person(s) to whom the admission was made, any document relating to such admission, and the substance of each such admission.

**Answer:** Objection to the extent the request seeks a legal conclusion. Without waiving the objection, see Heffern, Rouse, Starr, and Farver statements disclosed herein. Plaintiffs reserve the right to supplement this answer as discovery continues.

**WE SOLEMNLY DECLARE AND AFFIRM** under the penalties of perjury that we are over eighteen (18) years of age, competent to make this declaration, and that the contents of the foregoing Answers to Interrogatories are true to the best of our knowledge, information and belief.

Robert Krakat

Donald Krakat

16

Respectfully Submitted:

Byrd & Byrd, LLC

Timothy P. Leahy
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
(301) 464-7448
(301) 8-5-5178 – Fax
Tleahy@byrdandbyrd.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 2__ day of September, 2007, a copy of the foregoing Answers to Interrogatories was mailed first class, postage pre-paid to:

Karen A. Doner (Bar No. 458626)
Thomas J. McKee, Jr. (Bar No. 492482)
Williams Mullen, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia 22102
703-760-5200 (phone)
703-748-0244 (fax)

Timothy P. Leahy

1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3   ROBERT KRAKAT and DONALD      )

4   KRAKAT,                       )

5            Plaintiffs,          )   Case No.

6            -vs-                 )   1:07cv00693-RCL

7   BROOKS RANGE CONTRACT         )

8   SERVICES, INC.,               )

9            Defendant.           )

10

11                     Monday, January 21, 2008

12                     McLean, Virginia

13  Deposition of

14            KATIE FARVER

15  called for examination by counsel for the

16  Defendant, pursuant to notice, held at the

17  offices of, Williams Mullen, PC, 8270 Greensboro

18  Drive, Suite 700, McLean, Virginia 22102,

19  beginning at 10:01 a.m., before Bonnie Marcus

20  Olachea, a notary public in and for the

21  Commonwealth of Virginia, when were present on

22  behalf of the respective parties:

1      A.    That Kevin took him into the room,

2  told him he was being suspended for allegations

3  of theft, that there was going to be an

4  investigation, and that they were to return on

5  Thursday at 10:00 a.m.

6      Q.    What did Kevin tell you?

7      A.    He told me, I don't know what's going

8  on.  I didn't do this.  This isn't me.  People

9  on the Hill said they stole something.  We have

10  to investigate.

11      Q.    Did you ask him why Donny was

12  suspended?

13      A.    Yes.

14      Q.    And that was his response?

15      A.    Yes.

16      Q.    When he said that people on the Hill

17  said that they had stole things, he was

18  referring to Robert and Donald Krakat to your

19  knowledge?  To both of them?

20      A.    What, the people on the Hill?  Who was

21  that, is that what you're asking?

22      Q.    When Kevin told you that the people on

1  the Hill, whoever that was that said they had

2  stolen something or some things, was it your

3  understanding that Mr. Heffern was talking about

4  both Robert and Donald Krakat having stolen

5  things?

6      A.  Both.  I confronted Kevin after both

7  were suspended.

8      Q.  Where did your conversation with Kevin

9  take place?

10     A.  In the doorway to his office.

11     Q.  Was anyone else present?

12     A.  No.

13     Q.  No one else would have heard that

14  conversation between you and Kevin?

15     A.  No.

16     Q.  Okay.  Did Kevin state anything else?

17     A.  No.

18     Q.  And you said you heard from Sandy in

19  the government office.  Who is Sandy?

20     A.  She was a contractor that worked with

21  Dave Rouse and Jerry Wessel.  She took all the

22  work orders from the residents and put them into

26

1    the computer.

2         Q.   Do you know her last name?

3         A.   L-E-U-B-K-E-R-T.

4              MR. LEAHY:   Sorry, can you spell that

5    one more time?

6              THE WITNESS:   L-E-U-B-K-E-R-T.

7    BY MS. DONER:

8         Q.   What did she state to you?

9         A.   She called me and asked me if I had

10   heard that the Krakats were suspended for

11   allegations of theft.  She couldn't believe that

12   this had happened.

13             I told her that Kevin told me the

14   allegations came from the Hill.

15             And she said, they didn't come from up

16   here.  She said, Jerry's standing right here.

17   Jerry can't believe this is happening either.

18        Q.   Did she say anything else?

19        A.   I don't remember exact wording but

20   along the lines of, she really couldn't believe

21   this happened and Bob had worked there for

22   32 years, Stuff like that.  We talked on a daily

1    Krakat.

2        A.   I don't -- Donny said, what?  What are

3    you talking about?  I didn't hear anything from

4    Kevin.

5             And then Howard told them that they

6    were being -- told Donny he was being

7    investigated and would come back on Thursday.

8        Q.   Did you hear Howard say anything else?

9        A.   No.

10       Q.   Did you hear anyone else say anything

11   else --

12       A.   No.

13       Q.   -- other than what you just stated?

14       A.   Sorry, no.

15       Q.   So the only thing that you heard

16   Howard state was that Donald was being

17   investigated and to come back on Thursday; is

18   that correct?

19       A.   Yes.

20       Q.   Did you hear Howard or anyone else say

21   anything about theft, or did you only learn

22   about that afterwards?

40

1     with you -- other than what you've already

2     described your conversation with Kevin and

3     Sandy, did anyone else discuss with you the

4     reasons for the Krakats' suspensions or even the

5     fact they had been suspended?

6          A.    I discussed it with my uncle, yes.

7          Q.    What is your uncle's name?

8          A.    Rick Phillips.

9          Q.    How is he related to you?  Is he your

10    mom's brother or your father's brother?

11         A.    He's my mom's brother.

12         Q.    And does he work for the government or

13    for Brooks Range?

14         A.    Right now?

15         Q.    At that time.

16         A.    He worked for Brooks Range.

17         Q.    Do you know what his position was?

18         A.    He was the project manager at DEA.

19         Q.    And what was your conversation with

20    him?

21         A.    I told him what happened.

22         Q.    Okay.

41

1      A.    He'd already known of the problems

2    Brooks Range was having.  And he said to me

3    that, oh boy, that didn't go the way that he

4    thought it was going to go.

5           It was his understanding and therefore

6    my understanding that Howard was coming to fire

7    Kevin.

8      Q.    It was his understanding that Howard

9    was coming to fire Kevin on the day that the

10   Krakats were suspended?

11     A.    No.  In the time frame that Howard was

12   coming to D.C. or to projects in D.C., DEA, or

13   even Northern Virginia, DEA and Armed Forces and

14   in that trip it was our understanding that

15   Howard was coming to fire Kevin.

16     Q.    Okay.  And so he said to you that, oh

17   boy, that didn't go the way he had expected; is

18   that correct?

19     A.    Yes.

20     Q.    Okay.  And did he say to you that he

21   had thought Howard was coming to fire Kevin, or

22   did you already know that from a prior

1       Q.   What is your knowledge?

2       A.   We had a limited cash fund for I guess

3   employee relations.  I don't know how you would

4   say it, like birthday parties or Christmas

5   parties or pizza parties, whatever.  And Kevin

6   treated us to pizza on several occasions from

7   that fund, I guess maybe to boost morale or

8   something.

9            And we didn't have enough money for

10  the Christmas party so Kevin said he would throw

11  an extra invoice in there from VCS and that he

12  would pay for our Christmas party that way.

13      Q.   When did he tell you that?

14      A.   Sometime before Christmas.  I don't

15  know what to say.

16      Q.   Was anyone else present?

17      A.   No.

18      Q.   Did he in fact do that to your

19  knowledge?

20      A.   Did he in fact do what?  Did he in

21  fact submit another invoice or did he actually

22  use that money for the Christmas party?  What

208

1              THE WITNESS:  That's correct.

2      BY MS. DONER:

3          Q.   You didn't take any of those invoices

4      with you, correct?

5          A.   No, I did not.

6          Q.   But Bob did --

7              MR. LEAHY:  Objection.

8      BY MS. DONER:

9          Q.   -- right?

10         A.   Did Bob take any invoices or did he

11     take ones in addition to this?

12         Q.   Well, that's my question.  What is

13     your understanding of what was taken from Brooks

14     Range by Bob?

15         A.   My understanding is that Bob made

16     copies of a few things in the VCS file, but he

17     has said to me that he didn't take them all, you

18     know, copy them all.  So these might be the only

19     three he has.  I'm not sure.  I don't have a

20     copy of them.

21              But I know Kevin charged for painting

22     the Pipes building rooms.  And where are those?

209

1       Q.   Okay.  Did Bob tell you that he had

2   taken documents other than Virginia Contracting

3   Service invoices?

4       A.   I -- Bob told me he took the vendor

5   set-up form -- copied the vendor set-up form.

6       Q.   But the tree removal documentation?

7       A.   I don't know if he -- do you mean

8   invoices from the company or -- I'm not sure if

9   he has those.

10      Q.   Okay.  Other than your review of the

11  invoices that are part of Exhibit 8 and other

12  VCS invoices, do you have knowledge of the work

13  alleged to have been performed by VCS based on

14  anything else?

15          MR. LEAHY:  Objection.

16          THE WITNESS:  I guess I don't

17  understand what you're asking me.

18  BY MS. DONER:

19      Q.   Well, I'm trying to figure out how you

20  knew about VCS and the work that it was claiming

21  to have performed, which was of such concern to

22  you.  So I know that you reviewed three invoices

1    that are part of Exhibit 8. You just testified

2    there were other VCS invoices that you had seen.

3            I want to know, was there anything

4    else that caused you to be concerned about the

5    work that VCS was doing or invoicing the

6    government for?

7        A.   Yes.

8        Q.   What?

9        A.   Kevin told me that he was going to

10   throw in an extra invoice for the Christmas

11   party.

12       Q.   Okay.  Anything else?

13       A.   I guess I don't understand really.  I

14   don't want to say, no, because I'm not

15   understanding clearly if I had other knowledge.

16   Everything that he billed for were basically

17   like big jobs that our guys did, the mechanics

18   did, and that's how I knew he wasn't the one

19   doing them.

20       Q.   Okay.  And you knew that they did --

21   the BRCS employees did the work based on what?

22            Did you see them do it, or did they

1    tell you that they did it, or did Bob tell you

2    that Brooks Range employees did the work?

3        A.    Well, both.  Like the LaGarde kitchen

4    for example, I did not see this one but several

5    employees told me they did it.  Other ones like

6    in the Pipes building, I've been over there and

7    saw our guys, you know, painting the rooms and

8    such.

9            And Kevin would even list the room

10   numbers in the Pipes building and I would know

11   that our guys had just done that work.

12       Q.    You would know that they had done

13   those rooms?

14       A.    Those rooms.  But I don't -- do you

15   have those invoices or are you saying this is

16   it?

17       Q.    No, there are other invoices.  These

18   are the ones I'm asking about.

19       A.    Okay.

20       Q.    So with respect to painting the rooms,

21   you had seen the rooms that had been listed in

22   the VCS invoice and you knew that Brooks Range

212

1    employees had done the painting; is that your

2    testimony?

3        A.   It would not always just be the

4    invoice.  I don't remember if it was the

5    invoice.  But on the purchase order that's

6    attached to the invoice, they'd be the rooms

7    that Kevin you know would list that Virginia

8    Contracting Services would do.

9            And then sometimes they were on Van

10   Settle's list of the rooms that he was supposed

11   to be painting and that's how I would see.  And

12   by that point I already knew Kevin was stealing

13   money so I wasn't like surprised or anything.

14       Q.   For the Pipes building roofing and

15   canopy repair, did you see firsthand Brooks

16   Range employees doing that work, or did someone

17   tell you that they had done it?

18       A.   I did not see it firsthand.

19       Q.   Okay.  Did someone tell you?

20       A.   I don't know what the roofing is

21   about, but the canopy repair was -- I remember a

22   big job because they needed a lot of people.

213

1    And Jerry Wessel was coming down into the

2    office, you know, smoking all the time in the

3    office.  And he was telling me, telling Kevin,

4    that he needed more guys out there.  He needed

5    more guys out there.

6            But I don't know what Pipes building

7    roofing is really referring to.

8        Q.   Okay.  But with the canopy repair, did

9    someone tell you that Brooks Range employees had

10   done the work that VCS was charging for?

11       A.   Jerry told me he had all the guys out

12   there.  And all the guys were out there like in

13   communication via radio.

14       Q.   What about when it says other plumbing

15   work.  Do you know what that refers to?

16       A.   No.

17       Q.   Okay.  Paragraph 12 indicates that

18   Heffern threw out low bids for tree service in

19   order to hire AR Bryant Company owned by a

20   friend of Heffern.

21           Do you have firsthand knowledge of

22   that allegation?

214

1      A.   I have knowledge, yes.

2      Q.   What is your knowledge?

3      A.   That we received bids from several

4  companies.

5      Q.   Did you see them?

6      A.   Yes.

7      Q.   What did you do with them when you

8  received them?

9      A.   Gave them to Kevin.  Kevin then gave

10  them to me to file them together.

11     Q.   Were they filed in that filing

12  cabinet?

13     A.   They were under whatever the estimate

14  number was.  I don't remember.  Like do you see

15  at this thing in this little box there's an

16  estimate number?  Each over-and-above job had

17  its own estimate number.

18     Q.   You're referring to the box on the

19  bottom right of the Virginia Contracting

20  Services invoice?

21     A.   Right.

22     Q.   First page of Exhibit A, okay.

215

1      A.   So I'm pretty sure all of the bids

2    were in the folder that was marked with whatever

3    the corresponding estimate number was.   They

4    weren't in individual vendor folders.

5      Q.   Okay.   But those files were in the

6    file drawers that you described earlier in the

7    storage cabinet?

8      A.   Yes.

9      Q.   Okay.   Did you show any of those bids

10   to Robert Krakat?

11     A.   No.

12     Q.   Did you show them to Donald Krakat?

13     A.   No.

14     Q.   Did you tell either of them where they

15   were located?

16     A.   No.

17     Q.   Okay.   Did you bring to their

18   attention that these bids had been submitted but

19   that the contract was being awarded to

20   AR Bryant?

21     A.   No.

22     Q.   Okay.   So other than you receiving the

1    proposals in, you had no other involvement?

2        A.    No.

3        Q.    Is that correct?

4        A.    That's correct.

5        Q.    Okay.  I think you said earlier that

6    when you called Robert and Shirley at home on

7    that Saturday in October, that Bob told you

8    about the tree issue?

9        A.    Yes.

10       Q.    What exactly did he say to you about

11   it?

12       A.    He said that one of the -- a man he

13   knew submitted a proposal for the tree removal

14   contract.  And he found out from Jerry that it

15   was never submitted with the other proposals and

16   it would have been the lowest cost one.

17              So it was never submitted.  Therefore,

18   they were not picked and they never -- the

19   company or whoever it was never even heard back

20   about the status of their proposal, is what Bob

21   told me.

22       Q.    Is that when you learned about it?

217

1        A.    Learned about what?

2        Q.    Is that the first time that you

3    learned about the issue with the tree removal

4    bids?

5        A.    What do you mean issue?

6        Q.    Is that the first time that you

7    learned of this allegation that Kevin had done

8    something wrong with the tree removal bids?

9        A.    That was the first time I learned that

10   he did not submit all of the bids, yes.

11       Q.    Okay.  Other than what we've discussed

12   thus far, was there any other -- is there any

13   other wrongdoing by Kevin Heffern that you're

14   aware of during your employment at Brooks Range?

15       A.    Well, I don't know what you would

16   consider wrongdoing.  Like legally wrong,

17   morally wrong, what?

18       Q.    Wrong in any respect in your opinion.

19       A.    I mean I think he fired people that

20   didn't deserve to be fired.  But I don't know if

21   it's an employment well stayed (phonetic) or

22   whatnot so I don't know, but to me it was wrong.

218

1      Q.    Anything else?

2      A.    Okay, so besides VCS, correct?

3      Q.    Yes.

4      A.    I know he tried to get his girlfriend

5  to be the assistant project manager after he

6  fired him.  To my knowledge I think -- sorry, I

7  don't want to forget anything.  He tried to get

8  other people involved with taking money, getting

9  money and things so that once they were involved

10  they wouldn't be able to open their mouths.

11      Q.    Anything else?

12      A.    Not that I can remember right now.

13      Q.    Okay.  How did he try to get others

14  involved with taking money?

15      A.    He offered Donny and I money to go

16  clean a room in the Pipes building.  He said he

17  would pay us cash.  It was right before

18  Christmas time.  Said he would give us $400 if

19  we did it, so that was firsthand knowledge.

20          I have other knowledge that he offered

21  Bob money to kind of turn his head, but I did

22  not hear that conversation myself.

219

1        Q.   What did Bob tell you about it?

2        A.   That Kevin wrote down on a little

3   piece of paper that -- how much money he could

4   earn extra a month if he would just turn his

5   head.

6        Q.   When did Bob tell you this?

7        A.   Not until after we were out of Brooks

8   Range.

9        Q.   Not until after you all ended your

10  employment with Brooks Range?

11       A.   Correct.

12       Q.   Okay.  Did Bob have the piece of paper

13  to your knowledge?

14       A.   To my knowledge what I heard was Kevin

15  ripped it up and threw it in the trash can.

16       Q.   Okay.  Anything else?

17       A.   About that?

18       Q.   Yes.

19       A.   No.

20       Q.   Who was present when Kevin offered you

21  and Donny $400 to clean a room?

22       A.   Donny and I.

1    Q.    When was this?

2    A.    It was before Christmas.

3    Q.    Right before Christmas?

4    A.    I don't know.  I just remember

5    thinking about it like extra money would be

6    great but I wasn't getting involved in his

7    little mess.

8    Q.    So you both said, no?

9    A.    Well, to get out of the office I did

10   clean the room, but yeah I said, no, to the

11   money.  But I asked him if I could still go

12   clean something.

13   Q.    You said he didn't have to give you

14   the money but you'd clean it anyway?

15   A.    Yeah.  It was kind of boring being in

16   the office all the time.

17   Q.    Okay.  What room was it?

18   A.    It was in the Pipes building.  It was

19   almost at the end of a hall, you walked all the

20   way down the hall.  You had to go up the

21   elevator and elevators really weren't my thing.

22               I don't remember exactly what room it

221

1    was but had this thing coming from the ceiling.

2    I don't know if like the ceiling fell out.

3    There was dirt everywhere and we cleaned it and

4    that was it.

5         Q.   Was anyone else with you?  Did Donny

6    help you clean it?

7         A.   Yeah, Donny did.  Chris Jenkins was

8    around.  He was usually in that building.  He

9    came by and laughed at me cleaning.

10        Q.   Anyone else?

11        A.   I don't think anyone else came by the

12   room.  I know people saw me when I was walking

13   back to the office.

14        Q.   Okay.

15        A.   Because I walked there.  They all have

16   like golf carts and I walked.

17        Q.   Did you tell your tell your uncle or

18   anyone else at Brooks Range about Kevin offering

19   you the money to clean a room?

20        A.   At that point, no.  Not like that day

21   I didn't call, but I did tell my uncle later.

22        Q.   When?

1    A.    Would have been closer to the time

2  when we found out Howard was coming.  And like I

3  said we thought that he was coming to fire

4  Kevin.  You know, my uncle was telling me that

5  Howard would be coming and whatnot.

6              And I told him that he was now trying

7  to get me and Donny involved.

8              And that's when he offered Donny, you

9  know, like some roofing work to do in December.

10  It was the beginning of December.  I told my

11  uncle all of that but no one else at Brooks

12  Range.

13    Q.    Did Donny do the roofing work?

14    A.    Yes.

15    Q.    Is that the work that's reflected on

16  the invoice with Donny's name on it?

17              MR. LEAHY:  Objection.

18              THE WITNESS:  What invoice?  Which

19  one?

20  BY MS. DONER:

21    Q.    That you referred to earlier.

22              MS. DONER:  Can you see what that

1  number is, 11?  Do you need a break?  Why don't
2  we take a break then.
3       (Whereupon, a brief recess was taken.)
4       (Farver Deposition Exhibit Number 11 was
5       marked for identification and attached to
6       the transcript.)
7  BY MS. DONER:
8       Q.  You have what's been marked as
9  Exhibit 11 which appears to be an invoice with
10  Donald Krakat's name on it with respect to the
11  roof, and then attached to it is a purchase
12  order.
13       Is this the work that you were
14  referring to a minute ago?
15       A.  When I said that Kevin was trying to
16  get other people, yes.
17       Q.  Other than Kevin asking or offering
18  Donny to do this roofing work an offering you
19  and Donny $400 in cash to clean a room, and
20  other than Kevin writing down allegedly on a
21  piece of paper --
22       (Discussion off the record.)

1          MS. DONER:  Okay.  Can you read back

2     the beginning of my question?

3               (Whereupon, the court reporter read

4     the previous question.)

5     BY MS. DONER:

6          Q.  -- how much extra Bob could earn if he

7     would turn his head, is there anything else that

8     Kevin did to try to get others involved with

9     taking money as you were alleging earlier?

10         A.  Did you get the part about he fired

11    Bryon Clare?

12         Q.  I'm going to ask you about that.  Is

13    there anything else about him trying to get

14    others involved in taking money?

15         A.  Not that I recall right now.

16         Q.  Okay.  You indicated that Kevin had

17    fired people who shouldn't have been fired.  Who

18    did he fire?

19         A.  Bryon Clare.

20         Q.  Anyone else?

21         A.  Who else did he fire?

22         Q.  Or who else are you referring to when

1    you say that he shouldn't have fired them?

2         A.    Bob, Donny.

3         Q.    Anyone else?

4         A.    That's really what I was referring to.

5         Q.    Okay.  How do you know that Bryon

6    Clare was fired, as opposed to him resigning

7    from employment?

8         A.    Kevin told me.  And then Bryon Clare

9    called several times after he was terminated.

10   He would call, I would say, at least four times.

11        Q.    Okay.  What did Kevin specifically

12   tell you?

13        A.    Kevin told me to leave the office

14   because he was going to fire Bryon, and told me

15   to go into the shop.

16        Q.    And what did Bryon tell you?

17        A.    He -- the first time we discussed it

18   he left.  I went back into the office, and then

19   Bryon came back.  And it was kind of awkward.

20   He said, I don't know what happened.  I don't

21   what happened, man.  He's like Kevin just fired

22   me.  I don't know what happened.   There's

1    something fishy.

2          He always had told me that there's

3    something fishy with Kevin.

4      Q.   Did Bryon Claire ever tell you that he

5    had complained to anyone at the government or

6    Brooks Range regarding Kevin's alleged

7    wrongdoing?

8      A.   No, he did not.

9      Q.   Did you learn of that fact from

10   someone else?

11     A.   That he spoke to the corporate office?

12     Q.   That he complained about Kevin.

13     A.   You asked me earlier if he complained

14   to the corporate office, right?

15     Q.   What I'm asking is, do you have any

16   knowledge of any complaints made by Bryon Claire

17   to either Brooks Range, the corporate office, or

18   to the government regarding Kevin Heffern?

19     A.   He complained to me.  I don't know who

20   else he complained to.

21     Q.   Okay.  You said earlier that Robert

22   told you he spoke to Jerry Wessel; is that

239

1    or did you ever see him complete any counseling

2    forms for any employee?

3        A.    Never.

4        Q.    Were you aware of any counseling forms

5    that were used at Brooks Range?

6        A.    Yes.

7        Q.    What were those forms?

8        A.    The oral counseling Bob used, there

9    were also forms for written counseling, and I

10   think there was a form for suspension.

11       Q.    And had you seen all those forms?

12       A.    They were in our handbook.

13       Q.    Were they in the current handbook at

14   the time of your employment or were they in an

15   older version of the handbook if you know?

16       A.    We only had two handbooks and they

17   were the same.

18       (Farver Deposition Exhibit Number 12 was

19       marked for identification and attached to

20       the transcript.)

21   BY MS. DONER:

22       Q.    Let me hand you what's been marked as

1      IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, MARYLAND

2   ------------------------------x
                                    :
3   ROBERT KRAKAT and DONALD        :
    KRAKAT,                         :
4                                   :
            Plaintiffs,             :
5                                   :
        v.                          :  Case No. 1:07-CV-00693-RCL
6                                   :
    BROOKS RANGE CONTRACT SERVICES, :
7   INC.,                           :
                                    :
8           Defendant.              :
                                    :
9   ------------------------------x

10                                 Friday, February 29, 2008

11

12                                 Rockville, Maryland

13  Deposition of

14

15                      HOWARD ANASTASI

16  witness, called for examination by counsel for plaintiff,

17

18  pursuant to notice, at the office of Byrd and Byrd, LLC,

19  14300 Gallant Fox Lane, Suite 120, Bowie, Maryland 20715,

20

21  beginning at 3:17 p.m., before Donna Escobar, a notary

22  public of the State of Maryland, when were present on

23
    behalf of the respective parties:
24

25

*Deposition Services, Inc.*
*6245 Executive Boulevard*
*Rockville, MD  20852*
*Tel: (301) 881-3344 Fax: (301) 881-3338*
*info@DepositionServices.com   www.DepositionServices.com*

1   that was purchased when we buy supplies in Fairbanks,

2   which would have been bought at either Sam's Club or

3   Office Max.  There's not too many vendors in Fairbanks.

4   Just typical office supply.

5           MS. DONER:  And to clarify, I think that this

6   is a stamp, isn't it?  The top portion?

7           THE WITNESS: No, it's on there.

8           MS. DONER:  Oh, it is on there?

9           THE WITNESS:  It's actually on the tablet,

10  yeah.  I didn't put it up there, and I don't -- it has no

11  particular meaning to me.

12          MS. DONER:  Thank you, I'm sorry.

13          BY MR. LEAHY:

14      Q    And I don't know, if we need to mark this, but

15  this is a, it's Brooks Range document 7344 through 739

16  and previously identified as Kevin Heffern Deposition

17  Exhibit No. 1, which purports to be Brooks Range

18  Contracting Services Policies and Procedures for Employee

19  Counseling.  Have you ever seen this document before?

20      A    Yes.  And I killed it in May of 2004.  It was,

21  no, it's not been valid since then.  Not in use.  Not

22  officially sanctioned.  Not official policy.  Was told,

1   Katie Farver was told.  Kevin was told that these were

2   not to be used and they should have been wiped off of her

3   computer but apparently they were not.  It's not valid.

4   It has not been valid or in use since May of 2004.

5       Q    Was there a replacement for these particular

6   documents?

7       A    No in kind, no.  Not as such.

8            MR. LEAHY:  Go ahead and have that marked.  And

9   I'll just have it marked as Deposition Exhibit 2.

10                            (Deposition Exhibit no. 2 was

11                             marked for identification.)

12           BY MR. LEAHY:

13      Q    You indicate that they weren't replaced in

14   kind.  With what were they replaced?

15      A    They weren't replaced in kind.  I am not a

16   believer and do not subscribe, and the official company

17   policy is not to use forms, albeit there are still a few

18   hanging out there that occasionally resort to using

19   forms.  My recordkeeping involving any kind of employee

20   action is some form of a note or a memo.  Typically

21   speaking, non-union sites are dealt with simply by notes.

22   Most union sites are dealt with by typed memo, not all.

1          THE WITNESS:  What I do know is, I don't know

2    where the Krakats name came in this conversation because

3    it was never, it was never part of this deal.  And I mean

4    never.  Secondarily, Katie Farver never brought forward,

5    the only one she talked to was me.  She talked to her

6    uncle.  She didn't talk to her uncle in an official

7    capacity.  She talked to me as an official capacity, no

8    one else.  Katie never brought forward any of those

9    allegations, not even a whisper of it.  And I do know

10   that the work that Virginia Contracting was paid for by

11   us was performed.  It was checked on.  It was deemed to

12   be more than satisfactory.  It was also deemed to be

13   cheaper than the competition.

14          BY MR. LEAHY:

15   Q     Now, did Brooks Range make any investigation as

16   to whether or not Brooks Range employees did the work

17   that Virginia Contracting Services billed?

18   A     Well, it was never alleged, so we never, there

19   was no such animal.  And based on the number of work

20   orders that were turned in, and the regular work that was

21   done, if they'd been doing it, they had to clone

22   themselves because you can't be in two places at one

1    time.  So in looking at it, no.  But in terms of it ever

2    being mentioned, never.  Not even a whiff of it.  Katie

3    never brought it forward period.

4        Q    And is Brooks Range aware of anyone else ever

5    bringing those allegations forward?

6        A    Absolutely not.

7             MS. DONER:  Tim how much more do you think you

8    have?

9             MR. LEAHY:  Can we go off the record for a

10   second.

11            (Discussion off the record.)

12            COURT REPORTER:  We are back on the record.

13            BY MR. LEAHY:

14       Q    Mr. Anastasi, I've got a few documents that I'd

15   just like to have you identify.  I may not have that many

16   questions on it, but I do want to make sure that some

17   things that Mr. Heffren identified in his depositions

18   that Brooks Range is acknowledging that these are true

19   and accurate.  Let's start with what's been marked as

20   Exhibit 4, which Brooks Range documents 235 through 250.

21                          (Deposition Exhibit No. 4 was

22                           marked for identification.)

1   not sure of the gentleman's name, but I think it might

2   have been James Bernard, something like that, he was an

3   Atrac mechanic, and he was actually a pretty good

4   mechanic, but Robert didn't think that he was good enough

5   to fix an air handler, if I'm correct in my memory.  Fix

6   something, whatever it was, and I told him let him do it,

7   and he insisted on leaving a meeting we were having to go

8   do it himself.

9          Now, that's just what he did as opposed to

10  either letting somebody who should have been trained or

11  go ahead and training them.  And there were other

12  incidents.  I can't recall with as much clarity as those

13  two.

14         BY MR. LEAHY:

15  Q    Now, when he left this meeting, did you tell

16  him don't leave the meeting, have somebody else do it,

17  that's an order?

18  A    Yeah.  Yeah, I told him that he was stay in the

19  meeting.  He didn't stay.

20  Q    Well, why didn't you fire him when he disobeyed

21  you with respect to not training somebody?

22  A    For the same reason I originally hired him.  I

1    needed the body.  I was not in a position to remove him.

2    The moment I hired him I was planning on letting him go.

3    He was not, number one for the job he was in, he was the

4    fourth choice.  Three guys in front of him turned the job

5    down for pay reasons, one of them being Bill Jenkins.

6    Two of the other guys who turned them down wound up not

7    coming to work for us at all.  He was number four, he was

8    the fourth candidate.  That's number one.

9        Number two, from the moment that he was hired I

10   had set the plan in place to replace him.  He was not

11   qualified.  On top of not being qualified, which was a

12   very difficult situation, and it was extremely difficult

13   for me to control myself in this situation, he refused

14   innumerable occasions to me personally, which I can tell

15   I've never put up with before, but I've done a lot of

16   things that I had to do that I wouldn't have done in the

17   past.

18        This is a difficult position to be in, and

19   that's the position we were in.  So that's why I didn't

20   just fire him.

21       Q    And, I think, we've talked about four or five

22   things that he flatly refused to do.  Was your reason for

1    not firing him at those times the same?

2        A    Absolutely.

3        Q    So by the time you got to, I believe he was

4    suspended on February 21st of 2006 and terminated on

5    February 23rd, 2006.  What changed as of February 21st or

6    February 23rd, 2006?

7        A    By that time we had hired enough skilled people

8    that could carry us.  I was also in talks with the

9    Operating Engineers Union, and upon bringing them in

10   we've now attracted a much higher caliber of actual

11   people who are qualified.  So that's what changed.  The

12   entire dynamic shifted and took me that long to get it to

13   shift.

14       Q    Who had you hired by February 21st or February

15   23rd?

16       A    Oh, I hired, I mean, I let people go prior to

17   Mr. Robert Krakat and replaced them, and have hired and

18   replaced, let go people since him.  So he's, Robert and

19   Donald Krakat were by no means the only ones.  I think I

20   told you earlier there's only four remaining and only

21   three remaining hourly.  So, the workforce has been

22   turned over, and just as quickly as practicable, as

1       Q     Who had what conversations?

2       A     Ed Nealand had a slew of conversations.

3       Q     Who did he have conversations with?

4       A     I believe with Jeff Shaffer, as well as, I

5  don't know.  I'm not sure what other governmental

6  personnel.

7       Q     Would Mr. Nealand have documented these

8  conversations?

9       A     I doubt that sincerely.  I don't know.

10             MS. DONER:  I don't think so.  I requested that

11  information.  There's nothing.

12             THE WITNESS:  But, I mean, I think.  So I don't

13  know.  I would doubt it.

14             BY MR. LEAHY:

15       Q     And it's fair to say that the investigation

16  that Brooks Range conducted, which was basically the

17  results are contained in that letter that's also of

18  Deposition Exhibit No. 4?

19       A     I know that Ed generated a letter, I believe,

20  in response, if that's the one you're referring to, yeah.

21       Q     You can certainly take a look at Deposition

22  Exhibit No. 4.  I want to make sure that we've got

1    He said categorically no.  I asked him if he knew of

2    anything else.  Any other boosting going around.  Since I

3    had an hour before that been told that there was no

4    connection to Donny doing it, but I wanted to know just

5    for an information gathering thing.  And he said no.  And

6    that was it.  That was it.

7             Then when it was Robert's turn, I asked him

8    about the television.  I didn't ask him about the other

9    thing because the reaction I got from Donny, I figured

10   well, this is a dead end and I just didn't ask Robert.

11   But I did ask him about the TV.  I was told no.  And

12   that's it.  No one ever came to myself or any other

13   member of Brooks Range alleging, mentioning or even

14   insinuating that either one of these two guys were

15   involved in any kind of illicit, illegal or theft.

16   Anything that was inappropriate.

17            Nobody ever mentioned that and we had no

18   concept, no thought, no nothing of that.  Kevin had told

19   me Donny came to him.  And quite frankly, Kevin told me

20   he didn't believe it.  He didn't know what Donny was up

21   to, but he didn't believe.  So there was no credibility

22   given to it.  Because if I thought that there was

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT KRAKAT and** | ) |
| **DONALD KRAKAT,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) **Case No: 1:07-cv-00693-RCL** |
| | ) |
| **BROOKS RANGE CONTRACT SERVICES, INC.,** | ) |
| | ) |
| **Defendant** | ) |
| | ) |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**NOTICE OF LODGING UNDER SEAL**</u>

　　**NOW COME** the Plaintiffs Robert Krakat and Donald Krakat. (collectively "Plaintiffs"), by and through their undersigned counsel, and hereby files this Notice of Lodging Under Seal related to Documents filed with their Memorandum in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Motion for Leave to File Documents Under Seal.

　　　　　　Respectfully Submitted,

　　　　　　BYRD & BYRD, LLC

　　　　　　/s/
　　　　　　_____
　　　　　　Timothy P. Leahy, Bar No. 472964
　　　　　　14300 Gallant Fox Lane, Suite 120
　　　　　　Bowie, Maryland 20715
　　　　　　(301) 464-7448
　　　　　　(301) 805-5178 Fax
　　　　　　tleahy@byrdandbyrd.com

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on June 30, 2007, a copy of the foregoing Notice of Lodging Under Seal was mailed first class, postage pre-paid to:

Karen A. Doner, Esq.
Williams Mullen, P.C.
8720 Greensboro Drive, Suite 700
McLean, Virginia 22102
(703) 760-5200
(703) 748-0244
Attorneys for Defendant Brooks Range Contract Services, Inc.


/s/
_____
Timothy P. Leahy, Bar No. 472964

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT and )
DONALD KRAKAT, )
 )
Plaintiffs, )
 )
 ) Case No: 1:07-cv-00693-RCL
v. )
 )
BROOKS RANGE CONTRACT SERVICES, INC., )
 )
Defendant. )

## DEFENDANT'S RESPONSES TO PLAINTIFFS' FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Brooks Range Contract Services, Inc. ("BRCS" or "Defendant"), by counsel, hereby responds to Plaintiffs' Robert Krakat and Donald Krakat (collectively "Plaintiffs") Fourth Request for Production of Documents, and states as follows:

### GENERAL OBJECTIONS

Defendant expressly incorporates herein its General Objections set forth in Defendant's Answers to Plaintiffs' First Set of Interrogatories as if set forth fully herein.

### DOCUMENT REQUESTS

34.    Any and all documents relating to any advertising by Defendant, from 2005 through March 2006, to hire individuals to work at the AFRH, including but not limited to any advertising specific to hiring replacement employees for Kevin Heffern or the Plaintiffs.

RESPONSE:  See attached documents.

35.    Any and all documents relating to any individuals hired or fired by Defendant, from 2005 through March 2006 and who worked at the AFRH.

OBJECTION: Defendant objects to Request No. 35 to the extent it is overly broad, unduly burdensome, and is not calculated to lead to the discovery of admissible evidence. Defendant further objects to Request No. 35 to the extent it seeks confidential information.

RESPONSE: Subject to and without waiving its Objection, see list of mechanics terminated during the time-frame of January 2005 – December 2007.

36.    Any and all documents, from 2005 through March 2006, relating to Defendant's evaluation of the employee manpower or headcount required at the AFRH to fulfill Defendant's contract there, including but not limited to any documents referring to any plan or discussion to alter the employee manpower or headcount at the AFRH.

RESPONSE: Defendant is not aware of any additional documentation other than documents previously-produced.

37.    Any and all documents related to invalidating the Defendant's policy & procedures which were effective prior to 2004.

RESPONSE: Defendant has been unable to locate the email(s) sent by Mr. Anastasi or his assistant to which he testified to during his deposition.

38.    Any and all documents related to Standard Operating Procedures violated by the Krakats including but not limited to the flow charts detailed by Mr. Anastasi in his deposition.

RESPONSE: In addition to the policies and procedures set forth in the previously-produced Employee Handbook, see attached documents.

2

Respectfully submitted,

Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia  22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of April 2008, a copy of the foregoing document was

served via first-class mail postage prepaid, to:

Timothy P. Leahy, Esq.
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
*Counsel for Plaintiffs*

Karen A. Doner

1525063v5

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT KRAKAT and** | ) |
| **DONALD KRAKAT,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) **Case No:  1:07-cv-00693-RCL** |
| | ) |
| **BROOKS RANGE CONTRACT SERVICES, INC.,** | ) |
| | ) |
| **Defendant** | ) |
| | ) |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**NOTICE OF LODGING UNDER SEAL**</u>

     **NOW COME** the Plaintiffs Robert Krakat and Donald Krakat. (collectively "Plaintiffs"), by and through their undersigned counsel, and hereby files this Notice of Lodging Under Seal related to Documents filed with their Memorandum in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Motion for Leave to File Documents Under Seal.

     Respectfully Submitted,

     BYRD & BYRD, LLC

     /s/
     _____
     Timothy P. Leahy, Bar No. 472964
     14300 Gallant Fox Lane, Suite 120
     Bowie, Maryland 20715
     (301) 464-7448
     (301) 805-5178 Fax
     tleahy@byrdandbyrd.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June 30, 2007, a copy of the foregoing Notice of Lodging Under Seal was mailed first class, postage pre-paid to:

Karen A. Doner, Esq.
Williams Mullen, P.C.
8720 Greensboro Drive, Suite 700
McLean, Virginia 22102
(703) 760-5200
(703) 748-0244
Attorneys for Defendant Brooks Range Contract Services, Inc.

/s/
_____
Timothy P. Leahy, Bar No. 472964

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT KRAKAT and** | ) |
| **DONALD KRAKAT,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) **Case No:  1:07-cv-00693-** |
| **RCL** | |
| | ) |
| **BROOKS RANGE CONTRACT SERVICES, INC.,** | ) |
| | ) |
| **Defendant** | ) |
| | ) |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>NOTICE OF LODGING UNDER SEAL</u>

**NOW COME** the Plaintiffs Robert Krakat and Donald Krakat. (collectively "Plaintiffs"), by and through their undersigned counsel, and hereby files this Notice of Lodging Under Seal related to Documents filed with their Memorandum in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Motion for Leave to File Documents Under Seal.

Respectfully Submitted,

BYRD & BYRD, LLC

/s/
_____
Timothy P. Leahy, Bar No. 472964
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
(301) 464-7448
(301) 805-5178 Fax
tleahy@byrdandbyrd.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June 30, 2007, a copy of the foregoing Notice of Lodging Under Seal was mailed first class, postage pre-paid to:

Karen A. Doner, Esq.
Williams Mullen, P.C.
8720 Greensboro Drive, Suite 700
McLean, Virginia 22102
(703) 760-5200
(703) 748-0244
Attorneys for Defendant Brooks Range Contract Services, Inc.


/s/

_____
Timothy P. Leahy, Bar No. 472964

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2

3
------------------------------x
4  ROBERT KRAKAT, et al.,         :
        Plaintiffs,              :
5      v.                        : CASE NO.: 1:07-cv-00693
6  BROOKS RANGE CONTRACT RCL     :
   SERVICES, INC.,               :
7        Defendant.              :
8  ------------------------------x

9                              Tuesday, March 25, 2008
                               Bowie, Maryland
10

11

   DEPOSITION OF:
12

13                  DAVID ROUSE,

14 called for oral examination by counsel for the

15 Plaintiffs, at 14300 Gallant Fox Lane, Suite 120,

16

17 Bowie, Maryland, beginning at 11:23 a.m.,

18 Tuesday, March 25, 2008, before Lohna Esteb,

19 Court Reporter and Notary Public, when were present:

20

21

22

23

24

25

### Deposition Services, Inc.

*6245 Executive Boulevard*
*Rockville, MD  20852*
*Tel: (301) 881-3344 Fax: (301) 881-3338*
*info@DepositionServices.com   www.DepositionServices.com*

1    been Wayne B-E-U-C-H-L-E-R at the time.  I'm not sure

2    which one was the contracting officer at that point in

3    the contract.

4        Q.    Could you spell Wayne's last name?

5        A.    B-E-U-C-H-L-E-R, I think.

6        Q.    Okay.  What, if any, knowledge do you have

7    about what was done by the contracting officer in

8    response to this letter?

9        A.    Best of my knowledge, they did look into the

10   allegations and let us know they didn't find any

11   wrongdoing.

12       Q.    Was there a report generated?

13       A.    I don't recall one being written.  I went back

14   through our contract -- copies of our contract files to

15   see if I had anything, and I couldn't find anything.

16       Q.    If a report was generated, do you know who

17   would have a copy?

18       A.    Well, the contracting officer would.

19       Q.    Okay.  Were you or anyone at the Armed Forces

20   Retirement Home involved in investigating any of the

21   allegations made by the Krakats against Brooks Range?

22       A.    No, I was not.

1       Q.   Do you know anybody else at the home who was

2   involved in investigating the allegations?

3       A.   Not to the best of my knowledge.

4       Q.   Okay.  Do you think you would know if anybody

5   at the home was involved?

6            MS. DONER:  Objection.

7            BY MR. LEAHY:

8       Q.   You can answer.

9       A.   Okay.  If -- yes, I probably would if it was

10  one of my employees.  If it wasn't one of my employees, I

11  probably wouldn't know.

12      Q.   Okay. Do you remember when Robert Krakat first

13  came to you to tell you that he'd been suspended or

14  terminated?

15      A.   It would have been right around this same time.

16   I couldn't give you an exact date; but, it would have

17  been probably within a couple days before or after this

18  date here.

19      Q.   You know if it had to do with him telling you

20  he was suspended or terminated?

21      A.   I believe the first time he was suspended,

22  pending an internal BCRS issue.



**AFRH**
The Premier
Retirement Community
for America's Veterans

**Armed Forces Retirement Home**
**Office of the Chief Operating Officer**
**3700 N. Capitol Street, P.O. Box 1303**
**Washington, DC 20011-8400**

May 1, 2008

Mr. Timothy P. Leahy, Esq.
Byrd & Byrd, LLC
14300 Gallant Fox Lane, Suite 120
Bowie, MD 20715

Re: FOIA Request: Krakat v. Brooks Range Contract Services, Inc.

Dear Mr. Leahy:

This responds to your Freedom of Information Act (FOIA) request of November 15, 2007, to the Bureau of Public Debt (BPD) in which you seek records pertaining to the contract between Brooks Range Contract Services, Inc. (BRCS) and the government related to the Armed Forces Retirement Home (AFRH). You also requested any documents relating to the allegations against BRCS concerning the company's billing practices.

In your request letter, you state that your understanding was that BRCS reported the allegations in the above-referenced law suit to the AFRH and that the BPD investigated all reports and issued its own report. According to BPD, no additional documents were generated by the agency. The only documents they had in response were those initially submitted by BRCS. As such, the BPD is not the correct responding agency in this case. Additionally, AFRH does not have any responsive documents to your request.

Fees associated with the processing of your request are waived in this instance.

Any questions concerning this matter should be directed to the undersigned at 202-730-3077 or by e-mail at Karen.Harry@afrh.gov.

Karen B. Harry
KAREN B. HARRY
AFRH/Agency FOIA Officer

1                 IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLUMBIA

2

3  ----------------------------x

   ROBERT KRAKAT, et al.,              :

4            Plaintiffs,               :

   v.                      : CASE NO.: 1:07-cv-00693

5

BROOKS RANGE CONTRACT RCL          :

6 SERVICES, INC.,                     :

          Defendant.              :

7  ----------------------------x

8

                          Tuesday March 25, 2008

9                         Bowie, Maryland

10

11 DEPOSITION OF:

12              GERALD LEROY WESSEL,

13

   called for oral examination by counsel for the

14

15 Plaintiffs, at 14300 Gallant Fox Lane, Suite 120,

16 Bowie, Maryland, beginning at 9:56 a.m.,

17 Tuesday, March 25, 2008, before Lohna Esteb,

18

   Court Reporter and Notary Public, when were present:

19

20

21

22

23

24

25

### Deposition Services, Inc.

6245 Executive Boulevard
Rockville, MD  20852
Tel: (301) 881-3344 Fax: (301) 881-3338
info@DepositionServices.com   www.DepositionServices.com

1    A.    It's a base with four option years.

2    Q.    This is the part of the contract that was in

3    effect back in 2005 and 2006?

4    A.    Yes, sir.

5    Q.    It's still in effect now?

6    A.    Yes, sir.

7    Q.    Okay.  Looking at Page 2, the last paragraph

8    labeled 0006, "Indefinite Delivery, Indefinite Quantity,"

9    I think you were just referring to that in terms of

10   subcontract work.

11           I see the last line here is support cost

12   handling charge, 12 percent.

13           What's your understanding of what that means?

14   A.    In other words, that's 12 percent of the cost

15   if he would sub it out to a subcontractor, I would think,

16   or his profit, overhead and profit.

17   Q.    Okay.  And, again, looking a little bit further

18   up that same paragraph, it says:

19           "This is a loaded, fixed rate to include base

20   labor rate, overhead, G&A, profit and any other

21   applicable cost."

22           Do you see that?

1    A.    Are you on non-labor or what?

2    Q.    Under labor, one, two, three, four, five --

3    beginning on the fifth line, the sentence that starts,

4    "This is a" --

5    A.    The non-labor, right.

6    Q.    What does that mean to you?

7    A.    Well, that's a set cost for materials, stuff

8    like that.  It's non-labor.

9    Q.    Okay.  And I appreciate that; but, you know, it

10   looks like to me it says, "To include base labor rate."

11        To make sure we are looking at the same thing,

12   on the fifth line --

13   A.    Oh, this is loaded, okay.

14   Q.    We are still on Brooks Range, Page 2, paragraph

15   labeled six.  Last paragraph under labor, it says:

16        "This is a loaded, fixed rate, to include base

17   rate, labor rate, overhead, profit"...

18   A.    It would be, yes, sir.

19   Q.    Okay.  So, then, on Page 3, there's some trades

20   and some dollar amounts that follow.

21   A.    Right.

22   Q.    That would be the amount they would be allowed

1    to charge.

2        A.    Yes, that's the actual labor rates.

3        Q.    That would include overhead, G&A, profit and

4    other --

5        A.    No, that would not -- that's the labor rates

6    you would pay your subcontractor, you're allowed to pay

7    your subcontractor under Davis-Bacon.

8        Q.    Given that, what's your understanding of what

9    support cost handling charge is?

10       A.    Is what?

11       Q.    What's your understanding of the support cost

12   handling charge of 12 percent?

13       A.    On the 12 percent, my understanding of that,

14   it's on top of the actual base cost; in other words, the

15   bare cost.

16       Q.    Of the labor, or of the labor and materials?

17       A.    Of the material and the labor, too.

18             In other words, the operating cost to contract

19   the subcontractor, whatever, the paperwork involved, what

20   have you, like that.

21       Q.    Okay.  All right.  And when you get an IDIQ or

22   subcontract work proposal from Brooks Range Contracting

1    remember reading the price.

2        Q.    But on an IDIQ contract, if it was awarded --

3              Let me ask the question, then you can answer

4    it.

5              But on an IDIQ contract like the tree removal,

6    if the contract was awarded for $189,000, Brooks Range

7    would get 12 percent of the $189,000; and if the contract

8    was awarded for $245,000, Brooks Range would get 12

9    percent of $254,000?

10       A.    Yes, sir.

11       Q.    You said you don't recall Virginia Contracting

12   Services?

13       A.    No, sir.

14       Q.    Okay.  Do you have any recollection of anyone

15   discussing with you that a subcontractor that Brooks

16   Range used at the home was run either by Mr. Heffern or

17   Donna Sutherland, Mr. Heffern's fiancee?

18       A.    No, sir.

19       Q.    Is there a policy that you follow in terms of a

20   contractor like Brooks Range using subcontractors with

21   individuals they might have a relationship with?

22       A.    No, sir, it's not our concern.

1    up getting a lower bid over a period of time. Then you

2    debating is it worth it or not worth it?

3            When you're under an urgent, compelling

4    process, you don't do that.  You're going to get three

5    bids and you're going to take what is the best bid, you

6    know, go by past performance, what have you.

7        Q.    Taking the urgency out of it, because at least

8    it appears to me from this e-mail at the time you were

9    shown the bids, they had the Kauffman Construction bid

10   for $189,000, so given the bid was in hand, does the

11   government have any policy about not receiving the lowest

12   bid for a job?

13       A.    We would like to see the lowest bid, I'm sure

14   we would.  But I can't answer that because I don't even

15   know if there was a bid, then.  I haven't seen it.

16       Q.    I understand.  But if there was a lowest bid,

17   you would have liked to have seen it?

18       A.    I'm sure everybody would.

19       Q.    Because that would save the government money?

20       A.    Yes, sir.

21       Q.    Who generally approved subcontract work, was

22   that you or somebody else?

1    actually not covered under the base contract.

2        Q.    If work resumed, would that have been an

3    additional purchase order?

4        A.    Yes, sir.

5        Q.    Would that be a record that's kept at the home?

6        A.    What, additional purchase order?

7        Q.    Yes.

8        A.    Sure, yes.

9        Q.    Are you aware of any policies with regard to

10   Brooks Range or its personnel taking government property

11   off site of the home?

12       A.    No, sir.

13       Q.    You are not aware of any policies?

14       A.    Well, we don't allow it.  No, they don't take

15   equipment or anything that's owned by the home off site.

16       Q.    Okay.

17       A.    We are not even doing that.  We are not allowed

18   to do that.

19       Q.    Are you aware whether Kevin Heffern removed

20   scaffolding from the Armed Forces Retirement Home?

21       A.    No, I'm not aware of that, no, sir.

22       Q.    You didn't authorize Kevin Heffern to ever

26

1    remove any government property from the Armed Forces

2    Retirement Home site?

3        A.    No, sir.

4        Q.    Did anybody ever tell you that Kevin Heffern

5    had removed scaffolding from the grounds of --

6        A.    Not to my knowledge, no, sir.

7        Q.    Are you aware of anybody at Brooks Range ever

8    removing property owned by the government from the Armed

9    Forces Retirement Home?

10        A.    No, sir.  If they did, I would be calling the

11    contracting officer and telling them, you know, we no

12    longer want them here if I actually knew it myself.

13        Q.    Okay.  Beg your indulgence for a minute, I just

14    want to go over some of the things we've been looking at.

15            (Pause)

16            Did anyone ever bring allegations to your

17    attention that either Robert Krakat or Donald Krakat had

18    stolen something?

19        A.    Yes.

20        Q.    And who was that?

21        A.    I can't recall the person, I don't think he

22    works there anymore, but it wasn't about Robert, it was

1    done after Robert Krakat made the allegations.

2          All I've been trying to do is find out who, if

3    not him, was involved in the investigation.  I still

4    don't have a name other than possibly Jeff Schaffer.

5          MS. DONER:  You don't need to respond to my

6    objection.  I'm stating my objection for the record.

7          MR. LEAHY:  I do.

8          MS. DONER:  Well, that's your prerogative, I

9    guess.

10          MR. LEAHY:  Can you read back the last

11    question?

12          MS. DONER:  I would ask you keep your

13    commentary about other testimony in this case and trying

14    to lead the witness to yourself.

15          MR. LEAHY:  And I would ask you to let Mr.

16    Herrington make any objections for the witness.

17          MS. DONER:  I'm not objecting on behalf of the

18    witness.

19          MR. LEAHY:  Sure.  Can you read back the last

20    question, please?

21          COURT REPORTER:  "Okay.  So is it fair to say

22    that you didn't take any actions to verify whether or not

1    any of the subcontractor employees were also Brooks Range

2    employees?"

3            BY MR. LEAHY:

4        Q.    Can you answer the question?

5        A.    Again, there was no action had to be taken,

6    maybe I'll put it that way, because there was no Brooks

7    Range.

8            After the allegation, if I was asked, I would

9    have told him that, and there would be no investigation.

10   There was no need to investigate. The investigation was

11   closed because of the fact that there was no BCRS current

12   employees working that job under that contract during

13   regular working hours.

14           BY MR. LEAHY:

15       Q.    Your answer is no, you didn't take any steps to

16   investigate Mr. Krakat's allegations?

17       A.    No, I'm not saying that.  I'm not going to say

18   something I didn't say.

19       Q.    Okay, fine.  After Mr. Krakat made his

20   allegations, what steps did you take to investigate the

21   truth of those allegations?

22           MS. DONER:  Objection.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT KRAKAT and<br>DONALD KRAKAT,<br><br>Plaintiffs,<br><br>v.<br><br>BROOKS RANGE CONTRACT SERVICES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No: 1:07-cv-00693-RCL<br>)<br>)<br>)<br>) |

## DEFENDANT'S RESPONSES TO PLAINTIFFS'
## SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Brooks Range Contract Services, Inc. ("BRCS" or "Defendant"), by counsel, hereby responds to Plaintiffs' Robert Krakat and Donald Krakat (collectively "Plaintiffs") Second Request for Production of Documents, and states as follows:

### GENERAL OBJECTIONS

Defendant expressly incorporates herein its General Objections set forth in Defendant's Answers to Plaintiffs' First Set of Interrogatories as if set forth fully herein.

### DOCUMENT REQUESTS

25.    Any and all documents relating to or compromising [*sic*] any BRCS policy that provides for the discarding of hi [*sic*] and low bids.

RESPONSE:  Defendant is unaware of any such written policy.

26.    Any and all documents relating to or compromising [*sic*] telephone records of calls made by Donald Krakat, after his termination, to Kevin Heffern's BRCS telephone or BRCS Nextel.

RESPONSE:   As testified to by Mr. Heffern, the Nextel telephone records do not reflect intercom calls, such as the calls made by Donald Krakat to Mr. Heffern.  Thus, no responsive documents exist.

27.    Any and all documents relating to or compromising the personnel files of:

a.    Bill Jenkins

b.    Anne Flynn

OBJECTION: Defendant objects to Request No. 27 to the extent it is overly broad and is not calculated to lead to the discovery of admissible evidence.  Defendant further objects to Request No. 27 to the extent it seeks confidential information.

RESPONSE:  Subject to and without waiving its Objection, see attached documents relating to Bill Jenkins (BRCS-00621 - BRCS-00671), which are being produced subject to the Protective Order.  See Objection as to Anne Flynn other than her offer letter (BRCS-00670 - BRCS-00671), which is being produced subject to the Protective Order.

28.    Any and all documents relating to any counseling or disciplinary actions taken against:

a.    Bill Jenkins

b.    Anne Flynn

OBJECTION: Defendant objects to Request No. 28 to the extent it is overly broad and is not calculated to lead to the discovery of admissible evidence.  Defendant further objects to Request No. 28 to the extent it seeks confidential information.

RESPONSE:  Subject to and without waiving its Objection, no such documents exist.  See Objection as to Anne Flynn.

29.    Any and all documents relating to the job performance of:

2

a.    Bill Jenkins

b.    Anne Flynn

OBJECTION: Defendant objects to Request No. 28 to the extent it is overly broad and is not calculated to lead to the discovery of admissible evidence. Defendant further objects to Request No. 28 to the extent it seeks confidential information.

RESPONSE:  Subject to and without waiving its Objection, see Response to Request No. 27.

30.    Any and all documents that BRCS alleges that Katie Farver or either Plaintiff falsified.

RESPONSE:  See documents bates-numbered BRCS-0369, BRCS-0370, BRCS-0372, MARYLAND 027, MARYLAND 030, MARYLAND 031, MARYLAND 034, MARYLAND 036, MARYLAND 037, BRCS-00528 – BRCS-00550, BRCS-00551 – BRCS-00553.

Respectfully submitted,

Karen A. Doner (#458626)
Thomas J. McKee, Jr. (#492482)
WILLIAMS MULLEN, P.C.
8270 Greensboro Drive, Suite 700
McLean, Virginia  22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for Defendant

3

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of January, 2008, a copy of the foregoing document

was served via first-class mail postage prepaid, to:

> Timothy P. Leahy, Esq.
> 14300 Gallant Fox Lane, Suite 120
> Bowie, Maryland 20715
> *Counsel for Plaintiffs*

Karen A. Doner

1525063v3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT KRAKAT and** | ) |
| **DONALD KRAKAT,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) **Case No:  1:07-cv-00693-** |
| **RCL** | |
| | ) |
| **BROOKS RANGE CONTRACT SERVICES, INC.,** | ) |
| | ) |
| **Defendant** | ) |
| | ) |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***


## NOTICE OF LODGING UNDER SEAL


**NOW COME** the Plaintiffs Robert Krakat and Donald Krakat. (collectively "Plaintiffs"), by and through their undersigned counsel, and hereby files this Notice of Lodging Under Seal related to Documents filed with their Memorandum in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Motion for Leave to File Documents Under Seal.


Respectfully Submitted,

BYRD & BYRD, LLC


/s/
_____
Timothy P. Leahy, Bar No. 472964
14300 Gallant Fox Lane, Suite 120
Bowie, Maryland 20715
(301) 464-7448
(301) 805-5178 Fax
tleahy@byrdandbyrd.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on June 30, 2007, a copy of the foregoing Notice of Lodging Under Seal was mailed first class, postage pre-paid to:

Karen A. Doner, Esq.
Williams Mullen, P.C.
8720 Greensboro Drive, Suite 700
McLean, Virginia 22102
(703) 760-5200
(703) 748-0244
Attorneys for Defendant Brooks Range Contract Services, Inc.

/s/

_____
Timothy P. Leahy, Bar No. 472964

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT KRAKAT, ET. AL.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiffs　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　　　) Case No:  1:07-cv-00693-RCL
　　　　　　　　　　　　　　　　　　　　　　)
BROOKS RANGE CONTRACT SERVICES, INC.,　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
*************************************************************************

## AFFIDAVIT OF ROBERT KRAKAT

1.　　　I am over the age of 18, and am otherwise competent to testify.

2.　　　I have reviewed the attached Memorandum in Opposition to Motion for Summary

　　　　Judgment and have personal knowledge of the facts asserted therein and those facts are

　　　　true and accurate to the best of my knowledge, information, and belief.

**I CERTIFY**, under penalties of perjury that the foregoing facts asserted herein this Affidavit
are true and accurate to the best of my knowledge, information, and belief.

_____
Robert Krakat

## NOTARY

STATE OF MARYLAND
COUNTY OF PRINCE GEORGES

　　　　On this June 30, 2008, before me, a Notary Public in and for the jurisdiction aforesaid,
personally appeared ___Robert Krakat___, known to me or satisfactorily proven as the person whose
name is subscribed to the within instrument and acknowledged that he/she executed the same for
the purposes contained therein.

　　　　IN WITNESS THEREOF, I hereunto set my hand and Notarial Seal.

　　　　　　　　　　　　　　　　　　　Notary Public _____

My Commission Expires: ___8/1/2009___

**IN THE UNITED STATES**
**DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ROBERT KRAKAT, ET. AL. | * | | |
| | * | CASE NO: | 1:07-cv-00693-RCL |
|     Plaintiffs | * | | |
| | * | | |
| v. | * | | |
| | * | | |
| BROOKS RANGE CONTRACT | * | | |
| SERVICES, INC. | * | | |
| | * | | |
|     Defendant | * | | |
| | * | | |

************************************************************************

## ORDER

In consideration of the Plaintiff's Reply in Opposition to the Defendant's Motion for Summary Judgment, Defendant's Motion for Summary Judgment is **DENIED.**

————————    ————————————————————————————
Date          Honorable Judge of the U.S. District Court for the District of Maryland

21